CORRECTED
NONCONFIDENTIAL

2015-1288,-1289,-1290
_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
_____

ALBEMARLE CORPORATION & SUBSIDIARIES, NINGXIA HUAHUI
ACTIVATED CARBON COMPANY LIMITED,

Plaintiffs - Appellants

SHANXI DMD CORPORATION, BEIJING PACIFIC ACTIVATED CARBON
PRODUCTS CO., LTD., CHERISHMET INC., NINGXIA GUANGHUA
CHERISHMET ACTIVATED CARBON CO., LTD.,

Plaintiffs - Appellees

v.

UNITED STATES, CALGON CARBON CORPORATION, NORIT AMERICAS,
INC.,

Defendant - Cross-Appellant

CALGON CARBON (TIANJIN) CORPORATION LIMITED,

Defendant

_____

Appeal from the United States Court of International Trade in
consolidated case no. 11-00451, Chief Judge Timothy C. Stanceu
_____

**JOINT APPENDIX**
_____

November 16, 2015

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Daniel R. Wilson
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
jsg@mowrygrimson.com
202-688-3610 (ph)
*Counsel for Albemarle Corp., Ningxia Huahui Activated Carbon Co., Ltd.*

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
ALBEMARLE CORP. v. United States
No. 15-1288,-1289,-1290

**CERTIFICATE OF INTEREST**

Counsel for Plaintiffs-Appellants Albemarle Corp. and Ningxia Huahui Activated Carbon Co., Ltd., certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

Albemarle Corporation and Ningxia Huahui Activated Carbon Co., Ltd.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Same as above.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Mowry & Grimson, PLLC (Kristin H. Mowry, Jeffrey S. Grimson, Jill A. Cramer, Susan Lehman Brooks, Sarah M. Wyss, Keith F. Huffman, Rebecca M. Janz, Daniel Wilson).

November 16, 2015                    /s/ Jeffrey S. Grimson
Date                                 Signature of counsel

                                     Jeffrey S. Grimson
                                     Printed name of counsel

# TABLE OF CONTENTS
## ALBEMARLE CORP. v. UNITED STATES
### No. 15-1288,-1289,-1290

**Document**                                                                                     **Page**

U.S. Department of Commerce Administrative Protective Order (A-570-904)

### Required Documents

Judgment, Albemarle Corp. v. United States, Ct. No. 11-00451          JA000001
(consol.) (Ct. Int'l Trade Nov. 24, 2014)

Albemarle Corp. v. United States, 931 F. Supp. 2d 1280               JA000003
(Ct. Int'l Trade 2013)

Albemarle Corp. v. United States, 27 F. Supp. 3d 1336               JA000017
(Ct. Int'l Trade 2014)

Docket Sheets, Albemarle Corp. v. United States,                    JA000030
Ct. No. 11-00451 (consol.) (including Ct. Nos. 11-00468,
11-00475)

### Other Documents Cited by the Parties

Letter on Behalf of Huahui to Commerce re: Request for              JA100001
Administrative Review and Voluntary Respondent Status
of Ningxia Huahui Activated Carbon Co., Ltd.
(Apr. 30, 2010) (Public Document)

Initiation of Antidumping and Countervailing Duty Administrative    JA100006
Reviews, 75 Fed. Reg. 29,976 (Dep't Commerce May 28, 2010)

Letter on Behalf of Jacobi to Commerce re:  Section A              JA100015
Response of Jacobi Carbons (Aug. 12, 2010) (Public Version)

Letter on Behalf of Jacobi to Commerce re:  Jacobi's Response      JA100081
to Questionnaire Sections C&D (Sept. 13, 2010) (Public Version)

Letter on Behalf of Huahui to Commerce re: Separate Rate           JA100279

**Document**                                                                 **Page**

Letter on Behalf of Huahui to Commerce re: Separate Rate                     JA100279
Application of Ningxia Huahui Activated Carbon Co., Ltd.
(Dec. 23, 2010) (Public Version)

Letter on Behalf of Calgon Carbon Corp. and Norit                            JA100360
Americas to Commerce re:  Petitioners' Proposed
Surrogate Values (Jan. 13, 2011) (Public Document)

Letter on Behalf of Huahui to Commerce re:  Second Supplemental              JA100836
Questionnaire Regarding the December 23, 2010 Separate Rate
Application of Ningxia Huahui Activated Carbon Co., Ltd.
(Mar. 23, 2011) (Public Version)

Mem. from Katie Marksberry to the File re: Surrogate Values                  JA100872
for the Preliminary Results (Apr. 22, 2011) (Public Document)

Letter on Behalf of Huahui and Albemarle to Commerce re:                     JA100972
Resubmission of Case Br. (June 20, 2011) (Public Document)

Mem. from Christian Marsh to Ronald K. Lorentzen re:                         JA100989
Issues and Dec. Mem. for the Final Results of the
Third Antidumping Duty Administrative Review
(Dep't Commerce Oct. 24, 2011)  (Public Document)

Mem. from Bob Palmer to the File re: Surrogate Values                        JA101011
for the Final Results (Oct. 25, 2011) (Public Document)

Certain Activated Carbon from the People's Republic of China:                JA101038
Final Results and Partial Rescission of the Third Administrative
Antidumping Duty Administrative Review, 76 Fed. Reg. 67,142
(Dep't Commerce Oct. 31, 2011)

Huahui/Albemarle R. 56.2 Br. (May 21, 2012)(Public Version)                  JA101043

Def.'s Resp. Br. (July 30, 2012) (Public Document)                          JA101112

| **Document** | **Page** |
|---|---|
| Final Results of Redetermination Pursuant to Court Remand, <u>Albemarle Corp. v. United States</u>, Consol. Ct. No. 11-00451 (Aug. 15, 2013) (Public Document), ECF No. 96 | JA101154 |
| Mem. from Bob Palmer to the File re: Remand Redetermination Analysis Memorandum for Calgon Carbon (Tianjin) Co., Ltd. (Jan. 10, 2014) (Public Version) | JA101182 |
| Letter on Behalf of Shanxi DMD Corporation to Commerce re: Shanxi DMD Corporation's Separate Rate Certification (July 21, 2010) (Public Version) | JA101207 |
| Mem. From Jamie Blair-Walker to James Doyle re: Selection of Respondents for Individual Review (July 21, 2010) (Public Version) | JA101228 |
| Letter on Behalf of Ningxia Guanghua Cherishment Activated Carbon Co., Ltd. to Commerce re: Separate Rate Certification (July 27, 2010) (Public Version) | JA101236 |
| Letter on Behalf of Beijing Pacific Activated Carbon Products Co., Ltd. to Commerce re: Separate Rate Certification (July 27, 2010) (Public Version) | JA101256 |
| Mem. From Katie Marksberry to James Doyle re: Selection of Additional Mandatory Respondent (Sept. 29, 2010) (Public Version) | JA101275 |
| Transcript of Oral Argument, Ct. No. 11-00451 (Dec. 13, 2012) (Confidential Document) | JA101286 |
| Memorandum to James Doyle, Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China: Selection of Respondents for Individual Review (July 21, 2010) (Public Version) | JA200008 |

| **Document** | **Page** |
|---|---|
| Memorandum to James Doyle, Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China: Selection of Additional Mandatory Respondent  (Sept. 29, 2010) (Public Version) | JA200016 |
| Letter on Behalf of Shanxi DMD Corporation to Commerce re: Shanxi DMD Corporation's Separate Rate Certification (July 21, 2010) (Public Version) | JA200054 |
| Letter on Behalf of Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., to Commerce re: Separate Rate Certification for Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. (July 27, 2010) (Public Version) | JA200075 |
| Certain Activated Carbon from the People's Republic of China: Preliminary Results of the Third Antidumping Administrative Review, and Preliminary Rescission in Part, 76 Fed. Reg. 23,978 (Apr. 29, 2011) | JA200095 |
| Jacobi Carbons' Sept. 13, 2010 Section C Questionnaire Response (Public Version) | JA200109 |
| CCT's Nov. 23, 2010 Section C Questionnaire Response (Public Version) | JA200111 |
| Final Results Analysis Memorandum for Jacobi Carbons AB in the Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China (Oct. 25, 2011) (Public Version) | JA200113 |
| Final Results Analysis Memorandum for Calgon Carbon (Tianiin) Co., Ltd. in the Third Administrative Review of Certain Activated Carbon  from the People's Republic of China (Oct. 25, 2011) (Public Version) | JA200121 |

| **Document** | **Page** |
| --- | --- |
| Jacobi Carbons AB v. United States, Appeal Nos. 2014-1752,2014-1753,2014-1754,2014-1756,2015 U.S. App. LEXIS 13,626 (Fed. Cir. Aug. 3, 2015) | JA200130 |

Pursuant to Federal Circuit Rule 30(h)(1)(B), information subject to the protective order has been redacted or deleted from the public versions of documents included in the non-confidential version of the joint appendix. This information consists of confidential information discussed at the hearing held by the U.S. Court of International Trade as well as the U.S. Department of Commerce's proprietary calculations, and individual company's quantity and value of sales, sourcing, production process, prices and price calculations and other confidential financial data.

A-570-904
Administrative Review
4/1/09-3/31/10
Public Document
APO: Donna Watkins

---

In the Matter of the Administrative Review of the
Antidumping Duty Order on Activated Carbon
from the People's Republic Of China (A-570-904)
(4/1/09-3/31/10)

---

## ADMINISTRATIVE PROTECTIVE ORDER

IT IS HEREBY ORDERED THAT:

All business proprietary information submitted in the above-referenced
segment of the proceeding, including new information submitted in a
remand during litigation on this segment of the proceeding, which the
submitting party agrees to release or the Department of Commerce ("the
Department") determines to release, will be released to the authorized
applicants on the administrative protective order ("APO") service list for
this segment of the proceeding, except the following:

• customer names in an investigation; and

• specific information of a type for which the Department determines there is
a clear and compelling need to withhold from disclosure.

## USE OF BUSINESS PROPRIETARY INFORMATION UNDER THIS APO

An authorized applicant may use business proprietary information submitted
in this segment of the proceeding in this segment. If business proprietary
information that is submitted in this segment of the proceeding is relevant to

an issue in two consecutive subsequent administrative reviews, an authorized applicant may place such information on the record of those reviews. If business proprietary information submitted in this segment of the proceeding is relevant to an issue in other segments of this proceeding (such as scope, anticircumvention, changed circumstances) that are initiated before publication of the final results in the second consecutive subsequent administrative review, an authorized applicant may place such information on the record of those
segments. At the conclusion of the second consecutive subsequent administrative review or at such earlier date as the Department may determine to be appropriate, the authorized applicant must certify to the destruction of business proprietary information within 30 days in accordance with item 6 of this APO. The existence of a judicial protective order in a subsequent administrative review does not extend the deadline for destruction of business proprietary information subject to this APO.

## REQUIREMENTS FOR AUTHORIZED APPLICANTS

All applicants authorized to have access to business proprietary information under this APO are subject to the following terms:

1. The authorized applicant must establish and follow procedures to ensure that no employee of the authorized applicant's firm releases business proprietary information to any person other than the submitting party, an authorized applicant, or the appropriate Department official identified in section 351.306(a) of the regulations. No person in the authorized applicant's firm may release business proprietary information received under this APO to any person other than those described in this paragraph.

2. The authorized applicant may allow APO access to one or more paralegals, law clerks, secretaries, or other support staff employed by or on behalf of the applicant's firm and operating within the confines of the firm. The authorized applicant also may use the services of subcontracted individuals to transport business proprietary information released by the Department and to deliver APO information to other parties. All support staff must sign and date an acknowledgment that they will abide by the terms and conditions of the APO at the time they are first permitted access to any information subject to APO.

3. The authorized applicant must ensure that business proprietary information in an electronic format will not be accessible to parties not authorized to receive business proprietary information.

A-570-904

4. The authorized applicant must pay all reasonable costs incurred by the submitter of the electronic business proprietary information for the copying of its electronic information released to the authorized applicant, if payment is requested. Reasonable costs include the cost of the electronic medium and the cost of copying the complete proprietary version of the electronic information/medium submitted to the Department in APO releasable form, but not costs borne by the submitter of the electronic data in the creation of the electronic data/medium submitted to the Department.

## NOTIFICATION REQUIREMENTS

5. If changed circumstances affect the authorized applicant's representation of an interested party at any time authorized under this APO (i.e., reassignment, departure from firm), the authorized applicant must notify the Department in accordance with section 351.305(a)(2) of the regulations.

6. At the expiration of the time specified in this APO, the authorized applicant must destroy all business proprietary information and notify the Department of the destruction in accordance with section 351.305(a)(3) of the regulations, or provide to the Department official responsible for the administration of the APO in this segment of the proceeding a protective order issued by a court or in a binational panel proceeding.

## SANCTIONS FOR BREACH OF THIS APO

7. The authorized applicant will be subject to any or all of the sanctions described in 19 C.F.R. Part 354 if there is a violation of this APO by the authorized applicant or any of the persons identified in item 8 of this APO.

8. The authorized applicant will accept full responsibility, individually and on behalf of the authorized applicant's firm or corporate office, for violation of this APO by any employee of the firm or corporate office, support staff retained by the firm or corporate office, or any other consultant, expert, or other outside staff retained for the subject proceeding, who is permitted access to APO information.

9. The authorized applicant will promptly report and confirm in writing any possible violation of this APO to the Department.

A-570-904
## DEFINITIONS

For purposes of this APO , the following definitions apply:

**"Representative"** is an individual, enterprise, or entity acting on behalf of an interested party.

**"Applicant"** is an individual representative of an interested party who has applied for access to business proprietary information under this APO.

**"Authorized Applicant"** is an applicant that the Secretary has authorized to receive business proprietary information under this APO.

**"Lead firm"** is the firm that will be the primary contact with the Department and that will accept service of all documents for the party it represents where two firms independently have access under APO.

**"Support staff"** includes paralegals, law clerks, secretaries and other support staff that are employed by or on behalf of the applicant's firm, are operating within the premises of the firm, and work under the supervision of an authorized applicant, as well as subcontractors of the firm providing similar support staff functions.

**"Electronic data"** includes (1) data submitted by a party, generated by the Department, or entered by the recipient on computer tape, disk, diskette, or any other electronic computer medium; and (2) all electronic work products resulting from manipulation of this data, as transferred in any form onto any other electronic computer medium, such as tape, disk, diskette, Bernoulli cartridge, removable disk pack, etc.

*original on file*
_____

Evangeline D. Keenan
Acting Director, APO/Dockets Unit
Import Administration

05/28/2010
_____
(date)

A-570-904

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **ALBEMARLE CORP.,**<br><br>               Plaintiff,<br><br>    and<br><br>**NINGXIA HUAHUI ACTIVATED CARBON CO., LTD.,**<br><br>               Plaintiff-Intervenor,<br><br>    v.<br><br>**UNITED STATES,**<br><br>               Defendant,<br><br>    and<br><br>**CALGON CARBON (TIANJIN) CO., LTD., CALGON CARBON CORP. AND NORIT AMERICAS INC.,**<br><br>               Defendant-Intervenors. |

**Before: Timothy C. Stanceu, Chief Judge**

**Consol. Court No. 11-00451**

### JUDGMENT

Upon considering the Final Results of Redetermination Pursuant to Ct. Remand (Jan. 10, 2014), ECF No. 96 ("Remand Redetermination"), all comments thereon, and all other filings and proceedings herein, after due deliberation, and in conformity with *Albemarle Corp. v. United States*, 37 CIT __, 931 F. Supp. 2d 1280 (2013), and the Opinion issued this date, it is hereby

    **ORDERED** that plaintiff Albemarle Corporation's Mot. to Strike 1 (Feb. 28, 2014), ECF No. 110, is granted; it is further

    **ORDERED** that Def.-intervenors' Mot. to Accept Supplemental Br. 1 (Feb. 28, 2014), ECF No. 111, filed by Calgon Carbon Corporation and Norit Americas, Inc., is denied; it is further

**Consol. Court No. 11-00451**                                                         **Page 2**

      **ORDERED** that the Remand Redetermination be, and hereby is, affirmed; and it is further

      **ORDERED** that entries of merchandise that are affected by this litigation shall be liquidated in accordance with the final court decision in this action.

<div align="right">

/s/Timothy C. Stanceu

Timothy C. Stanceu

Chief Judge

</div>

Dated:  November 24, 2014
      New York, NY



**ALBEMARLE CORP., Plaintiff, and NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., Plaintiff-Intervenor, v. UNITED STATES, Defendant, and CALGON CARBON (TIANJIN) CO., LTD., CALGON CARBON CORP. AND NORIT AMERICAS INC., Defendant-Intervenors.**

**Consol. Court No. 11-00451**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

*931 F. Supp. 2d 1280; 35 Int'l Trade Rep. (BNA) 1942; 2013 Ct. Intl. Trade LEXIS 111; SLIP OP. 2013-106*

**August 15, 2013, Decided**

**SUBSEQUENT HISTORY:** Decision reached on appeal by *Albemarle Corp. v. United States, 2014 Ct. Intl. Trade LEXIS 137 (Ct. Int'l Trade, Nov. 24, 2014)*

**DISPOSITION:** [**1]    Remanding to the U.S. Department of Commerce the final results of an administrative review of an antidumping duty order on certain activated carbon from the People's Republic of China.

**COUNSEL:** Jeffrey S. Grimson, Mowry & Grimson, PLLC, of Washington, DC, for plaintiff Albemarle Corp. and plaintiff-intervenor Ningxia Huahui Activated Carbon Co., Ltd. With him on the brief were Kristin H. Mowry, Jill A. Cramer, Susan Lehman Brooks, Sarah M. Wyss, and Keith F. Huffman.

Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff Shanxi DMD Corp. With him on the brief were John J. Kenkel and J. Kevin Horgan.

Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd. and Cherishmet Inc. With him on the brief were Mark E. Pardo, Andrew T. Schutz, and Kavita Mohan.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, [**2] Assistant Director. Of counsel on the brief was Devin S. Sikes, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Craig A. Lewis, Hogan Lovells U.S. LLP, of Washington, DC, for defendant-intervenor Calgon Carbon (Tianjin) Co., Ltd. With him on the brief was Hrishikesh N. Hari.

David A. Hartquist, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenors Calgon Carbon Corp. and Norit Americas Inc. With him on the brief were R. Alan Luberda and John M. Herrmann II.

931 F. Supp. 2d 1280, \*; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, \*\*2; SLIP OP. 2013-106

**JUDGES:** Before: Timothy C. Stanceu, Judge.

**OPINION BY:** Timothy C. Stanceu

**OPINION**

[\*1282] <u>OPINION AND ORDER</u>

   Stanceu, Judge: In this consolidated action,[1] three plaintiffs challenge the determination ("Final Results") the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued [\*1283] to conclude the third periodic administrative review of an antidumping duty order on imports of certain activated carbon (the "subject merchandise")[2] from the People's Republic of China ("China" or the "PRC"). *Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review, 76 Fed. Reg. 67,142 (Oct. 31, 2011)* [\*\*3] ("*Final Results*"); Issues & Decision Mem., A-570-904, ARP 3-10 (Oct. 24, 2011) ("Decision Mem."). The third review covers entries of subject merchandise made between April 1, 2009, and March 31, 2010 (the "period of review" or "POR").

   1  The actions consolidated under Consol. Court No. 11-00451, *Albemarle Corp. v. United States*, are *Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd. v. United States*, Court No. 11-00468 and *Shanxi DMD Corp. v. United States*, Court No. 11-00475. Order (Jan. 26, 2012), ECF No. 34.
   2  Activated carbon is a powdered, granular, or pelletized carbon product obtained by heat "activating" various carbon-containing materials, such as wood or coal, with steam or carbon dioxide gas. *See Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China, 72 Fed. Reg. 20,988 (Apr. 27, 2007)* ("*Order*"). The activating process removes organic materials and creates a porous inner surface in the material. *See Certain Activated Carbon from China*, Inv. No. 731-TA-1103, USITC Pub. 3913, at 3 (Apr 2007) (Final) ("*ITC Report*"). Excluded from the scope of the antidumping duty order is "chemically-activated" carbon. *Order, 72 Fed. Reg. at 20,988.* [\*\*4] Chemically-activated carbon is produced by treating the raw materials with chemicals to achieve a similar result through chemical rather than physical means. *ITC Report* at 3. Activated carbon is commonly used in water filtration, food and chemical purification, and emissions filtration. *Id.*

   Before the court are three motions for judgment on the agency record brought under *USCIT Rule 56.2*. Plaintiff Albemarle Corporation ("Albemarle") is supported in its *Rule 56.2* motion by plaintiff-intervenor Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"). Mot. for J. upon the Agency R. pursuant to *Rule 56.2* by Pl. Albemarle Corporation and Intervenor-Pl. Ningxia Huahui Activated Carbon Co., Ltd. (May 18, 2012), ECF No. 43 ("Albemarle *Rule 56.2* Mot."). The two other *Rule 56.2* motions are brought by plaintiff Shanxi DMD Corporation ("Shanxi DMD"), and plaintiffs Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd. ("GHC") and Beijing Pacific Activated Carbon Products Company, Ltd. ("BPAC") (collectively, "Cherishmet"), respectively. Mot. for J. on the Agency R. (May 18, 2012), ECF No. 42 ("Shanxi DMD *Rule 56.2* Mot."); Consol. Pls.' *Rule 56.2* Mot. for J. upon the Agency R. [\*\*5] (May 18, 2012), ECF No. 44 ("Cherishmet *Rule 56.2* Mot.").

   Opposing the *Rule 56.2* motions are defendant United States and defendant-intervenors Calgon Carbon Corporation and Norit Americas, Inc. (collectively "CCC"), and Calgon Carbon (Tianjin) Co., Ltd. ("CCT"). Def.'s Resp. to Pl.'s, Consol. Pls.', and Pl.-Intervenor's Mots. for J. upon the Agency R. (July 30, 2012), ECF No. 57 ("Def.'s Resp."); Def.-Intervenor's Br. in Resp. to Pls.' Mots. for J. on the Agency R. (July 30, 2012), ECF No. 53 ("CCC's Resp."); Def.-Intervenor Calgon Carbon (Tianjin) Co., Ltd.'s Br. in Opp'n to Pls.' *Rule 56.2* Mot. for J. upon the Agency R. (July 30, 2012), ECF No. 56 ("CCT's Resp.").

   For the reasons discussed herein, the court will order a remand for reconsideration of certain aspects of the Final Results.

931 F. Supp. 2d 1280, *1283; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **5; SLIP OP. 2013-106

## I. BACKGROUND

### A. The Parties to the Consolidated Action

Plaintiff Albemarle is a U.S. importer of subject merchandise. Compl. ¶ 5 (Nov. 18, 2011), ECF No. 6 ("Albemarle Compl."); *Certain Activated Carbon From the People's Republic of China: Prelim. Results of the Third Antidumping Duty Administrative Review, and Prelim. Rescission in Part, 76 Fed. Reg. 23,978, 23,979 (Apr. 29, 2011)* ("*Preliminary Results*"). [**6] During [*1284] the POR, Albemarle imported activated carbon from plaintiff-intervenor Huahui, a Chinese exporter. Albemarle Compl. ¶ 16; Consent Mot. to Intervene as a Matter of Right as Pl.-Intervenor 1 (Dec. 2, 2011), ECF No. 13 ("Huahui Mot. to Intervene"). Plaintiff Shanxi DMD is also a Chinese exporter of activated carbon. Compl. ¶ 5 (Dec. 5, 2011), ECF No. 9 (Court No. 11-00475) ("Shanxi DMD Compl."). Plaintiffs GHC and BPAC are producers and/or exporters of subject merchandise, and plaintiff Cherishmet, Inc. is the U.S. importer affiliate of GHC and BPAC. Compl. ¶ 3 (Nov. 23, 2011), ECF No. 6 (Court No. 11-00468) ("Cherishmet Compl.").

Defendant-intervenor CCT is a Chinese producer and exporter of activated carbon, and defendant-intervenor CCC, the parent company of CCT, is a domestic activated carbon producer and the petitioner. Consent Mot. to Intervene as of Right 2 (Dec. 6, 2011), ECF No. 18; Mot. for Leave to Intervene as of Right 2 (Dec. 15, 2011), ECF No. 24; *Final Results, 76 Fed. Reg. at 67,143.*

### B. Procedural History

On April 27, 2007, Commerce issued the antidumping order on certain activated carbon from China. *Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China, 72 Fed. Reg. 20,988 (Apr. 27, 2007).* [**7] Commerce initiated the third administrative review of that order on May 28, 2010. *Initiation of Antidumping & Countervailing Duty Administrative Reviews, 75 Fed. Reg. 29,976 (May 28, 2010).*

Commerce published the preliminary results of the review on April 29, 2011 after selecting Jacobi Carbons AB ("Jacobi") and CCT as the only mandatory respondents, and after identifying India as the primary surrogate country for the purpose of valuing the factors of production ("FOPs"). *Preliminary Results, 76 Fed. Reg. at 23,981.* Commerce determined a preliminary margin of $0.05 per kilogram for CCT and a preliminary *de minimis* margin for Jacobi. *Id.* Commerce also preliminarily assigned a margin of $0.05 per kilogram ("$/kg") to the unexamined respondents who had demonstrated entitlement to a rate that was separate of that assigned to the PRC entity (the "separate rate" respondents), which included Huahui, Shanxi DMD, BPAC, and GHC. *Id.*

In the Final Results, issued October 31, 2011, Commerce determined *de minimis* margins for both mandatory respondents, Jacobi and CCT. *Final Results, 76 Fed. Reg. at 67,145.* Huahui was assigned a margin of $0.44/kg, the margin Commerce assigned to it in the previous [**8] (second) administrative review of the order, while the other separate rate respondents were assigned a margin of $0.28/kg, the rate Commerce assigned to the separate rate respondents in the previous review. *Id.*

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, *28 U.S.C. § 1581(c)*, pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 ("Tariff Act"), *19 U.S.C. § 1516a(a)(2)(B)(iii)*, including an action contesting the Department's issuance, under section 751 of the Tariff Act, *19 U.S.C. § 1675a(a)*, of the final results of an administrative review of an antidumping duty order.[3] In reviewing the final results, the court will hold unlawful any finding, conclusion, or determination that is not support by substantial evidence on the record [*1285] or that is otherwise not in accordance with law. *See 19 U.S.C. § 1516a(b)(1)(B)(i).*

3  Unless otherwise indicated, all statutory citations herein are to the 2006 edition of the U.S. Code and all

931 F. Supp. 2d 1280, *1285; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **8; SLIP OP. 2013-106

citations to regulations are to the 2011 edition.

B. Claims Asserted in this Litigation

There are four claims in this consolidated action. [**9] First, both Albemarle and Shanxi DMD challenge the Department's valuation of CCT's coal-based carbonized materials using Indian Harmonized Tariff Schedule ("Indian HTS") subheading 4402.90.10, "Coconut Shell Charcoal." Mem. of P. & A. in Supp. of *Rule 56.2* Mot. for J. on the Agency R. by Pl. Albemarle Corp. and Intervenor-Pl. Ningxia Huahui Activated Carbon Co., Ltd. 11, 19-23 (May 21, 2012), ECF No. 45 ("Albemarle *Rule 56.2* Mem."); Pl.'s *Rule 56.2* Mem. in Support of Mot. for J. upon the Agency R. 2-3 (May 18, 2012), ECF No. 42-2 ("Shanxi DMD *Rule 56.2* Mem."). Second, Albemarle challenges the Department's valuation of CCT's "coal and fines" by-products, claiming this valuation is unlawful because it is based on findings unsupported by substantial evidence and, contrary to Department policy, is significantly higher than the Department's surrogate value for the coal-based carbonized materials. Albemarle *Rule 56.2* Mem. 15-18. Third, Albemarle challenges the $0.44/kg margin that Commerce assigned to Huahui in the Final Results, while Shanxi DMD and Cherishmet challenge the Department's assignment of a $0.28/kg "separate rate" margin to Shanxi DMD, BPAC and GHC, respectively.[4] Albemarle [**10] *Rule 56.2* Mem. 24-29; Shanxi DMD *Rule 56.2* Mem. 8-17; Brief in Supp. of Consol. Pls.' *Rule 56.2* Mot. for J. upon the Agency R. 14-18 (May 18, 2012), ECF No. 44 ("Cherishmet *Rule 56.2* Mem."). Fourth, Shanxi DMD claims that Commerce erred in assigning it a specific, *i.e.,* U.S. dollar per kilogram, assessment and cash deposit rate rather than an *ad valorem* rate. Shanxi DMD *Rule 56.2* Mem. 17-25.

> 4  The separate-rate claim is the only claim plaintiffs Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd. ("GHC") and Beijing Pacific Activated Carbon Products Company, Ltd. ("BPAC") (collectively, "Cherishmet") asserted in their *Rule 56.2* motion. Consolidated Pls.' *Rule 56.2* Mot. for J. upon the Agency R. (May 18, 2012), ECF No. 44. Other claims asserted in Cherishmet's complaint are not addressed in the motion and therefore are abandoned. Compl. ¶¶ 15-19 (Nov. 23, 2011), ECF No. 6 (Court No. 11-00468).

As discussed herein, the court decides that on remand Commerce must reconsider (1) the surrogate values it determined for carbonized materials and coal and fines by-products; (2) the rate it assigned to certain separate-rate respondents who are parties to this litigation; [**11] and (3) its decision to use a per-unit rather than an *ad valorem* rate for the cash deposit and assessment rates applicable to Shanxi DMD.

C. On Remand, Commerce Must Reconsider the Surrogate Values for CCT's Carbonized Materials and Coal and Fines By-Products

When determining the normal value of subject merchandise from a nonmarket economy country such as China, Commerce, applying *section 773(c)(1)* of the Tariff Act, ordinarily determines "surrogate" values for "the factors of production utilized in producing the merchandise" and does so "based on the best available information regarding the values of such factors in a market economy country or countries" that Commerce considers appropriate. *19 U.S.C. § 1677b(c)(1)*. The surrogate values Commerce determined for CCT's use of coal-based "carbonized material" in producing subject merchandise, and for CCT's "coal and fines" by-products derived from processing the coal-based carbonized material, are at issue in this litigation. Defendant has submitted voluntary remand requests under which Commerce would reconsider both surrogate values, which requests CCT opposes. [*1286] For the reasons discussed below, the court will order Commerce to reconsider [**12] both surrogate values.

1. The Surrogate Value for CCT's Coal-Based Carbonized Material

Carbonized material, the principal material used in producing activated carbon, consists of "most any solid material that has a high carbon content," including "coal, wood, coconut shells, olive stones, and peat." *Certain Activated Carbon from China,* Inv. No. 731-TA-1103, USITC Pub. 3913, at I-5 (Apr. 2007) (Final). Coal is the material most commonly used in producing activated carbon in the United States and China. *Id.*

In the Preliminary Results, Commerce calculated the surrogate value of CCT's coal-based carbonized material

using Global Trade Atlas ("GTA") import data for Indian HTS subheading 2704.00.90, "Other Cokes of Coal," which yielded an average unit value ("AUV") of 13,865.83 Rupees per metric ton ("Rs/MT"). *Decision Mem.* 14; *Mem. from Int'l Trade Specialist to the File* 2 (Apr. 22, 2011) (Admin.R.Doc. No. 2138). In the Final Results, Commerce substantially reduced its surrogate value to 3,796.54 Rs/MT, which reflected an AUV Commerce obtained from GTA import data for Indian HTS subheading 4402.90.10, "Coconut Shell Charcoal," submitted by Jacobi. *Letter from Jacobi to the Sec'y of Commerce* [**13] Ex. 1 (May 19, 2011) (Admin.R.Doc. No. 2164).

Commerce changed its decision in response to comments that mandatory respondent Jacobi, who is not a party to this action, submitted to Commerce in a case brief. In that brief, Jacobi argued that "[t]he Department should value Jacobi's use of carbonized materials using coconut shell charcoal classified under HTS 4402.90.10 because 'other cokes of coal' is not used to produce activated carbon." *Letter from Jacobi to the Sec'y of Commerce* 1 (June 14, 2011) (Admin.R.Doc. No. 2204) ("*Jacobi Case Br.*"). Citing the Department's Draft Remand Determination for the first administrative review of the Order,[5] Jacobi argued, further, that "coconut shell charcoal shares similar properties with carbonized material," namely, "porosity and adsorption," and that "those similar properties are essential in the production of activated carbon." *Id.* at 3-4 (citation omitted).

     5  The Department's Draft Remand Determination in the first administrative review of the Order on certain activated carbon from the People's Republic of China was issued pursuant to this Court's Opinion and Order in *Calgon Carbon Corp. v. United States*, 35 CIT   , Slip Op. 11-21 (Feb. 17, 2011).

Agreeing [**14] with Jacobi's argument, Commerce valued both Jacobi's and CCT's carbonized materials using import statistics for Indian HTS subheading 4402.90.10 ("Coconut Shell Charcoal") and the associated AUV of 3,796.54 Rs/MT. *Decision Mem.* 14. Citing the Department's Final Remand Redetermination for the first administrative review of the Order, Commerce found that "Other Cokes of Coal" was not specific to substances that are carbonized, and that the subheading for "Coconut Shell Charcoal" is more product-specific because it pertains to a material with properties of adsorption and porosity similar to those of carbonized material and essential in the production of subject merchandise. *Id.* at 14-15 (citing *Final Remand Redetermination in the First Administrative Review* 10-11 (July 26, 2011) (Consol. Court No. 09-00524)).[6] Commerce [*1287] also noted that the coconut shell charcoal import data were contemporaneous with the POR and exclusive of tax and duty, consistent with the Department's preferences when selecting surrogate values. *Id.* at 14.

     6  In *Hebei Foreign Trade and Advertising Corp. v. United States*, 35 CIT  ,  , *807 F. Supp. 2d 1317, 1319 (Oct. 24, 2011)*, this Court sustained the redetermination [**15] of the surrogate value for carbonized material value in the first administrative review, *id.* at n.2.

Albemarle and Shanxi DMD claim that the Department's revised surrogate value cannot be sustained because there is no record evidence to support a finding that the determination was based on the best available information. Albemarle *Rule 56.2* Mem. 19-23; Shanxi DMD *Rule 56.2* Mem. 2-3.

At oral argument held on December 13, 2012, the court noted that the record as filed by Commerce appeared to lack the evidence on which Commerce relied in determining its surrogate value for carbonized materials, specifically, the evidence on which the Department relied in the Final Remand Redetermination in the First Review. Oral Tr. 87-88 (Dec. 13, 2012), ECF No. 84. Defendant agreed to submit the missing materials, and the court entered an order with dates for that submission and for submission of additional briefing by the parties on the carbonized material surrogate value issue. Order (Dec. 12, 2012), ECF No. 73. Rather than submit additional record materials in accordance with the order, defendant moved for a voluntary remand, under which Commerce would reconsider its surrogate value for CCT's carbonized [**16] material input and also submit the missing record materials. Def. Mot. for a Voluntary Remand 2-3 (Dec. 19, 2012), ECF No. 74. Defendant stated as its reason for requesting a voluntary remand that, the court having ordered the completion of the administrative record, "the proper course of action at this point is for the Government to seek a voluntary remand to place the evidence on the administrative record and for the agency to accept comments from the parties regarding the evidence and to address those comments in a remand." *Id.* at 2. Defendant, accordingly,

931 F. Supp. 2d 1280, *1287; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **16; SLIP OP. 2013-106

requested that "the Court vacate its December 13, 2012 order to the extent that it requires the agency to supplement the record with the evidence related to the surrogate value for carbonized material," and that "[i]n the instant proceeding, Commerce [] be allowed to place the evidence on the record and consider comments from the parties in the first instance." *Id.*

CCT filed a response in opposition to defendant's voluntary remand motion. Def.-Intervenor Calgon Carbon (Tianjin) Co., Ltd.'s Resp. in Opp'n to Def.'s Mot. for Voluntary Remand (Dec. 20, 2012), ECF No. 75 ("CCT's Opp'n to Def.'s Mot."). CCT argued that a voluntary [**17] remand on the Department's valuation of its carbonized materials is inappropriate because the court, by requesting that Commerce supplement the record submitted, "has already fashioned the appropriate procedure to address the carbonized material claims" and "it is not the proper role of this Court to effectively delegate to Commerce to decide, after the fact, whether its contested final decision was supported by substantial evidence." *Id.* at 1, 4. CCT also argued that plaintiffs' claims regarding the surrogate value of CCT's carbonized material input "should be dismissed on exhaustion grounds pursuant to *28 U.S.C. § 2637(d)*" because no party before Commerce commented in opposition to Jacobi's advocating a change from Indian HTS subheading 2704.00.90, "Other Cokes of Coal," to Indian HTS subheading 4402.90.10, "Coconut Shell Charcoal," for valuation of CCT's carbonized material input. *Id.* at 2; CCT's Resp. 15-16.

An agency generally should be allowed a voluntary remand to reconsider its position provided that "the agency's concern is substantial and legitimate." *SKF USA Inc. v. United States, 254 F.3d 1022, 1028-30* [*1288] *(Fed. Cir. 2001).* Here, however, the rationale defendant put forth to [**18] explain the basis for the Department's concern is opaque. Reconsideration of the carbonized material surrogate value does not necessarily follow merely from the fact that the agency erred in failing to include in the administrative record submitted to the court the evidence on which it relied. Defendant offers no reason related to the merits of the decision it wants Commerce to have the opportunity to reconsider, nor does defendant provide a convincing explanation of why the order the court issued upon oral argument is not sufficient. That order directed the completion of the record and allowed the parties to submit briefing that may address the additional evidence. In this respect, CCT's objection to the voluntary remand request has some merit. However, the court finds reasons to order reconsideration of the carbonized material surrogate value despite the shortcomings in defendant's motion.

Although sparse in its justification, defendant's motion indicates at least that Commerce desires to reconsider its decision, thus placing CCT in the unfavorable posture of taking a position on a voluntary remand request that is contrary to the current position of defendant United States, the party [**19] on whose behalf CCT has intervened. Furthermore, as discussed later in this Opinion and Order, the court sees a need for a remand on the other surrogate value at issue in this case, which pertains to coal and fines by-products. As the court explains, the two surrogate value issues are related with respect to an assertion that the Department has a policy of disfavoring valuations for downstream by-products that exceed those of the upstream material input.

Finally, the court does not find merit in CCT's objection grounded in the requirement to exhaust administrative remedies. As CCT concedes, whether and how the exhaustion requirement is applied is a matter for the court's discretion. CCT's Resp. 15; *28 U.S.C. § 2637(d)* ("the [court] shall, where appropriate, require the exhaustion of administrative remedies."); *Corus Staal BV v. United States, 502 F.3d 1370, 1379-80 (Fed. Cir. 2007)* (stating that "applying exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade"). Here, the Department's change in position on the carbonized material surrogate value was announced in the Final Results, after the submission of case briefs. *See Decision* [**20] *Mem.* 14; *19 C.F.R. § 351.309(c)(2)* (requiring a party to submit a case brief "present[ing] all arguments that continue in [its] view to be relevant to [the Department's] final determination or final results").

2. The Surrogate Value for CCT's Coal and Fines By-Products

In the Preliminary Results, Commerce determined that CCT was eligible for by-product offsets for "non-activated by-products, such as pressroom powder and non-activated fines." *Preliminary Results, 76 Fed. Reg. at 23,989.* CCT

931 F. Supp. 2d 1280, *1288; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **20; SLIP OP. 2013-106

submitted proposed surrogate value information based on Indian HTS data, which Commerce accepted, resulting in a surrogate value for its "coal by-product" of 4,860.88 Rs/MT and a surrogate value for its "fines by-product" of 11,319.90 Rs/MT.[7] *Mem. from* [*1289] *Case Analyst to the File* 5, Ex. 1 (Apr. 22, 2011) (Admin.R.Doc. No. 2144). No party having objected to or commented on these determinations, Commerce left these two by-product surrogate values unchanged in the Final Results. *Decision Mem.* 1-2. As a result, the Decision Memorandum did not address issues pertaining to these surrogate values. *Id.*

> 7  According to Calgon Carbon (Tianjin) Co., Ltd ("CCT"), the fines by-product "is subject merchandise that is [**21] simply smaller in size and thus is generally not sold to customers, but instead is recycled and used by CCT to produce subject merchandise." *Letter from CCT to the Sec'y of Commerce: CCT Sections C and D Questionnaire Resp.* 19 (Pub. Version) (Nov. 23, 2010) (Admin.R.Doc. No. 2018) (Section D, Factors of Production Resp.).

Albemarle claims that the by-product surrogate value determinations are unsupported by substantial evidence and run counter to agency policy "because they result in an unreasonable and inappropriate inversion" in which the downstream by-products are valued considerably higher than the upstream carbonized material. Albemarle *Rule 56.2* Mem. 3-4, 15. Pointing to the Department's revised surrogate value of 3,796.54 Rs/MT for carbonized materials, Albemarle argues that Commerce should correct the value inversion by reverting to Indian HTS subheading 2704.00.90, "Other Cokes of Coal," with a value of 13,865.83 Rs/MT, to value CCT's carbonized material input, as was done in the Preliminary Results. *Id.* at 18. Defendant, while not confessing error, seeks a voluntary remand so that Commerce may reconsider the surrogate values it assigned to CCT's coal and fines by-products. [**22] Def.'s Resp. 19-20.

CCT seeks to raise various arguments against defendant's request for a voluntary remand and moves for the filing of its brief in opposition. Def.-Intervenor Calgon Carbon (Tianjin) Co., Ltd.'s Mot. for Leave to File Resp. in Opp'n to Def.'s Req. for Voluntary Partial Remand 3 (Sept. 25, 2012), ECF No. 67 ("CCT's Opp'n to Def.'s Remand Request"). No party having objected to CCT's motion to file its brief, the court grants CCT's motion and deems the accompanying brief filed as of September 25, 2012. The court, however, does not agree with the arguments CCT puts forth.

CCT opposes defendant's remand request on the grounds that (1) Albemarle did not exhaust its administrative remedies on the issue of surrogate values for coal and fines by-products; (2) defendant has offered no reason for requesting a remand; (3) a remand is not warranted unless error is shown; and (4) a voluntary remand would further delay and complicate the court's proceedings, causing a delay of at least the 60 days for the requested remand and complicating the court's appellate review "such that the Court likely would have to deal with two different determinations by the Department (the original final [**23] results and the remand results)." CCT's Opp'n to Def.'s Remand Request 2-5. The court is not persuaded by these arguments and will order a remand in response to defendant's request.

As discussed *supra*, decisions pertaining to exhaustion of administrative remedies are matters for the court's discretion. Here, the court does not consider it appropriate to dismiss Albemarle's challenge to the by-product surrogate values for failure to exhaust. The ground on which Albemarle brings that challenge—a value inversion relative to the value of carbonized material—did not become apparent until issuance of the Final Results, when Commerce announced that it had changed its surrogate value for the carbonized material based on the argument made by Jacobi.

The court also disagrees with CCT's assertion that defendant offered no reason for seeking a remand. In requesting the remand, defendant stated as follows:

> Albemarle and Huahui contend that the surrogate values currently assigned to the coal and fine by-products do not constitute the best information available for these factors of production and that Commerce's determination runs counter to agency practice. Upon reviewing plaintiffs' motion and without [**24] confessing [*1290] error, we respectfully request a partial remand for Commerce to reexamine the values assigned to the by-products.

931 F. Supp. 2d 1280, *1290; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **24; SLIP OP. 2013-106

Def.'s Resp. 19-20 (citations omitted). The court reasonably may infer from the quoted language that Commerce wishes to reconsider its surrogate values in light of the arguments put forth by Albemarle, including the argument that the "value inversion" is contrary to the Department's practice.

CCT's third argument, that a remand is not appropriate unless error is shown, is not a correct statement of the law. An agency need not confess error to obtain a voluntary remand. *SKF, 254 F.3d at 1029.*

CCT's final objection is also without merit. Although a voluntary remand takes some time, it carries the potential of saving time in that it might avoid a remand later in the proceeding. The objection that the voluntary remand would complicate the proceeding by requiring the court to deal with two decisions is not a valid one, as the agency either will reach the same decision on remand that it reached before or it will reach a different one. In either event, only one decision will be before the court.

D. On Remand, Commerce Must Reconsider Its Separate Rate Methodology as Applied [**25] to Unexamined Respondents Shanxi DMD and BPAC and GHC

Albemarle challenges the $0.44/kg margin that Commerce assigned to Huahui in the Final Results, which was based on Huahui's individual rate in the previous (second) administrative review. Albemarle *Rule 56.2* Mem. 4. Albemarle argues that "[i]t makes no sense for Commerce to consider older rates to reasonably reflect margins for the current period while at the same time rejecting current rates as not representative of the dumping margins of the separate rate companies." Albemarle *Rule 56.2* Mem. 29.

Both Shanxi DMD and Cherishmet contest the Department's assignment of a $0.28/kg margin, which was based on the "separate rate" calculated in the second review, to unexamined respondents Shanxi DMD and BPAC and GHC, respectively. Shanxi DMD *Rule 56.2* Mem. 2; Cherishmet *Rule 56.2* Mem. 2. Shanxi DMD contends that the rate is unreasonable because Commerce "failed to establish why past data is [*sic*] more relevant than current data of mandatory respondents." Shanxi DMD *Rule 56.2* Mem. 15. Similarly, Cherishmet challenges the $0.28/kg margin assigned to BPAC and GHC on the ground that "the Department has presented no evidence or reason for diverting [**26] from the well-established premise that the Final Results of a proceeding should be based solely on the facts on the record *in that proceeding*." Cherishmet *Rule 56.2* Mem. 14, 16. Albemarle, Shanxi DMD, and Cherishmet request that the issue be remanded to Commerce so that Commerce may reconsider the margins applied to unexamined respondents Huahui, Shanxi DMD, and BPAC and GHC, respectively.

When Commerce limits the number of individually examined respondents in an administrative review, as it did here, it must establish a rate for the remaining cooperative, but unexamined, respondents who have demonstrated eligibility for a separate rate. The Tariff Act does not address how Commerce must calculate this separate rate. However, in an investigation, section 735(c)(5) of the Tariff Act directs Commerce, initially, to determine the separate rate by weight-averaging the individual rates calculated for the investigated respondents, excluding *de minimis* or zero rates and rates based on facts available. *19 U.S.C.§ 1673d(c)(5)(A).* If, pursuant to section 735(c)(5)(A), all individually [*1291] investigated respondents' dumping margins are zero, *de minimis,* or based on facts available, section 735(c)(5)(B) [**27] directs Commerce to "use any reasonable method to establish the estimated all others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." *Id. § 1673d(c)(5)(B).* Because Congress has not given explicit instructions for calculating the separate rate in periodic administrative reviews, Commerce has a measure of discretion in determining what methodology to employ. This discretion is not unlimited, however, and Commerce must "articulate a satisfactory explanation" for its choice of methodology. *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013)* ("*Bestpak*").

In the Preliminary Results, Commerce noted that Huahui, Shanxi DMD, BPAC, and GHC were among eight firms who met the criteria for separate rate status. *Preliminary Results, 76 Fed. Reg. at 23,979.* Commerce assigned the

931 F. Supp. 2d 1280, *1291; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **27; SLIP OP. 2013-106

qualifying separate rate respondents a rate of $0.05/kg based on the rate calculated for CCT. *Id. at 23,990.* Commerce did not include in the separate rate calculation the *de minimis* margin assigned to Jacobi. *Id.* In the Final Results, [**28] Commerce assigned a *de minimis* margin to both Jacobi and CCT. *Final Results, 76 Fed. Reg. at 67,145.* Commerce assigned Huahui the same margin it determined in the second review, *i.e.,* $0.44/kg, because Huahui was individually examined in that review. *Decision Mem.* 4, 7. Commerce assigned the separate rate respondents other than Huahui a $0.28/kg margin that also was based on the previous (second) administrative review. *Id.* at 4-7. This margin was the margin Commerce calculated for the unexamined respondents in the second review, which Commerce had calculated as a simple average. *Id.*

Noting that the statute is silent on the method to be employed, the Decision Memorandum submits that the Department's method of determining a rate for the separate rate respondents (other than Huahui) is "reasonable" because it represents a "contemporaneous examination of individually-reviewed respondents exclusive of zero, *de minimis* and facts available margins, and reasonably reflects potential dumping margins for the non-selected companies." *Id.* at 5. Further, the Decision Memorandum reasons that the Department's methodology is appropriate because there is no record evidence to determine whether Jacobi [**29] and CCT's pricing behavior in the POR for the third review was representative of that of the separate rate companies. *Id.*

The court concludes that Commerce must reconsider the margin it assigned to Shanxi DMD, BPAC, and GHC. The $0.28/kg margin was not based on data pertaining to any pricing behavior that occurred in the third POR. Nor was it based on any data pertaining to these respondents; instead, Commerce reverted to a margin it determined in *another* review for *other* respondents. This margin does not reflect commercial reality with respect to Shanxi DMD, BPAC, and GHC and is, in that sense, arbitrary. The Department's statement that this margin is based on a "contemporaneous examination of individually-reviewed respondents exclusive of zero, *de minimis* and facts available margins, and reasonably reflects potential dumping margins for the non-selected companies," *Decision Mem.* 5, is factually incorrect when viewed in the context of the record evidence of the third review. There is nothing "contemporaneous" about the margin, and, having no factual relationship to the pricing behavior of the respondents [*1292] who received it, the $0.28/kg margin cannot be said to "reasonably reflect potential [**30] dumping margins" in the third POR. Moreover, the Department's decision is not justified by its rationale, as stated in the Decision Memorandum, that that there was no record evidence with which to determine whether Jacobi and CCT's pricing behavior in the third POR was representative of that of the separate rate companies. There is no record evidence to support a finding or a reasonable inference that the $0.28/kg margin was representative of the separate rate companies' pricing behavior in the third POR. While the *de minimis* margins assigned to Jacobi and CCT at least reflect commercial realities prevailing in the pertinent POR, the same cannot be said for the margin Commerce assigned to Shanxi DMD, BPAC, and GHC.

The Department's overriding purpose in administering the antidumping laws must be "to calculate dumping margins as accurately as possible." *Bestpak, 716 F.3d at 1379; see also SNR Roulements v. United States, 402 F.3d 1358, 1363 (Fed. Cir. 2005)* ("Antidumping laws intend to calculate antidumping duties on a fair and equitable basis."). Commerce selected Jacobi and CCT as the mandatory respondents because it found that these two respondents were the largest producer/exporters [**31] of subject merchandise during the POR.[8] In this respect, the *de minimis* margins must be considered more representative of industry-wide pricing behavior during the POR than the $0.28/kg calculation from the previous review, which bears no rational relationship to the POR. Commerce ordinarily gives considerable weight to the contemporaneity of data when conducting periodic administrative reviews. *See Decision Mem.* 13. As shown by a comparison with the Preliminary Results, the apparently controlling reason Commerce did not do so here was that the margins Commerce assigned to the mandatory respondents in the Final Results were *de minimis.*

8  Commerce asserted these facts in its respondent selection memoranda. *See Mem. to the File (Selection of Resp'ts for Individual Review)* 6 (Pub. Version) (July 21, 2010) (Admin.R.Doc. No. 1873) (selecting Jacobi Carbons AB as a mandatory respondent and stating that Jacobi "is either the largest or second largest exporter by volume of total U.S. entries during the POR of certain activated carbon from the PRC under review."); *Mem. to the File (Selection of Additional Mandatory Resp't)* 5 (Pub. Version) (Sept. 29, 2010) (Admin.R.Doc. No. 1928) (selecting CCT [**32] as a mandatory respondent and stating that "the largest producer/exporter is CCT.").

Case: 15-1288    Document: 100    Page: 24    Filed: 11/17/2015

Page 10
931 F. Supp. 2d 1280, *1292; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **32; SLIP OP. 2013-106

Defendant argues that the margin Commerce assigned to the separate rate respondents was permissible because Commerce has "broad discretion to select any reasonable methodology." Def.'s Resp. 21. Defendant is correct that Commerce may exercise considerable discretion in assigning a margin to the separate rate respondents in a review; however, the court disagrees that the margin Commerce chose was permissible. Where, as here, Commerce actually examined the sales of what it considered to be the two most representative respondents in the POR, and no others, that discretion does not permit the arbitrary assignment of a margin that has no rational relationship to any pricing behavior during the POR or to the likely pricing behavior of the recipients of the margin.

Defendant also points to the Department's finding that there were no data on the record to determine whether the separate rate respondents' pricing behavior was comparable to that of the examined respondents during the third administrative review, arguing that this finding supports the conclusion that the rates calculated during the second review [**33] are the most reliable on the record. *Id.* at 29 [*1293] (citing *Decision Mem. 6*). Defendant further argues that the separate rate respondents who are plaintiffs in this case have never been assigned a *de minimis* margin and therefore are not entitled to one here. *Id.* at 29. These arguments impliedly acknowledge that the only reason Commerce changed its methodology from the Preliminary Results was the fact that both mandatory respondents received a *de minimis* margin. These arguments are unpersuasive because there are no record data about the pricing behavior of the separate rate respondents in the third review from which it could be reasonably inferred that the margin would, or would not, be a *de minimis* margin. Moreover, the state of the record is not the fault of the separate rate respondents. The available data pertaining to the POR for the third review were limited by the Department's decision to individually examine only two mandatory respondents. *See Mem. to the File (Selection of Resp'ts for Individual Review)* 6 (July 21, 2010) (Admin.R.Doc. No. 1873) (selecting Jacobi as a mandatory respondent); *Mem. to the File (Selection of Additional Mandatory Resp't)* 5 (Sept. 29, 2010) (Admin.R.Doc. [**34] No. 1928) (selecting CCT as a mandatory respondent). Commerce made this decision despite its general statutory obligation to examine all respondents for which a review was requested. *See 19 U.S.C §§ 1675(a); 1677f-1(c)(2)* (providing only a narrow exception where Commerce is authorized to limit the number of individually examined respondents "[i]f it is not practicable to make individual weighted average dumping margin determinations . . . because of the large number of exporters or producers involved in the . . . review.").[9] Here, there were eight respondents, including Shanxi DMD, BPAC, and GHC, who qualified for a separate rate.

9 *Paragraph (2) of 19 U.S.C. § 1677f-1(c)* provides:

> If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination [**35] at the time of selection, or
>
> > (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority [**35] at the time of selection, or
> >
> > (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

*19 U.S.C. § 1677f-1(c)(2).*

The margin Commerce assigned to Huahui, like the margin assigned to the other plaintiffs, was not based on sales during the POR. However, unlike those margins, it is grounded in actual sales by Huahui, albeit sales during the previous (second) POR. The court reserves any decision on whether the margin assigned to Huahui was permissible.

Page 11

931 F. Supp. 2d 1280, *1293; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **35; SLIP OP. 2013-106

Commerce may or may not decide to assign Huahui a different margin based on other decisions it makes upon remand, and this Opinion and Order does not preclude Commerce from reconsidering the $0.44/kg margin assigned to Huahui in the Final Results. The court will consider this question anew upon reviewing the remand redetermination required by this Opinion and Order.

Defendant-intervenor CCC argues that the Department's methodology is permissible because "[p]laintiffs have not demonstrated with substantial evidence that assigning them a zero average margin would be reasonable, when none of the Plaintiffs has ever had a zero margin before" and that plaintiffs [**36] have not met their burden of "establish[ing] that assigning margins from previous periods--especially for Huahui [*1294] which received a margin based upon its own data from the immediately prior review--is inherently unreasonable." CCC's Resp. 17-18. CCC also contends that "each of the Plaintiffs affirmatively sought to participate in the third administrative review as a separate rate respondent and, therefore, had no expectation of receiving a precisely calculated, company-specific margin." *Id.* at 15.

The court is not persuaded by CCC's arguments as they apply to the $0.28/kg separate rate margin assigned to Shanxi DMD, BPAC, and GHC. The court must review the Department's decision according to the substantial evidence standard of review; it would be unsound to attempt to shift the evidentiary burden to plaintiffs in the way that CCC suggests. The implied premise underlying CCC's argument is that Commerce may not assign a *de minimis* margin to an unexamined respondent unless that respondent demonstrates with record evidence a reasonable likelihood that it would have received a *de minimis* margin had it actually been examined. In determining a margin for unexamined respondents, Commerce is subject [**37] to no such restriction but instead must employ a reasonable method for which it provides a rational explanation. *See Bestpak, 716 F.3d at 1378.*

E. Commerce Must Reconsider its Decision to Apply a Per-Unit Cash Deposit and Assessment Rate To Shanxi DMD

Under the applicable regulation, Commerce "normally will calculate an assessment rate for each importer of subject merchandise covered by the review." *19 C.F.R. § 351.212(b)(1).* The regulation states, further, that Commerce "normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes."[10] *Id.* Thus, the normal method as prescribed by the regulation results in an *ad valorem* assessment rate.

    10  *19 C.F.R. § 351.212(b)(1)* provides that:

        If the Secretary has conducted a review of an antidumping order . . . the Secretary normally will calculate an assessment rate for each importer of subject merchandise covered by the review. The Secretary normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty [**38] purposes. The Secretary then will instruct the Customs Service to assess antidumping duties by applying the assessment rate to the entered value of the merchandise.

    *19 C.F.R. § 351.212(b)(1).*

In the Final Results of the previous (second) review, Commerce deviated from the normal method by changing "the cash deposit and assessment methodology from an *ad valorem* to a per-unit basis," thereby stating margins in dollars per kilogram. *Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review, 75 Fed. Reg. 70,208, 70,209 (Nov. 17, 2010)* ("*Final Results AR2*"); Issues & Decision Mem., A-570-904, ARP 3-09, at 11-12 (Nov. 9, 2010) ("*Decision Mem. AR2*"). The Department made this decision upon a finding that Jacobi, a mandatory respondent and the largest Chinese exporter of subject merchandise in the second POR, was absorbing antidumping duties. *Id.* Specifically, Commerce had found that the domestic net unit price for Jacobi's entries of certain activated carbon was significantly higher than the entered value reported to U.S. Customs and Border Protection ("CBP"). *Final Results AR2, 75 Fed. Reg. at 70,209; Decision* [**39] *Mem. AR2* 10-11. Commerce concluded that "while [Jacobi's presumed duty absorption] does not prevent the

931 F. Supp. 2d 1280, *1294; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **39; SLIP OP. 2013-106

Department from calculating appropriate [*1295] assessment rates," a per-unit rate is preferable because duty absorption "can result in the undercollection of duties by CBP if the Department were to issue cash deposit instructions on an *ad valorem* basis." *Decision Mem. AR2* 11-12. Commerce further determined that this decision would be applied "to the order in its entirety" such that per-unit rates will "be applied to all respondents in this particular administrative review and all future reviews of the order." *Id.* at 12.

During the third review, Shanxi DMD filed an administrative case brief challenging the Department's continued use of a per-unit methodology. Shanxi DMD argued, *inter alia,* that "the per-unit rate benefit[s] companies who sell premium goods at higher costs while low cost goods are penalized." *Letter from Shanxi DMD to the Sec'y of Commerce* 9 (June 13, 2011) (Admin.R.Doc. No. 2201) ("*Shanxi DMD Case Br.*"). Shanxi DMD also submitted that "the Department does not actually resolve the issue at assessment because the Separate Rate Companies are not assessed antidumping duty margins [**40] based on their own data," and that, therefore, there is "no rationale" for deviating from the normal practice of establishing the assessment rate as an *ad valorem* rate. *Id.*

In the Final Results, Commerce continued to apply per-unit assessment and cash deposit rates to all respondents, whether or not individually examined. *Final Results,* 76 Fed. Reg. at 67,145. As support for this decision, the Department, referencing its Decision Memorandum from the second administrative review, stated that "it would be extremely burdensome to determine whether to apply an *ad valorem* or a per-unit rate on a company-specific basis," and that "[t]he change in methodology to per-unit assessment rates will not negatively impact these companies because the total duties due will not change; they will only be allocated over quantity instead of over entered value." *Decision Mem.* 7 (quoting *Decision Mem. AR2* 12) (internal quotations omitted). In response to Shanxi DMD's objections, Commerce stated in the Decision Memorandum that Shanxi DMD failed to provide any record evidence to rebut the presumption of continued underselling by Jacobi or to support its claim that the per-unit methodology unfairly penalizes [**41] companies that sell more low-cost subject merchandise. *Id.* at 8.

Shanxi DMD claims that it was unlawful for Commerce to assign it a per-unit assessment and cash deposit rate in the third administrative review, invoking the same grounds stated in its case brief. Shanxi DMD *Rule 56.2* Mem. 17-25. The court agrees, concluding that the decision to assign a per-unit margin is unlawful in three respects and must be remanded to the Department.

First, Commerce impermissibly grounded its decision in a finding of duty absorption that not only pertained solely to Jacobi but also pertained to data from a previous review. *Decision Mem.* 7-8 (stating that Jacobi's "behavior was the basis for the Department to use per-unit assessment rates" in the Final Results of the previous (second) administrative review). Commerce did not find that Shanxi DMD had engaged in the practice of duty absorption, and it failed to base its decision to assign Shanxi DMD a per-unit rate based on findings of fact grounded in the record of the third review. Second, Commerce attempted to justify its decision upon a finding that Shanxi DMD would not be prejudiced in any way by a per-unit rate. *Id.* at 7 (citations omitted) (stating [**42] that the "change in methodology to per-unit assessment rates will not negatively impact [separate rate] companies because the total duties due will not change; they will only be allocated over quantity instead of over entered value"). [*1296] The court is aware of no evidence on the record of the third review to support a finding that importers of Shanxi DMD's subject merchandise will not, under any circumstances, pay higher deposits and not be assessed higher duties than would occur under an *ad valorem* assessment rate.

Third, Commerce found, without an adequate evidentiary foundation, that "it would be extremely burdensome to determine whether to apply an ad valorem or a per-unit rate on a company-specific basis." *Decision Mem.* 7 (citations omitted). The court fails to see why determining Shanxi DMD's rate as an *ad valorem* rate would impose a significant burden. Even if some burden resulted, that burden would not justify a decision that is unsupported by findings of fact grounded in the record of the third review.

Defendant supports the Department's determination, arguing that the plain language of the statute, *19 U.S.C. § 1673e(a)(1),* and the accompanying regulation, *19 C.F.R. § 351.212(b)(1),* [**43] do not require Commerce to

931 F. Supp. 2d 1280, *1296; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **43; SLIP OP. 2013-106

calculate assessment and cash deposit rates in a particular manner or limit per-unit rates to particular factual circumstances. Def.'s Resp. 36-37. According to Defendant, Commerce acted within its discretion in the second administrative review when it made the global change to per-unit assessment and cash deposit rates and continued to "properly follow[] its practice" in doing the same in the third review. *Id.* at 36-37, 40 (citing *Decision Mem.* 7-8). Defendant also points to several Court of Appeals decisions upholding Commerce's departure from the *ad valorem* methodology under certain circumstances. *Id.* at 36-37 (citing *Koyo Seiko Co. v. United States, 258 F.3d 1340 (Fed. Cir. 2001); Thai Pineapple Canning Indus. v. United States, 273 F.3d 1077 (Fed. Cir. 2001)).*

Defendant's arguments are unconvincing. The cases upon which defendant relies do not establish the principle that Commerce has unfettered discretion to apply per-unit cash deposit and assessment rates. To the contrary, the Department's discretion is not so broad as to sustain an arbitrary decision to apply a per-unit rate to Shanxi DMD, one that was not grounded in any findings pertinent to Shanxi [**44] DMD or any findings supported by evidence in the third review. Finally, defendant's argument that Commerce properly followed its "practice" is unavailing. The "normal" method established by the regulation, *19 C.F.R. § 351.212(b)(1)*, is to determine *ad valorem* assessment rates. Here, Commerce departed from the normal practice and did so in a way that was arbitrary with respect to Shanxi DMD.

## III. CONCLUSION AND ORDER

For the reasons discussed above, the court concludes that: (1) Commerce must reconsider and redetermine the surrogate values it applied to CCT's carbonized materials and coal and fines by-products; (2) Commerce must reconsider its method of determining the margins for Shanxi DMD, BPAC, and GHC, respectively, and redetermine those margins; and (3) Commerce must reconsider its assignment of a per-unit cash deposit and assessment rate as applied to Shanxi DMD.

Upon consideration of all papers and proceedings in this case and upon due deliberation, it is hereby

**ORDERED** that the Motion for Leave to File Response in Opposition to Defendant's Request for Voluntary Partial Remand, filed September 25, 2012, ECF No. 67, by Defendant-Intervenor Calgon Carbon (Tianjin) Co., Ltd. ("CCT") [**45] be, and hereby is, granted, and that the accompanying Memorandum in Opposition to Defendant's Request for Voluntary Remand, [*1297] be, and hereby is, deemed filed on September 25, 2012; it is further

**ORDERED** that *Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review, 76 Fed. Reg. 67,142 (Oct. 31, 2011),* be, and hereby is, remanded to the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") for reconsideration and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce must redetermine, in accordance with this Opinion and Order, the surrogate values that it applied to CCT's carbonized materials and coal and fines by-products; it is further

**ORDERED** that Commerce must reconsider its method of determining the margins for Shanxi DMD Corporation ("Shanxi DMD"), Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd., and Beijing Pacific Activated Carbon Products Company, Ltd., and redetermine those margins in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall reconsider its decision to assign [**46] a per-unit cash deposit and assessment rate to Shanxi DMD and redetermine that rate in accordance with this Opinion and Order; and it is further

**ORDERED** that Commerce shall file its remand redetermination within ninety (90) days of the date of this Opinion and Order, that each plaintiff and defendant-intervenor shall have thirty (30) days from the filing of the remand redetermination in which to file with the court comments on the remand redetermination, and that defendant shall have fifteen (15) days from the date of the last filing of such comments in which to file with the court any responses to the comments of other parties.

931 F. Supp. 2d 1280, *1297; 35 Int'l Trade Rep. (BNA) 1942;
2013 Ct. Intl. Trade LEXIS 111, **46; SLIP OP. 2013-106

/s/ Timothy C. Stanceu

Timothy C. Stanceu

Judge

Dated: August 15, 2013

New York, New York



**ALBEMARLE CORP., Plaintiff, and NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., Plaintiff-Intervenor, v. UNITED STATES, Defendant, and CALGON CARBON (TIANJIN) CO., LTD., CALGON CARBON CORP. AND NORIT AMERICAS INC., Defendant-Intervenors.**

**Consol. Court No. 11-00451**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

*27 F. Supp. 3d 1336; 36 Int'l Trade Rep. (BNA) 1289; 2014 Ct. Intl. Trade LEXIS 137;*
*SLIP OP. 14-135*

**November 24, 2014, Decided**

**PRIOR HISTORY:** *Albemarle Corp. v. United States, 931 F. Supp. 2d 1280, 2013 Ct. Intl. Trade LEXIS 111 (2013)*

**DISPOSITION:**    Affirming a redetermination issued upon remand in an action contesting the final results of an administrative review of an antidumping duty order on certain activated carbon from the People's Republic of China.

**COUNSEL:** [**1] Jeffrey S. Grimson, Mowry & Grimson, PLLC, of Washington, DC, for plaintiff Albemarle Corp. and plaintiff-intervenor Ningxia Huahui Activated Carbon Co., Ltd. With him on the brief were Kristin H. Mowry, Jill A. Cramer, and Sarah M. Wyss.

Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff Shanxi DMD Corp. With him on the brief were John J. Kenkel and J. Kevin Horgan.

Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd. and Cherishmet Inc. With him on the brief were Mark E. Pardo, Andrew T. Schutz, and Kavita Mohan.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Devin S. Sikes, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Craig A. Lewis, Hogan Lovells U.S. [**2] LLP, of Washington, DC, for defendant-intervenor Calgon Carbon (Tianjin) Co., Ltd.

David A. Hartquist, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenors Calgon Carbon Corp. and Norit Americas Inc. With him on the brief were R. Alan Luberda and John M. Herrmann II.

JA000017

27 F. Supp. 3d 1336, *; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **2; SLIP OP. 14-135

**JUDGES:** Before: Timothy C. Stanceu, Chief Judge.

**OPINION BY:** Timothy C. Stanceu

**OPINION**

[*1338] Stanceu, Chief Judge: This consolidated action arose from judicial challenges to a final determination that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued in an antidumping duty proceeding.[1] The contested determination (the "Final Results") concluded the third administrative review of an antidumping duty order (the "Order") on certain activated carbon (the "subject merchandise") from the People's Republic of China ("China" or the "PRC"). *Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review, 76 Fed. Reg. 67,142 (Int'l Trade Admin. Oct. 31, 2011)* ("*Final Results*"). The third administrative review applies to entries of subject merchandise that were made between April 1, 2009 and March 31, 2010 (the "period of review" or "POR"). *Id.*

> 1   The cases consolidated under this action are *Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. et al v. United States*, Court No. 11-00468 [**3] and *Shanxi DMD Corp. v. United States*, Court No. 11-00475. Order (Jan. 26, 2012), ECF No. 34.

Before the court is the Department's decision ("Remand Redetermination") issued pursuant to the court's order in *Albemarle Corp. v. United States, 37 CIT   ,   , 931 F. Supp. 2d 1280, 1282-83 (2013)* ("*Albemarle*").[2] Final Results of Redetermination Pursuant to Ct. Remand (Jan. 10, 2014), ECF No. 96 ("*Remand Redetermination*"). [*1339] For the reasons discussed in this Opinion, the court is affirming the Remand Redetermination.

> 2   Also before the court are two motions pertaining to a brief filed by defendant-intervenors Calgon Carbon Corporation and Norit Americas, Inc. (collectively "CCC") that responds to the Remand Redetermination comments filed by plaintiff Albemarle Corporation ("Albemarle"). *See* Def.-intervenors' Responsive Comments on Remand Redetermination (Feb. 27, 2014), ECF No. 108. Albemarle moves to strike CCC's response brief from the record of this case. Mot. to Strike 1 (Feb. 28, 2014), ECF No. 110. CCC concedes that its response brief contravened the terms of the court's order in *Albemarle Corp. v. United States, 37 CIT   ,   , 931 F. Supp. 2d 1280, 1282-83 (2013)*, but asks that the court accept the filing as supplemental briefing and allow additional briefing from the other parties to this litigation. Def.-intervenors' Mot. to Accept Supplemental [**4] Br. 1 (Feb. 28, 2014), ECF No. 111. Because all parties already have had the opportunity to comment on the Remand Redetermination, the court determines that permitting additional briefing would not promote the judicial economy and efficiency of this case. *See USCIT R. 1.* Moreover, CCC's supplemental brief argues in support of a determination that the court has concluded it will sustain; *see* part II.B of this Opinion. The court reaches this conclusion without considering the brief in question. Therefore, the court will grant Albemarle's Motion to Strike and deny CCC's Motion for Supplemental Briefing.

**I. BACKGROUND**

The court's opinion in *Albemarle* provides detailed background information on this case that is supplemented herein. *Albemarle, 37 CIT at   , 931 F. Supp. 2d at 1283-88.*

A. The Parties to the Consolidated Action

This consolidated case arose from challenges to the Final Results by three plaintiffs: (1) Albemarle Corporation ("Albemarle"), a U.S. importer of subject merchandise produced and exported from China by plaintiff-intervenor Ninxia Huahui Activated Carbon Co., Ltd. ("Huahui"); (2) Shanxi DMD Corporation ("Shanxi DMD"), a Chinese exporter of subject merchandise; and (3) Cherishmet, Inc., a U.S. importer affiliated with Chinese exporters [**5] Ningxia Guanghou Cherishmet Activated Carbon Products Company, Ltd. ("GHC") and Beijing Pacific Activated Carbon Products Company, Ltd. ("BPAC"). *Albemarle, 37 CIT at   , 931 F. Supp. 2d at 1283-84.*

27 F. Supp. 3d 1336, *1339; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **5; SLIP OP. 14-135

Defendant-intervenor Calgon Carbon (Tianjin) Co., Ltd. ("CCT") is a Chinese producer and exporter of subject merchandise. CCT is a subsidiary of defendant-intervenor Calgon Carbon Corporation and Norit Americas, Inc. (collectively "CCC"), a domestic producer of activated carbon and the petitioner in the antidumping investigation that resulted in the issuance of the Order. *Albemarle, 37 CIT at    , 931 F. Supp. 2d at 1284.*

B. Procedural History

In the third administrative review, Commerce examined individually, and assigned individual calculated margins to, only two producer/exporters ("mandatory respondents"): CCT, which is a party to this case, and Jacobi Carbons AB ("Jacobi"), which is not. *Certain Activated Carbon from the People's Republic of China: Prelim. Results of the Third Antidumping Duty Admin. Review, & Prelim. Rescission in Part, 76 Fed. Reg. 23,978, 23,979 (Int'l Trade Admin. Apr. 29, 2011)* ("*Prelim. Results*"). In the preliminary phase of the third administrative review, Commerce determined a preliminary margin of zero for Jacobi and a $0.05/kg. preliminary margin for CCT. *Id., 76 Fed. Reg. at 23,990.* Based on CCT's margin, Commerce determined preliminary margins of $0.05/kg. for respondents Shanxi DMD, BPAC, GHC, and Huahui, each of which Commerce had chosen not to examine but [**6] which qualified for a "separate rate," i.e., a rate other than the rate assigned to the government of China and government-affiliated entities.[3] *Id.*

> 3 The International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") makes the rebuttable presumption that all companies operating within the People's Republic of China ("China" or the "PRC") to be under government control, and because the PRC government did not cooperate in the Department's conducting of the review giving rise to this action, Commerce, pursuant to *19 U.S.C. § 1677e(b)*, determined a "PRC-wide" margin of $2.42/kg. for application to all Chinese exporters and producers of the subject merchandise that did not establish their entitlement to a "separate rate," i.e., a rate other than the PRC-wide rate, by demonstrating their *de jure* and *de facto* independence from government control. *Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review, 76 Fed. Reg. 67,142, 67,145 (Int'l Trade Admin. Oct. 31, 2011)* ("*Final Results*"). The Chinese producer/exporters of the subject merchandise at issue in this case were among the eight producer/exporters who so qualified.

In the Final Results, Commerce assigned to each of the two examined respondents a margin of "$0.00/kg.," which [*1340] Commerce described as "*de minimis.*" [**7] *Final Results, 76 Fed. Reg. at 67,145.* Commerce determined a final margin of $0.44/kg. for Huahui based on the individual margin Huahui had been assigned as a mandatory respondent in the final results of the previous (second) administrative review of the Order, and determined a margin of $0.28/kg. for unexamined respondents Shanxi DMD, BPAC, GHC, which was also based on the final results of the second administrative review. *Id.*

In *Albemarle*, the court granted defendant's motion for a voluntary remand that would allow Commerce to reconsider two surrogate values (for carbonized material and for coal and fines by-products) affecting the calculation of CCT's margin. *Albemarle, 37 CIT at    , 931 F. Supp. 2d at 1297.* Also, the court in *Albemarle* ordered Commerce to reconsider the method used to determine the margins for unexamined respondents Shanxi DMD, BPAC and GHC and redetermine those margins in accordance with the court's opinion and order. *Id.* Third, the court ordered Commerce to reconsider the decision Commerce made in the Final Results to assign a per-unit, as opposed to an *ad valorem*, margin to Shanxi DMD and redetermine this margin in accordance with the opinion and order. *Id.* In *Albemarle*, the court reserved any decision on whether the $0.44/kg. margin assigned [**8] to Huahui was permissible but did not preclude Commerce from reconsidering that margin on remand. *Id. at    , 931 F. Supp. 2d at 1293.*

Commerce filed the Remand Redetermination with the court on January 10, 2014. *Remand Redetermination 1.* Pursuant to the court's order in *Albemarle*, the parties have submitted briefs addressing various issues raised by the Remand Redetermination. Pl. and Pl.-intervenor's Comments on Final Results of Redetermination Pursuant to Ct. Remand (Feb. 12, 2014), ECF No. 100 ("Albemarle's Comments"); Comments of Def.-intervenor Calgon Carbon (Tianjin) Co., Ltd. Regarding Final Results of Redetermination Pursuant to Ct. Remand (Feb. 12, 2014), ECF No. 102

("CCT's Comments"); Def.-intervenors' Comments on Remand Redetermination (Feb. 12, 2014), ECF No. 103 ("CCC's Comments"); Def.'s Reply to the Parties' Remand Comments, ECF No. 109 ("Def.'s Reply").

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, *28 U.S.C. § 1581(c)*, pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 ("Tariff Act"), *19 U.S.C. § 1516a(a)(2)(B)(iii)*, including an action contesting the Department's issuance, under section 751 of the Tariff Act, *19 U.S.C. § 1675(a)*, of the final results of an administrative review of an antidumping duty [**9] order.[4] The court will sustain the Department's redetermination if it complies with the court's remand order, is supported by substantial evidence on the record and is otherwise in accordance with the law. *See 19 U.S.C. § 1516a(b)(1)(B)(i)*.

4   All statutory citations to the Tariff Act of 1930 are to the 2006 edition of the United States Code, unless otherwise indicated.

In the Remand Redetermination, Commerce reassessed its surrogate value determinations for CCT's carbonized material and for CCT's coal and fines by-products. *Remand Redetermination* 1-2. Accordingly, Commerce recalculated CCT's weighted average dumping margin to reflect the redetermined surrogate values, resulting in a margin of $0.004/kg. [*1341] for CCT, which remained *de minimis*. *Remand Redetermination* 10, 25. Commerce assigned redetermined zero margins to unexamined respondents Shanxi DMD, BPAC and GHC, which were based on the zero/*de minimis* margins for mandatory respondents Jacobi and CCT. *Remand Redetermination* 13, 25. Commerce left unchanged the $0.44/kg. margin it assigned to Huahui in the Final Results.

No party contests the Department's redetermined surrogate values, which the court affirms for the reasons discussed in subparts II.C and II.D of this [**10] Opinion. The margins to be assigned to GHC, BPAC, and Shanxi DMD, and the margin to be assigned to Huahui, are the only issues that remain contested in this litigation. In subpart II.A of this Opinion, the court affirms the Department's assignment of zero margins to GHC, BPAC, and Shanxi DMD. In subpart II.B, the court affirms the Department's assignment of the $0.44/kg. margin to Huahui. Because Commerce determined Shanxi DMD's margin to be zero, and because the court affirms that margin in this Opinion, Shanxi DMD's challenge to a per-unit margin is now moot.

A. The Court Affirms the Redetermined Margins for GHC, BPAC, and Shanxi DMD

The Tariff Act provides generally that Commerce, in an antidumping duty investigation or a review of an antidumping duty order, "shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise." Section 777A(c)(1) of the Tariff Act, *19 U.S.C. § 1677f-1(c)(1)*. However, if "it is not practicable" to calculate individual dumping margins for every exporter or producer "because of the large number of exporters or producers involved" in the review, Commerce may limit the number of examined respondents. Section 777A(c)(2) of the Tariff Act; *19 U.S.C. § 1677f-1(c)(2)*. In the [**11] third administrative review, Commerce chose CCT and Jacobi for individual examination out of ten companies that qualified for a separate rate "because it found that these two respondents were the largest producer/exporters of subject merchandise during the POR." *Albemarle, 37 CIT at    , 931 F. Supp. 2d at 1292* (footnote omitted).

In the Final Results, Commerce assigned an antidumping duty margin of $0.28/kg. to unexamined respondents GHC, BPAC, and Shanxi DMD. *Final Results, 76 Fed. Reg. at 67,145* & n.26. As it explained in an Issues & Decision Memorandum ("Decision Memorandum") incorporated by reference in the Final Results, Commerce obtained this margin from the immediately preceding, i.e., second, administrative review of the Order, in which it had assigned a margin of $0.28/kg. to nine unexamined, separate rate respondents. *Issues & Decision Mem.* at 5, A-570-904, (Oct. 24, 2011), *available at* http://enforcement.trade.gov/frn/summary/prc/2011-28158-1.pdf (last visited Nov. 18, 2014) ("*Decision Mem.*"). In the second administrative review, Commerce calculated the $0.28/kg. margin as a simple average of the margins it determined for the two mandatory respondents it examined individually in that review, which were

Case: 15-1288 Document: 100 Page: 33 Filed: 11/17/2015

Page 5
27 F. Supp. 3d 1336, *1341; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **11; SLIP OP. 14-135

Jacobi ($0.11/kg.) and Huahui ($0.44/kg.). *Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review, 75 Fed. Reg. 70,208, 70,211 & n.10 (Int'l Trade Admin. Nov. 17, 2010).*

No statutory or regulatory provision addresses the method by which Commerce is to determine margins [**12] for respondents that are reviewed, but not individually examined, in an administrative review of an [*1342] antidumping duty order. Rather, Congress left the method of determining such margins to the Department's discretion. That discretion is broad but not unfettered. According to long-standing precedent of the Court of Appeals for the Federal Circuit ("Court of Appeals"), "[a]n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013)* ("*Bestpak*") (citing *Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)); Parkdale Intern. v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007); Lasko v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994)* (citation omitted).

*Bestpak* involved an all-others rate Commerce applied to uninvestigated "separate rate" respondents in an antidumping investigation. The Court of Appeals concluded that the margin applied to these uninvestigated respondents not only must be determined "as accurately as possible," *Bestpak, 716 F.3d at 1379,* but also must be one that "reflects economic reality," *id. 716 F.3d at 1378.* Rejecting the 123.83% margin Commerce applied to the separate rate respondents, which Commerce calculated by taking a simple average of a zero/*de minimis* margin assigned to an investigated respondent and a 247.65%, adverse inference margin assigned to an uncooperative respondent, the Court of Appeals held that the [**13] record lacked "substantial evidence to support the calculated margin as being a reasonable reflection of Bestpak's potential dumping margin." *Id., 716 F.3d at 1375, 1378.*

*Bestpak* arose from an antidumping investigation, not a review as does this case. Nevertheless, the court considers the objectives of obtaining the most accurate margin possible and of ensuring that the margin reflects economic reality, both of which the Court of Appeals in *Bestpak* viewed as fundamental to the antidumping statute, to be as valid in a review as they are in an investigation. To meet the *Bestpak* standard, the margins assigned to Shanxi DMD, BPAC and GHC must be a reasonable reflection of the potential dumping margins of these respondents.

For the Final Results, Commerce stated in the Decision Memorandum that in selecting the $0.28/kg. margin it had been guided by section 735(c)(5) of the Tariff Act, *19 U.S.C. § 1673d(c)(5),* which provides the methodology for calculating the "all-others" rate that is applied to uninvestigated producer/exporters in an antidumping investigation. *Decision Mem.* 4 ("Generally, we have looked to section 735(c)(5) of the Tariff Act . . . , which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate [**14] for respondents we did not individually examine in an administrative review."). Under *paragraph (A) of § 1673d(c)(5),* Commerce determines the all-others rate in an investigation by calculating "the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under section 776, [*19 U.S.C. § 1677e*]." *19 U.S.C. § 1673d(c)(5)(A).* Because it assigned zero/*de minimis* margins to both respondents examined in the third review, Commerce could not apply the *paragraph (A)* method in the review to determine an all-others rate for the separate rate respondents.

The paragraph (A) method is subject to an exception in *paragraph (B),* which provides that if all of the individually investigated companies' margins "are zero or *de* [*1343] *minimis* margins, or are determined entirely under section 776, [*19 U.S.C. § 1677e*]," then Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." *19 U.S.C. § 1673d(c)(5)(B).* Commerce expressly cited the paragraph (B) exception in the Decision Memorandum: "Section 735(c)(5)(B) of the Act also provides that, where [**15] all margins are zero, *de minimis,* or based on total facts available, we may use 'any reasonable method' for assigning the rate to non-selected respondents." *Decision Mem.* 4. Commerce added that "[o]ne method that section 735(c)(5)(B) of the Act contemplates as a possibility is 'averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.'" *Id.* (quoting *19 U.S.C. §*

27 F. Supp. 3d 1336, *1343; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **15; SLIP OP. 14-135

*1673d(c)(5)(B)*). In the Final Results, Commerce rejected that "possibility."

Commerce explained that it has a practice of "excluding zero and *de minimis* margins when calculating the separate rate margin." *Decision Mem.* 4. Choosing to follow this practice in the Final Results, Commerce stated that "[b]ased on the facts of this case, we determine that a reasonable method for determining the margin for separate rate companies in this review is the average of the margins, other than those which are zero, *de minimis*, or based on total facts available, that we found for the most recent period in which there were such margins," *i.e.*, the second administrative review. *Id.* at 5. As Commerce also explained, "the Department does not consider the rates calculated in the current review [i.e., the zero/*de minimis* margins calculated for [**16] Jacobi and CCT] to reasonably reflect the potential dumping margins of the separate rate companies." *Id.* According to Commerce, "no data on the record exists to determine whether the non-selected companies' pricing behavior matches that of the mandatory respondents in the current review." *Id.* Acknowledging that it had departed from its practice by assigning a zero margin to separate rate respondents in one administrative review, *Honey from Argentina: Final Results of Antidumping Duty Admin. Review & Determination Not to Revoke in Part, 73 Fed. Reg. 24,220 (Int'l Trade Admin. May 2, 2008)*, Commerce identified that review as the only instance in which it had done so voluntarily in its recent history. *Decision Mem.* 6. Commerce further stated in the Decision Memorandum:

> As seen in recent cases, the Department has found for case-specific reasons that using a calculated rate from a prior segment more reasonably reflects the potential dumping margins of non-selected companies than does a *de minimis* or zero rate from an ongoing segment because the margins from the previous review more accurately capture recent and potential pricing behavior of non-selected companies, given that these companies were not selected for individual examination and that there is no data on the record to determine whether the non-selected companies' pricing behavior [**17] matches that of the mandatory respondents in the ongoing review.

*Id.* Commerce added that the only other instance in which it had departed from the practice in recent history by assigning zero/*de minimis* margins to unexamined respondents was in response to a remand order that this Court entered in *Amanda Foods (Vietnam) Ltd. v. United States, 34 CIT    , 714 F. Supp. 2d 1282 (2010)* ("*Amanda Foods 2010*"). *Decision Mem.* 6. Commerce explained that in that instance [*1344] it assigned a *de minimis* separate rate "under protest" and "only after the Department reopened the record, requested further information from the plaintiff, and performed additional data comparisons to information on the record." *Id.* (citing *Amanda Foods (Vietnam) Ltd. v. United States, 35 CIT    ,    , 774 F. Supp. 2d 1286, 1292 (2011)* ("*Amanda Foods 2011*")). Commerce further explained that "the Department has not undertaken such steps in this case and, therefore, finds it inappropriate to rely on *Amanda Foods 2011* as applicable precedent." *Decision Mem.* 6-7.

In *Albemarle*, the court rejected the $0.28/kg. margin for Shanxi DMD, BPAC and GHC and the reasoning Commerce put forth. Noting that "Commerce reverted to a margin it determined in *another* review for *other* respondents," the court concluded that the $0.28/kg. margin "was not based on data pertaining to any pricing behavior that occurred in the third [**18] POR" and "does not reflect commercial reality with respect to Shanxi DMD, BPAC, and GHC." *Albemarle, 37 CIT at    , 931 F. Supp. 2d at 1291* (emphasis in original). The court stated that "[t]he Department's statement that this margin is based on a 'contemporaneous examination of individually-reviewed respondents exclusive of zero, *de minimis*, and facts available margins, and reasonably reflects potential dumping margins for the non-selected companies,' *Decision Mem.* 5, is factually incorrect when viewed in the context of the record evidence of the third review." *Id. at    , 931 F. Supp. 2d at 1291*. Responding to the Department's conclusion that there were "no data on the record to determine whether the non-selected companies' pricing behavior matches that of the mandatory respondents in the instant review," the court observed that no data on the record demonstrated that the pricing behavior of the three non-selected companies matched the pricing behaviors of the mandatory respondents in the previous review, from whose individually-determined margins the $0.28/kg. was calculated. *Id. at    , 931 F. Supp. 2d at 1292-93*. The court directed Commerce to "reconsider its method of determining the margins" for Shanxi DMD, BPAC, and GHC, and to redetermine those margins in accordance with the court's order. *Id. at    , 931 F. Supp. 2d at 1296-97*.

27 F. Supp. 3d 1336, *1344; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **18; SLIP OP. 14-135

In response [**19] to the court's order, Commerce decided to average the zero and *de minimis* rates calculated for Jacobi and CCT and to assign the result, i.e., zero, as the margins for GHC, BPAC, and Shanxi DMD. The court affirms the Department's decision to assign these margins, which were derived from the actual margin Commerce determined in the Final Results for Jacobi, and the actual margin Commerce determined in the Remand Redetermination for CCT, based on record information pertaining to factors of production and examined sales occurring in the relevant period of review, i.e., April 1, 2009 to March 31, 2010.[5] In this case, the margins Commerce determined for Jacobi and CCT are no less actual, calculated margins because they were *de minimis*. Because they were calculated from record data for examined sales made during the correct period, they are necessarily a more "reasonable reflection of [the] potential dumping margin," *Bestpak, 716 F.3d at 1378*, that GHC, BPAC, and Shanxi DMD would have been assigned in the third review, had they [*1345] been examined, than is the margin of $0.28/kg., which bears no relationship to the relevant POR.

   5   The *de minimis* margin assigned to Jacobi, as determined in the decision under review, was not [**20] contested in this case. As discussed elsewhere in this Opinion, CCT's margin remained *de minimis* after redetermination, upon remand, of the surrogate values contested in this litigation.

CCC opposes, on various grounds, the Department's decision to assign zero margins to GHC, BPAC and Shanxi DMD. CCC argues, first, that Commerce "misinterpreted this Court's opinion and remand order as making factual findings and requiring the Department to assign GHC, BPAC, and Shanxi DMD a zero percent separate rate on remand." CCC's Comments 4. According to CCC, another remand is appropriate because of the Department's "mistaken belief that the Court dictated the separate rate to be assigned to GHC, BPAC, and Shanxi DMD." *Id.* at 7. The court must reject this argument. As discussed below, the text of the Remand Redetermination does not support CCC's conclusion that Commerce considered itself under a judicial directive to assign zero antidumping duty margins to GHC, BPAC, and Shanxi DMD.[6]

   6   Nothing in the court's opinion and order in *Albemarle* correctly could have been construed by Commerce as a directive to assign zero margins to GHC, BPAC, or Shanxi DMD. Regarding CCC's other point, the Remand Redetermination [**21] does not state that the court made factual findings. Instead, disagreeing with comments CCC submitted to Commerce on a draft version of the remand decision, the Remand Redetermination attributed to the court's decision in *Albemarle* "substantive assessments" that the *de minimis* margins assigned to the mandatory respondents were more representative of industry-wide pricing behavior and more reflective of commercial realities during the POR than the $0.28/kg. margins Commerce assigned. Final Results of Redetermination Pursuant to Ct. Remand at 20 (Jan. 10, 2014), ECF No. 96 ("*Remand Redetermination*"). In any event, the opinion and order in *Albemarle* did not draw its own findings of fact from the record evidence and instead took issue with the Department's reasoning. The observations the court made concerning the record described the *absence* of evidence to support the Department's choice and were not directed to any contested factual issue. The court observed that the *de minimis* margins Commerce assigned to the two mandatory respondents in the third review were derived from data pertaining to sales occurring during the POR for that same review, which the $0.28/kg. margin was not; this point was not the subject of a factual dispute in the case. *Albemarle, 37 CIT at   , 931 F. Supp. 2d at 1292* ("While the *de minimis* [**22] margins assigned to Jacobi and CCT at least reflect commercial realities prevailing in the pertinent POR, the same cannot be said for the margin Commerce assigned to Shanxi DMD, BPAC, and GHC.").

The Remand Redetermination states that "[t]he Department respectfully disagrees with the Court's holdings in this *Remand Opinion and Order*," adding that "[h]owever, under protest, the Department has averaged the zero and *de minimis* rates calculated for Jacobi and CCT in this administrative review and assigned the resulting zero dumping margin to GHC, BPAC, and Shanxi DMD." *Remand Redetermination* 13 (citing *Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003))*. The Remand Redetermination does not go so far as to conclude that the court directed Commerce to assign zero margins to GHC, BPAC, and Shanxi DMD. Instead, Commerce expresses disagreement with "the Court's holdings," explaining that it "followed the Court's logic, under protest, to its natural conclusion." *Id.* Implicitly acknowledging an alternative to its assigning zero margins to these three unexamined

Page 8

27 F. Supp. 3d 1336, *1345; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **22; SLIP OP. 14-135

respondents, Commerce disagreed with CCC's comment, submitted in response to a draft version of the Remand Redetermination, that it should reopen the record to obtain pricing and other information from [**23] GHC, BPAC, and Shanxi DMD. *Id.* at 21; *see* CCC's Comments 13. The Remand Redetermination rejects this option on the ground that Commerce previously stated it has resources sufficient only to examine two respondents and that [*1346] "obtaining this information would consume resources which we previously stated we do not have." *Remand Redetermination* 21.

When read in the entirety, the Remand Redetermination is correctly interpreted as protesting that the court remanded for reconsideration the Department's decision to assign the 0.28/kg. margin, and the logic by which the court did so, rather than protesting a directive to assign zero margins to GHC, BPAC, and Shanxi DMD. *See id.* (rejecting CCC's comment, submitted on the draft version of the decision, that Commerce should remove the "under protest" language and stating that "[a]s an initial matter, the Department may protest when ordered to make a remand redetermination") & n.66 (citing *Viraj, 343 F.3d 1371*). Commerce appears to have viewed reopening the record as a possible alternative to assigning zero margins to GHC, BPAC, and Shanxi DMD that was available to it on remand, albeit one Commerce chose not to pursue due to resource constraints. Having noted the absence of meaningful [**24] record evidence concerning the sales of these three respondents, having rejected the option of reopening the record in an effort to redress that absence, and also having noted the court's rejecting as unreasonable the Department's decision to assign $0.28/kg. margins in the Final Results to GHC, BPAC, and Shanxi DMD, the Remand Redetermination disagreed with CCC "that the CIT has left us other options to pursue on remand." *Remand Redetermination* 20. That is not the same as the Department's concluding that it was under a court order to assign the zero margins.

CCC next argues that the court should issue a second remand because the decision to assign the zero margins was unsupported by substantial record evidence. CCC's Comments 7. Based on the premise that the decision lacks evidentiary support, CCC further argues that "[t]he Department's refusal to re-open the record on remand to obtain pricing and other relevant data to determine if the mandatory respondents' commercial reality was representative of the separate rate respondents was unreasonable and improper." *Id.* at 12. According to CCC, among the types of information missing from the record is information "concerning the factors of production [**25] consumed in manufacturing the subject merchandise exported to the United States by GHC, BPAC, and Shanxi DMD" that is "necessary to determine the 'commercial reality' faced by these separate rate respondents and whether that commercial reality bears a rational relationship to the margins assigned to the mandatory respondents." *Id.* at 10 (citing *Bestpak, 716 F.3d at 1380*). On the subject of the Department's obtaining the missing information in general, CCC argues that "[o]nly by collecting this information will the Department be able to analyze whether the zero margins calculated for Jacobi and CCT are, in fact, reflective of the commercial reality for the separate rate respondents." *Id.* at 14. The court rejects these arguments as well.

The record contains evidence consisting of data Commerce used to calculate the *de minimis* margins Commerce assigned to Jacobi and CCT in the third review and in the remand proceeding, respectively. These data pertain to sales and factors of production that are contemporaneous with the POR and are individual to the two highest-volume respondents in the review. Because unexamined respondents are just that—unexamined—the statute, in *19 U.S.C. § 1677f-1(c)(2)*, must be read implicitly to contemplate that Commerce may be required [**26] to assign margins to one or more respondents for which the record lacks data pertaining to sales during the POR from which an individual margin [*1347] could be separately calculated or separately estimated. And as the Court of International Trade reasoned in *Amanda Foods (Vietnam) Ltd. v. United States, 36 CIT    ,    , 837 F. Supp. 2d 1338, 1346 (2012)*, an average of *de minimis* rates of mandatory respondents may serve as a reasonable all-others rate in an administrative review because it is supported by substantial evidence on the record of the review, in the form of the record information underlying those very rates. For these reasons, the court disagrees with CCC's argument that it must order a second remand on the ground that the record lacked substantial evidence in support of the zero margins assigned by the Remand Redetermination to GHC, BPAC, and Shanxi DMD. The court also disagrees with CCC's argument that Commerce improperly decided not to reopen the record. Were the court now to adopt the extraordinary remedy of ordering Commerce to reopen the record in a second remand, in the circumstances presented it would be, in effect, an

Page 9

27 F. Supp. 3d 1336, *1347; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **26; SLIP OP. 14-135

order to conduct some form of "examination" of unexamined respondents. As the court discussed above, Congress, in enacting *19 U.S.C. § 1677f-1(c)(2)*, implicitly contemplated [**27] that Commerce may be required to assign margins to one or more respondents for which the record lacks individual data pertaining to sales during the POR. In summary, the circumstances presented do not support a conclusion that the decision to assign zero margins to GHC, BPAC, and Shanxi DMD is unreasonable for lack of substantial evidence or because of the Department's decision not to reopen the record.

Related to its arguments on the state of the record evidence, CCC also makes the argument that the decision to assign the zero margins was "not adequately explained," and therefore "arbitrary and capricious," on the ground that the Remand Redetermination fails to explain how that decision is supported by substantial evidence. CCC's Comments 11. This argument is unconvincing.

Even though it indicated disagreement with the logic employed by the court in *Albemarle*, the Remand Redetermination adopted that logic as an explanation for the decision Commerce made on remand, stating as follows:

> In assigning GHC, BPAC and Shanxi DMD zero dumping margins, we follow the Court's logic, under protest, to its natural conclusion--because Jacobi and CCT's margins are "more representative of industry-wide [**28] pricing behavior during the POR" and "more contemporaneous" than the non-POR margins relied upon in *AR3 Final Results* [i.e., the Final Results of the third administrative review], applying the Jacobi and CCT's margins to CCT, BPAC and Shanxi DMD will achieve a "more representative" result than would relying upon non-POR margins.

*Remand Redetermination* 13. Responding to a comment CCC made on the draft version of the remand decision in opposition to the zero margins, the Remand Redetermination also reasons that "the contemporaneity of the mandatory respondents' dumping margins--the only margins calculated during this POR--demonstrates that these margins reasonably reflect potential dumping margins for companies not individually investigated (without a company-specific rate calculated in the immediately preceding review) during the same time." *Id.* at 19. The court must view the Department's explanation in light of the circumstances presented by the state of the record and the Department's need to determine, in the context of *19 U.S.C. § 1677f-1(c)*, antidumping duty margins for CCT, BPAC and Shanxi DMD--none of which was an examined respondent. When so viewed, [*1348] the explanation Commerce provided is not deficient and therefore [**29] not a valid basis upon which the court may order a second remand.

B. Commerce Permissibly Determined the Margin it Assigned to Huahui

In the third administrative review, Commerce assigned Huahui, as an unexamined respondent, a $0.44/kg. margin corresponding to the $0.44/kg. margin Huahui had been assigned as a mandatory respondent in the second administrative review. In *Albemarle*, the court "reserve[d] any decision on whether the margin assigned to Huahui was permissible," reasoning that "Commerce may or may not decide to assign Huahui a different margin based on other decisions it makes upon remand." *Albemarle, 37 CIT at  , 931 F. Supp. 2d at 1293.*

The Remand Redetermination provides the following explanation for the decision to continue to assign to Huahui, as an unexamined respondent in the third administrative review, the $0.44/kg. margin based on the margin calculated for Huahui in the previous review:

> We decline to reconsider Huahui's dumping margin and continue to find that, for the reasons provided in the IDM [Decision Memorandum] and the Government's response in opposition to the summary judgment motions, the margin assigned to Huahui is reasonably reflective of potential dumping margins during the POR, especially given that (1) the [**30] margin is specific to Huahui and temporally proximate to the third administrative review (i.e., separated at most by twelve months) and (2) zero or *de minimis* dumping margins had never previously been calculated for mandatory respondents during the course of the subject antidumping duty order.

27 F. Supp. 3d 1336, *1348; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **30; SLIP OP. 14-135

*Remand Redetermination* 22.

The court concludes that Commerce applied a reasonable method to determine the margin for Huahui in the third administrative review. The Department's method relies upon data that were specific to Huahui's sales and factors of production. The data pertained to the previous, not the current, period of review, but analogous data pertaining to the POR for the third review are absent from the record because Huahui was an unexamined respondent in the third review. In the words of *Bestpak, 716 F.3d at 1378*, Commerce permissibly could conclude that the $0.44/kg. margin is a "reasonable reflection" of the potential margin of Huahui in the third review, had Huahui been an examined respondent.

Albemarle opposes the assignment to Huahui of the $0.44/kg. margin, which it describes as lacking "the reasonableness and rational explanation required by law," and argues that "the Court should remand the issue to [**31] Commerce to assign Huahui the same rate it has determined on remand for every other separate rate respondent in the current review." Albemarle's Comments 4. The court disagrees.

As the court discussed previously, Commerce must be afforded considerable discretion in choosing a method of determining a margin for an unexamined respondent in an administrative review. Commerce chose a margin that was calculated in the preceding review and was individual to Huahui. It chose this margin over a margin derived from the margins calculated for the two mandatory respondents in the current review or a margin calculated in some other way. In rejecting the option of assigning Huahui the zero margin assigned to other unexamined respondents, Commerce chose specificity to Huahui over contemporaneity. [*1349] Because the Department's choice was not an unreasonable one, the court concludes that Commerce acted within its discretion.

Albemarle raises various objections to the Department's decision. It cites the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1 at 873 (1994) *reprinted in* 1994 U.S.C.C.A.N. 4040, 4021, ("SAA") as providing that "the expected [**32] method is to 'weight average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available.'" Albemarle's Comments 4 (quoting *SAA* at 873, 1994 U.S.C.A.A.N. at 4201). The language Albemarle quotes pertains to a statutory provision, *19 U.S.C. § 1673d(c)(5)*, governing the selection of an all-others rate in an antidumping duty investigation, not a review. Although Commerce stated in the Decision Memorandum that it obtains guidance from this investigation-related provision in selecting an all-others rate in a review, *Decision Mem.* 4, Commerce was not required to follow the "expected method." Moreover, the Statement of Administrative Action itself provides, in the sentence following the quoted language, that "if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods." *SAA* at 873, 1994 U.S.C.A.A.N. at 4201.

Characterizing the Department's decision to assign the $0.44/kg. margin as unreasonable, Albemarle argues that "[i]t defies logic and the parameters of the law for Commerce to single out one respondent for a margin [**33] while determining that no other individual respondent has an antidumping rate above *de minimis*." Albemarle's Comments 5. This argument is unpersuasive because Commerce had a reasonable basis to distinguish Huahui from the unexamined producer/exporters to which it assigned the zero margins: Huahui was individually examined and assigned a calculated antidumping duty margin in the previous administrative review. Commerce was within its discretion in considering that margin to be reasonably reflective of Huahui's potential margin in the third review. The decision was, therefore, neither illogical nor outside the "parameters" of the Department's authority under the statute.

Albemarle makes various arguments to the effect that Commerce failed to provide a satisfactory explanation for choosing to assign Huahui the rate from the previous review instead of the zero rate. The court does not consider the explanation provided in the *Remand Redetermination* to be a ground upon which to overturn the Department's decision. Most significant in that explanation is the Department's reasoning that "the margin is specific to Huahui and temporally proximate to the third administrative review," Remand Redetermination [**34] 22, which reflects consideration of two relevant factors: the specificity of the margin to Huahui and the reasonable proximity in time to the third review. As to

Page 11

27 F. Supp. 3d 1336, *1349; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **34; SLIP OP. 14-135

the latter factor, Albemarle argues that "[s]urrogate values, and calculated dumping margins themselves, can change wildly from review to review," Albemarle's Comments 6. Although Albemarle is correct in implying that, on the record of the third review, no one can know to what degree a potential margin for Huahui in the third review would have varied from the individually-determined margin in the second review, Commerce still was within its discretion in balancing the factor of contemporaneity with the specificity of the $0.44/kg. margin [*1350] to Huahui.[7]

> 7  Additionally, Albemarle could have challenged Huahui's non-selection as an examined respondent in the third administrative review, provided Huahui properly had requested to be reviewed as a voluntary respondent under *19 U.S.C. § 1677m(a)*. Had such a request been denied, Albemarle would have been in a position to challenge that denial before the court. *See Dupont Teijin Films China LTD v. United States, 38 CIT    ,    , 7 F. Supp. 3d 1338, Slip Op. 14-106 at 29-31 (2014).*

Albemarle next argues that the court's reasoning for rejecting the $0.28/kg. margin assigned to unexamined respondents GHC, BPAC, and Shanxi DMD applies equally [**35] to the $0.44/kg. margin assigned to Huahui in the third review as an unexamined respondent. Albemarle's Comments 13-16. But the reasoning does not apply equally. The $0.28/kg. margin Commerce assigned to GHC, BPAC, and Shanxi DMD was neither "based on data pertaining to any pricing behavior that occurred in the third POR" nor "based on any data pertaining to these respondents." *Albemarle, 37 CIT    , 931 F. Supp. 2d at 1291.* Only the former, not the latter, consideration applied with respect to the assignment of a margin for Huahui in the third review.

Albemarle argues, further, that the decision to assign the $0.44/kg. margin to Huahui in the current review is unreasonable because one of the reasons given in the Remand Redetermination, which is the Department's assertion that zero or *de minimis* margins never had been calculated previously for mandatory respondents, is self-contradictory, irrelevant, and baseless. Albemarle's Comments 11-13. According to Albemarle, "[i]f Commerce believes temporal proximity is paramount, it cannot also reject the fully contemporaneous *de minimis*/zero rates for all other respondents *in this review* in favor of a margin that is from a prior period, no matter how near that period may be" because "Commerce [**36] cannot have it both ways." *Id.* at 12. Albemarle adds that "it is wholly unreasonable to conclude," based on a finding that no previous mandatory respondents had received a zero or *de minimis* margin, "that the separate rate companies' margins must be frozen in time at rates calculated in earlier reviews." *Id.* at 12.

As to the assertion that "Commerce cannot have it both ways," the rationale Commerce gave for its decision as to Huahui is not self-contradictory. Commerce did not say that temporal proximity is paramount in all situations; instead, in the specific context of selecting a margin for GHC, BPAC, and Shanxi DMD in the remand proceeding, it chose a contemporaneous margin (zero) over a margin derived from the previous review ($0.28/kg.). On remand, Commerce continued to follow a different rationale as to Huahui, and it did so in part for the reason the court discussed above: unlike those three respondents, Huahui had been assigned an individually-determined margin in the previous review. The characterization of the rationale as "baseless" and "irrelevant" is also unconvincing. The absence of zero or *de minimis* margins for any mandatory respondent in earlier reviews would not, in itself, be a reason [**37] sufficient to support the Department's decision as to the margin to be applied to Huahui. But it does not logically follow that the Department's restating this rationale from the Decision Memorandum compels the court to order a remand. That Huahui's most recently calculated margin was not *de minimis*, and that no margin calculated for any respondent (including Huahui) in a review prior to the third review was *de minimis*, cannot fairly be characterized as "irrelevant" considerations.

[*1351]  Finally, Albemarle raises various arguments to distinguish the administrative decisions relied upon by Commerce in the *Final Results*. Albemarle's Comments at 16-17 & n.4. Because Albemarle failed to raise these arguments in its motion for judgment upon the agency record, *see generally* Mem. of P. & A. in Support of Rule 56.2 Mot. for J. on the Agency R. by Pl. Albemarle Corp. and Intervenor-Pl. Ningxia Huahui Activated Carbon Co., Ltd. (May 21, 2012), ECF No. 45, it is precluded from raising them here.[8] *See Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002)* (holding that a party waives an argument if not raised in its principal judgment brief). Regardless, neither the court nor Commerce is bound by agency determinations in unrelated administrative reviews.

27 F. Supp. 3d 1336, *1351; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **37; SLIP OP. 14-135

8  Although Albemarle's motion for judgment on the agency [**38] record contains language adopting the arguments made by the other consolidated plaintiffs in their respective motions for judgment on the agency record, those motions do not make the arguments Albemarle is attempting to make here. *See e.g.* Mot. for J. on the Agency R. (May 18, 2012), ECF No. 42; Consol. Pls.' Rule 56.2 Mot. for J. upon the Agency R. (May 18, 2012), ECF No. 44.

C. The Court Sustains the Department's Redetermined Surrogate Value for CCT's Carbonized Material Input

In the Final Results, Commerce determined a surrogate value for CCT's carbonized material input[9] using Global Trade Atlas ("GTA") statistics on imports under Indian Harmonized Tariff Schedule ("HTS") subheading 4402.90.10 ("Coconut Shell Charcoal"),[10] which had an average unit value ("AUV") of 3,796.54 Indian rupees per metric ton ("Rs/MT"). *Albemarle, 37 CIT at    , 931 F. Supp. 2d at 1286.* Commerce chose these statistics as the "best available information," *19 U.S.C. § 1677b(c)(1),* to value CCT's carbonized material over other data on the record.[11] *Albemarle, 37 CIT at    , 931 F. Supp. 2d at 1286.*

9  "Carbonized material" is the principal input used to produce activated carbon and can be "most any solid material that has a high carbon content" including "coal, wood, coconut shells, olive stones, and peat." *Certain Activated Carbon from China* [**39] , Inv. No. 731-TA-1103, USITC Pub. 3913, at I-5 (Apr. 2007) (Final). The most common carbonized material used to produce activated carbon in the United States and China is coal. *Id.*
10  For the third administrative review, Commerce selected India as the primary surrogate country for valuing examined respondents' factors of production; a selection no party challenges. *Albemarle, 37 CIT at    , 931 F. Supp. 2d at 1284.*
11  The record also contained Global Trade Atlas ("GTA") import data for Indian HTS subheading 2704.00.90, "Other Cokes of Coal," which yielded an average unit value ("AUV") of 13,865.83 rupees per metric ton ("Rs/MT"). *Albemarle, 37 CIT at    , 931 F. Supp. 2d at 1286.*

Prior to issuing its opinion on the Final Results, the court informed defendant that the record as filed appeared to lack the evidence on which Commerce had relied for its choice of the "best available information," specifically, an expert report regarding the similarities between coconut shell charcoal and coal-based carbonized materials. *Id. at    , 931 F. Supp. 2d at 1287.* Defendant sought, and the court granted, a voluntary remand so that Commerce could place the relevant evidence on the administrative record "and consider comments from the parties in the first instance." *Id. at    , 931 F. Supp. 2d at 1287-88.*

Commerce placed the report on the record on September 3, 2013 and provided [**40] an opportunity for the parties to comment. *Remand Redetermination* 1-2, 4; *Mem.* [*1352] *from Bob Palmer to the File,* ECF No. 114-1 (Pub. Remand. R. Doc. No. 1). No party disputed the validity of the report or its core findings.[12] *Remand Redetermination* 22-23.

12  Although Albemarle submitted comments to Commerce on the new record evidence, these comments were limited to whether Commerce had used the "best available information" and did not question the report's validity. *Letter from Albemarle to the Sec'y of Commerce* (Sept. 10, 2013), ECF No. 116-1 (Pub. Remand Rec. Doc. No. 2).

On remand, Commerce again valued CCT's carbonized materials according to the Indian HTS "Coconut Shell Charcoal" data, explaining that the data result in a "better, input-specific price for coal-based carbonized materials." *Remand Redetermination* 8. No party contests the Department's redetermination. Accordingly, because the Department's redetermination complies with the court's opinion and order in *Albemarle,* and because no party opposes, the court sustains this aspect of the Remand Redetermination.

D. The Court Sustains the Department's Redetermined Surrogate Value for CCT's Coal and Fines By-Products

In the Final Results, [**41] Commerce determined surrogate values for CCT's coal and fines by-products, which

27 F. Supp. 3d 1336, *1352; 36 Int'l Trade Rep. (BNA) 1289;
2014 Ct. Intl. Trade LEXIS 137, **41; SLIP OP. 14-135

result from CCT's production of carbonized materials, using GTA Indian HTS import data.[13] *Remand Redetermination* 8-9. Based on these data, Commerce assigned CCT's coal by-product an AUV of 4,860.88 Rs/MT and its fines by-product and AUV of 11,319.90 Rs/MT. *Albemarle, 37 CIT at , 931 F. Supp. 2d at 1288-89.* Albemarle challenged these surrogate values, arguing, *inter alia,* that they "result[ed] in an unreasonable and inappropriate inversion in which the downstream by-products are valued considerably higher than the upstream carbonized material." *Id. at , 931 F. Supp. 2d at 1289* (citation omitted). Without confessing error, defendant requested a voluntary remand so that Commerce could reconsider the by-product surrogate values, which the court granted. *Id.*

> 13  Commerce "valued CCT's coal and fines by-products generated during the production of carbonized materials using two GTA sources -- import data under Indian HTS number 2701.19.90 'Other Coal W/N Pulvrsd But Ntagldmrtd' . . . and Indian HTS number 2714.10 'Bituminous Or Oil Shale And Tar Sands,' . . . respectively." *Remand Redetermination* 8 (footnote omitted).

On remand, Commerce found no record evidence to show that CCT's by-products underwent further treatment [**42] or manufacturing "such that higher values than that of the main input may be considered reasonable." *Remand Redetermination* 10. Accordingly, Commerce capped both surrogate values at the value assigned to CCT's carbonized material input.[14] *Id.* Because the Department's redetermination complies with the court's opinion and order in *Albemarle,* and because no party opposes, the court sustains this aspect of the Remand Redetermination.

> 14  Commerce set the cap according to data under the Indian Harmonized Tariff Schedule subheading 4402.00.10 "Coconut Shell Charcoal." *Remand Redetermination* 10.

## III. CONCLUSION

For the reasons stated in the foregoing, the court affirms the Department's Remand Redetermination and will enter judgment accordingly.

/s/ Timothy C. Stanceu

Timothy C. Stanceu

Chief Judge

Dated: November 24, 2014

New York, New York

APPEAL,CONSOLIDATION,TERMINATED

# U.S. Court of International Trade
## LIVE Database (New York)
## CIT DOCKET FOR CASE #: 1:11-cv-00451-TCS

Albemarle Corporation v. United States
**Assigned to:** Timothy C. Stanceu
**Lead Docket:**

| | |
|---|---|
| **Jurisdiction:**<br>28USC § 1581(c) Antidumping or Countervailing Duty Determination(s) | **Date Filed:** 11/18/2011<br>**Jury Demand:** No |
| | **Date Terminated:** 11/24/2014 |
| **Category:**<br>Final Determination: 751 Periodic Review 19USC § 1516a(a)(2)(B)(iii) | **Date Reopened:** |
| | **Does this action raise an issue of constitutionality?:** N |
| **Agency:**<br>U.S. Department of Commerce | |

**Product Description:**
Activated Carbon

**Export Country:**
China

**Plaintiff**

| | |
|---|---|
| **Albemarle Corporation** | represented by **Jeffrey Sheldon Grimson**<br>Mowry & Grimson, PLLC<br>5335 Wisconsin Avenue, NW.<br>Suite 810<br>Washington, DC 20015-2052<br>(202) 688-3610<br>Fax: (202) 595-8968<br>Email: jsg@mowrygrimson.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>***ATTORNEY IN SEALED GROUP***<br>***Bar Status: ACTIVE*** |

**Daniel Robert Wilson**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3613
Fax: (202) 595-8968
Email: drw@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Jill A. Cramer**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3610
Fax: (202) 595-8968
Email: jac@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Keith Francis Huffman**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3618
Fax: (202) 595-8968
Email: kfh@mowrygrimson.com
***TERMINATED: 02/28/2013***
*Bar Status: ACTIVE*

**Kristin Heim Mowry**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015-2052
(202) 688-3610
Fax: (202) 595-8968
Email: khm@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Rebecca Marie Janz**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 668-3610
Fax: (202) 595-8968
Email: rmj@mowrygrimson.com
*TERMINATED: 06/27/2014*
*Bar Status: ACTIVE*

**Sarah Marie Wyss**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3610
Fax: (202) 595-8968
Email: smw@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Susan Lehman Brooks**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3610
Fax: (202) 595-8968
*TERMINATED: 01/02/2014*
*Bar Status: ACTIVE*

**Consolidated Plaintiff**

**Shanxi DMD Corporation**                 represented by **Gregory Stephen Menegaz**
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6904
Fax: (202) 783-6909
Email: gmenegaz@dhlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***

*Bar Status: ACTIVE*

**James Kevin Horgan**
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6902
Fax: (202) 783-6909
Email: khorgan@dhlaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**John Joseph Kenkel**
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6900
Fax: (202) 783-6909
Email: jkenkel@dhlaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Consolidated Plaintiff**

**Beijing Pacific Activated Carbon Products Company, Ltd.**

represented by **Francis J. Sailer**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 783-6881
Fax: (202) 783-0405
Email: fsailer@gdlsk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650

Washington, DC 20005
(202) 661-7795
Fax: (202) 783-0405
Email: aschutz@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Kavita Mohan**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 783-6881
Fax: (202) 783-0405
Email: kmohan@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Mark E. Pardo**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 783-6881
Fax: (202) 783-0405
Email: mpardo@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Consolidated Plaintiff**

**Cherishmet Inc.**        represented by **Francis J. Sailer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***

*Bar Status: ACTIVE*

**Kavita Mohan**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Mark E. Pardo**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Consolidated Plaintiff**

**Ningxia Guanghua Cherishmet**
**Activated Carbon Company, Ltd.**

represented by **Francis J. Sailer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Kavita Mohan**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Mark E. Pardo**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Rebecca Marie Janz**
(See above for address)
*TERMINATED: 06/27/2014*
*Bar Status: ACTIVE*

**Intervenor Plaintiff**

**Ningxia Huahui Activated Carbon Co., Ltd.**

represented by **Jeffrey Sheldon Grimson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
**Bar Status: ACTIVE**

**Daniel Robert Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
**Bar Status: ACTIVE**

**Jill A. Cramer**
(See above for address)
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
**Bar Status: ACTIVE**

**Keith Francis Huffman**
(See above for address)
**TERMINATED: 02/28/2013**
**Bar Status: ACTIVE**

**Kristin Heim Mowry**
(See above for address)
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
**Bar Status: ACTIVE**

**Rebecca Marie Janz**
(See above for address)
**TERMINATED: 06/27/2014**
**Bar Status: ACTIVE**

**Sarah Marie Wyss**
(See above for address)
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
**Bar Status: ACTIVE**

**Susan Lehman Brooks**
(See above for address)
**TERMINATED: 01/02/2014**
**Bar Status: ACTIVE**

**Defendant**

**United States**                          represented by     **Antonia Ramos Soares**
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-7405
Fax: (202) 514-7965
Email: Antonia.Soares@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Devin Scott Sikes**
**Of Counsel**
U.S. Department of Commerce
Office of Chief Counsel for Import
Administration
1401 Constitution Avenue, NW.
Room 3627
Washington, DC 20230-0001
(202) 482-4044
Fax: (202) 482-4912
Email: devin.sikes@trade.gov
***TERMINATED: 04/15/2015***
***Bar Status: ACTIVE***

**Melissa Marion Devine**
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-0341
Fax: (202) 514-7965
Email: melissa.m.devine@usdoj.gov
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Shelby Mitchell Anderson**
U.S. Department of Commerce
1401 Constitution Avenue

Suite 4610
Washington, DC 20230-0001
(202) 482-5052
Fax: (202) 501-8045
Email: Shelby.Anderson@trade.gov
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Calgon Carbon (Tianjin) Co., Ltd.**          represented by   **Craig Anderson Lewis**
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-8613
Fax: (202) 637-5910
Email: craig.lewis@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
*Bar Status: ACTIVE*

**Brian Samuel Janovitz**
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-6818
Fax: (202) 637-5910
Email: brian.janovitz@hoganlovells.com
*TERMINATED: 08/02/2012*
*Bar Status: ACTIVE*

**Hrishikesh Navnitlal Hari**
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-3696
Fax: (202) 637-5910
Email:
hrishikesh.hari@hoganlovells.com
*TERMINATED: 06/17/2013*
*Bar Status: ACTIVE*

**R. Alan Luberda**
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8835
Fax: (202) 342-8451
Email: aluberda@kelleydrye.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Calgon Carbon Corporation**              represented by  **R. Alan Luberda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**David Alan Hartquist**
Kelley Drye & Warren, LLP
3050 K Street, NW
Suite 400
Washington, DC 20007-5108
(202) 342-8450
Fax: (202) 342-8451
Email: dhartquist@kelleydrye.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**John M. Herrmann , II**
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8488
Fax: (202) 342-8451
Email: jherrmann@kelleydrye.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Norit Americas Inc.**              represented by  **R. Alan Luberda**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**David Alan Hartquist**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**John M. Herrmann , II**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2011 | 1 | Summons . Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 11/18/2011) |
| 11/18/2011 | 2 | Form 5 Information Statement . Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 11/18/2011) |
| 11/18/2011 | 3 | Form 13 Corporate Disclosure Statement . Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 11/18/2011) |
| 11/18/2011 | 4 | Form 11 Notice of Appearance *of Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan L. Brooks and Sarah M. Wyss*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation.(Grimson, Jeffrey) (Entered: 11/18/2011) |
| 11/18/2011 | 5 | Form 17 Business Proprietary Information Certification filed on behalf of *Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan L. Brooks and Sarah M. Wyss*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 11/18/2011) |
| 11/18/2011 | 6 | Complaint against United States. Administrative Record due by 1/3/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation.(Grimson, Jeffrey) (Entered: 11/18/2011) |
| 11/18/2011 | 7 | Consent Application/Motion for preliminary injunction *and expedited consideration thereof*. Responses due by 12/7/2011. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. |

| | | (Attachments: # 1 Brief in Support of Consent Motion for Preliminary Injunction, # 2 Proposed Order)(Grimson, Jeffrey). (Entered: 11/18/2011) |
|---|---|---|
| 11/18/2011 | 8 | Certificate of service (related document(s) 7 , 2 , 1 , 5 , 4 , 3 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 11/18/2011) |
| 11/18/2011 | 9 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Goell, Geoffrey) (Entered: 11/18/2011) |
| 11/18/2011 | 10 | Order entered on 11/18/2011, Granting consent motion for preliminary injunction (Related Doc # 7 ). (Taronji, Steve) (Entered: 11/18/2011) |
| 11/18/2011 | 11 | Proof of service *of the Court's November 18, 2011 Order* (related document(s) 10 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 11/18/2011) |
| 11/30/2011 | 12 | Form 11 Notice of Appearance . Filed by Melissa Marion Devine of U.S. Department of Justice on behalf of United States.(Devine, Melissa) (Entered: 11/30/2011) |
| 12/02/2011 | 13 | Consent Motion to Intervene as plaintiff intervenor *as a Matter of Right*. Responses due by 12/21/2011. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 12/02/2011) |
| 12/02/2011 | 14 | Form 11 Notice of Appearance *on behalf of Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan Lehman Brooks and Sarah M. Wyss*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd..(Grimson, Jeffrey) (Entered: 12/02/2011) |
| 12/02/2011 | 15 | Form 17 Business Proprietary Information Certification filed on behalf of *Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan Lehman Brooks and Sarah M. Wyss as attorneys*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 12/02/2011) |
| 12/02/2011 | 16 | Form 13 Corporate Disclosure Statement . Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 12/02/2011) |
| 12/05/2011 | 17 | Order entered on 12/5/2011, Granting Ningxia Huahui Activated Carbon Co., Ltd., consent motion to intervene as a Pltf-Intervenor. (Related Doc # 13 ) (Taronji, Steve) (Entered: 12/05/2011) |
| 12/06/2011 | 18 | Consent Motion to Intervene as defendant intervenor *as of right*. Responses due by 12/27/2011. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 19 | Form 11 Notice of Appearance *on behalf of Craig A. Lewis (lead) and Brian S. Janovitz*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of |

| | | Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 12/06/2011) |
|---|---|---|
| 12/06/2011 | 20 | Form 13 Corporate Disclosure Statement *on behalf of Calgon Carbon (Tianjin) Co., Ltd.*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 21 | Form 17 Business Proprietary Information Certification filed on behalf of *Craig A. Lewis and Brian S. Janovitz as attorneys*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 22 | Order entered on 12/6/2011, Granting Calgon Carbon (Tianjin) Co., Ltd.'s consent motion to intervene as a Defendant Intervenor. (Related Doc # 18 ) (Taronji, Steve) (Entered: 12/06/2011) |
| 12/08/2011 | 23 | Order entered on 12/8/2011 assigning action to Judge Timothy C. Stanceu.(Love, Cynthia) (Entered: 12/08/2011) |
| 12/15/2011 | 24 | Motion to Intervene as Defendant intervenor . Responses due by 1/3/2012. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Proposed Order) (Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 25 | Form 11 Notice of Appearance . Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 26 | Form 13 Corporate Disclosure Statement . Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Form 13)(Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 27 | Form 17 Business Proprietary Information Certification filed on behalf of *David Harquist, Kelley Drye & Warren LLP*. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Form 17 Herrmann, # 2 Form 17 Luberda, # 3 Form 17 Hudak)(Herrmann, John) (Entered: 12/15/2011) |
| 12/16/2011 | 28 | Order entered on 12/16/2011 granting Calgon Carbon Corporation and Norit Americas, Inc. Motion to intervene as defendant-intervenors (Related Doc # 24 ). (Love, Cynthia) (Entered: 12/16/2011) |
| 12/21/2011 | 29 | Confidential and Public Administrative record for U.S. Department of Commerce filed *with 2 public and 2 non-public cds*. (Cheevers, Casey) (Entered: 12/29/2011) |
| 12/21/2011 | 30 | Notice of Manual Filing. The document for Docket Entry #29 has been filed manually. (related document(s) 29 ). Filed by United States United States. (Cheevers, Casey) (Entered: 12/29/2011) |
| 01/03/2012 | 31 | Form 17 Business Proprietary Information Certification filed on behalf of consultant, *Willam H. Crow*. Filed by John M. Herrmann, II of Kelley Drye & |

| | | |
|---|---|---|
| | | Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 01/03/2012) |
| 01/20/2012 | 32 | Joint status report *and Proposed Scheduling Order*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 01/20/2012) |
| 01/25/2012 | 33 | Consent Motion to consolidate case(s) 11-00451, 11-00468, 11-00475 with lead case 11-00451 . Responses due by 2/13/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 01/25/2012) |
| 01/26/2012 | 34 | Order entered on 1/26/2012 granting Motion to consolidate cases 11-00451, 11-00468 & 11-00475. Ordered that, from this date forward, the consolidated cases will be designated Albermale Corp. v. United States, Consol. Court No. 11-00451 (Related Doc # 33 ). (Love, Cynthia) (Entered: 01/26/2012) |
| 02/03/2012 | 35 | Amended Proposed scheduling order *and Amended Proposed Briefing Schedule as Requested by the Court*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Amended Proposed Briefing Schedule) (Grimson, Jeffrey) (Entered: 02/03/2012) |
| 02/06/2012 | 36 | Scheduling Order entered on 2/6/2012: Dispositive motions, if any, due by 4/30/2012. Response to Dispositive Motion due by 6/29/2012. Replies due by 7/27/2012. Any motion for oral argument due by 8/17/2012..(Love, Cynthia) (Entered: 02/06/2012) |
| 04/02/2012 | 37 | Form 11 Notice of Appearance *for Keith F. Huffman*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Grimson, Jeffrey) (Entered: 04/02/2012) |
| 04/02/2012 | 38 | Form 17 Business Proprietary Information Certification filed on behalf of *Keith F. Huffman*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 04/02/2012) |
| 04/18/2012 | 39 | Form 11 Notice of Appearance . Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 04/18/2012) |
| 04/24/2012 | 40 | Consent Motion for extension of time until 5/18/2012 to *submit motions for judgment on the agency record*. Responses due by 5/14/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 04/24/2012) |
| | | |

| | | |
|---|---|---|
| 04/25/2012 | 41 | Order entered on 4/25/2012 granting Motion for extension of time (Related Doc # 40 ). Amended Scheduling Order: Dispositive motions, if any, due by 5/18/2012. Response to Dispositive Motion due by 7/30/2012. Replies due by 8/30/2012. Any motion for oral argument due by 9/20/2012. (Love, Cynthia) (Entered: 04/25/2012) |
| 05/18/2012 | 42 | Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 7/30/2012. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Attachments: # 1 Proposed Order, # 2 Brief In support of motion for judgment on agency record)(Menegaz, Gregory) Modified on 5/18/2012 (Demb, Rebecca). (Entered: 05/18/2012) |
| 05/18/2012 | 43 | Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 7/30/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 05/18/2012) |
| 05/18/2012 | 44 | Motion for judgment on agency record 56.2 *with Brief In Support of Motion and Proposed Order*. Response to 56.2 Motion due by 7/30/2012. Filed by Andrew Thomas Schutz of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of Beijing Pacific Activated Carbon Products Company, Ltd., Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd..(Schutz, Andrew) (Entered: 05/18/2012) |
| 05/18/2012 | 46 | Confidential Memorandum of Points and Authorities *in Support of Rule 56.2 Motion for Judgment (Bracketing of BPI Not Final For One Business Day After Date of Filing)*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Love, Cynthia) (Entered: 05/22/2012) |
| 05/18/2012 | 47 | Notice of Manual Filing. The document for Docket Entry #46 has been filed manually. (related document(s) 46 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Love, Cynthia) (Entered: 05/22/2012) |
| 05/21/2012 | 45 | Public Memorandum of Points and Authorities . Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 05/21/2012) |
| 05/22/2012 | 50 | Confidential Appendix *to Memorandum of Points and Authorities in Support of Rule 56.2 Motion for Judgment on the Agency Record, with one confidential CD* (related document(s) 46 , 45 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Love, Cynthia) (Entered: 05/25/2012) |
| 05/22/2012 | 51 | Notice of Manual Filing. The document for Docket Entry #50 has been filed manually. (related document(s) 50 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Love, Cynthia) (Entered: 05/25/2012) |
| | | |

| | | |
|---|---|---|
| 05/23/2012 | <u>48</u> | Attachment *1 of the confidential version of Memorandum of Points and Authorities in Support of Rule 56.2* (related document(s) <u>46</u> ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Love, Cynthia) (Entered: 05/23/2012) |
| 05/24/2012 | <u>49</u> | Public Appendix *to Memorandum of Points and Authorities in Support of Rule 56.2 Motion for Judgment on the Agency Record* (related document(s) <u>43</u> ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # <u>1</u> Appendix Part II)(Grimson, Jeffrey) (Entered: 05/24/2012) |
| 05/25/2012 | <u>52</u> | Appendix *to Brief in Support of 56.2 Motion* (related document(s) <u>44</u> ). Filed by Andrew Thomas Schutz of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of Beijing Pacific Activated Carbon Products Company, Ltd., Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd.. (Schutz, Andrew) (Entered: 05/25/2012) |
| 07/30/2012 | <u>53</u> | Response *of Defendant-Intervenors* to motion *for Judgment on the Agency Record* (related document(s) <u>44</u> , <u>42</u> , <u>43</u> ). Reply due by 8/30/2012. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc..(Herrmann, John) Modified on 7/31/2012 (Love, Cynthia). (Entered: 07/30/2012) |
| 07/30/2012 | <u>54</u> | Form 11 Notice of Appearance *on Behalf of Hrishikesh Hari, Esq.*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 07/30/2012) |
| 07/30/2012 | <u>55</u> | Form 17 Business Proprietary Information Certification filed on behalf of *Hrishikesh Hari, Esq.*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 07/30/2012) |
| 07/30/2012 | <u>56</u> | Response *of Defendant-Intervenor Calgon Carbon (Tianjin) Co., Ltd.* to motion *of Plaintiffs for Judgment Upon the Agency Record* (related document(s) <u>44</u> , <u>42</u> , <u>43</u> ). Reply due by 8/30/2012. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) Modified on 7/31/2012 (Love, Cynthia). (Entered: 07/30/2012) |
| 07/30/2012 | <u>57</u> | Response to motion *of Plaintiffs for Judgment upon the Agency Record* (related document(s) <u>44</u> , <u>42</u> , <u>43</u> ). Reply due by 8/30/2012. Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States. (Attachments: # <u>1</u> Appendix Tabs 1 - 8)(Soares, Antonia) Modified on 7/31/2012 (Love, Cynthia). (Entered: 07/30/2012) |
| 08/02/2012 | <u>58</u> | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Brian S. Janovitz*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 08/02/2012) |

| 08/08/2012 | 59 | Errata Memorandum . Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 08/08/2012) |
|---|---|---|
| 08/08/2012 | 60 | Public Appendix *to Response of Defendant-Intervenor Calgon Carbon (Tianjin) Co., Ltd. to motion of Plaintiffs for Judgment Upon the Agency Record* (related document(s) 56 ). Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 08/08/2012) |
| 08/27/2012 | 61 | Motion for extension of time until 9/13/2012 to file reply brief . Responses due by 9/17/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 08/27/2012) |
| 08/28/2012 | 62 | Amended Scheduling Order entered on 8/28/2012 granting Motion for extension of time to file reply brief. Plaintiffs and Plaintiff-Intervenors shall file their replies on or before September 13, 2012 and any motions for oral argument shall be filed on or before October 4, 2012. (Related Doc # 61 ). (Love, Cynthia) (Entered: 08/28/2012) |
| 09/13/2012 | 63 | Form 11 Notice of Appearance . Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of Beijing Pacific Activated Carbon Products Company, Ltd., Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd..(Mohan, Kavita) (Entered: 09/13/2012) |
| 09/13/2012 | 64 | Reply (related document(s) 53 , 57 , 56 ). Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of Beijing Pacific Activated Carbon Products Company, Ltd., Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd..(Mohan, Kavita) (Entered: 09/13/2012) |
| 09/13/2012 | 65 | Public Reply *of Shanxi DMD Corp.* (related document(s) 53 , 57 , 56 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Attachments: # 1 Appendix Attachment of Record Document) (Menegaz, Gregory) (Entered: 09/13/2012) |
| 09/13/2012 | 66 | Public Reply *Brief in Support of Rule 56.2 Motion* (related document(s) 53 , 57 , 56 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Appendix to Reply Brief)(Grimson, Jeffrey) (Entered: 09/13/2012) |
| 09/25/2012 | 67 | Motion for leave *to File Response in Opposition to Defendant's Request for Voluntary Partial Remand* (related document(s) 57 ). Responses due by 10/15/2012. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 09/25/2012) |
| 10/03/2012 | 68 | Motion for oral argument on Consolidated Plaintiff's Rule 56.2 Motion for Judgement Upon Agency Record . Responses due by 10/22/2012. Filed by Andrew Thomas Schutz of Grunfeld Desiderio Lebowitz Silverman & Klestadt, |

| | | LLP on behalf of Beijing Pacific Activated Carbon Products Company, Ltd., Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd..(Schutz, Andrew) (Entered: 10/03/2012) |
|---|---|---|
| 10/04/2012 | 69 | Response to motion *for oral argument* (related document(s) 68 ). Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 10/04/2012) |
| 10/04/2012 | 70 | Response to motion *for leave to file a response in opposition to defendant's request for voluntary partial remand* (related document(s) 67 ). Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 10/04/2012) |
| 10/04/2012 | 71 | Motion for oral argument on Plaintiff and Intervenor-Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record *and Request for Closed Hearing*. Responses due by 10/23/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 10/04/2012) |
| 11/13/2012 | 72 | Order entered on 11/13/2012, Granting motions for oral argument (Related Doc # 68 , 71 ) ORDERED that the hearing should be CLOSED to the public. ORDERED that oral argument will be held on Thursday, December 13, 2012, at 11:00 a.m. in Courtroom 3 of the James L. Watson Courthouse of the United States Court of International Trade, One Federal Plaza, New York, N.Y. (Taronji, Steve) (Entered: 11/13/2012) |
| 12/13/2012 | 73 | Oral argument held on 12/13/12 at 11:00 a.m. in USCIT, Courtroom 3. *So Ordered by the Court: The Government's Supplement to the record due by Friday, December 21, 2012. Parties to file submissions on voluntary remand request by Thursday, January 10, 2013. Briefs with additional grounds on the Coconut claim due by Friday, January 18, 2013. Defendant and Defendant-Intervenors Response briefs due by Friday, February 15, 2013. Plaintiff's and Plaintiff-Intervenor's Reply briefs due by Friday, March 1, 2013. All parties agreed No Confidential Materials were discussed during Oral argument.* (Love, Cynthia) (Entered: 12/13/2012) |
| 12/19/2012 | 74 | Motion to remand case *related to the issue of the surrogate value for carbonized material*. Responses due by 1/7/2013. Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 12/19/2012) |
| 12/20/2012 | 75 | Response *of Defendant-Intervenor Calgon Carbon (Tianjin) Co., Ltd.* to motion *of Defendant for Voluntary Remand on the Carbonized Material Issue* (related document(s) 74 ). Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 12/20/2012) |
| 01/10/2013 | 76 | Letter *of Defendant-Intervenors regarding no submission regarding United Statest' voluntary remand request*. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. |

| | | (Herrmann, John) (Entered: 01/10/2013) |
|---|---|---|
| 01/11/2013 | 77 | Form 11 Notice of Appearance . Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States.(Sikes, Devin) (Entered: 01/11/2013) |
| 01/18/2013 | 78 | Letter *of Plaintiff and Plaintiff-Intervenor Regarding Briefs on the Coconut Shell Claim*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 01/18/2013) |
| 02/28/2013 | 79 | Notice of withdrawl as attorney of record filed by *Jill A. Cramer on behalf of Keith F. Huffman*. Filed by Jill A. Cramer of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Cramer, Jill) (Entered: 02/28/2013) |
| 02/28/2013 | 80 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Keith F. Huffman*. Filed by Jill A. Cramer of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Cramer, Jill) (Entered: 02/28/2013) |
| 06/17/2013 | 81 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Hrishikesh N. Hari*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 06/17/2013) |
| 06/20/2013 | 82 | Form 11 Notice of Appearance . Filed by Rebecca Marie Janz of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Janz, Rebecca) (Entered: 06/20/2013) |
| 06/20/2013 | 83 | Form 17 Business Proprietary Information Certification filed on behalf of *Rebecca M. Janz*. Filed by Rebecca Marie Janz of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Janz, Rebecca) (Entered: 06/20/2013) |
| 07/09/2013 | 84 | Transcript of Confidential Oral Argument held on 12/13/2012 filed with court. (Attachments: # 1 Transcript pages 101-208) Notice of Intent to Redact Deadline due 7/16/2013. Redaction Request due 7/30/2013. Redacted Transcript Deadline set for 8/9/2013. Release of Transcript Restriction set for 10/7/2013. (Love, Cynthia) (Entered: 07/09/2013) |
| 07/09/2013 | 85 | Letter *regarding redaction of transcript*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 07/09/2013) |
| 07/17/2013 | 86 | Letter *concerning redaction of hearing transcript*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 07/17/2013) |
| 07/23/2013 | 87 | Letter *of Defendant-Intervenors, Calgon Carbon Corp. and Norit Americas regarding redaction of confidential transcript*. Filed by John M. Herrmann, II of |

| | | Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 07/23/2013) |
|---|---|---|
| 08/15/2013 | <u>88</u> | Order entered on 8/15/2013, Slip opinion: 13-106. ORDERED that the Motion for Leave to File Response in Opposition to Defendants Request for Voluntary Partial Remand, filed September 25, 2012, ECF No. 67, by Defendant-Intervenor Calgon Carbon (Tianjin) Co., Ltd. (CCT) be, and hereby is, granted, andthat the accompanying Memorandum in Opposition to Defendants Request for Voluntary Remand, be, and hereby is, deemed filed on September 25, 2012; it is further ORDERED that Certain Activated Carbon from the Peoples Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review, 76 Fed. Reg. 67,142 (Oct. 31, 2011), be, and hereby is, remanded to the International Trade Administration, U.S. Department of Commerce (Commerce or the Department) for reconsideration and redetermination in accordance with this Opinion and Order; it is further Consol. Court No. 11-00451 Page 28 ORDERED that Commerce must redetermine, in accordance with this Opinion and Order, the surrogate values that it applied to CCTs carbonized materials and coal and fines by-products; it is further ORDERED that Commerce must reconsider its method of determining the margins forShanxi DMD Corporation (Shanxi DMD), Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd., and Beijing Pacific Activated Carbon Products Company, Ltd., and redetermine those margins in accordance with this Opinion and Order; it is further ORDERED that Commerce shall reconsider its decision to assign a per-unit cash deposit and assessment rate to Shanxi DMD and redetermine that rate in accordance with this Opinion and Order; and it is further ORDERED that Commerce shall file its remand redetermination within ninety (90) days (November 13, 2013)of the date of this Opinion and Order, that each plaintiff and defendant-intervenor shall have thirty (30) days(December 13, 2013) from the filing of the remand redetermination in which to file with the court comments on the remand redetermination, and that defendant shall have fifteen (15) days (December 30, 2013) from the date of the last filing of such comments in which to file with the court any responses to the comments of other parties. (related document(s) <u>74</u> ).(Love, Cynthia) (Entered: 08/15/2013) |
| 08/19/2013 | <u>89</u> | Errata filed for slip opinion 13-106 (related document(s) <u>88</u> ). (Taronji, Steve) (Entered: 08/19/2013) |
| 10/18/2013 | <u>90</u> | Consent Motion for extension of time until 12/13/2013 to *file remand redetermination*. Responses due by 11/6/2013. Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 10/18/2013) |
| 10/21/2013 | <u>91</u> | Order entered on 10/21/2013 granting Motion for extension of time (Related Doc # <u>90</u> ). Commerce's Remand Results due by 12/13/2013. (Love, Cynthia) (Entered: 10/21/2013) |
| 12/11/2013 | <u>92</u> | Consent Motion for extension of time until 1/13/2014 to *File Remand Results*. Responses due by 12/31/2013. Filed by Antonia Ramos Soares of U.S. |

| | | Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 12/11/2013) |
|---|---|---|
| 12/19/2013 | 93 | Order entered on 12/19/2013 granting Motion for extension of time (Related Doc # 92 ). Remand Results due by 1/13/2014. Comments on Remand Results due by 2/12/2014. Reply on Comments on Remand Results due by 2/27/2014. (Love, Cynthia) (Entered: 12/19/2013) |
| 01/02/2014 | 94 | Notice of withdrawl as attorney of record filed by *Jill Cramer on behalf of Susan Lehman Brooks*. Filed by Jill A. Cramer of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Cramer, Jill) (Entered: 01/02/2014) |
| 01/02/2014 | 95 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Susan Lehman Brooks*. Filed by Jill A. Cramer of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Cramer, Jill) (Entered: 01/02/2014) |
| 01/10/2014 | 96 | Public Remand results filed by Department of Commerce . Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States. (Sikes, Devin) (Entered: 01/10/2014) |
| 01/14/2014 | 97 | Administrative record for Department of Commerce filed *for redetermination pursuant to court remand*. Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States. (Sikes, Devin) (Entered: 01/14/2014) |
| 01/28/2014 | 98 | Form 11 Notice of Appearance . Filed by Daniel Robert Wilson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Wilson, Daniel) (Entered: 01/28/2014) |
| 01/28/2014 | 99 | Form 17 Business Proprietary Information Certification filed on behalf of *Daniel R. Wilson*. Filed by Daniel Robert Wilson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Wilson, Daniel) (Entered: 01/28/2014) |
| 02/12/2014 | 100 | Comments on remand results (related document(s) 96 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd. . (Grimson, Jeffrey) (Entered: 02/12/2014) |
| 02/12/2014 | 101 | Appendix *to Comments on Final Results of Redetermination Pursuant to Court Remand* (related document(s) 100 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 02/12/2014) |
| 02/12/2014 | 102 | Comments on remand results *by Calgon Carbon (Tianjin) Co., Ltd.* (related document(s) 96 ). Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 02/12/2014) |
| 02/12/2014 | 103 | Comments on remand results *by Calgon Carbon Corporation and Norit Americas* |

| | | |
|---|---|---|
| | | *Inc.* (related document(s) 96 ). Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 02/12/2014) |
| 02/19/2014 | 104 | Confidential Appendix *to Comments on Remand Redetermination*. Filed by R. Alan Luberda of Kelley Drye & Warren, LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd., Calgon Carbon Corporation, Norit Americas Inc.. (Luberda, R.) (Entered: 02/19/2014) |
| 02/19/2014 | 105 | Public Appendix *to Comments on Remand Redetermination*. Filed by R. Alan Luberda of Kelley Drye & Warren, LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd., Calgon Carbon Corporation, Norit Americas Inc.. (Luberda, R.) (Entered: 02/19/2014) |
| 02/21/2014 | 106 | Amended Administrative record for Department of Commerce filed . Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States. (Sikes, Devin) (Entered: 02/21/2014) |
| 02/27/2014 | 107 | Confidential Comments on remand results *Responsive to Albemarle Corporation and Ningxia Huahui Activated Carbon Co.* (related document(s) 100 ). Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 02/27/2014) |
| 02/27/2014 | 108 | Public Comments on remand results *Responsive to Albemarle Corporation and Ningxia Huahui Activated Carbon Co.* (related document(s) 107 , 100 ). Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 02/27/2014) |
| 02/27/2014 | 109 | Reply to comments on remand results (related document(s) 102 , 103 , 100 ). Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States. (Soares, Antonia) (Entered: 02/27/2014) |
| 02/28/2014 | 110 | Motion to strike (related document(s) 107 , 108 ). Responses due by 3/19/2014. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Grimson, Jeffrey) (Entered: 02/28/2014) |
| 02/28/2014 | 111 | Motion for leave to *Supplement Briefing* (related document(s) 108 ). Responses due by 3/19/2014. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Proposed Order)(Herrmann, John) (Entered: 02/28/2014) |
| 06/27/2014 | 112 | Notice of withdrawl as attorney of record filed by *Jill A. Cramer on behalf of Rebecca M. Janz*. Filed by Jill A. Cramer of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Cramer, Jill) (Entered: 06/27/2014) |
| 06/27/2014 | 113 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Rebecca M. Janz*. Filed by Jill A. Cramer of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon |

| | | Co., Ltd.. (Cramer, Jill) (Entered: 06/27/2014) |
|---|---|---|
| 08/08/2014 | 114 | Response to Court's Request/Order . Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Public Remand R. Doc. 1)(Sikes, Devin) (Entered: 08/08/2014) |
| 08/08/2014 | 115 | Confidential Response to Court's Request/Order . Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 BPI Remand R. Doc. 1, # 2 BPI Remand R. Doc. 4, # 3 BPI Remand R. Doc. 5, # 4 BPI Remand R. Doc. 8, # 5 BPI Admin. R. Doc. 93)(Sikes, Devin) (Entered: 08/08/2014) |
| 08/12/2014 | 116 | Response to Court's Request/Order . Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Public Remand R. Doc. 2)(Sikes, Devin) (Entered: 08/12/2014) |
| 11/24/2014 | 117 | Order entered on 11/24/2014, Slip opinion: 14-135. the court affirms the Departments Remand Redetermination and will enter judgment accordingly. (related document(s) 96 ) (Attachments: # 1 Cited Web Pages).(Love, Cynthia) (Entered: 11/24/2014) |
| 11/24/2014 | 118 | Judgment Order entered on 11/24/2014: ORDERED that plaintiff Albemarle Corporations Mot. to Strike 1 (Feb. 28, 2014), ECF No. 110, is granted; it is further ORDERED that Def.-intervenors Mot. to Accept Supplemental Br. 1 (Feb. 28, 2014),ECF No. 111, filed by Calgon Carbon Corporation and Norit Americas, Inc., is denied; it is further ORDERED that the Remand Redetermination be, and hereby is, affirmed; and it is further ORDERED that entries of merchandise that are affected by this litigation shall be liquidated in accordance with the final court decision in this action. (related document(s) 117 ).(Love, Cynthia) (Entered: 11/24/2014) |
| 01/22/2015 | 119 | Notice of Appeal of judgment/order and opinion of 11/24/2014 filed. (related document(s) 118 , 117 ). Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Grimson, Jeffrey) (Entered: 01/22/2015) |
| 01/22/2015 | 120 | Notice of Appeal of judgment of 11/24/14 filed. (related document(s) 118 , 117 ). Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc..(Herrmann, John) (Entered: 01/22/2015) |
| 01/22/2015 | 121 | Notice of Appeal of Judgment/Order of 11/24/2014 filed. (related document(s) 88 , 118 , 117 ). Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 01/22/2015) |
| 01/26/2015 | 122 | Appeal of *Albemarle Corporation & Ningxia Huahui Activated Carbon Company Limited* docketed on 1/26/2015 by the CAFC as appeal no. 15-1288 (related document(s) 119 ). (Love, Cynthia) (Entered: 01/26/2015) |
| 01/26/2015 | 123 | Appeal of *Calgon Carbon Corporation, Norit Americas Inc.* docketed on |

| | | |
|---|---|---|
| | | 1/26/2015 by the CAFC as appeal no. 15-1289 (related document(s) <u>120</u> ). (Love, Cynthia) (Entered: 01/26/2015) |
| 01/26/2015 | <u>124</u> | Appeal of *United States* docketed on 1/26/2015 by the CAFC as appeal no. 15-1290 (related document(s) <u>121</u> ). (Love, Cynthia) (Entered: 01/26/2015) |
| 04/15/2015 | <u>125</u> | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Devin S. Sikes*. Filed by Devin Scott Sikes of U.S. Department of Commerce on behalf of United States (Sikes, Devin) (Entered: 04/15/2015) |
| 04/16/2015 | <u>126</u> | Form 11 Notice of Appearance . Filed by Shelby Mitchell Anderson of U.S. Department of Commerce on behalf of United States.(Anderson, Shelby) (Entered: 04/16/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/20/2015 10:37:30 | | | |
| **PACER Login:** | mi2097:3375509:0 | **Client Code:** | albemarle |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-cv-00451-TCS |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

CONSOLIDATED,TERMINATED

# U.S. Court of International Trade
# LIVE Database (New York)
# CIT DOCKET FOR CASE #: 1:11-cv-00468-TCS

**Ningxia Guanghua Cherishmet Activated Carbon Company,
Ltd. et al v. United States**
**Assigned to:** Timothy C. Stanceu
**Lead Docket:** 1:11-cv-00451-TCS
Member case: (View Member Case)

**Date Filed:** 11/23/2011
**Jury Demand:** No

**Jurisdiction:**
28USC § 1581(c) Antidumping or Countervailing Duty
Determination(s)

**Date Terminated:** 11/24/2014

**Date Reopened:**

**Category:**
Final Determination: 751 Periodic Review 19USC § 1516a(a)
(2)(B)(iii)

**Does this action raise an issue of
constitutionality?:** N

**Agency:**
U.S. Department of Commerce

**Product Description:**
Certain Activated Carbon

**Export Country:**
China

**Plaintiff**

**Ningxia Guanghua Cherishmet
Activated Carbon Company, Ltd.**

represented by **Francis J. Sailer**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 783-6881
Fax: (202) 783-0405
Email: fsailer@gdlsk.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Andrew Thomas Schutz**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 661-7795
Fax: (202) 783-0405
Email: aschutz@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Mark E. Pardo**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 783-6881
Fax: (202) 783-0405
Email: mpardo@gdlsk.com
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Plaintiff**

**Cherishmet Inc.**                    represented by **Francis J. Sailer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Mark E. Pardo**
(See above for address)
*ATTORNEY TO BE NOTICED*

*Bar Status: ACTIVE*

**Plaintiff**

**Beijing Pacific Activated Carbon Products Company, Ltd.**

represented by **Francis J. Sailer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Mark E. Pardo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Intervenor Plaintiff**

**Albemarle Corporation**

represented by **Jeffrey Sheldon Grimson**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015-2052
(202) 688-3610
Fax: (202) 595-8968
Email: jsg@mowrygrimson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Daniel Robert Wilson**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3613
Fax: (202) 595-8968
Email: drw@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Jill A. Cramer**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3610
Fax: (202) 595-8968
Email: jac@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Kristin Heim Mowry**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015-2052
(202) 688-3610
Fax: (202) 595-8968
Email: khm@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Sarah Marie Wyss**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3610
Fax: (202) 595-8968
Email: smw@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Susan Lehman Brooks**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3610
Fax: (202) 595-8968
Email: sel@mowrygrimson.com
***TERMINATED: 01/02/2014***
***Bar Status: ACTIVE***

**Intervenor Plaintiff**

Ningxia Huahui Activated Carbon Co.,     represented by **Jeffrey Sheldon Grimson**
Ltd.                                                     (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         ***ATTORNEY IN SEALED GROUP***
                                                         *Bar Status: ACTIVE*

                                                         **Daniel Robert Wilson**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*
                                                         ***ATTORNEY IN SEALED GROUP***
                                                         *Bar Status: ACTIVE*

                                                         **Jill A. Cramer**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*
                                                         ***ATTORNEY IN SEALED GROUP***
                                                         *Bar Status: ACTIVE*

                                                         **Kristin Heim Mowry**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*
                                                         ***ATTORNEY IN SEALED GROUP***
                                                         *Bar Status: ACTIVE*

                                                         **Sarah Marie Wyss**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*
                                                         ***ATTORNEY IN SEALED GROUP***
                                                         *Bar Status: ACTIVE*

                                                         **Susan Lehman Brooks**
                                                         (See above for address)
                                                         *TERMINATED: 01/02/2014*
                                                         *Bar Status: ACTIVE*

**Defendant**

**United States**                         represented by **Antonia Ramos Soares**
                                                         U.S. Department of Justice
                                                         Commercial Litigation Branch - Civil
                                                         Division
                                                         P.O. Box 480
                                                         Ben Franklin Station
                                                         Washington, DC 20044

(202) 305-7405
Fax: (202) 514-7965
Email: Antonia.Soares@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Melissa Marion Devine**
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-0341
Fax: (202) 514-7965
Email: melissa.m.devine@usdoj.gov
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Intervenor Defendant**

**Calgon Carbon (Tianjin) Co., Ltd.**          represented by   **Craig Anderson Lewis**
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-8613
Fax: (202) 637-5910
Email: craig.lewis@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Brian Samuel Janovitz**
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-6818
Fax: (202) 637-5910
Email: brian.janovitz@hoganlovells.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***

*Bar Status: ACTIVE*

**Intervenor Defendant**

**Calgon Carbon Corporation**                      represented by   **R. Alan Luberda**
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8835
Fax: (202) 342-8451
Email: aluberda@kelleydrye.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**David Alan Hartquist**
Kelley Drye & Warren, LLP
3050 K Street, NW
Suite 400
Washington, DC 20007-5108
(202) 342-8450
Fax: (202) 342-8451
Email: dhartquist@kelleydrye.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**John M. Herrmann , II**
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8488
Fax: (202) 342-8451
Email: jherrmann@kelleydrye.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Norit Americas Inc.**                      represented by   **R. Alan Luberda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**David Alan Hartquist**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**John M. Herrmann , II**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/23/2011 | 1 | Summons . Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 11/23/2011) |
| 11/23/2011 | 2 | Form 5 Information Statement . Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 11/23/2011) |
| 11/23/2011 | 3 | Form 13 Corporate Disclosure Statement . Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 11/23/2011) |
| 11/23/2011 | 4 | Form 17 Business Proprietary Information Certification filed on behalf of *Francis J. Sailer, Mark E. Pardo, Andrew T. Schutz*. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 11/23/2011) |
| 11/23/2011 | 5 | Form 11 Notice of Appearance *for Francis J. Sailer, Mark E. Pardo, and Andrew T. Schutz*. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs.(Mohan, Kavita) (Entered: 11/23/2011) |
| 11/23/2011 | 6 | Complaint against United States. Administrative Record due by 1/9/2012. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs.(Mohan, Kavita) (Entered: 11/23/2011) |
| 11/23/2011 | 7 | Certificate of service (related document(s) 3 , 1 , 2 , 6 , 4 , 5 ). Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 11/23/2011) |
| 11/28/2011 | 8 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Benbow, Troy) (Entered: 11/28/2011) |
| 11/30/2011 | 9 | Consent Application/Motion for preliminary injunction *with Proposed Order and* |

| | | |
|---|---|---|
| | | *Certificate of Service.* Responses due by 12/19/2011. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs.(Mohan, Kavita) (Entered: 11/30/2011) |
| 11/30/2011 | 10 | Order entered on 11/30/2011 granting Motion for preliminary injunction (Related Doc # 9 ). (Benbow, Troy) (Entered: 11/30/2011) |
| 11/30/2011 | 11 | Form 11 Notice of Appearance . Filed by Melissa Marion Devine of U.S. Department of Justice on behalf of United States.(Devine, Melissa) (Entered: 11/30/2011) |
| 11/30/2011 | 12 | Consent Motion to Intervene as Plaintiff intervenor *As A Matter Of Right.* Responses due by 12/19/2011. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation.(Grimson, Jeffrey) (Entered: 11/30/2011) |
| 11/30/2011 | 13 | Form 11 Notice of Appearance *for Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan L. Brooks and Sarah M. Wyss.* Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation.(Grimson, Jeffrey) (Entered: 11/30/2011) |
| 11/30/2011 | 14 | Form 17 Business Proprietary Information Certification filed on behalf of *Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan L. Brooks and Sarah M. Wyss as attorneys.* Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 11/30/2011) |
| 11/30/2011 | 15 | Form 13 Corporate Disclosure Statement . Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 11/30/2011) |
| 11/30/2011 | 16 | Proof of service *of Preliminary Injunction Order* (related document(s) 10 ). Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of Beijing Pacific Activated Carbon Products Company, Ltd., Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd.. (Mohan, Kavita) (Entered: 11/30/2011) |
| 12/01/2011 | 17 | Order entered on 12/1/2011, Granting Albemarle Corporation consent motion to intervene as a Pltf-Intervenor. (Related Doc # 12 ) (Taronji, Steve) (Entered: 12/01/2011) |
| 12/02/2011 | 18 | Consent Motion to Intervene as plaintiff intervenor *As A Matter of Right.* Responses due by 12/21/2011. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 12/02/2011) |
| 12/02/2011 | 19 | Form 11 Notice of Appearance *on behalf of Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan Lehman Brooks and Sarah M. Wyss.* Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd..(Grimson, Jeffrey) (Entered: 12/02/2011) |
| 12/02/2011 | 20 | Form 17 Business Proprietary Information Certification filed on behalf of *Jeffrey S.* |

| | | |
|---|---|---|
| | | *Grimson, Kristin H. Mowry, Jill A. Cramer, Susan Lehman Brooks and Sarah M. Wyss as attorneys.* Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 12/02/2011) |
| 12/02/2011 | 21 | Form 13 Corporate Disclosure Statement . Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 12/02/2011) |
| 12/05/2011 | 22 | Order entered on 12/5/2011, Granting Ningxia Huahui Activated Carbon Co., Ltd., consent motion to intervene as a Pltf-Intervenor. (Related Doc # 18 ) (Taronji, Steve) (Entered: 12/05/2011) |
| 12/06/2011 | 23 | Consent Motion to Intervene as defendant intervenor *as of right.* Responses due by 12/27/2011. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 24 | Form 11 Notice of Appearance *on behalf of Craig A. Lewis and Brian S. Janovitz.* Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 25 | Form 13 Corporate Disclosure Statement *on behalf of Calgon Carbon (Tianjin) Co., Ltd.*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 26 | Form 17 Business Proprietary Information Certification filed on behalf of *Craig A. Lewis and Brian S. Janovitz as attorneys.* Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 27 | Order entered on 12/6/2011, Granting Calgon Carbon (Tianjin) Co., Ltd.'s consent motion to intervene as a Defendant Intervenor. (Related Doc # 23 ) (Taronji, Steve) (Entered: 12/06/2011) |
| 12/08/2011 | 28 | Order entered on 12/8/2011 assigning action to Judge Timothy C. Stanceu.(Love, Cynthia) (Entered: 12/08/2011) |
| 12/15/2011 | 29 | Motion to Intervene as Defendant intervenor *Calgon Carbon and Norit Americas.* Responses due by 1/3/2012. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Proposed Order)(Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 30 | Form 11 Notice of Appearance . Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 31 | Form 13 Corporate Disclosure Statement . Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Form 13)(Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 32 | Form 17 Business Proprietary Information Certification filed on behalf of *David* |

| | | |
|---|---|---|
| | | *Harqtuist, Kelley Drye & Warren LLP.* Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Form 17 Herrmann, # 2 Form 17 Luberda, # 3 Form 17 Hudak)(Herrmann, John) (Entered: 12/15/2011) |
| 12/16/2011 | 33 | Order entered on 12/16/2011granting Calgon Carbon Corporation and Norit Americas, Inc. Motion to intervene as defendant-intervenors (Related Doc # 29 ).. (Love, Cynthia) (Entered: 12/16/2011) |
| 12/21/2011 | 34 | Confidential and Public Administrative record for U.S. Department of Commerce filed *with 2 public and non-public cds.* (Cheevers, Casey) (Entered: 12/29/2011) |
| 12/21/2011 | 35 | Notice of Manual Filing. The document for Docket Entry #34 has been filed manually. (related document(s) 34 ). Filed by United States United States. (Cheevers, Casey) (Entered: 12/29/2011) |
| 01/03/2012 | 36 | Form 17 Business Proprietary Information Certification filed on behalf of consultant,*William Crow.* Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 01/03/2012) |
| 01/20/2012 | 37 | Joint status report *and Proposed Briefing Schedule.* Filed by Andrew Thomas Schutz of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of Beijing Pacific Activated Carbon Products Company, Ltd., Cherishmet Inc., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd.. (Schutz, Andrew) Modified on 4/2/2013 (Swindell, Stephen). (Entered: 01/20/2012) |
| 01/25/2012 | 38 | Consent Motion to consolidate case(s) 11-00451, 11-00468, 11-00475 with lead case 11-00451 . Responses due by 2/13/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 01/25/2012) |
| 01/26/2012 | 39 | Order entered on 1/26/2012 granting Motion to consolidate cases 11-00451, 11-00468 & 11-00475. Ordered that, from this date forward, the consolidated cases will be designated Albermarle Corp. v. United States, Consol. Court No. 11-00451 (Related Doc # 38 ). (Love, Cynthia) (Entered: 01/26/2012) |
| 04/18/2012 | 40 | Form 11 Notice of Appearance . Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 04/18/2012) |
| 11/24/2014 | 41 | Order entered on 11/24/2014, Slip opinion: 14-135. the court affirms the Departments Remand Redetermination and will enter judgment accordingly. (Attachments: # 1 Cited Web Pages).(Love, Cynthia) (Entered: 11/24/2014) |
| 11/24/2014 | 42 | Judgment Order entered on 11/24/2014: ORDERED that plaintiff Albemarle Corporations Mot. to Strike 1 (Feb. 28, 2014), ECF No. 110, is granted; it is further ORDERED that Def.-intervenors Mot. to Accept Supplemental Br. 1 (Feb. 28, 2014),ECF No. 111, filed by Calgon Carbon Corporation and Norit Americas, Inc., |

is denied; it is further ORDERED that the Remand Redetermination be, and hereby is, affirmed; and it is further ORDERED that entries of merchandise that are affected by this litigation shall be liquidated in accordance with the final court decision in this action. (related document(s) 41 ).(Love, Cynthia) (Entered: 11/24/2014)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/20/2015 10:42:06 | | | |
| **PACER Login:** | mi2097:3375509:0 | **Client Code:** | albemarle |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-cv-00468-TCS |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

CONSOLIDATED,TERMINATED

# U.S. Court of International Trade
## LIVE Database (New York)
## CIT DOCKET FOR CASE #: 1:11-cv-00475-TCS

Shanxi DMD Corporation v. United States
**Assigned to:** Timothy C. Stanceu
**Lead Docket:** 1:11-cv-00451-TCS
Member case: (View Member Case)

**Date Filed:** 11/30/2011
**Jury Demand:** No

**Jurisdiction:**
28USC § 1581(c) Antidumping or Countervailing Duty
Determination(s)

**Date Terminated:** 11/24/2014

**Category:**
Final Determination: 751 Periodic Review 19USC § 1516a(a)
(2)(B)(iii)

**Date Reopened:**

**Does this action raise an issue of
constitutionality?:** N

**Agency:**
U.S. Department of Commerce

**Product Description:**
Certain Activated Carbon from the People's Republic of China

**Export Country:**
China

**Plaintiff**

**Shanxi DMD Corporation**

represented by **Gregory Stephen Menegaz**
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6904
Fax: (202) 783-6909
Email: gmenegaz@dhlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***

*Bar Status: ACTIVE*

**James Kevin Horgan**
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6902
Fax: (202) 783-6909
Email: khorgan@dhlaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**John Joseph Kenkel**
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6900
Fax: (202) 783-6909
Email: jkenkel@dhlaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Intervenor Plaintiff**

**Albemarle Corporation**    represented by  **Jeffrey Sheldon Grimson**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015-2052
(202) 688-3610
Fax: (202) 595-8968
Email: jsg@mowrygrimson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Daniel Robert Wilson**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3613

Fax: (202) 595-8968
Email: drw@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Jill A. Cramer**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3610
Fax: (202) 595-8968
Email: jac@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Kristin Heim Mowry**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015-2052
(202) 688-3610
Fax: (202) 595-8968
Email: khm@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Sarah Marie Wyss**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015
(202) 688-3610
Fax: (202) 595-8968
Email: smw@mowrygrimson.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Susan Lehman Brooks**
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW.
Suite 810
Washington, DC 20015

(202) 688-3610
Fax: (202) 595-8968
Email: sel@mowrygrimson.com
*TERMINATED: 01/02/2014*
*Bar Status: ACTIVE*

**Intervenor Plaintiff**

**Ningxia Huahui Activated Carbon Co., Ltd.**                represented by  **Daniel Robert Wilson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Jeffrey Sheldon Grimson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Jill A. Cramer**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Sarah Marie Wyss**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Susan Lehman Brooks**
(See above for address)
*TERMINATED: 01/02/2014*
*Bar Status: ACTIVE*

**Defendant**

**United States**                represented by  **Antonia Ramos Soares**
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

JA000069

(202) 305-7405
Fax: (202) 514-7965
Email: Antonia.Soares@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Melissa Marion Devine**
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-0341
Fax: (202) 514-7965
Email: melissa.m.devine@usdoj.gov
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Intervenor Defendant**

**Calgon Carbon (Tianjin) Co., Ltd.**          represented by **Craig Anderson Lewis**
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-8613
Fax: (202) 637-5910
Email: craig.lewis@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Brian Samuel Janovitz**
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-6818
Fax: (202) 637-5910
Email: brian.janovitz@hoganlovells.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***

*Bar Status: ACTIVE*

**John M. Herrmann , II**
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8488
Fax: (202) 342-8451
Email: jherrmann@kelleydrye.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Calgon Carbon Corporation**                    represented by **R. Alan Luberda**
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8835
Fax: (202) 342-8451
Email: aluberda@kelleydrye.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**David Alan Hartquist**
Kelley Drye & Warren, LLP
3050 K Street, NW
Suite 400
Washington, DC 20007-5108
(202) 342-8450
Fax: (202) 342-8451
Email: dhartquist@kelleydrye.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**John M. Herrmann , II**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Intervenor Defendant**

Norit Americas Inc.                           represented by  **R. Alan Luberda**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              ***ATTORNEY IN SEALED GROUP***
                                                              *Bar Status: ACTIVE*

                                                              **David Alan Hartquist**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*
                                                              ***ATTORNEY IN SEALED GROUP***
                                                              *Bar Status: ACTIVE*

                                                              **John M. Herrmann , II**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*
                                                              ***ATTORNEY IN SEALED GROUP***
                                                              *Bar Status: ACTIVE*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/30/2011 | 1 | Summons . Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Goell, Geoffrey) (Entered: 12/05/2011) |
| 11/30/2011 | 2 | Form 5 Information Statement . Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Goell, Geoffrey) (Entered: 12/05/2011) |
| 11/30/2011 | 3 | Form 13 Corporate Disclosure Statement . Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Goell, Geoffrey) (Entered: 12/05/2011) |
| 11/30/2011 | 4 | Form 11 Notice of Appearance *For Gregory S. Menegaz, J. Kevin Horgan & John J. Kenkel*. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation.(Goell, Geoffrey) (Entered: 12/05/2011) |
| 11/30/2011 | 5 | Form 17 Business Proprietary Information Certification filed on behalf of *Gregory S. Menegaz, J. Kevin Horgan & John J. Kenkel as attorneys*. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Goell, Geoffrey) (Entered: 12/05/2011) |
| 11/30/2011 | 6 | Form 17 Business Proprietary Information Certification filed on behalf of *Judith L. Holdsworth as consultant*. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Goell, Geoffrey) (Entered: 12/05/2011) |
| 11/30/2011 | 7 | Certificate of service (related document(s) 4 , 3 , 5 , 2 , 1 , 6 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. |

| | | (Goell, Geoffrey) (Entered: 12/05/2011) |
|---|---|---|
| 12/05/2011 | 8 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Goell, Geoffrey) (Entered: 12/05/2011) |
| 12/05/2011 | 9 | Public Complaint against United States. Administrative Record due by 1/23/2012. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Attachments: # 1 Certificate of Service)(Menegaz, Gregory) (Entered: 12/05/2011) |
| 12/05/2011 | 10 | First Application/Motion for preliminary injunction *of Shanxi DMD Entries*. Responses due by 12/27/2011. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Attachments: # 1 Exhibit Exhibit 1 -- Case 451 PI, # 2 Exhibit Exhibit 2 - Case 468 PI, # 3 Supplement Memo of Authority In Support of Motion, # 4 Proposed Order Proposed Order for PI, # 5 Certificate of Service)(Menegaz, Gregory) (Entered: 12/05/2011) |
| 12/05/2011 | 11 | Amended Application/Motion for preliminary injunction *of Shanxi DMD entries*. Responses due by 12/27/2011. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Attachments: # 1 Exhibit PI Case No. 451, # 2 Exhibit PI Case No. 468, # 3 Supplement Amended Memo In Support, # 4 Proposed Order (Amended), # 5 Certificate of Service)(Menegaz, Gregory) (Entered: 12/05/2011) |
| 12/06/2011 | 12 | Consent Motion to Intervene as defendant intervenor *as of right*. Responses due by 12/27/2011. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 13 | Form 11 Notice of Appearance *on behalf of Craig A. Lewis and Brian S. Janovitz*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd..(Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 14 | Form 13 Corporate Disclosure Statement *on behalf of Calgon Carbon (Tianjin) Co., Ltd.*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 15 | Form 17 Business Proprietary Information Certification filed on behalf of *Craig A. Lewis and Brian S. Janovitz as attorneys*. Filed by Craig Anderson Lewis of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Lewis, Craig) (Entered: 12/06/2011) |
| 12/06/2011 | 16 | Order entered on 12/6/2011, Granting consent motion for preliminary injunction (Related Doc # 11 ). (Taronji, Steve) (Entered: 12/06/2011) |
| 12/06/2011 | 17 | Form 11 Notice of Appearance . Filed by Melissa Marion Devine of U.S. Department of Justice on behalf of United States.(Devine, Melissa) (Entered: 12/06/2011) |
| 12/06/2011 | 18 | Order entered on 12/6/2011, Granting Calgon Carbon (Tianjin) Co., Ltd.'s consent motion to intervene as a Defendant Intervenor.(Related Doc # 12 ) (Taronji, Steve) |

| | | (Entered: 12/06/2011) |
|---|---|---|
| 12/08/2011 | 19 | Order entered on 12/8/2011 assigning action to Judge Timothy C. Stanceu.(Love, Cynthia) (Entered: 12/08/2011) |
| 12/15/2011 | 20 | Motion to Intervene as Defendant intervenor *Calgon Corporation and Norit Americas*. Responses due by 1/3/2012. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Proposed Order)(Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 21 | Form 11 Notice of Appearance . Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 22 | Form 13 Corporate Disclosure Statement . Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Form 13)(Herrmann, John) (Entered: 12/15/2011) |
| 12/15/2011 | 23 | Form 17 Business Proprietary Information Certification filed on behalf of *David Hartquist, Kelley Drye & Warren LLP*. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Attachments: # 1 Form 17 Herrmann, # 2 Form 17 Luberda, # 3 Form 17 Hudak)(Herrmann, John) (Entered: 12/15/2011) |
| 12/16/2011 | 24 | Order entered on 12/16/2011 granting Calgon Carbon Corporation and Norit Americas, Inc. Motion to intervene as defendant-intervenors (Related Doc # 20 ).. (Love, Cynthia) (Entered: 12/16/2011) |
| 12/21/2011 | 25 | Partial Consent Motion to Intervene as Plaintiff intervenor *As A Matter of Right*. Responses due by 1/9/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 12/21/2011) |
| 12/21/2011 | 26 | Form 11 Notice of Appearance *on behalf of Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan Lehman Brooks and Sarah M. Wyss*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd..(Grimson, Jeffrey) (Entered: 12/21/2011) |
| 12/21/2011 | 27 | Form 17 Business Proprietary Information Certification filed on behalf of *Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan Lehman Brooks and Sarah M. Wyss*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 12/21/2011) |
| 12/21/2011 | 28 | Form 13 Corporate Disclosure Statement *on behalf of Albemarle Corporation*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation. (Grimson, Jeffrey) (Entered: 12/21/2011) |
| 12/21/2011 | 29 | Form 13 Corporate Disclosure Statement *on behalf of Ningxia Huahui Activated* |

| | | |
|---|---|---|
| | | *Carbon Co., Ltd.*. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Ningxia Huahui Activated Carbon Co., Ltd.. (Grimson, Jeffrey) (Entered: 12/21/2011) |
| 12/21/2011 | 31 | Confidential and Public Administrative record for U.S. Department of Commerce filed *with 2 public and 2 non-public cds*. (Cheevers, Casey) (Entered: 12/29/2011) |
| 12/21/2011 | 32 | Notice of Manual Filing. The document for Docket Entry *#31* has been filed manually. (related document(s) 31 ). Filed by United States United States. (Cheevers, Casey) (Entered: 12/29/2011) |
| 12/23/2011 | 30 | Response *of Calgon Carbon (Tianjin) Co., Ltd.* to motion *to Intervene as a Matter of Right As Plaintiff-Intervenors* (related document(s) 25 ). Filed by Brian Samuel Janovitz of Hogan Lovells US LLP on behalf of Calgon Carbon (Tianjin) Co., Ltd.. (Janovitz, Brian) (Entered: 12/23/2011) |
| 01/03/2012 | 33 | Form 17 Business Proprietary Information Certification filed on behalf of *consultant, William H. Crow*. Filed by John M. Herrmann, II of Kelley Drye & Warren, LLP on behalf of Calgon Carbon Corporation, Norit Americas Inc.. (Herrmann, John) (Entered: 01/03/2012) |
| 01/03/2012 | 34 | Order entered on 1/3/2012 granting Motion to intervene (Related Doc # 25 ).Ordered that Albermarle Corporation and Ningxia Huahui Activated Carbon Co., Ltd. are parties to this action as Plaintiff-Intervenors (Love, Cynthia) (Entered: 01/03/2012) |
| 01/20/2012 | 35 | Consent Joint status report *of the parties*. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Shanxi DMD Corporation. (Attachments: # 1 Proposed Order for briefing schedule, # 2 Certificate of Service)(Menegaz, Gregory) Modified on 4/2/2013 (Swindell, Stephen). (Entered: 01/20/2012) |
| 01/25/2012 | 36 | Consent Motion to consolidate case(s) 11-00451, 11-00468, 11-00475 with lead case 11-00451 . Responses due by 2/13/2012. Filed by Jeffrey Sheldon Grimson of Mowry & Grimson, PLLC on behalf of Albemarle Corporation, Ningxia Huahui Activated Carbon Co., Ltd.. (Attachments: # 1 Proposed Order)(Grimson, Jeffrey) (Entered: 01/25/2012) |
| 01/26/2012 | 37 | Order entered on 1/26/2012 granting Motion to consolidate cases 11-00451, 11-00468 & 11-00475. Ordered that, from this date forward, the consolidated cases will be designated Albermarle Corp. v. United States, Consol. Court No. 11-00451 (Related Doc # 36 ). (Love, Cynthia) (Entered: 01/26/2012) |
| 04/18/2012 | 38 | Form 11 Notice of Appearance . Filed by Antonia Ramos Soares of U.S. Department of Justice on behalf of United States.(Soares, Antonia) (Entered: 04/18/2012) |
| 11/24/2014 | 39 | Order entered on 11/24/2014, Slip opinion: 14-135. the court affirms the Departments Remand Redetermination and will enter judgment accordingly. (Attachments: # 1 Cited Web Pages).(Love, Cynthia) (Entered: 11/24/2014) |
| | | |

| 11/24/2014 | 40 | Judgment Order entered on 11/24/2014: ORDERED that plaintiff Albemarle Corporations Mot. to Strike 1 (Feb. 28, 2014), ECF No. 110, is granted; it is further ORDERED that Def.-intervenors Mot. to Accept Supplemental Br. 1 (Feb. 28, 2014),ECF No. 111, filed by Calgon Carbon Corporation and Norit Americas, Inc., is denied; it is further ORDERED that the Remand Redetermination be, and hereby is, affirmed; and it is further ORDERED that entries of merchandise that are affected by this litigation shall be liquidated in accordance with the final court decision in this action. (related document(s) 39 ).(Love, Cynthia) (Entered: 11/24/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/20/2015 10:42:48 | | | |
| PACER Login: | mi2097:3375509:0 | Client Code: | albemarle |
| Description: | Docket Report | Search Criteria: | 1:11-cv-00475-TCS |
| Billable Pages: | 7 | Cost: | 0.70 |

**FOR OFFICIAL FILE**



RECEIVED

· 2010 APR 30  P 3: 42

U.S. DEPT OF COMMERCE
ITA
IMPORT ADMINISTRATION 

**Mowry & Grimson, PLLC**

5335 Wisconsin Avenue, NW
Suite 440
Washington, DC 20015
202.730.1255

7201 Wisconsin Avenue
Suite 460
Bethesda, MD 20814
301.652.1630
301.652.3350 (fax)
www.mowrygrimson.com

April 30, 2010                    1718

**VIA HAND DELIVERY**

The Honorable Gary Locke
Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
    APO/Dockets Unit, Room 1870
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

Case No.: A-570-904
Total Number of Pages:  5
Administrative Review (§751)
**POR 3:  4/1/09 – 3/31/10**
NME Unit, Office 9

**PUBLIC DOCUMENT**

Re:    **Activated Carbon from the People's Republic of China:**
       **Request for Administrative Review and Voluntary Respondent Status of**
       **Ningxia Huahui Activated Carbon Co., Ltd.**

Dear Mr. Secretary:

On behalf of Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"), and pursuant to

the Department's notice of opportunity to request review (75 Fed. Reg. 16426 (April 1, 2010)),

we hereby request that the Department conduct an administrative review of Huahui's sales to

the United States during the period April 1, 2009 – March 31, 2010.

Huahui is a Chinese producer and exporter of subject merchandise.  Huahui, therefore,

qualifies as an interested party as defined under 19 U.S.C. § 1677(9)(A) and 19 C.F.R. §

351.102.

000007

JA100001

The Honorable Gary Locke
April 30, 2010
Page 2

Huahui requests this review in order to more accurately calculate its antidumping deposit and assessment rates for sales made during the above-referenced period.

This request is timely filed in accordance with 19 C.F.R. § 351.213(b)(2).

Lastly, in accordance with 19 U.S.C. §1677m(a)(1)(A), 19 CFR §351.204(d), and 19 CFR §351.213(f), Huahui hereby requests precedence in eligibility to participate in the case as a voluntary respondent in the event Huahui is not individually examined by the Department, pursuant to the Department's "first come, first served" rule. See, Preamble to Regulations, 62 FR at 27310 (May 19, 1997) ("we intend to accept voluntary responses based on the order in which written requests to be accepted as voluntary respondents are submitted"). We request a time-stamp on this filing according to the Department's procedures applicable to requests for voluntary respondent status.

If the Department has any questions regarding this submission, please contact the undersigned.

Respectfully submitted,

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Susan E. Lehman
Jodi B. Herman
MOWRY & GRIMSON, PLLC





has been processed pursuant to the FTZ Act and the Board's regulations; and,

Whereas, the Board adopts the findings and recommendations of the examiner's report, and finds that the requirements of the FTZ Act and Board's regulations are satisfied, and that the proposal is in the public interest;

Now, therefore, the Board hereby orders:

The application to expand FTZ 272 is approved, subject to the FTZ Act and the Board's regulations, including Section 400.28, and to the Board's standard 2,000-acre activation limit for the overall general-purpose zone project, and further subject to a sunset provision that would terminate authority on May 31, 2017 for Site 9 if no activity has occurred under FTZ procedures before that date.

Signed at Washington, DC, this 13th day of May 2010.

**Ronald K. Lorentzen,**

*Deputy Assistant Secretary for Import Administration, Alternate Chairman, Foreign-Trade Zones Board.*

Attest:

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2010–12958 Filed 5–27–10; 8:45 am]

**BILLING CODE 3510–DS–P**

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–475–826]**

### Certain Cut-to-Length Carbon–Quality Steel Plate Products From Italy: Extension of the Final Results of Antidumping Duty Administrative Review

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**EFFECTIVE DATE:** May 28, 2010.

**FOR FURTHER INFORMATION CONTACT:** Dmitry Vladimirov, AD/CVD Operations, Office 5, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW, Washington, DC 20230; telephone: (202) 482–0665.

**SUPPLEMENTARY INFORMATION:**

### Background

On January 29, 2010, the Department of Commerce (the Department) published the preliminary results of the administrative review of the antidumping duty order on certain cut-to-length carbon–quality steel plate products from Italy. *See Certain Cut-to–*

*Length Carbon-Quality Steel Plate Products From Italy: Preliminary Results of Antidumping Duty Administrative Review,* 75 FR 4779 (January 29, 2010). The review covers the period February 1, 2008, through January 31, 2009. The final results of this administrative review were originally due no later than May 29, 2010. As explained in the memorandum from the Deputy Assistant Secretary for Import Administration, the Department has exercised its discretion to toll deadlines for the duration of the closure of the Federal Government from February 5 through February 12, 2010. Thus, the deadline for the final results of this administrative review has been extended by seven days, until June 5, 2010. *See* Memorandum to the Record from Ronald Lorentzen, DAS for Import Administration, regarding "Tolling of Administrative Deadlines As a Result of the Government Closure During the Recent Snowstorm," dated February 12, 2010.

### Extension of Time Limit for Final Results

Section 751(a)(3)(A) of the Tariff Act of 1930, as amended (the Act), requires the Department to issue the final results of an administrative review within 120 days after the date on which the preliminary results are published. However, if it is not practicable to complete the review within this time period, section 751(a)(3)(A) of the Act allows the Department to extend the time limit for the final results up to 180 days after the date on which the preliminary results are published.

The Department finds that it is not practicable to complete this review by June 5, 2010, because the Department requires additional time to consider the extensive comments submitted by the interested parties in relation to the preliminary results of this review. Consequently, in accordance with section 751(a)(3)(A) of the Act, the Department is extending the time limit for completion of the final results of this administrative review by 60 days until August 4, 2010.

This notice is published in accordance with section 751(a)(3)(A) of the Act and 19 CFR 351.213(h)(2).

Dated: May 20, 2010.

**John M. Andersen,**

*Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2010–12963 Filed 5–27–10; 8:45 am]

**BILLING CODE 3510–DS–S**

# DEPARTMENT OF COMMERCE

## International Trade Administration

### Initiation of Antidumping and Countervailing Duty Administrative Reviews

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce ("the Department") has received requests to conduct administrative reviews of various antidumping and countervailing duty orders and findings with April anniversary dates. In accordance with the Department's regulations, we are initiating those administrative reviews.

**DATES:** *Effective Date:* May 28, 2010.

**FOR FURTHER INFORMATION CONTACT:** Sheila E. Forbes, Office of AD/CVD Operations, Customs Unit, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, DC 20230; telephone: (202) 482–4697.

**SUPPLEMENTARY INFORMATION:**

### Background

The Department has received timely requests, in accordance with 19 CFR 351.213(b), for administrative reviews of various antidumping and countervailing duty orders and findings with April anniversary dates.

### Change to the Deadlines for No-Shipment Letters and Separate Rate Certifications

Effective with this Federal Register notice, the Department is changing the deadline for submission of No-Shipment Letters and Separate Rate Certifications from 30-days after initiation to 60-days after initiation, as indicated in the relevant sections of this Federal Register notice. The Department requires that a company under review, which currently has a separate rate, submit either a No-Shipment Letter or a Separate Rate Certification, as relevant to the company's situation, as described in the relevant sections of this Federal Register notice, below. If a company under review that currently has a separate rate fails to submit either a No-Shipment Letter, a Separate Rate Certification, or a Separate Rate Application (as appropriate) for this POR, the company will not have demonstrated its eligibility to retain its separate rate status and will be considered to be part of the China-wide entity for purposes of this administrative review. The Department's practice remains unchanged for companies that do not

| | Period to be reviewed |
|---|---|
| **Antidumping Duty Proceedings** | |
| Brazil: Certain Hot-Rolled Flat-Rolled Carbon Quality Steel Products,[3] A–351–828 .................................................................. | 3/1/09–2/28/10 |
| Usinas Siderurgicas de Minas Gerais, S.A. (Usiminas) | |
| France: Sorbitol, A–427–001. | |
| Syral, S.A.S. | 4/1/09–3/31/10 |
| India: 1–Hydroxyethylidene-1, 1–Diphosphonic Acid (HEDP), A–533–847 ............................................................................... | 4/23/09–3/31/10 |
| Aquapharm Chemicals Pvt., Ltd. | |
| Russia: Magnesium Metal, A–821–819 .............................................................................................................................................. | 4/1/09–3/31/10 |
| PSC VSMPO–AVISMA Corporation | |
| Solikamsk Magnesium Works | |
| The People's Republic of China: Certain Activated Carbon,[4][5] A–570–904 ............................................................................. | 4/1/09–3/31/10 |
| AmeriAsia Advanced Activated Carbon Products Co., Ltd. | |
| Anhui Handfull International Trading (Group) Co., Ltd. | |
| Anhui Hengyuan Trade Co., Ltd. | |
| Anyang Sino-Shon International Trading Co., Ltd. | |
| Baoding Activated Carbon Factory | |
| Beijing Broad Activated Carbon Co., Ltd. | |
| Beijing Haijian Jiechang Environmental Protection Chemicals | |
| Beijing Hibridge Trading Co., Ltd. | |
| Beijing Pacific Activated Carbon Products Co., Ltd. | |
| Benbu Jiutong Trade Co., Ltd. | |
| Calgon Carbon (Tianjin) Co., Ltd. | |
| Changji Hongke Activated Carbon Co., Ltd. | |
| Chengde Jiayu Activated Carbon Factory | |
| Cherishmet Incorporated | |
| China National Building Materials and Equipment Import and Export Corp. | |
| China National Nuclear General Company Ningxia Activated Carbon Factory | |
| China Nuclear Ningxia Activated Carbon Plant | |
| Da Neng Zheng Da Activated Carbon Co., Ltd. | |
| Datong Carbon Corporation | |
| Datong Changtai Activated Carbon Co., Ltd. | |
| Datong City Zouyun County Activated Carbon Co., Ltd. | |
| Datong Fenghua Activated Carbon | |
| Datong Forward Activated Carbon Co., Ltd. | |
| Datong Fuping Activated Carbon Co., Ltd. | |
| Datong Guanghua Activated Carbon Co., Ltd. | |
| Datong Hongtai Activated Carbon Co., Ltd. | |
| Datong Huanqing Activated Carbon Co., Ltd. | |
| Datong Huaxin Activated Carbon | |
| Datong Huibao Active Carbon Co., Ltd. | |
| Datong Huibao Activated Carbon Co., Ltd. | |
| Datong Huiyuan Cooperative Activated Carbon Plant | |
| Datong Juqiang Activated Carbon Co., Ltd. | |
| Datong Kaineng Carbon Co, Ltd. | |
| Datong Locomotive Coal & Chemicals Co., Ltd. | |
| Datong Municipal Yunguang Activated Carbon Co., Ltd. | |
| Datong Tianzhao Activated Carbon Co., Ltd. | |
| DaTong Tri-Star & Power Carbon Plant | |
| Datong Weidu Activated Carbon Co., Ltd. | |
| Datong Xuanyang Activated Carbon Co. Ltd. | |
| Datong Yunguang Chemicals Plant | |
| Datong Zuoyun Biyun Activated Carbon Co., Ltd. | |
| Datong Zuoyun Fu Ping Activated Carbon Co., Ltd. | |
| Dezhou Jiayu Activated Carbon Factory | |
| Dongguan Baofu Activated Carbon | |
| Dongguan SYS Hitek Co., Ltd. | |
| Dushanzi Chemical Factory | |
| Fu Yuan Activated Carbon Co., Ltd. | |
| Fujian Jianyang Carbon Plant | |
| Fujian Nanping Yuanli Activated Carbon Co., Ltd. | |
| Fujian Yuanli Active Carbon Co., Ltd. | |
| Fuzhou Taking Chemical | |
| Fuzhou Yihuan Carbon | |
| Great Bright Industrial | |
| Hangzhou Hengxing Activated Carbon | |
| Hangzhou Hengxing Activated Carbon Co., Ltd. | |
| Hangzhou Linan Tianbo Material (HSLATB) | |
| Hangzhou Nature Technology | |
| Hebei Foreign Trade and Advertising Corporation | |
| Hebei Shenglun Import & Export Group Company | |
| Hegongye Ninxia Activated Carbon Factory | |
| Heilongjiang Provincial Hechang Import & Export Co., Ltd. | |
| Hongke Activated Carbon Co., Ltd. | |

| | Period to be reviewed |
|---|---|
| Huaibei Environment Protection Material Plant | |
| Huairen Jinbei Chemical Co., Ltd. | |
| Huairen Huanyi Purification Material Co., Ltd. | |
| Huaiyushan Activated Carbon Group | |
| Huatai Activated Carbon | |
| Huzhou Zhonglin Activated Carbon | |
| Inner Mongolia Taixi Coal Chemical Industry Limited Company | |
| Itigi Corp. Ltd. | |
| J&D Activated Carbon Filter Co., Ltd. | |
| Jacobi Carbons AB | |
| Jiangle County Xinhua Activated Carbon Co., Ltd. | |
| Jiangsu Taixing Yixin Activated Carbon Technology Co., Ltd. | |
| Jiangxi Hansom Import Export Co. | |
| Jiangxi Huaiyushan Activated Carbon | |
| Jiangxi Huaiyushan Activated Carbon Group Co. | |
| Jiangxi Huaiyushan Suntar Active Carbon Co., Ltd. | |
| Jiangxi Jinma Carbon | |
| Jianou Zhixing Activated Carbon | |
| Jiaocheng Xinxin Purification Material Co., Ltd. | |
| Jilin Bright Future Chemicals Company, Ltd. | |
| Jilin Province Bright Future Industry and Commerce Co., Ltd. | |
| Jing Mao (Dongguan) Activated Carbon Co., Ltd. | |
| Kaihua Xingda Chemical Co., Ltd. | |
| Kemflo (Nanjing) Environmental Tech | |
| Keyun Shipping (Tianjin) Agency Co., Ltd. | |
| Kunshan Actview Carbon Technology Co., Ltd. | |
| Langfang Winfield Filtration Co. | |
| Link Link Shipping Limited | |
| Longyan Wanan Activated Carbon | |
| Mindong Lianyi Group | |
| Nanjing Mulinsen Charcoal | |
| Nanlong Amerlasia Advanced Activated Carbon Product Co., Ltd. | |
| Ningxia Baota Active Carbon Plant | |
| Ningxia Baota Activated Carbon Co., Ltd. | |
| Ningxia Blue-White-Black Activated Carbon (BWB) | |
| Ningxia Fengyuan Activated Carbon Co., Ltd. | |
| Ningxia Guanghua A/C Co., Ltd. | |
| Ningxia Guanghua Activated Carbon Co., Ltd. | |
| Ningxia Guanghua Chemical Activated Carbon Co., Ltd. | |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. | |
| Ningxia Haoqing Activated Carbon Co., Ltd. | |
| Ningxia Henghui Activated Carbon | |
| Ningxia Honghua Carbon Industrial Corporation | |
| Ningxia Huahui Activated Carbon Co., Ltd. | |
| Ningxia Huinong Xingsheng Activated Carbon Co., Ltd. | |
| Ningxia Jirui Activated Carbon | |
| Ningxia Lingzhou Foreign Trade Co., Ltd. | |
| Ningxia Luyuangheng Activated Carbon Co., Ltd. | |
| Ningxia Mineral & Chemical Limited | |
| Ningxia Pingluo County Yaofu Activated Carbon Plant | |
| Ningxia Pingluo County Yaofu Activated Carbon Factory | |
| Ningxia Pingluo Xuanzhong Activated Carbon Co., Ltd. | |
| Ningxia Pingluo Yaofu Activated Carbon Factory | |
| Ningxia Taixi Activated Carbon | |
| Ningxia Tianfu Activated Carbon Co., Ltd. | |
| Ningxia Tongfu Coking Co., Ltd. | |
| Ningxia Weining Active Carbon Co., Ltd. | |
| Ningxia Xingsheng Coal and Active Carbon Co., Ltd. | |
| Ningxia Xingsheng Coke and Activated Carbon Co., Ltd. | |
| Ningxia Yinchuan Lanqiya Activated Carbon Co., Ltd. | |
| Ningxia Yirong Alloy Iron Co., Ltd. | |
| Ningxia Zhengyuan Activated | |
| Nuclear Ningxia Activated Carbon Co., Ltd. | |
| OEC Logistic Qingdao Co., Ltd. | |
| Panshan Import and Export Corporation | |
| Pingluo Xuanzhong Activated Carbon Co., Ltd. | |
| Pingluo Yu Yang Activated Carbon Co., Ltd. | |
| Shanghai Activated Carbon Co. Ltd. | |
| Shanghai Coking and Chemical Corporation | |
| Shanghai Goldenbridge International | |
| Shanghai Jiayu International Trading (Dezhou Jiayu and Chengde Jiayu) | |
| Shanghai Jinhu Activated Carbon (Xingan Shenxin and Jiangle Xinhua) | |
| Shanghai Light Industry and Textile Import & Export Co., Ltd. | |

| | Period to be reviewed |
|---|---|
| Shanghai Mebao Activated Carbon | |
| Shanhai Xingchang Activated Carbon | |
| Shanxi Blue Sky Purification Material Co., Ltd. | |
| Shanxi Carbon Industry Co., Ltd. | |
| Shanxi Dapu International Trade Co., Ltd. | |
| Shanxi DMD Corporation | |
| Shanxi Industry Technology Trading Co., Ltd. | |
| Shanxi Newtime Co., Ltd. | |
| Shanxi Qixian Foreign Trade Corporation | |
| Shanxi Qixian Hongkai Active Carbon Goods | |
| Shanxi Sincere Industrial Co., Ltd. | |
| Shanxi Supply and Marketing Cooperative | |
| Shanxi Tianli Ruihai Enterprise Co. | |
| Shanxi Xiaoyi Huanyu Chemicals Co., Ltd. | |
| Shanxi Xinhua Activated Carbon Co., Ltd. | |
| Shanxi Xinhua Chemical Co., Ltd. (formerly Shanxi Xinhua Chemical Factory) | |
| Shanxi Xinhua Protective Equipment | |
| Shanxi Xinshidai Import Export Co., Ltd. | |
| Shanxi Xuanzhong Chemical Industry Co., Ltd. | |
| Shanxi Zuoyun Yunpeng Coal Chemistry | |
| Shenzhen Sihaiweilong Technology Co. | |
| Sincere Carbon Industrial Co., Ltd. | |
| Sinoacarbon International Trading Co., Ltd. | |
| Taining Jinhu Carbon | |
| Tangshan Solid Carbon Co., Ltd. | |
| Tangshan (Tianjin) Activated Carbon | |
| Tianjin Century Promote International Trade Co., Ltd. | |
| Tianjin Jacobi International Trading Co. Ltd. | |
| Tianjin Maijin Industries Co., Ltd. | |
| Taiyuan Hengxinda Trade Co., Ltd. | |
| Tonghua Bright Future Activated Carbon Plant | |
| Tonghua Xinpeng Activated Carbon Factory | |
| Triple Eagle Container Line | |
| Uniclear New-Material Co., Ltd. | |
| United Manufacturing International (Beijing) Ltd. | |
| Valqua Seal Products (Shanghai) Co. | |
| VitaPac (HK) Industrial Ltd. | |
| Wellink Chemical Industry | |
| Xi Li Activated Carbon Co., Ltd. | |
| Xi'an Shuntong International Trade & Industrials Co., Ltd. | |
| Xiamen All Carbon Corporation | |
| Xingan County Shenxin Activated Carbon Factory | |
| Xinhua Chemical Company Ltd. | |
| Xuanzhong Chemical Industry | |
| Yangyuan Hengchang Active Carbon | |
| Yicheng Logistics | |
| Yinchuan Lanqiya Activated Carbon Co., Ltd. | |
| Zhejiang Quzhou Zhongsen Carbon | |
| Zhejiang Xingda Activated Carbon Co., Ltd. | |
| Zhejiang Yun He Tang Co., Ltd. | |
| Zhuxi Activated Carbon | |
| Zuoyun Bright Future Activated Carbon Plant | |
| The People's Republic of China: Certain Steel Threaded Rod,[6] A–570–932 ................................................................. | 10/8/08–3/31/10 |
| Advanced Hardware Company | |
| Anhui Ningguo Zhongding Sealing Co. Ltd. | |
| Autocraft Industrial (Shanghai) Ltd. | |
| Beijing Peace Seasky International | |
| Billion Land Ltd. | |
| Century Distribution Systems | |
| Certified Products International Inc. | |
| China Jiangsu International Economic Technical Cooperation Corporation | |
| Dalian Americh International Trading Co., Ltd. | |
| Dalian Fortune Machinery Co., Ltd. | |
| Dalian Harada Industry Co., Ltd. | |
| EC International (Nantong) Co. Ltd. | |
| Ever Industries Co. | |
| Fastwell Industry Co. Ltd. | |
| Gem-Year Industrial Co., Ltd. | |
| Haining Light Industry Trade Co. Ltd. | |
| Haiyan County No. 1 Fasteners Factory (Hu-Hang Company) | |
| Haiyan Dayu Fasteners Co., Ltd. | |
| Haiyan Feihua Fasteners Co. Ltd. | |
| Haiyan Haiyu Hardware Co. Ltd. | |

**WINSTON & STRAWN LLP**    **FOR OFFICIAL FILE**

SUITE 718, CHINA WORLD OFFICE 1
1 JIANGUOMENWAI AVENUE
BEIJING 100004, CHINA

214 NORTH TRYON STREET
CHARLOTTE, NORTH CAROLINA 28202-1078

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

43 RUE DU RHÔNE
1204 GENEVA, SWITZERLAND

GLOUCESTER TOWER
11TH FLOOR
THE LANDMARK
15 QUEEN'S ROAD CENTRAL
HONG KONG, CHINA

99 GRESHAM STREET
LONDON, EC2V 7NG, UK

1700 K STREET, N.W.
WASHINGTON, D.C. 20006-3817

+1 (202) 282-5000

FACSIMILE +1 (202) 282-5100

www.winston.com

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

SUITE A350, 4 STASOVOY STREET
MOSCOW, 119071, RUSSIAN FEDERATION

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

ONE RIVERFRONT PLAZA, SUITE 730
NEWARK, NEW JERSEY 07102-5401

25 AVENUE MARCEAU, CS 31621
75773 PARIS CEDEX 16, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5802

UNITS 3105-3106, SHANGHAI KERRY CENTRE
1515 NANJING ROAD WEST
JING'AN, SHANGHAI 200040, CHINA

August 12, 2010

1888

*PUBLIC VERSION*

RECEIVED
AUG 12 2010
DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

Case No. A-570-904
Total No. of Pages:
Status:  AD Administrative Review
(04/01/09 – 3/31/10)

Office of AD/CVD Enforcement, Office 9

The proprietary version of this document contains **BUSINESS PROPRIETARY INFORMATION** on pages 3-4, 8-9, 11, 16-17 and 22 and in Exhibits 1 through 18. This information has been ranged, rounded or deleted in the public version of this submission.

The proprietary version of this submission may be released under APO.

The Honorable Gary Locke
Secretary of Commerce
U.S. Department of Commerce
Import Administration, Room 1870
U.S. Department of Commerce
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

ATTN: Catherine Bertrand; Kathleen Marksberry

Re:    **Section A Response of Jacobi Carbons**
Certain Activated Carbon from China

Dear Mr. Secretary:

On behalf of Jacobi Carbons AB and its affiliates, Tianjin Jacobi International Trading Co. Ltd, Jacobi Carbons Industry (Tianjin), and Jacobi Carbons, Inc. (collectively, "Jacobi"), we hereby submit the Section A Response of Jacobi Carbons.

DC:650118.1

000091

*PUBLIC VERSION*

Case No.          A-570-904

Total No. of Pages:      50

Status: AD Administrative Review
        (04/01/09 – 3/31/10)

Office of AD/CVD Enforcement, Office 9

The proprietary version of this document contains **BUSINESS PROPRIETARY INFORMATION** on pages 3-4, 8-9, 11, 16-17 and 22 and in Exhibits 1 through 18. This information has been ranged, rounded or deleted in the public version of this submission.

The proprietary version of this submission may be released under APO.

# SECTION A RESPONSE OF JACOBI CARBONS
*Certain Activated Carbon from China  — Antidumping Administrative Review*

Daniel L. Porter
Ross Bidlingmaier
Michael Ferrier (Advisor)

**Winston & Strawn LLP**
1700 K St., NW
Washington, D.C.  20006
202-282-2000

*Counsel to Jacobi Carbons*

*Dated*:  August 12, 2010

DC:650125.1

**PUBLIC VERSION**

Please respond to this section of the questionnaire if neither your company nor an affiliate produced the merchandise under consideration which you sold to the United States.

a.  Provide the names, addresses and facsimile numbers of those companies that supplied you with the merchandise under consideration that your company or an affiliate sold to the United States. The Department notes that, as discussed in Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries, the Department is issuing exporter-producer combination rates in investigations. Therefore, the names and antidumping duty rates with respect to these exporter and producer combinations will be listed in the *Federal Register* at the preliminary results of this review, and as such, these combinations must be public information.

**ANSWER:**   Jacobi provides below a list of all of its unaffiliated suppliers in China who supplied activated carbon or power carbons for sale to the United States.  Jacobi does not maintain any agreements with its suppliers by which Jacobi control any aspects of the suppliers' production of the merchandise under review.

| Name | Function/Purpose | Address |
|------|------------------|---------|
| Ningxia Huahui Activated Carbon Co., Ltd. | Supply activated carbon products | No. A-1 Chuang Xin Yuan, High Tech Developing Zone Yinchuan, Ningxia Province, 750002, P.R. China Fax: 0951-5070221 |
| Ningxia Guanghua Activated Carbon Co.,Ltd | Supply activated carbon products | Minzu Nanjie Yinchuan, Ningxia Province, 750001, P.R. China Fax: 0951-4095600 |
| Ningxia Tianfu Activated Carbon Co., Ltd. | Supply activated carbon products | Taisha Industry Zone, Pingluo Ningxia Province, P.R.China Fax: 0952-6693250 |

19

DC:650125.1

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| BEIJING | 1700 K STREET, N.W. | MOSCOW |
| CHARLOTTE | WASHINGTON, D.C. 20006-3817 | NEW YORK |
| CHICAGO | | NEWARK |
| GENEVA | +1 (202) 282-5000 | PARIS |
| HONG KONG | | SAN FRANCISCO |
| LONDON | FACSIMILE +1 (202) 282-5100 | SHANGHAI |
| LOS ANGELES | www.winston.com | WASHINGTON, D.C. |

FOR OFFICIAL FILE

September 13, 2010

*190*

RECEIVED
SEP 13 2010
DEPT. OF COMMERCE
IMPORT ADMINISTRATION
ITA

**Public Version**
Case No.: A-570-904
Total No. of Pages: 150
Status: Administrative Review
(POR: 04/01/09 – 03/31/10)
This proceeding is conducted by Import
Administration, Office of AD/CVD Enforcement

This document contains **BUSINESS PROPRIETARY
INFORMATION** on pages 4-10, 21-24, 26, 28, 31, 36
and 39 of section C; pages 4 and 7 of NXGH; pages 7
of NXHH; and in Exhibits C-1 to C-12, NXGH-1 TO
NXGH-13, and NXHH-1 TO NXHH-11. This information
has been ranged, rounded or deleted in the public
version of this submission.

The proprietary version of this submission may
be released under APO.

The Honorable Gary Locke
Secretary of Commerce
U.S. Department of Commerce
Import Administration
Central Records Unit, Room 1870
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn:   Catherine Bertrand; Kathleen Marksberry

Re: *Jacobi's Response to Questionnaire Sections C and D: Certain Activated Carbon from China*

Dear Mr. Assistant Secretary:

On behalf of Jacobi Carbons AB and its affiliates, Tianjin Jacobi International Trading Co. Ltd.,

Jacobi Carbons Industry (Tianjin), and Jacobi Carbons, Inc. (collectively, "Jacobi"), we hereby submit

Jacobi's response to the Department's sections C and D questionnaire for Jacobi Carbons, Inc., Ningxia

Guanghua Activated Carbon Co., Ltd., and Ningxia Huahui Activated Carbon Co., Ltd, in the above-referenced administrative review.

## Request for Proprietary Treatment

Pursuant to 19 C.F.R. § 351.304, Jacobi requests business proprietary treatment for the bracketed information contained in this submission. Disclosure of this information would cause substantial harm to the competitive interests of Jacobi and it's suppliers. The specific pages and exhibits in which business proprietary information appears are listed on the first page of this letter. The specific types of information for which proprietary treatment is sought are detailed below:

### Sales and Cost Data and Supplier Names

This response presents very sensitive sales and cost data. The disclosure of this information would cause substantial harm to the competitive position of Jacobi and it's suppliers. Pursuant to 19 C.F.R. § 351.105(c)(6) and (c)(11), Jacobi requests proprietary treatment for this information.

### Consent to APO Release and Service

Jacobi consents to the release of the proprietary version of this submission under administrative protective order ("APO"). This submission is being served on the response due date on the persons indicated on the attached service list. Any replacement pages to correct bracketing errors will be served on those persons one business day after the response due date.

### Number of Copies and Public Version

In accordance with 19 C.F.R. § 351.303(c)(2), we have submitted one copy of the initial proprietary version of this submission on the due date. Six copies of the final proprietary version and three copies of the public version of this submission are being submitted one business day after filing the initial proprietary version.

DC:652939.1

FOR OFFICIAL FILE



**MOWRY & GRIMSON**
PLLC

**Mowry & Grimson, PLLC**
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
202.688.3610
202.595.8968 (fax)
www.mowrygrimson.com

RECEIVED
DEC 23 2010
DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

Case No. A-570-904
Total Number of Pages: 59
Administrative Review (§751)
4/1/09-03/31/10
IA/NME/9

2060

**PUBLIC VERSION**
Business Proprietary Info. Deleted From
SR Application and Exhibits 2 through 16

**Document May Be Released Under APO**

December 23, 2010

**VIA HAND DELIVERY**

The Honorable Gary Locke
Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
APO/Dockets Unit, Room 1870
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

Re:    **Third Administrative Review of the Antidumping Duty Order on Certain Activated
Carbon from the People's Republic of China:  Separate Rate Application of Ningxia
Huahui Activated Carbon Co., Ltd.**

Dear Secretary Locke:

On behalf of Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"), an exporter of the

subject merchandise in the above-captioned administrative review, we hereby submit Huahui's

Separate Rate Application ("SRA").

000185

The Honorable Gary Locke
December 23, 2010
Page 2

On July 20, 2010, Huahui submitted its Separate Rate Certification to the Department.
See Letter from Mowry & Grimson to the Department, Certain Activated Carbon from the
People's Republic of China: Separate Rate Certification of Ningxia Huahui Activated Carbon
Co., Ltd. (July 20, 2010). On December 7, 2010, the Department informed Huahui that its
Separate Rate Certification was inadequate and requested that Huahui complete a SRA. Huahui
thereafter requested an extension of time to submit its SRA, which was granted on December 8,
2010. See Memorandum from Bob Palmer to the File, Separate Rate Application Extension for
Ningxia Huahui Activated Carbon Co., Ltd. (Dec. 8, 2010) (Public Document). The current
deadline for submission of Huahui's SRA is December 27, 2010. This submission, therefore, is
timely.

Some of the information contained herein is business proprietary information. Pursuant
to 19 C.F.R. §§ 351.304(a)(1)(i), 351.105(c) and 351.303 (2009), Huahui hereby requests that
the Department grant confidential treatment to the information so designated. Huahui consents
to the release of information contained in this submission to the extent required by the
Department under a valid administrative protective order ("APO").

The Honorable Gary Locke
December 23, 2010
Page 3

&ast;    &ast;    &ast;

  This document has been served in accordance with the attached certificate of service.

Pursuant to the directions provided by the Department in its SRA, Huahui has provided six

copies of the business proprietary version of its SRA. If you have any questions concerning this

submission, please do not hesitate to contact the undersigned.

       Respectfully submitted,

       Jeffrey S. Grimson
       Kristin H. Mowry
       Jill A. Cramer
       Susan E. Lehman*
       Sarah M. Wyss*
       MOWRY & GRIMSON, PLLC

       *Counsel to Ningxia Huahui Activated Carbon
       Co., Ltd.*

       * Admitted only in Maryland; practice directly
       supervised by principals of the firm admitted to the D.C.
       Bar.

The Honorable Gary Locke
December 23, 2010
Page 4

### Explanation of Requests for Proprietary Treatment

Pursuant to 19 C.F.R. § 351.105(c), Ningxia Huahui Activated Carbon Co., Ltd. hereby requests that the Department accord confidential treatment to the information so designated. For each request, we have provided an explanation of why the information qualifies for proprietary treatment under one or more of the factors identified in the Department's regulations at 19 C.F.R. § 351.105(c).

<u>Separate Rate Application</u>

The narrative response and Exhibits 2 through 16 contain specific business information the release of which to the public would cause substantial harm to the competitive position of Ningxia Huahui Activated Carbon Co., Ltd.

The Honorable Gary Locke
December 23, 2010
Page 5

## ATTORNEY CERTIFICATION

I, Jeffrey S. Grimson, of Mowry & Grimson, PLLC, counsel to Ningxia Huahui Activated Carbon Co., Ltd., certify that: (1) I have read the attached submission; and (2) based on the information made available to me by Ningxia Huahui Activated Carbon Co., Ltd. I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Jeffrey S. Grimson
Mowry & Grimson, PLLC

*Counsel to Ningxia Huahui Activated*
*Carbon Co., Ltd.*



宁夏华辉活性炭股份有限公司
Ningxia Huahui Activated Carbon Company Limited
Tele: +86-951-5070220    Fax: +86-951-5070221

I, Yang Dong, currently employed by Ningxia Huahui Activated Carbon Company Limited, certify that (1) I have read the attached submission, and (2) the information contained in this submission is, to the best of my knowledge, complete and accurate.

_____
(Signature of certifying official)

**Public Service List: A-570-904**
**Certain Activated Carbon from People's Republic of China**
**Third Administrative Review: 4/1/2009-3/31/2010**

I, Jeffrey S. Grimson, certify that a copy of the attached submission was served this 23rd day of December 2010 by Federal Express or first class mail to the following parties:

R. Alan Luberda, Esq.
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, DC 20007-5108
(Via Fed Ex)

Daniel Porter, Esq.
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006-3817

Francis J. Sailer, Esq.
Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP
1201 New York Avenue, NW
Suite 650
Washington, DC 20005

Gregory S. Menegaz, Esq.
deKieffer & Horgan
729 15th Street, NW
Suite 800
Washington, DC 20005

Craig A. Lewis, Esq.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

Ronald M. Wisla, Esq.
Kutak Rock LLP
Suite 1000
1101 Connecticut Ave., NW
Washington, DC 20036

Matthew J. McConkey, Esq.
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006-1101

Paul Lee
Anli Partners
9/F, Tower 3, Beijing International
Center
No. 38 Dongsanhuan North Rd.
Chaoyang District
Beijing, 10026 PRC

Jeffrey S. Grimson

## Exhibit Content

| | |
|---|---|
| Exhibit 1 | Company Certification |
| | Attorney Certification |
| Exhibit 2 | Purchase Order |
| | Commerce Invoice |
| | Packing List |
| | Bill of Lading |
| | Payment Documentation |
| Exhibit 3 | Purchase e-mail with Client |
| Exhibit 4 | U.S. Importer 7501 Form |
| Exhibit 5 | Huahui Business License |
| Exhibit 6 | Registration Form for Foreign Trade Operator Record |
| Exhibit 7 | Shareholder's Business License |
| Exhibit 8 | Capital Verification Report |
| Exhibit 9 | Financial Statement |
| Exhibit 10 | Share Transfer Agreement |
| Exhibit 11 | Company Article of Association |
| Exhibit 12 | Legal Structure Chart |
| Exhibit 13 | Company-issued Resolutions |
| Exhibit 14 | Bank Information |
| Exhibit 15 | Top 10 Shareholders Information |
| Exhibit 16 | Shareholder Worksheet |

OFFICE OF AD/CVD OPERATIONS

PEOPLE'S REPUBLIC OF CHINA ("PRC")
# SEPARATE RATE APPLICATION
### AND REQUIRED SUPPORTING DOCUMENTATION

**REQUESTER(S):**    **Ningxia Huahui Activated Carbon Co., Ltd.**

**REPRESENTATION:**    **Jeffrey S. Grimson**
**Mowry & Grimson, PLLC**
**5335 Wisconsin Avenue, NW, Suite 810**
**Washington, DC 20015**
**Phone: 202-688-3610**
**Fax: 202-595-8968**
**E-mail: trade@mowrygrimson.com**

**CASE:**    **Activated Carbon from the People's Republic of China**

**PERIOD OF INVESTIGATION/REVIEW:**    April 1, 2009 – March 31, 2010

**DEADLINE FOR SUBMISSION:**    60 days from **publication** date of the initiation
notice, *See* http://ia.ita.doc.gov/frn/index.html.

**FILING ADDRESS:**
U.S. Department of Commerce
International Trade Administration
APO/Dockets Unit, Room 1870
1401 Constitution Avenue, N.W.
Washington, DC 20230

**FILING INSTRUCTIONS:** *See* "Instructions for Filing the Application" at Section V.
*See also* http://ia.ita.doc.gov/filing/index.html.

1

## INTRODUCTION

Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui") hereby responds to the Department of Commerce's (the "Department's") letter of December 7, 2010 requiring Huahui to answer the full Separate Rates Application. Huahui's response is timely filed pursuant to the extension granted by the Department on December 8, 2010.

Huahui has cooperated in every phase of the Department's proceedings in this case. In the original investigation, Huahui submitted a full Separate Rate Application and was also verified by the Department by virtue of its role as a supplier to another mandatory respondent. Huahui was granted a separate rate in the investigation. See Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Certain Activated Carbon from the People's Republic of China, 71 Fed. Reg. 59,721 (Oct. 11, 2006). Huahui was granted separate rate status in both the first and second administrative reviews. See Certain Activated Carbon From the People's Republic of China: Notice of Preliminary Results of the Antidumping Duty Administrative Review and Extension of Time Limits for the Final Results, 74 Fed. Reg. 21,317 (May 7, 2009); Certain Activated Carbon From the People's Republic of China: Notice of Preliminary Results of the Second Antidumping Duty Administrative Review and Preliminary Rescission in Part, 75 Fed. Reg. 26,927 (May 13, 2010). In the second administrative review, Huahui filed a response not only to the separate rates questionnaire, but also to the full Section A and numerous supplemental questionnaires regarding Huahui's eligibility for a separate rate (Huahui was a mandatory respondent in the second review). See Letter from Mowry & Grimson to the Department, Third Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China: Separate Rate Certification of Ningxia Huahui Activated Carbon Co., Ltd. (July 20, 2010) (hereinafter Huahui's SRC; see also Letter from Troutman Sanders to the Department, Certain Activated Carbon from the People's Republic of China: Second Administrative Review; Section A Questionnaire Response (Oct. 20, 2009) (Public Version).

In the instant review, Huahui followed the instructions in the questionnaire and answered the Separate Rate Certification "for firms previously awarded a separate rate." Huahui answered each questionnaire, including question 11, which includes a box stating, "I certify that during the POR, the ownership under which the firm registered itself with the official government business license issuing authority remains the same as for the previous Granting Period." The footnote accompany question 11 clarifies that, "If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation." Huahui followed this instruction and left the box unchecked, explaining in a short narrative that there was a change in some of Huahui's shareholders occurring in the very last month of the POR. See Huahui's SRC at 3-4. The Department's December 7, 2010 letter seems to imply that Huahui was not eligible to answer the SRC. As explained above, however, Huahui properly answered the SRC and, as detailed herein,

2

remains eligible for a separate rate in the third review.

## SECTION I

**General Certifications**

(To be signed by the company official of the applying firm who is officially responsible for presentations made to the Department of Commerce.)

*1.[1]

I, (name and title), currently employed by (person), certify that (1) I have read the attached submission, and (2) the information contained in this submission is, to the best of my knowledge, complete and accurate.

_____{ signature }_____

(For the person's legal counsel or other representative)

**This signed certification is provided in Exhibit 1.**

*2. I, (name), of (law or other firm), counsel or representative to (person), certify that (1) I have read the attached submission, and, (2) based on the information made available to me by (person), I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

_____{ signature }_____

**This signed certification is provided in Exhibit 1.**

## SECTION II

**Administration**

*1. The full name and contact information (including address, telephone, fax, and e-mail address) of the exporter applying for separate rate status:

| | |
|---|---|
| **Name:** | **Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui")** |
| **Address:** | **No. A Chuangxin Yuan**<br>**High Tech Development Zone**<br>**Yinchuan Ningxia China** |

---

[1] Note again that the asterisked fields are to be completed by *all* firms, including those wholly foreign-owned by entities located in market-economy countries. Wholly market-economy owned firms need not respond to non-asterisked fields.

3

Telephone:    0951-5070220
Fax:          0951-5070221
Email:        info@huahui-carbon.com

*2. Is the applicant identified by any other names, as a legal matter in the home market, in third countries, or in the United States (*i.e.*, does the company use trade names)?[2]

      ___  Yes
      √   No

If yes, then list any and all other names here, when and under what circumstances they are used, and confirm whether the business license/registration documents submitted with this application and covering the period of review ("POR")/period of investigation ("POI") include each of these or other alternative names. Please also provide evidence that these names were used during the POR/POI.

If a trade name is not listed on the company's business license/registration documents, please provide an explanation and any evidence as to how the company is permitted to use that trade name.

*3. The applicant certifies the accuracy of and can document the following statements: (check any of the following that apply)

      ☑ a. It has exported, or has sold for export, subject merchandise to the United States during the period of investigation/review.

      ☑ b. It has, under its own name(s), made a shipment of merchandise that was entered for consumption in the United States.

      ☐ c. It has, sold the merchandise during the period of investigation/review to an unaffiliated third-country customer for export to the United States (there must be either a sale or entry during the period of investigation/review to proceed with the separate-rate request).

*4. ☑ The applicant certifies that it will, to the maximum extent possible, provide a direct legible photocopy (not a copy of a copy) of all of the following original documents for the first sale by invoice date of subject merchandise to an unaffiliated customer in the

---

[2] Trade names are other names under which the company does business. It does not include product brand names or the names of any other entities in the applicant's "group," affiliated or otherwise. If your firm is assigned separate rate status, your firm will only be able to ship under your separate rate under names that are included on your business license/registration documents, or are otherwise permitted, as explained in your response to this question.

4

PUBLIC VERSION
Proprietary Information
Deleted

United States during the POR/POI for a commercial transaction.[3] These documents must not be altered in any way. If your firm's first sale by invoice date during the period of investigation/review was a sample sale, a sale of non-commercial quantities, or a sale to an affiliated party, identify this sale and provide documentation on another sale.[4] If providing documentation on another sale during the period of investigation/review, attach an explanation of why providing documentation for the first sale during the period of investigation/review was not possible. If you are not able to supply completely legible photocopies of any documents required below, you must supply the most legible photocopies available, complete the additional certification in Appendix B, and include an explanation in it of why submission of all the photocopies in completely legible form is not possible.

A.    The U.S. Customs 7501 Entry Summary or the U.S. FDA Release Form.[5]

If the exporter is unable to obtain the relevant U.S. Customs 7501 Entry Summary or U.S. FDA Release Form, the exporter must explain why it is unable to submit these documents and provide documentation that it has attempted to obtain these documents from its customers.

B.    The bill of lading.
C.    The commercial invoice.
D.    The packing list.
E.    Documentation demonstrating receipt of payment.

All the documents above must pertain to the same sale (normally, the first sale by invoice date in the POR/POI, unless one of the conditions discussed above applies). In addition to providing these documents, you must provide a narrative explanation of how the documents relate to one another and what the specific links are among the documents. If volumes or values do not exactly match from one document to the next, the applicant must provide in this narrative a clear explanation of any apparent discrepancies among the documents. The applicant must also provide and explain additional documentation necessary to corroborate its explanation in this regard. For example, if the invoice and payment amount do not match, the applicant must explain the difference and provide documentary support for this explanation.

**Huahui's first sale to the United States during the POR includes items from two different purchase orders. [    ] of subject merchandise included in Huahui's first shipment come from Purchase Order number [            ],**

---

[3] If you are not able to supply completely legible photocopies of any documents requested in the application, you must attach an explanation of why submission of completely legible photocopies is not possible.

[4] If your firm has *only* made sales to affiliated parties during the period of investigation/review, you must provide evidence of the first sale to an *unaffiliated* U.S. customer by the affiliated party to qualify for a separate rate.

[5] If the merchandise was entered into the United States informally using Customs Form 368 or 368A because the value of the entry was USD $2000 or less, provide a copy of Customs Form 368 or 368A.

5

PUBLIC VERSION
Proprietary Information
Deleted

dated [                    ], while [    ] MT comes from PO [                ],
dated [                ].

The negotiation relating to the final prices reflected on the Commercial
Invoice began on [                ], when Huahui's customer, [
                                        ], contacted Mr.
Dong Yang about [                                    ].
Upon learning more about [                    ], Mr. Dong Yang agreed [
                            ].    Exhibit 3 includes e-mail
communications between Mr. Dong Yang and [        ] staff explaining the
circumstances surrounding these sales.    Exhibit 3 shows the [            ],
which was [            ], and also the shipping schedule, which was shipment of
[  ] MT of product number [    ] and [        ] of product number [    ] every
week from June 16, 2009 forward.

The final negotiated price between Huahui and its customer, [        ], is
evident in the commercial invoice issued on [            ]. See Exhibit 2. The
total quantity listed in this invoice is [            ], which includes [
                        ]. The total quantity amount
also shows on the packing list (see Exhibit 2) with total [    ] bags and gross weight
[        ] kgs., traces to the bill of lading (also provided in Exhibit 2).

The commercial invoice in Exhibit 2 also shows [
                                        ]. For [
                                        ]. The
total price on the invoice was [                        ]. As [        ]
requested that Huahui to show the inland freight (door-to-port and port-to-boat) in
the invoice, Huahui adjusted the unit price to [
                            ] separately in the invoice, while holding
total price unchanged.

Huahui received the wire transfer payment of [                    ] to
Huahui's bank account at [                    ] and requested for (Foreign)
exchange control declaration. These documents are attached in Exhibit 2.

The total amount of [        ] also shows in Exhibit 4 the U.S. Importer
7501 Form.

To summarize, the following documents are attached in Exhibit 2: Purchase
Order; Commercial Invoice; Packing List; Bill of Lading; Payment Documentation.
E-mails documenting price negotiations with Huahui's U.S. customer are attached
in Exhibit 3. Form 7501 for this sale is attached in Exhibit 4.

As the foregoing documentation confirms, Huahui made its sales decisions in
independent negotiations with the unrelated U.S. customers, without any

6

involvement by any government entity at any level.

*5. Does the applicant have any knowledge that merchandise it sold was resold to the United States through market-economy third-country exporters in U.S. dollars?[6]

    _____ Yes
   √ No

*6. Provide the full name and contact information (including address, telephone, fax, and e-mail address) of each of the applicant's producers and/or suppliers of subject merchandise whose merchandise the applicant sold or exported to the United States during the POR/POI[7]:

**Huahui produced all of the subject merchandise it exported to the United States during the POR. Huahui's contact information is provided in Section II, question 1, above.**

*7. Are the producers and/or suppliers, listed under question 6 above, identified by any other names as a legal matter in the home market, in third countries, or in the United States (*i.e.*, do the companies use trade names)?[8]

    _____ Yes
   √ No

**Not applicable, as Huahui produced all of the subject merchandise it exported to the United States during the POR.**

If yes, then list any and all other names here, and provide a copy of the business licenses/registration documents showing that the suppliers use these alternative names and the dates in which these names were in effect.

---

*8. Indicate whether, to the best of your knowledge, the producers and/or suppliers identified under question 6 above directly exported subject merchandise to the United

---

[6] The Department considered Belarus, Georgia, the Kyrgyz Republic, the People's Republic of China, the Republic of Armenia, the Republic of Azerbaijan, the Republic of Moldova, the Republic of Tajikistan, the Republic of Uzbekistan, the Socialist Republic of Vietnam, and Turkmenistan to be non-market economies during this period of investigation/review.

[7] With respect to investigations, if your firm is assigned separate rate status, the rate will *only* apply to merchandise exported by your firm and supplied by the producers identified here. *See* Import Administration Policy Bulletin 05.1, available on the Department's website at http://ia.ita.doc.gov/policy/index.html.

[8] Trade names are other names under which the company does business. It does not include product brand names or the names of any other entities in the applicant's "group," affiliated or otherwise.

7

States during the period of investigation/review.

**Not applicable, as Huahui produced all of the subject merchandise it exported to the United States during the POR.**

## SECTION III

*De Jure* Control
Please check the boxes below if you can certify that the statements below are accurate

1. ☑ The applicant certifies that there are no government laws or regulations, at either national and sub-national (*e.g.*, provincial, local) levels of government, that control the applicant's export activities.

*2a. ☑ The applicant possesses an official government business license/registration documents valid during the period of investigation/review and is submitting with the application original-language and translated copies of any business licenses in effect during the POR/POI, the most current business license, and original-language and translated unaltered photocopies of any and all additional business licenses/registration documents or amendments thereto issued to the applicant and in effect during the POR/POI. If you are not able to supply completely legible photocopies of any of these required documents, you must supply the most legible photocopies available, complete the additional certification in Appendix B, and include an explanation in it of why submission of all the photocopies in completely legible form is not possible.[9]

**Huahui's business license (with English translation) is attached in Exhibit 5.**

2b. Indicate the full name and contact information (address, telephone, fax, and e-mail address) of the business license/registration documents authority which issued your business license/registration documents and the expiration date of your business license/registration documents (see footnote 10).

| Issuing Authority: | **Ningxia Hui Autonomous Region Industrial and Commercial Administration Bureau** |
|---|---|
| Address: | **No.106 Beijing Middle Street Yinchuan, Ningxia, China** |
| Tel: | **0951-5672001** |
| Fax: | **0951-5672004** |

---

[9] Note that if the Department determines that your firm is eligible for separate rate status, the separate rate will only apply to the firm as named in your business license/registration documents and not to any alternative or trade names that are not included in your business license/registration documents. It is the Department's understanding that a valid business license/registration documents with clearly defined periods of validity issued by the appropriate licensing authority is required for all business activity. An applicant submitting a business license without an expiration date must provide an explanation in order for the Department to consider its application.

8

**E-mail:** postmaster@nxdofcom.gov.cn
**Expiration Date:** December 30, 2053

2c. Provide the month, day, and year on which the business license authority last renewed your business license/registration documents.

**Huahui's business license was last renewed on March 1, 2010 and bears the stamp from Huahui's annual inspection covering 2009. See Exhibit 5.**

*2d. Indicate from the following choices the ownership structure under which your company has registered itself with the official government business license issuing authority.

        ☐ owned by all of the people ☐
        ☐ collective ☐
        ☐ limited liability ☐
        ☐ proprietorship
        ☐ partnership ☐
        ☑ joint-stock limited company
        ☐ other (please describe:_____)

Select from the following choices any applicable secondary forms of registration related to foreign-invested enterprises that apply to your firm:

        ☐ domestic-foreign equity joint venture
        ☐ domestic-foreign contractual joint venture
        ☐ wholly foreign-owned enterprise
        ☐ other (please describe:_____)

**Not applicable.**

3a. Indicate the full name and contact information (address, telephone, fax, e-mail address) of the business license authority which issued your export certificate of approval and the dates in which it was in effect.

**Name:**         **Department of Commerce of Ningxia Hui Autonomous Region**

**Address:**      **No. 363 Jiefang West Road**
                 **Yinchuan, Ningxia, China**

**Tel:**           **0951-50433032**
**Fax:**          **0951-5044239**
**E-mail:**       **N/A**

**The Department of Commerce of Ningxia Hui Autonomous Region no longer requires companies to have an export certificate of approval. Now, in order to export, companies need only fill out the "Registration Form for Foreign Trade**

Operator Record." Huahui has provided two of these forms which, together, cover the period of review in Exhibit 6.

3b. Provide the month, day, and year on which the business license authority issued your export certificate of approval.

**As discussed in Question 3.a., above, the Department of Commerce of Ningxia Hui Autonomous Region no longer requires companies to have an export certificate of approval. Huahui's most recent Registration Form for Foreign Trade Operator Record was issued on April 26, 2010.**

3c. ☑ By checking the box, the applicant certifies that it is submitting with the application an original-language and translated copy of its export certificate of approval or foreign trade operator registration form which was valid during the period of investigation/review.[10]

**Again, as discussed in Question 3.a., above, the Department of Commerce of Ningxia Hui Autonomous Region no longer requires companies to have an export certificate of approval. Huahui has provided its Registration Forms for Foreign Trade Operator Record in Exhibit 6.**

4. In order to conduct export activities, is the applicant required by any national, provincial, or local government law or regulation to possess additional certificates or other documents related to the legal status and/or operation of its business beyond those discussed above?[11]

    ___ Yes
    _√_ No

        If yes, identify the certificates below, and submit original-language and translated copies thereof with the application.

5. Check the box next to the following PRC government laws and legislative enactments that apply to the applicant firm:

☑ Company Law of the PRC, effective as of January 1, 2006
☑ Foreign Trade Law of the PRC, effective as of July 1, 2004
☑ Administrative Regulations of the PRC Governing the Registration of Legal
    Corporations

---

[10] It is the Department's understanding that an export certificate of approval or foreign trade operator registration form issued by the appropriate licensing authorities is required for all export activity. Therefore, the Department will not consider a separate rate for any applicant not providing such a certificate/form.

[11] The Department is interested only in government laws or regulations which restrict or limit exports rather than regulations which regulate purely domestic operations (i.e., environmental or labor regulations). If you are unsure of the possible relevance of a given law, please contact the Department immediately.

☑ PRC's Enterprise Legal Person Registration Administrative Regulations of June 13, 1998
□ Law of the PRC on Chinese-Foreign Cooperative Joint Ventures
□ Regulation Governing Rural Collectively-Owned Enterprises of the PRC of 1990
□ Law of the PRC on Industrial Enterprises Owned by the Whole People, adopted on April 13, 1988 ("The Industrial Enterprises Law")
□ Regulations for Transformation of Operational Mechanisms of State-Owned Industrial Enterprises of 1992 ("Business Operation Provisions")
□ The Organic Law on Village Communities in the PRC ("Village Committee Law")
□ Other (if checked, please identify below any additional specific national PRC laws and/or legislative enactments which relate to the export functions of the applying company)

6. Are there any sub-national (provincial, local) government laws affecting the applicant's export operations?

    \_\_\_ Yes
    √ No

If yes, identify the laws and submit original and translated copies of each provincial or local government law with the application:

## SECTION IV

**De Facto Control**

**A.  Ownership**

*1. For each intermediate and ultimate[12] shareholder entity (*i.e.*, shareholders that are not individuals) of the applying firm, please respond to the following:

    a.  Provide the names and contact information (full business address, telephone number, fax number, and e-mail address) of the legal entities which are the shareholders (*i.e.,* both intermediate and ultimate owners) of each shareholder entity and indicate the percentage ownership.

---

[12] If you have questions as to the meaning of intermediate and ultimate shareholders, please contact the Department official(s) in charge (noted on the cover page) prior to responding.

11

PUBLIC VERSION
Proprietary Information
Deleted

| Description Before Modification | Description After Modification |
|---|---|
| [<br><br><br><br><br>] | ] |
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |

As explained in POR 2, although some shareholders of Huahui [

], both before and after the shareholder changes reflected above.

12

JA100298

PUBLIC VERSION
Proprietary Information
Deleted

**Please see Exhibit 16 for a calculation of the number of shares of Huahui [**
**].**

b.        Submit a copy of each shareholder entity's business license.

**The business license for each shareholder is attached at Exhibit 7.**

c.        State the legal domicile of each shareholder entity.[13]

**The legal domicile for each shareholder entity is provided in Section IV.A., Question 1a.**

*2. Applicants must provide the following documentation to support your response to question 1 above.

    a. capital verification report
    b. consolidated financial statements
    c. share transfer agreement
    d. articles of incorporation/articles of association
    e. export certificate of approval

**The requested documents, with English translations, have been provided in the following exhibits:**

| | |
|---|---|
| **Exhibit 8** | **Huahui's Capital verification report** |
| **Exhibit 9** | **Huahui's Audited Financial Statements during POR; Huahui's unaudited financial information for January, February and March 2010.** |
| **Exhibit 10** | **Share Transfer Agreement** |
| **Exhibit 11** | **Company Article of Association** |
| **Exhibit 6** | **Registration Form for Foreign Trade Operator** |

**Please note, Huahui does not have consolidated financial statements. Huahui's financial statement is audited in early January of the preceding year. As this review period also covers the first quarter of 2010 and this precedes Huahui's annual audit, Huahui is only able provide un-audited financial statement for the first quarter of 2010. Huahui will submit its audited 2010 financial statement as soon as it becomes available.**

---

[13] Note to firms applying as wholly market-economy owned entities: document whether the ultimate owners of your company are located in market-economy countries and, if so, indicate which market-economy countries.

13

PUBLIC VERSION
Proprietary Information
Deleted

If you are provide the most legible unaltered copies of the documents available, complete the additional certification in Appendix B, and provide a narrative description of why you are not able to provide legible photocopies all of the above documents.

3.   In addition, identify the top 10 individual shareholders of your company.

**Not Applicable.  Huahui has no individual shareholders.**

4A.   For each of the applying firm's top ten shareholders (individuals and entities) and all of their entity shareholders, at any time during period of investigation/review, report in detail any significant relationship[14] with any of the following:

PRC state asset management company (government-owned and/or private chartered)
The PRC national government and/or its ministries/agencies
PRC provincial governments;
PRC local/municipal/village government(s)/agency(ies).

[



]

**Notwithstanding [**
**] Huahui's ability to set prices and make business decisions independent from government control.  In POR 2, the Department was aware of [**
**] in Huahui by virtue of the fact that some shares of Huahui's shareholders were held by [               ].  The situation in the current review is not conceptually different: as of the last month of the POR, some shares of Huahui are**
**[                                                                                          ]**
**but these funds do not have any involvement in the setting of day-to-day prices, etc., in connection with Huahui's U.S. sales of activated carbon, as is confirmed by the sample correspondence submitted by Huahui regarding its first sale.  See Exhibit 3.**
**[                                ] continues to represent only a minority of Huahui's shares, as shown in Exhibit 16.**

**Huahui was granted a Separate Rate in POR 2.  The Department has consistently stated that any given level of ownership by a state asset management entity does not disqualify a company from eligibility for a separate rate.  See Unpublished Issues and Decision Memorandum, Cut-to-Length Carbon Steel Plate from the People's Republic of China: Issues and Decision Memorandum for the Final Results of Administrative Review at Comment 1 (Feb. 16, 2010) (available at http://ia.ita.doc.gov/frn/summary/PRC/2010-3743-1.pdf).  The Department, therefore, should continue to grant Huahui separate rate status.**

---

[14] A significant relationship would include ownership, control, affiliation, significant transactions, *etc.*

14

**PUBLIC VERSION**
Proprietary Information
Deleted

4B.    Please state what relationship(s) each shareholder entity's managers and board of director members has with any level of the government, (*e.g.*, national, provincial, local) and/or government agencies.

**Huahui currently has four shareholder entities. They are [**


**].  Huahui does not interact with its shareholders with respect to Huahui's daily operation, price negotiation, management selection or export activity.  Also, Huahui has no involvement with its shareholders' decision making at any level.  Hence, Huahui cannot compel its shareholders to provide information regarding managers and members of the board of directors at upper shareholder levels.**

**Huahui nevertheless provides the names and positions of each shareholder entities' board of directors and management, below.**

[                                                                              ]

| 姓名 Name | 职位 Position |
|---|---|
| [ | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | ] |

[                                                                              ]

15

PUBLIC VERSION
**Proprietary Information
Deleted**

| 姓名 Name | 职位 Position |
|---|---|
| [ | |
| | |
| | |
| | ] |

[                                        ]

| 姓名 Name | 职位 Position |
|---|---|
| [ | |
| | |
| | ] |

[                                        ]

| 姓名 Name | 职位 Position |
|---|---|
| [ | |
| | |
| | |
| | |
| | |
| | |
| | ] |

5.    For the top ten individual owners of the intermediate and ultimate shareholder entities (*i.e.*, shareholders that are not individuals) of the applying firm, please state whether they hold office at any level of the PRC government (*e.g.*, national, provincial, local) or held office at any PRC government agencies during the past three years. If so, for each not able to submit legible, unaltered photocopies of each of these documents, you must individual, identify the office held, the level of the government and/or agency with which the office is held, and describe the official role of each.

**The following Huahui's shareholder entities do not have individual owners.**
    − [

16

PUBLIC VERSION
Proprietary Information
Deleted

]. Please also see our answer in Section IV A 4A.

– [

].

– [

] Please refer to Exhibit 12 for Huahui Legal Structure Chart.

[

]. Huahui does not have access to detailed information on individual shareholders, which can change frequently.  To comply with the Department's request to the best of its ability, Huahui is providing the best information available, provided via publicly-available websites.   See Exhibit 15 for top 10 shareholders of [

]

**B.   Price Negotiation**

Please check the boxes below to make the following certifications.

6.    ☑ The applicant certifies that its export prices are not set by, subject to the approval of, or in any way controlled by a government entity at any level (national, provincial, local).[15]

7.    ☑ The applicant certifies that it has independent authority to negotiate and sign export contracts and other agreements (conducts independent price negotiation).[16]

8.    ☑ The applicant must provide documentation supporting its certification that the applicant conducts independent price negotiations. (see question 7 above) You must submit such documentation related to the first sale of the period of investigation/review with the application.[17] If you cannot provide such documentation please contact the official in charge. Examples include the following

---

[15] This includes, but is not limited to, the presence of government officials at any meeting where export and pricing decisions are discussed.

[16] The authority to conduct independent price negotiation refers to the ability of an NME exporter to set its own export prices independently of the government at any level (national, provincial, local) and without the approval of any government entity.

[17] Applicants must provide documents showing price negotiation, not documents merely confirming that a sale will take place at a given price. If your firm conducts its price negotiation by phone, does not keep phone logs of meetings conducted over the phone, and therefore has no records of price negotiation, you are required to attach 1) a certification that there are no records of price negotiation, and 2) an affidavit signed and dated by the unaffiliated U.S. customer attesting that it conducts independent price negotiation with the applying firm. Affidavits must provide adequate information to link the applicant to the party signing the affidavit.

17

types of documentation:

- faxes/e-mail correspondence between applicant and unaffiliated U.S. customer
- purchase order from unaffiliated U.S. customer
- order confirmation
- logs of negotiations conducted over the telephone with an unaffiliated U.S. customer

**Huahui has provided this information in Section II, Question 4 and also in Exhibit 2 (purchase order) and Exhibit 3 (price negotiation emails with the unrelated U.S. customer).**

If you do not have any documentation to support your certification that your firm conducts independent price negotiation, you may submit an affidavit as an alternative. This affidavit testifying to independent price negotiation must signed and dated by an *unaffiliated* U.S. customer, and include the unaffiliated U.S. customer's contact information.

## C.    Selection of Management

9. ☑ By checking the box, the applicant certifies that it has autonomy from all levels of the government (national, provincial, local) and from any government entities in making decisions regarding the selection of management.

10. The applicant must provide specific documentation that evidence independence in the selection of management which supports its certification in question 9 above. Examples might include the following:

- appointment letters
- director meeting minutes
- company-issued resolutions/notifications (besides appointment letters)

**Company-issued resolutions regarding the appointment of management are attached at Exhibit 13.**

11. Provide the name of each manager and board member in the applicant's company who held a management position during the period of investigation/review and the date (month, day, year) that each of the managers obtained his or her position at your company. Also provide the names of each manager and his or her employment (*i.e.*, position, name of company) for the three years prior to working at your company if they have been working at your company for less than three years.

| 姓名 | 现职务 | 任期 |
|------|--------|------|
|      |        |      |

18

PUBLIC VERSION
Proprietary Information
Deleted

| Name | Current Position | Date of Obtaining the Position |
|------|------------------|-------------------------------|
| [ |  |  |
|  |  |  |
|  |  |  |
|  |  | ] |

| 姓名<br>Name | 任期<br>Date of Obtaining<br>the Position | 工作单位<br>Name of Company | 职务<br>Position |
|------|------|------|------|
| [ |  |  | ] |

12. Have any of the applying firm's managers or board members worked for the government, at any level (national, provincial, local), or any government entities, in the past three years?

    _____ Yes
    √ No

    If yes, briefly describe the government involvement of the manager in question in supporting documentation.

13. Does the applying firm have to submit any of its candidates for managerial positions within the firm for approval to any government entity at any level (national, provincial, local)?

    _____ Yes
    √ No

If yes, you certify that you are filing a document with the application containing an

19

PUBLIC VERSION
Proprietary Information
Deleted

explanation.

**D.    Disposition of Profits**

14. ☑ By checking the box, the applicant certifies that it retains the proceeds of its export
sales and makes independent decisions regarding the disposition of profits or
financing of losses.

15. If the applicant realized a profit during the period of investigation/review, then
describe the process by which the applicant's profits were distributed. Specifically,
indicate the sections in the company's books and records where such profits were
recorded.

**At the end of the year, [**
**       ]. The rest of net profit will be retained as "Undistributed Profit" in the**
**accounting record of Huahui. Such amount is distributed to the shareholders**
**according to the share percentages.**

16. Did the applicant make any disbursements to government accounts during the period
of investigation/review other than for tax or government-provided goods or services?

      ___ Yes
      _√_ No

If yes, describe these disbursements, the specific government accounts, and file a
document or documents with the Department illustrating these disbursements.

17. For each bank account held by the applicant during the period of
investigation/review, the applicant certifies it will provide the following information:

  • Name and address of the bank
  • Bank account number
  • Month/Year in which the account was opened

**Please refer to Exhibit 14 for Huahui's bank information.**

18. ☑The applicant certifies that it is submitting with the application audited year-end
financial statements covering all months of the POR/POI as well as any other information
which supports the applicant's response to question 16 above.[18] If the applicant does not
have audited year-end financial statements for the period in question, it must
affirmatively state so and submit with the application un-audited year-end financial
statements covering all months of the POR/POI.

---

[18] If financial statements covering the POR/POI are not available at the time this application is filed, please indicate
when these statements would be available and submitted to the Department, and provide the Department with monthly
financial statements, if available.

20

Exhibit 9 contains all audited year-end financial statements available at the time of this response covering the POR. Huahui's 2009 financial statement has been audited by ShingWing Certified Public Accountants Co., Ltd. Huahui's financial statement is audited in early January of the preceding year. As this review period also covers the first quarter of 2010 and this precedes Huahui's annual audit, Huahui is only able provide un-audited financial statement for the first quarter of 2010. Huahui will submit its audited 2010 financial statement as soon as it becomes available.

### E.    Affiliation

All firms must respond to question 19. In addition, firms applying under NME ownership must respond to question 20, and firms that are applying for separate rate status under the status of 100% foreign ownership must respond to question 21.

Section 771(33) of the Tariff Act of 1930, as amended, defines affiliates as:

A.    Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and linked descendants
B.    Any officer and director of an organization and such organization
C.    Partners
D.    Employer and Employee
E.    Any person directly or indirectly owning, controlling, or holding with power to vote, five percent or more of the outstanding voting stock or shares or any organization and such organization
F.    Two or more persons directly or indirectly controlling, controlled by, or under common
       control with, any person
G.    Any person who controls any other person

For the purposes of affiliation, the Department will consider a person to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

*19. Explain whether your firm made shipments or sales to unaffiliated parties, affiliated parties or both, during the period of investigation/review, as defined by Section 771(33) of the Tariff Act of 1930. If your firm *only* made sales to affiliated parties during the period of investigation/review, you must provide evidence of the first sale to the first unaffiliated party to qualify for a separate rate.

        □ shipments or sales to affiliated parties only
        ☑ shipments or sales to unaffiliated parties only
        □ shipments or sales to both affiliated and unaffiliated parties

20. As defined by Section 771(33) of the Tariff Act of 1930, as amended, does the

21

applicant have *any affiliates that are located in the United States, or that exported merchandise to the United States* which would fall under the description of merchandise covered by the scope of the proceeding?

      ___Yes
      √ No

If the applying firm is affiliated with any other exporters of subject merchandise pursuant to this definition of affiliation, then the firm must list the full names and contact information (business address, telephone, fax, e-mail address) of the affiliates below. In addition, it would be useful if you would provide a chart demonstrating the ownership and affiliation structure of all of your affiliates that are involved in the production or sale of subject merchandise. For an example of how you might design this chart, *see* Appendix A.

**Huahui is not affiliated with any companies that are involved with the production or sale of subject merchandise.**

\*21. As defined by Section 771(33) of the Tariff Act of 1930, as amended, does the applicant have any *affiliates involved in the production or sale of merchandise in the home market, third-country markets, or the United States* which would fall under the description of merchandise covered by the scope of the proceeding?

      ___Yes
      √ No

If the applying firm is affiliated with any other producers or exporters of subject merchandise pursuant to this definition of affiliation, then list the full names and contact information (business address, telephone, fax, e-mail address) of the affiliates below. In addition, it would be useful if you would provide a chart demonstrating the ownership and affiliation structure of all of your affiliates that are involved in the production or sale of subject merchandise. For an example of how you might design this chart, *see* Appendix A.

**Huahui is not affiliated with any companies that are involved with the production or sale of subject merchandise.**

22

**KELLEY DRYE & WARREN** LLP

A LIMITED LIABILITY PARTNERSHIP

**WASHINGTON HARBOUR, SUITE 400**

**3050 K STREET, NW**

**WASHINGTON, D.C. 20007-5108**

(202) 342-8400

NEW YORK, NY
CHICAGO IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICES
MUMBAI, INDIA

FACSIMILE
(202) 342-8451
www.kelleydrye.com

**FOR OFFICIAL FILE**

**RECEIVED**

JAN 1 4 2011

DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

January 13, 2011

2072

Case No. A-570-904
Total No. of Pages: 178
§ 751(a) Annual Administrative Review for the Period
04/01/09-03/31/10
AD/CVD Operations, Office NME 9
**PUBLIC DOCUMENT**

**DELIVERY BY HAND**

Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
       Central Records Unit, Room 1870
14th Street and Constitution Avenue, N.W.
Washington, DC 20230

Attn: Ms. Catherine Bertrand, Ms. Katie Marksberry; Mr. Robert Palmer

Re:   **Third Administrative Review of the Antidumping Order on Certain**
      **Activated Carbon From the People's Republic of China: Petitioners'**
      **Proposed Surrogate Values**

Dear Mr. Secretary:

On behalf of Calgon Carbon Corporation and Norit Americas Inc. (hereinafter
"Petitioners"), this submission contains publicly available information relating to the
Department's valuation of the factors of production in this proceeding. This submission is
timely filed in accordance with the Department's Memorandum to the File dated November 5,
2010.

000191

A-570-904
ARP: 04/01/08 - 3/31/09
**Public Document**
IA/NME/IX: RJP

November 9, 2010

MEMORANDUM TO:    The File

THROUGH:         Catherine Bertrand
                          Program Manager, Office 9
                          Import Administration

FROM:                Bob Palmer
                          Case Analyst, Office IX
                          Import Administration

RE:                  Second Administrative Review of Certain Activated Carbon from
                          the People's Republic of China: Surrogate Values for the Final
                          Results

---

On May 13, 2010, the Department of Commerce ("Department") published the preliminary results of the second administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC"). See Certain Activated Carbon From the People's Republic of China: Notice of Preliminary Results of the Second Antidumping Duty Administrative Review and Preliminary Rescission in Part, 75 FR 26927 (May 13, 2010) ("Preliminary Results")

This memorandum covers any adjustments the Department made to the calculations of each of the factor values used in the final results for the above-captioned review. For detailed analysis of certain surrogate value changes, see "Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Second Antidumping Duty Administrative Review," dated November 9, 2010 ("Decision Memo"). Unless discussed below, we used the same surrogate value data that we used in the Preliminary Results.

We excluded from our calculations imports from the countries identified in "Second Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Preliminary Results," dated May 7, 2010 ("Prelim Surrogate Value Memo"). See Attachment 1 for the revised surrogate value spreadsheet used in these final results. The values listed in the text of this memorandum are rounded to the nearest hundredth for convenience purposes; however, the un-rounded values are used in the actual calculation.

## I.   GENERAL SURROGATE VALUE CHANGES

Value Submission, dated June 2, 2010 at Attachment 18; see also Jacobi's Post-Prelim Surrogate Value Submission, dated June 2, 2010 at Exhibit 1. We have used the information contained Kalpalka's 2007/2008 and Quantum's 2007/2008 in these financial statements to determine the surrogate value financial ratios of factory overhead, SG&A, and profit, because they are public, audited, complete, and represent companies that produce comparable merchandise.

Using this information the Department derived the following financial ratios:

Quantum Activated Carbon (07-08):
| | | |
|---|---|---|
| Factory Overhead | = | 4.78% |
| Selling, General, and Administrative | = | 16.65% |
| Profit | = | 1.09% |

Kalpalka Chemicals Ltd. (07/08)
| | | |
|---|---|---|
| Factory Overhead | = | 12.49 % |
| Selling, General, and Administrative | = | 26.00 % |
| Profit | = | 4.98 % |

The average surrogate financial ratios calculated from these financial statements are as follows:

| | | |
|---|---|---|
| Factory Overhead | = | 8.64 % |
| Selling, General, and Administrative | = | 21.33 % |
| Profit | = | 3.03 % |

See Attachments 1, 3, 3a, and 3b.

C.    Brokerage and Handling

We valued brokerage and handling using a price list of export procedures necessary to export a standardized cargo of goods in India. The price list is compiled based on a survey case study of the procedural requirements for trading a standard shipment of goods by ocean transport in India that is published in Doing Business 2010: India, published by the World Bank. See Memorandum to the File from Bob Palmer, Case Analyst, Office 9, dated May 7, 2010; see also Attachment 4.

3



**MOWRY & GRIMSON**

RECEIVED
MAR 2 3 2011
DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

2 116

**FOR OFFICIAL FILE**

**Mowry & Grimson, PLLC**

5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
202.688.3610
202.595.8968 (fax)

www.mowrygrimson.com

Case No.: A-570-904
Total Number of Pages: 36
§751(a) Review for the Period
4/1/09-03/31/10
IA/NME/9

**PUBLIC VERSION**
Business Proprietary Info. Deleted from Explanation of
Proprietary Treatment, Narrative Pages 1 through 11, 13-14,
and Exhibits 1 through 7

March 23, 2011

**VIA HAND DELIVERY**

The Honorable Gary Locke
Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
APO/Dockets Unit, Room 1870
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

**Re:    Third Administrative Review of the Antidumping Duty Order on Certain Activated
        Carbon from the People's Republic of China:  Second Supplemental Questionnaire
        Regarding the December 23, 2010 Separate Rate Application of Ningxia Huahui
        Activated Carbon Co., Ltd.**

Dear Secretary Locke:

On behalf of Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"), an exporter of the

subject merchandise in the above-captioned administrative review, we hereby submit Huahui's

000216

The Honorable Gary Locke
March 23, 2011
Page 2

response to the Department of Commerce's (the "Department's") March 11, 2011 second

supplemental questionnaire.

The deadline for submission of the second supplemental questionnaire was March 18,

2011. Huahui requested, and was subsequently granted, and extension of time to March 23,

2011 to submit its response. This submission, therefore, is timely.

Some of the information contained herein is business proprietary information. Pursuant

to 19 C.F.R. §§ 351.304(a)(1)(i), 351.105(c) and 351.303 (2010), Huahui hereby requests that

the Department grant confidential treatment to the information so designated. Huahui consents

to the release of information contained in this submission to the extent required by the

Department under a valid administrative protective order ("APO").

This document has been served in accordance with the attached certificate of service. If

you have any questions concerning this submission, please do not hesitate to contact the

undersigned.

Respectfully submitted,

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Susan E. Lehman*
Sarah M. Wyss*
MOWRY & GRIMSON, PLLC
*Counsel to Ningxia Huahui Activated Carbon
Co., Ltd.*

**Attachment**

\* Admitted only in Maryland; practice directly supervised
by principals of the firm admitted to the D.C. Bar.

The Honorable Gary Locke
March 23, 2011
Page 3

## ATTORNEY CERTIFICATION

I, Jeffrey S. Grimson, of Mowry & Grimson, PLLC, counsel to Ningxia Huahui Activated Carbon Co., Ltd., certify that: (1) I have read the attached submission; and (2) based on the information made available to me by Ningxia Huahui Activated Carbon Co., Ltd. I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Jeffrey S. Grimson
Mowry & Grimson, PLLC

*Counsel to Ningxia Huahui Activated Carbon Co., Ltd.*



**宁夏华辉活性炭股份有限公司**
Ningxia Huahui Activated Carbon Company Limited
Tele: +86-951-5070220    Fax: +86-951-5070221

I, Yang Dong, currently employed as General Manager by Ningxia Huahui Activated Carbon Co., Ltd., certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

_Yang, Dong_

Yang Dong, General Manager

地址：宁夏银川市高新技术开发区，科技创新园A座1号，邮编：750002
Address: No.A1 Chuangxin Yuan, High Tech Developing Zone, Yinchuan Ningxia China
Post Code: 750002 E-mail: mail@huahui-carbon.com Web: http://www.huahui-carbon.com

**Public Service List: A-570-904**
**Certain Activated Carbon from People's Republic of China**
**Third Administrative Review: 4/1/2009-3/31/2010**

I, Jeffrey S. Grimson, certify that a copy of the attached submission was served this 23rd day of March 2011 by Federal Express or first class mail to the following parties:

R. Alan Luberda, Esq.
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, DC 20007-5108
(Via Fed Ex)

Daniel Porter, Esq.
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006-3817

Francis J. Sailer, Esq.
Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP
1201 New York Avenue, NW
Suite 650
Washington, DC 20005

Gregory S. Menegaz, Esq.
deKieffer & Horgan
729 15th Street, NW
Suite 800
Washington, DC 20005

Craig A. Lewis, Esq.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

Ronald M. Wisla, Esq.
Kutak Rock LLP
Suite 1000
1101 Connecticut Ave., NW
Washington, DC 20036

Matthew J. McConkey, Esq.
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006-1101

Paul Lee
Anli Partners
9/F, Tower 3, Beijing International
Center
No. 38 Dongsanhuan North Rd.
Chaoyang District
Beijing, 10026 PRC

Jeffrey S. Grimson

**PUBLIC VERSION**
**Proprietary Information**
**Deleted**

**Attachment 1**

**Explanation of Requests for Proprietary Treatment**

Pursuant to 19 C.F.R. § 351.105(c), Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui") hereby requests that the Department accord confidential treatment to the information so designated. For each request we have provided an explanation of why the information qualifies for proprietary treatment under one or more of the factors identified in the Department's regulations at 19 C.F.R. § 351.105(c).

**Narrative Response**

| Page Nos. | Explanation |
|---|---|
| 1 through 11, 13-14 | Names of particular persons from whom business proprietary information was obtained; other specific business information the release of which to the public would cause substantial harm to the competitive position of the Huahui and its shareholders |

**Exhibit List and Exhibits**

| Exhibit No. | Exhibit Name | Explanation |
|---|---|---|
| 1 | [      ·  ] Appointment Documentation | Names of particular persons from whom business proprietary information was obtained; other specific business information the release of which to the public would cause substantial harm to the competitive position of the Huahui and its shareholders |
| 2 | Board of Directors Minutes Regarding Appointment of [      ] | Names of particular persons from whom business proprietary information was obtained; other specific business information the release of which to the public would cause substantial harm to the competitive position of the Huahui and its shareholders |
| 3 | Board of Directors Responsibilities | Names of particular persons from whom business proprietary information was obtained; other specific business information the release of which to the public would cause substantial harm to the competitive position of the Huahui and its shareholders |
| 4 | [                        ] Responsibilities | Names of particular persons from whom business proprietary information was obtained; other specific business information the release of which to the public would cause substantial harm to the competitive position of the Huahui and its shareholders |
| 6 | Huahui's Chief Financial Officer's Responsibilities | Names of particular persons from whom business proprietary information was obtained; other specific business information the release of which to the public would cause substantial harm to the competitive position of the Huahui and its shareholders |
| 7 | Chart Detailing Board of Directors and [      ] | Names of particular persons from whom business proprietary information was obtained; other specific business information the release of which to the public would cause substantial harm to the competitive position of the Huahui and its shareholders |

PUBLIC VERSION
Proprietary Information
Deleted

## SEPARATE RATE APPLICATION SUPPLEMENTAL QUESTIONNAIRE

### Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui")

NOTE:     In accordance with 19 CFR 351.303(e), "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department."

NOTE:     Please repeat the question prior to giving your response when responding to this supplemental questionnaire.

1. Please explain whether Huahui had a chief financial officer ("CFO") before the change of ownership that occurred in [          ]. If so, please explain in detail what the responsibilities of the previous CFO were before and during the period of review ("POR"), and the selection process of the CFO.

**RESPONSE:**

Huahui had a CFO before change of ownership that occurred in [          ]. [                    ] was Huahui's CFO before [          ] and during the POR. Therefore, there was no change in the CFO resulting from the ownership change.

Huahui has provided a list of the CFO's responsibilities in Exhibit 6. This list includes the responsibilities of the CFO before and during the POR. [          ] was nominated as CFO by Huahui's general manager, [                    ], and appointed by the Board of Directors. Please refer to Exhibit 1 for the relevant appointment documentation. In the same meeting, the board members elected [                    ] as the Chairman of the Board. Id. [

[          ]. Article 131(1) of the Articles of Association grants the General Manager the power to "to be in charge of the production, operation and management of the Company." See Letter from Mowry & Grimson to the Department, Third Administrative Review of the Antidumping Duty Order on Activated Carbon from the People's Republic of China: Supplemental Questionnaire Regarding the December 23, 2010 Separate Rate Application of Ningxia Huahui Activated Carbon Co., Ltd. at Exhibit 11 (Feb. 22, 2011) (Public Version) (hereinafter "Supplemental SRA Response").

Please note that the document provided in Exhibit 6 was previously submitted in Huahui's Supplemental SRA Response at Exhibit 8. We are providing the portion of this document again describing the CFO's responsibilities in order to correct a translation error. In paragraph 1 of the document "CFO Responsibility" the previous translation stated that the CFO was "responsible for general manager and the board." Id. The

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 2

correct translation is that the CFO is "responsible <u>to</u> the general manager and the board" (emphasis added).  <u>See</u> Exhibit 6 hereto.  The CFO is subordinate to the General Manager.

2.  In Exhibit 15 of your supplemental separate rate questionnaire ("SQR") you stated that
[


]

    a.  Please explain whether any entities other than [                    ] are able to recommend a [      ] for Huahui.

**RESPONSE:**

Any of Huahui's shareholders may recommend a [      ] candidate to Huahui. Huahui's Articles of Association require that the formal proposal to appoint or dismiss the [                              ] must be made by the General Manager (<u>i.e.</u>, [      ]).  <u>See</u> Huahui's SRA Resp. at Exhibit 6, Art. 131(6).  Article 131 specifies that [
].

The formal decision and subsequent appointment must to be approved and the individual subsequently appointed by Huahui's Board of Directors.  Moreover, the above-quoted language from an internal [                          ] was not included in the final [                              ] provided in Exhibit 3 to Huahui's Supplemental SRA Response.

    b.  Please explain whether Huahui's board of directors is obligated to accept [          ] recommendation for its [      ].

**RESPONSE:**

While Huahui will consider the recommendations of any of its shareholders, Huahui is not obligated to accept the [      ] candidate recommendations of [      ], nor is it obligated to accept the recommendations of any other shareholders. Huahui's Board of Directors will make an independent decision regarding the nomination and appointment of its [      ].  As mentioned above, the Articles of Association confer the right to nominate candidates for [      ] upon the General Manager, who is [      ] -- the same individual in charge of setting prices, etc., who has always been in charge of the company and under whose management the Department has previously granted Huahui separate rates in every segment of this proceeding.

In addition, we note that the [      ] recommended to serve the Board is the same person who had previously held that position for four years, [                    ], whose previous employment was with [                          ]  <u>See</u> Letter

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 3

from Mowry & Grimson to the Department, **Third Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China: Separate Rate Application of Ningxia Huahui Activated Carbon Co., Ltd.** at 19 (Dec. 23, 2010) (Proprietary Version) (hereinafter "Huahui SRA"). **This indicates an objective of the new shareholders to maintain continuity of Huahui's financial management and not, as inferred by the petitioners, to install their "own" people to dictate policy. Therefore, the decision to accept the nomination of [          ] was not at all controversial.**

    c. Please explain whether the [     ] that is recommended by [                ] is confirmed by the board of directors. Please provide any relevant minutes from any board of director meetings or [                    ] meetings that relate to hiring or appointing [          ] as [     ] of Huahui.

**RESPONSE:**

    **After receiving the recommendation from [                ] regarding a [     ] candidate, Huahui's board of directors researched the recommendation prior to selecting and appointing [                ]. The recommendation, therefore, was confirmed by Huahui's board of directors. Exhibit 1 contains the appointment documents of [                ] and Exhibit 2 contains the minutes of the board of directors meeting selecting [          ] as [     ].**

3.  In Exhibit 15, you submitted a [

                     ] that states that [

                             ]

a.  Please provide a list of all the members of the [                    ].

**RESPONSE:**

    **The board of supervisors includes: [**

                     **].**

b.  Please explain in what ways the [                ] differs from the board of directors.

**RESPONSE:**

    **The board of directors and the [                ] differ in their appointment, the parties that they represent and the functions that they perform.**

| [          ] | | **Board of Directors** |
|---|---|---|
| [ | | **Executes or implements the** |

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 4

| | shareholder's decision or planning |
|---|---|
| | Prepares financial statement or accounting related information; reports financial budget plan, profit distribution plan to shareholders; makes decision on registered capital, issuing the Company's stocks. |
| | Provides overall direction to the Company's general manager and other senior managers; has a right to hire or fire managers of the Company, and also make a decision regarding a manager's salary |
| ] | Sets up the Company's policy, internal management structure, Articles of Association, etc. |

The Board of Directors exercises the rights that are authorized by the shareholders' meeting and the rights based on law or regulations and company Articles of Association to company management. The [                    ] is responsible to all shareholders to maintain the legitimate rights and interests of the Company and its shareholders. Please refer to Exhibit 3 for Board of Director's responsibilities and Exhibit 4 for [                    ] responsibilities.

c.  Please explain how the members of the [                    ] are chosen.

RESPONSE:

The members of [                    ] are selected from [        ] of Huahui. The [        ]. The [

                    ]. [

                    ].

d.  Please explain in detail the functions and responsibilities of the [                    ].

RESPONSE:

The following are functions and responsibilities of the [                    ]:

[

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 5

].

e. Please provide a chart detailing the board of directors and [                    ]. Include in
your chart a detailed explanation of the members of each board, the structure of each board,
and an explanation of how each board fits into the ownership structure of Huahui and its
shareholders. You should include information relating to any board members who serve in
more than one position concurrently during the POR.

**RESPONSE:**

**Please refer to Exhibit 7 for the requested chart. [**
**].  [**
**].**

4. In Exhibit 15 you state that [

].

a. Please explain in detail what positions are held by the [        ] and [        ] sent by
[                              ] or any other shareholders.

**RESPONSE:**

**The chart attached as Exhibit 7 provides an illustration of the members of the
board of directors and the [                ]. Exhibit 7 indicates which shareholder
entity was responsible for designating each member of the board of directors and the
[                      ]. With the exception of [**

**]. They were not
"sent" by [                    ].**

b. Please explain whether the [        ] and [          ] participate in the management of
Huahui at the board of directors or [                ] level, or in direct company
management positions. Please specify the exact positions held by any [        ] or
[            ] sent by any of Huahui's shareholders.

**RESPONSE:**

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 6

All of the members of the board of directors vote on resolutions pertaining to the matters falling within the board's responsibility.  The same is true of the [                       ], although the responsibilities of the [                                                    ].  With one exception, none of the members of the board of directors or the [                       ] exercises any control over the day-to-day operation of the company.    The exception is the Chairman of the Board, [                            ], who served in that position prior to the ownership change (since 2003) and who concurrently fills the role of General Manager of the company, a post he held for many years prior to the ownership change. In English, the title, "General Manager" may diminish the responsibilities of a person holding that position in a Chinese company.  The General Manager is more akin to "President" in a U.S. company.  The General Manager is in charge of all day-to-day operational decision-making as to sales, pricing levels, production, etc.

None of the other board of directors or [                            ] members hold any direct company management position.

c. Please explain in detail whether any of the [             ] or [             ] are employed by Huahui.

RESPONSE:

As described above, [
].

d. Please explain in detail whether any of the [             ] or [             ] are employed by any of Huahui's shareholders [
].

RESPONSE:

Please refer to Exhibit 7 for detailed Board of Directors and [                                              ] chart.

5. On page 15 of your SQR you stated that [                       ] makes [                                           ] However, in Exhibit 8 of your SQR you provided a list of responsibilities for Huahui's [        ] which include being [
].

a. Please explain in detail what actual duties are carried out by the [        ] in his responsibilities. In particular, please explain what the [        ] does regarding [                                   ]; and [
].

RESPONSE:

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 7

**The  [**



**].**

**Regarding [**



**].**

**Regarding [**



**].**

b. In addition, please explain whether [
] entails actually setting export prices for subject merchandise.

**RESPONSE:**

**No, the [**



**].  Huahui has
provided evidence of price negotiation between Huahui's [
], and the unrelated U.S. customer.  See SRA at Exhibit 3.    The [      ] was not
involved in price negotiations.**

e. Please detail any and all day-to-day activities and business responsibilities conducted by
the [      ].

**RESPONSE:**

**The [**



**].**

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 8

## APPENDIX I

In addition to the supplemental questions provided by the Department, Huahui wishes to address some aspects of issues raised in a letter filed by the petitioners. See Letter from Kelley Drye to the Department, Third Administrative Review of the Antidumping Duty Order on Certain Activated carbon from the People's Republic of China – Petitioners' Pre-Preliminary Comments on Ningxia Huahui's Application for a Separate Rate (Mar. 2, 2011) (Proprietary Version) (hereinafter "Petitioners' Comments"). Although Huahui is under no affirmative obligation to address comments filed by the petitioners, Huahui does wish to correct several misstatements of fact in the petitioners' comments and other instances where the petitioners mislead the Department which cannot go unanswered.

| Petitioners' Claim | Facts as Submitted by Huahui |
|---|---|
| "{C}hanges in Huahui's ownership were [<br><br><br><br>]<br>Petitioners' Comments at 6 (emphasis added). | The decision to increase Huahui's capital and to extend share ownership opportunities to additional entities was made by Huahui's Board of Directors before any members of [                ] held seats on the board. See Exhibit 1 to Huahui's Supplemental SRA Response at Exhibits 1 [<br><br><br><br>] and Exhibit 2 [<br><br>].<br>Thus, the decision to make the ownership change in Huahui [<br><br>]. |
| [<br><br>] Id. at 6. | The document cited by the petitioners is [ |

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 9

| | |
|---|---|
| | ]. |
| | That being said, the original Chinese-language document submitted by Huahui in Exhibit 13 to the Supplemental SRA Response differs from the English translation on this particular phrase.  The correct translation of [ |
| | ]. |
| "Huahui's [ <br><br> ]" Id. at 9. | The distribution of Huahui's profits is governed by the company's Articles of Association.  The Articles confer upon the shareholder the exclusive right to approve profit distributions by voting according to the number of shares owned.  Article 60 states that, "Shareholders (including proxies of shareholders) exercise voting rights in proportion to the number of shares which they hold, and each share has one voting right." Id.  Petitioners do not dispute that only a [ <br><br> ].  Hence, Petitioners' statement that [ <br> ] is incorrect. <br><br> Article 40(7) of the Articles of Association confers upon the shareholders the right to [ <br><br><br> ] Huahui Supplemental SRA at Exhibit 11 (emphasis supplied). <br><br> The specific [ |

The Honorable Gary Locke
March 23, 2011
Page 10

| | |
|---|---|
| | ].<br><br>Because Huahui's [<br><br><br>], it is not correct to conclude that<br>[<br><br>] as stated by petitioners. |
| [<br><br><br><br><br><br><br>] Id. at 9 | Petitioners are completely incorrect regarding this aspect of the equity infusion into Huahui.   The [<br><br><br>].  See Supplemental SRA, Exhibit 15 at item 3.3.[1]  Only then are [<br><br><br><br><br><br>].<br>The [<br><br><br>].<br>Thus, [<br><br>].  Petitioners' assertion [<br>] has no basis in fact. |
| [ | [ |

---

[1]  Exhibit 15 states: [


] Supplemental SRA, Exhibit 15 at item 3.3 (emphasis added).

**PUBLIC VERSION**
**Proprietary Information**
**Deleted**

The Honorable Gary Locke
March 23, 2011
Page 11

| | Id. at |
|---|---|
| 10. | |
| | ]. |
| [ | Petitioners cite to their own January 3, 2011 submission in support of this claim. That submission filed on the record of this review two questionnaire responses of Huahui from POR 2. One of those responses contains the language petitioners quote regarding the government-ordered closure of Huahui's factory number 1. See Petitioners' January 3, 2011 submission, Attachment 2 at 8. That submission was made by Jacobi on January 15, 2010 to answer questions the Department had relating to Section D information provided by Huahui. |
| Id. at 13. | Petitioners inclusion of this one document, and their representation to the Department that this statement confirms "government involvement in Huahui's operations" (id. at 13) is highly misleading. |
| | The Department is well aware that, after the Jacobi filing cited by the petitioners, the Department posed numerous questions directly to Huahui to gather information regarding the circumstances of the closure of Factory 1. See Letter from Catherine Bertand to Jeffrey S. Grimson, 2nd Supplemental Sections A, C and D Questionnaire: 2nd Administrative Review of Certain Activated Carbon from the People's Republic of China (Mar. 15, 2010). Huahui duly answered those questions in its supplemental responses dated April 5, 2010. See Letter from Mowry & Grimson to the Department, Activated Carbon from the People's Republic of China: Second Supplemental C-D Response and Third Supplemental D Response of Ningxia Huahui Activated Carbon Co., Ltd. (Apr. 5, 2010). A redacted version of this document has been attached in |

The Honorable Gary Locke
March 23, 2011
Page 12

Exhibit 5.

The responses from POR 2 totally belie the petitioners'
assertion that the closure of Huahui's Factory 1 was related
to "government involvement in Huahui's operations."
Rather, the factory was closed for zoning reasons to permit
the construction of a new port project as Huahui explained
in its April 5, 2010 response:

3.     On page 6 of Huahui's January 19, 2010
       supplemental section D questionnaire response for
       Jacobi Carbons AB ("JSSDR"), Huahui states that it
       produced the subject merchandise at four facilities.
       On page 8 of the same supplemental response,
       Huahui states that "factory #1 ceased production due
       to government planning and the location of factory 1
       was part of government planning hence it was not
       allowed to build a factory there."

       a.     Please explain which government authority
              ordered the closure of Huahui's factory #1.

**Response:     Huahui's factory #1 was located in the
Yinchuan Economical and Technology Development
Zone, a State Government-approved special local
developing zone. According to the overall developing
planning, the Zone is approved to build the Yinchuan
Inland Port Project, and Huahui's factory #1 happened
to be located in the planned project land.  The land
management office of the development zone reached a
"Removing and Compensation Agreement" with Huahui
to remove Huahui's factory #1.  The agreement is
attached hereto as Exhibit 2.**

       b.     Please explain the circumstances of the
              government authorities ordering the closure
              of factory #1.

**Response:     As explained above, the closure of factory
#1 was because the land on which factory #1 was built
was needed to build the Yinchuan Inland Port Project,
and therefore the factory #1 was closed and may be
removed according to the Removing and Compensation
Agreement reached between Huahui and the government.**

       c.     Please explain if the government closure of

PUBLIC VERSION
Proprietary Information
Deleted

The Honorable Gary Locke
March 23, 2011
Page 13

| | |
|---|---|
| | factory #1 was related to government controlled production quotas. |
| | **Response:** **As explained above, the closure of factory #1 was not related to any government controlled production quotas. It is similar to the government exercising eminent domain for a large public infrastructure project in the USA.** |
| | d.   Please provide translated copies of all notices, statements, or orders issued by government entities regarding Huahui's production facilities. |
| | **Response:** **A Removing and Compensation Agreement reached by the local land management office with Huahui to relocate Huahui's factory #1 is attached hereto as Exhibit 2.** |
| | After considering Huahui's response, the Department concluded that Huahui was eligible for the separate rate. |
| "...changes in Huahui's ownership are part of a [        ] Chinese activated carbon industry." Petitioners' Comments at 11. | The petitioners cite to the new shareholders' internal studies on Huahui and the Chinese activated carbon industry. These studies are typical of due diligence evaluations performed by any investor and are wholly reasonable in light of the objective of the new shareholders to earn a return on investment and to [                    ]. There is no indication that the analysis described in these documents relates to a [                ] the Chinese activated carbon industry as petitioners state. The new shareholders did not make any investments in other activated carbon factories. |
| "...one of the primary reasons for [ | This is a transparent attempt by petitioners to develop support for their continued attempts to impose <u>combination rates</u> in this case. With respect to Huahui, petitioners' point is off the mark as petitioners cite to nothing in any documents submitted by Huahui that indicate that [                    ]. The language quoted by the petitioners suggests the opposite, namely, that the investors in Huahui |



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-904

ARP: 04/01/09–03/31/10
**Public Document**
IA/NME/Office IX: KM

**FOR OFFICIAL FILE**

April 22, 2011                                                                                   *2138*

MEMORANDUM TO:        The File

THROUGH:                      Catherine Bertrand
                                        Program Manager
                                        AD/CVD Operations, Office IX

FROM:                           Katie Marksberry
                                        International Trade Specialist, Office IX

RE:                               Third Administrative Review of Certain Activated Carbon from
                                        the People's Republic of China: Surrogate Values for the
                                        Preliminary Results

**INTRODUCTION AND METHODOLOGY**

The Department of Commerce ('Department') is conducting the third administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ('PRC'). The presumption of non-market economy ('NME') status for the PRC has not been revoked by the Department and remains in effect for purposes of this review. Therefore, in this review, the PRC is being treated as an NME country.

When the Department is investigating imports from an NME country, section 773(c)(1) of the Tariff Act of 1930, as amended ('the Act') directs it to base normal value ('NV'), in most circumstances, on the NME producer's factors of production ('FOP'), valued in a surrogate market-economy country or countries considered to be appropriate by the Department. In accordance with section 773(c)(4) of the Act, in valuing the FOP, the Department shall utilize, to the extent possible, the prices or costs of FOPs in one or more market-economy countries that are at a level of economic development comparable to that of the NME country and are significant producers of comparable merchandise. This memorandum outlines the methodology and selection of surrogate values ('SVs') used in the calculation of NV and U.S. price for the preliminary results of the second administrative review of certain activated carbon from the PRC.

On September 28, 2010, the Department sent interested parties a letter inviting comments on surrogate country selection and information regarding valuing FOPs. On November 5, 2010, the Department issued a memorandum extending the deadline for submission of surrogate country and surrogate values comments. On January 13, 2011, the Department received comments on information with which to value the factors of production in this review from Petitioners[1], Jacobi

---

[1] Norit Americas, Inc. and Calgon Carbon Corporation

prefer to use more than one financial statement where possible to replicate the experience of producers of certain activated carbon in the surrogate country. See Folding Metal Tables and Chairs from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 72 FR 71355 (December 17, 2007) and accompanying Issues and Decisions Memorandum at comment 1. Moreover, we find that both financial statements do not pre-date the POR so significantly as not to be useful. See Hebei Metals v. United States, 366 F. Supp. 2d 1264, 1275 (Ct. Int'l Trade 2005). Therefore, we have used these financial statements to value factory overhead, SG&A, and profit, for these preliminary results.

Additionally, according to recent Department practice, we are adding the net of beginning inventory minus ending inventory to the denominator of the SG&A calculation. See, e.g., Seamless Refined Copper Pipe and Tube From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 75 FR 60725 (October 1, 2010), and accompanying Issues and Decision Memorandum at Comment 2 ("Copper Pipe").

Using this information the Department derived the following financial ratios:

Quantum Activated Carbon (07/08):

| Factory Overhead | = | 4.78% |
|---|---|---|
| Selling, General, and Administrative | = | 15.89% |
| Profit | = | 1.09% |

Kalpalka Chemicals Ltd. (07/08)

| Factory Overhead | = | 11.90 % |
|---|---|---|
| Selling, General, and Administrative | = | 26.00 % |
| Profit | = | 4.98 % |

The average surrogate financial ratios calculated from these three financial statements are as follows:

| Factory Overhead | = | 8.34 % |
|---|---|---|
| Selling, General, and Administrative | = | 20.95 % |
| Profit | = | 3.04 % |

See Attachments 1, 7, 7a, and 7b.

## IX.    Transportation and Handling

### A.    Supplier Distances

In accordance with the decision of the Court of Appeals for the Federal Circuit in Sigma Corporation v. United States, 117 F3d 1401, 1407-08 (Fed. Cir. 1997), when the surrogate value used was derived using Indian Import Statistics, we added a surrogate freight cost to surrogate values using the shorter of the reported distances from either the closest PRC port of exportation

FOR OFFICIAL FILE



**MOWRY & GRIMSON**

**Mowry & Grimson, PLLC**

5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
202-688-3610
202-595-8968 (fax)

www.mowrygrimson.com

**RECEIVED**

JUN 2 0 2011

DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

June 20, 2011

22 16

Case No.: A-570-904
Total Number of Pages: 17
Administrative Review (§751)
POR 3: 4/1/09 – 3/31/10
NME Unit, Office 9

**PUBLIC DOCUMENT**

VIA HAND DELIVERY

The Honorable Gary Locke
Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
APO/Dockets Unit, Room 1870
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

     Re:    <u>Activated Carbon from the People's Republic of China: Re-Submission of
Case Brief for Consideration Prior to the Final Results</u>

Dear Secretary Locke:

       On behalf of Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui") and

Albemarle Corporation ("Albemarle"), we hereby re-submit a case brief for consideration

by the Department of Commerce (the "Department") prior to the issuance of the final

results of this administrative review. On June 13, 2011, Huahui and Albemarle submitted

000248

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE
INTERNATIONAL TRADE ADMINISTRATION

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| CERTAIN ACTIVATED CARBON | ) |
| FROM THE PEOPLE'S | ) |
| REPUBLIC OF CHINA | ) |
| | ) |

Case No. A-570-904
Third Administrative Review:
4/1/09-3/31/10

# CASE BRIEF OF
# NINGXIA HUAHUI ACTIVATED CARBON CO., LTD.
# AND ALBEMARLE CORPORATION

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Susan E. Lehman
Sarah M. Wyss*

MOWRY & GRIMSON, PLLC
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015

*Counsel to Ningxia Huahui Activated Carbon
Co., Ltd. and Albemarle Corporation.*

*Admitted only in Maryland; DC admission
pending. Practice directly supervised by principals
of the firm admitted to the D.C. Bar

June 20, 2011

The Honorable Gary Locke
June 20, 2011
Page 2

## II.    PRINCIPLES OF STATUTORY CONSTRUCTION SUPPORT THE INCLUSION OF ZERO AND *DE MINIMIS* MANDATORY RESPONDENT RATES

In the <u>Preliminary Results</u>, the Department properly assigned a separate rate to Huahui

equal to the non-*de minimis* mandatory respondent rate. <u>Preliminary Results</u> at 23,985. The

Department was also proper in its reliance on Section 735(c)(5) of the Tariff Act of 1930

(hereinafter the "Act") when assigning the separate rate, even though this provision only relates

to antidumping investigations, because it is consistent with the past practice of the Department

and has been upheld by the Court of International Trade. <u>See</u> <u>Preliminary Results</u> at 23,984; <u>see</u>

<u>also</u> <u>Amanda Foods (Vietnam) Ltd. v. United States</u>, Slip Op. 2011-39, 2011 Ct. Intl. Trade

LEXIS 37 at 5 (CIT Apr. 14, 2011) (hereinafter "<u>Amanda Foods 2011</u>"). The Department

explained its reliance on 735(c)(5) as the following:

> The statute and the Department's regulations do not address the establishment of a
> rate to be applied to individual companies not selected for examination where the
> Department limited its examination in an administrative review pursuant to
> section 777A(c)(2) of the Act. Generally we have looked to section 735(c)(5) of
> the Act, which provides instructions for calculating the all-others rate in an
> investigation, for guidance when calculating the rate for respondents we did not
> examine in an administrative review. <u>Preliminary Results</u> at 23,984.

In the event that the Department calculates a zero or *de minimis* margin for both

mandatory respondents in the Final Results, the Department should calculate a new separate rate

according to Section 735(c)(B), by "averaging the estimated weighted average dumping margins

determined for the exporters and producers individually investigated."

The Department "may not categorically exclude averaging the zero and *de minimis* rates

received by all individually investigated respondents from the Department's consideration of

reasonable methodologies for determining rates for companies not individually investigated."

<u>Amanda Foods 2011</u>, Slip Op. 2011-39 at 12 (citing <u>Amanda Foods (Vietnam) Ltd. v. United</u>

2

The Honorable Gary Locke
June 20, 2011
Page 3

States, 35 CIT __, 714 F. Supp. 2d 1282, 1291-92 (2010) (hereinafter "Amanda Foods 2010")).

This is because "the statute explicitly contemplates averaging the zero and *de minimis* rates

received by individually investigated respondents as a reasonable methodology for assigning an

estimated 'all others rate' in cases where all rates calculated for individually investigated

respondents are zero or *de minimis*." Amanda Foods 2011, Slip Op. 2011-39 at 12 (citing

Amanda Foods 2010 714 F. Supp. 2d at 1291-92). The Amanda Foods 2010 court continued:

> Simply put, when a statutory provision specifically lists 'averaging the {zero and
> *de minimis*} estimated weighted average dumping margins determined for the
> exporters and producers individually investigated' as the sole provided example
> of 'a reasonable method to establish the estimated all-others rate' when all
> mandatory respondents' margins are zero or *de minimis*, *19 U.S.C. §
> 1673d(c)(5)(B)*, it is impermissible to interpret this provision as expressing a
> preference against the use of such methodology in such situations." Id.

The Statement of Administrative Action accompanying the Uruguay Round Agreements

Act ("SAA") further explains that, under section 735(c)(5)(B), in cases where all individually

investigated companies' rates are zero or *de minimis*, "{t}he expected method...will be to

weight-average the zero and *de minimis* margins and margins determined pursuant to the facts

available, provided that volume data is available." SAA, H.R. Doc. No. 103-316 (1994),

reprinted in 1994 U.S.C.A.A.N. at 4201.[1] For the foregoing reasons, if circumstances require

recalculation, the Department should average the mandatory respondents' rates, including zero

and *de minimis* margins.

---

[1] The reference to "volume data" relates to information necessary to perform a weighted- rather
than simple average, which issue is not germane to Huahui/Albemarle's argument. In this case,
under the "rule of three" the Department would need to use a simple average in order to prevent
the mandatory respondents' actual volume data from being reverse-calculated."

The Honorable Gary Locke
June 20, 2011
Page 4

### III.  THE DEPARTMENT SHOULD AVERAGE MANDATORY RESPONDENT RATES BECAUSE OF EVIDENCE OF HOMOGENAITY AMONG THE PRODUCING COMPAIES

The Department has encountered the issue of zero and *de minimis* mandatory respondent assessments in other proceedings and should follow its prior practice if it is necessary in the immediate case.  In Brake Rotors from the People's Republic of China the Department "determined that the brake rotor firms are fairly homogenous in terms of economic characteristics" and assigned "non-selected respondents that are eligible for a separate rate a margin based on the weighted average of the two rates calculated for the mandatory respondents (i.e., zero and *de minimis*)."  Brake Rotors From the People's Republic of China: Final Results of 2006–2007 Administrative and New Shipper Reviews and Partial Rescission of 2006–2007 Administrative Review, 73 Fed. Reg. 32,678 (June 10, 2008) and Accompanying Issues and Decision Memorandum at Comment 1.  In Certain Polyester Staple Fiber from the People's Republic of China, the Department confirmed that its decision in Brake Rotors was based on the homogeneity of the industry: "{i}n Brake Rotors, the Department found that the industry was homogenous and thus the assignment of *de minimis* rates was appropriate." Certain Polyester Staple Fiber From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review, 76 Fed. Reg. 2,886 (Jan. 18, 2011) and Accompanying Issues and Decision Memorandum at Comment 5.

In the Brake Rotors case, the Department compared the inputs each company used in production of the subject merchandise, among other factors, in reaching the conclusion that the producing firms were economically homogenous.  See Letter to All Interested Parties from James C. Doyle, Case No. A-570-846 at 2 (Nov. 10, 2005) (Public Document).  Similarly, producers of Activated Carbon have comparable practices with regard to their inputs.  See

4

The Honorable Gary Locke
June 20, 2011
Page 5

International Trade Commission Report, Certain Activated Carbon From China Investigation No.
731-TA-1103, Publication 3852 (May 2006) at V-1 (Public Version). According to Petitioners,
and as reported by the International Trade Commission, "coal is the raw material most widely
used by both U.S. and Chinese producers of certain activated carbon." Id. Since coal is the raw
material making up the predominant portion of the cost of production, the respondents' cost
structures are, by definition, very similar.

IV.   **QUANTITY AND VALUE DATA IS AVAILABLE TO THE DEPARMENT TO
      AFFIRM THAT DUMPING IS UNLIKELY WITH THE UNSELECTED
      COMPANIES**

On June 1, 2010, the Department released U.S. Customs and Border Protection ("CBP")
data under Administrative Protective Order and used this CBP data as a basis for its mandatory
respondent selection in the third administrative review. See Letter James Doyle to Jamie Blair-
Walker and Kabir Archuletta, Antidumping Duty Administrative Review of Certain Activated
Carbon from the People's Republic of China: Selection of Respondents for Individual Review
(July 21, 2010) (Public Version). The Department should review the CBP data on file for
Huahui and other separate rate respondents in comparison with the mandatory respondents' data.
In doing so, the Department will find that U.S. sales prices of separate rate respondents are in
line with mandatory respondents' normal values, and thus the mandatory respondents' rates
(including zero and de minimis rates) are reasonably reflective of the separate rate respondents.

This methodology is in line with past Commerce practice, affirmed by the CIT in the case
of Frozen Warmwater Shrimp from the People's Republic of China. See Amanda Foods 2011,
Slip Op. 2011-39 at 14-15. Amanda Foods 2011 upheld a second remand determination in
which Commerce "employed the methodology provided by {Section 735(c)(B)} as a reasonable

5

The Honorable Gary Locke
June 20, 2011
Page 6

approach for assigning rates to non-individually investigated companies in proceedings where all rates calculated for mandatory respondents are zero or de minimis." Id. at 14. The Amanda Foods 2011 court held the following:

> Commerce confirmed the reasonableness of using this approach with supplementary evidence. Second Remand Results 9 (explaining that Commerce "compared supplementary Q&V data {obtained from} the 23 Plaintiffs to a weighted-average {normal value} for the mandatory respondents," and concluded that the comparisons "yielded information that provided no evidence that the 23 Plaintiffs were dumping during the POR"). The Department interpreted this supplementary evidence to support the conclusion that averaging the mandatory respondents' zero and de minimis rates in this case would result in rates that were reasonably reflective of the non-individually investigated companies' pricing behavior. In other words, because the Q&V data indicated that the count-size specific U.S. sales of the separate rate respondents were in line with the mandatory respondents' count-size specific weighted-average normal values, the Department inferred that the separate rate companies' pricing behavior was not out of line with the behavior of the mandatory respondents, who were found not to be dumping. Id. at 14-15.

Similarly, the CBP data in the third administrative review of activated carbon confirms that the "separate rate companies' pricing behavior {is} not out of line with the behavior of the mandatory respondents, who were found not to be dumping." Id. Further, if the Department finds it necessary, it could request supplementary quantity and value data from separate rate respondents in order to adequately compare these companies' pricing behavior with that of the mandatory respondents.

In addition, mandatory respondent Jacobi Carbons AB's ("Jacobi") rate is "reasonably reflective" of Huahui's separate rate because Huahui was one of Jacobi's suppliers during the third POR. See Jacobi's August 12, 2010 Section A Response at 19 (Public Version). Thus, the normal value which resulted in the zero dumping margin for Jacobi was based, in part, on the cost structure of Huahui.

6



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-904
ARP: 04/01/09 – 3/31/10
Public Document
IA/NME/9: RJP

October 24, 2011

MEMORANDUM TO:    Ronald K. Lorentzen
                         Deputy Assistant Secretary
                          for Import Administration

FROM:              Christian Marsh
                         Deputy Assistant Secretary
                          for Antidumping and Countervailing Duty Operations

SUBJECT:       Certain Activated Carbon from the People's Republic of China:
                         Issues and Decision Memorandum for the Final Results of the
                         Third Antidumping Duty Administrative Review

---

**SUMMARY:** We have analyzed the case and rebuttal briefs of interested parties in the third administrative review of the antidumping duty order[1] on certain activated carbon from the People's Republic of China ("PRC"). As a result of our analysis, we have made changes to the Preliminary Results.[2] We recommend that you approve the positions described in the "Discussion of the Issues" section of this Issues and Decision Memorandum. Below is the complete list of the issues in this antidumping duty administrative review for which we received comments and rebuttal comments from interested parties:

**General Issues**
Comment 1: Assignment of the Separate Rate
Comment 2: Ad Valorem Deposit Rates
Comment 3: Zeroing
Comment 4: Surrogate Values
    a. Energy Coal
    b. Carbonized Material
    c. Surrogate Financial Ratios
    d. Labor Rate
Comment 5: Issues Regarding CCT
    a. Hydrochloric Acid Purity Level Adjustment
    b. Freight Cost Calculation
    c. Plastic Wrapping Weight Conversions

---

[1] See Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China, 72 FR 20988 (April 27, 2007) ("Order")
[2] See Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part, 76 FR 23978 (April 29, 2011) ("Preliminary Results").



    d.  Raw Material Reporting by CCT and JB
Comment 6:  Issues Regarding Jacobi
    a.  Brokerage and Handling
    b.  Adverse Facts Available ("AFA") for NXGH's Water Usage

**BACKGROUND:** The period of review ("POR") is April 1, 2009, through March 31, 2010. In accordance with 19 CFR 351.309(c)(1)(ii), the Department of Commerce ("Department") invited parties to comment on our <u>Preliminary Results</u>.

Between June 13 and 14, 2011, Petitioners[3], CCT[4], Huahui[5] Shanxi Industry[6], Shanxi DMD[7], and Jacobi[8] filed case briefs.[9] On June 16, 2011, the Department rejected Huahui's case because it contained new information and provided Huahui until June 20, 2011, to re-file its case brief.[10] On June 20, 2011, Huahui re-filed its case brief. On June 20, 2011, Petitioners, Albemarle[11], CCT, Huahui, Shaxi Industry, and Shanxi DMD filed rebuttal briefs.

On June 21, 2011, the Department placed labor rate data to value the input of labor on the record for comment by interested parties.[12] On July 5, 2011, Albemarle provided comments on the June 21, 2011, data. On July 7, 2011, the Department placed additional information regarding the labor rate calculation on the record for comment by interested parties.[13] On July 12, 2011, CCT filed rebuttal comments to Albemarle's July 5, 2011, labor data comments.

**DISCUSSION OF THE ISSUES:**

**Comment 1:  Assignment of the Separate Rate**

*Petitioners' Arguments*
- Following Department precedent, the Department should use the separate rate established in the final results of the second administrative review to establish the separate rate in this proceeding, if the Department calculates zero or <u>de minimis</u> margins for Jacobi and CCT.

---

[3] Calgon Carbon Corporation and Norit Americas Inc. ("Petitioners").
[4] Calgon Carbon (Tianjin) Co., Ltd. and Calgon Carbon Corporation (collectively, "CCT").
[5] Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui").
[6] Shanxi Industry Technology Trading Co., Ltd. ("Shanxi Industry").
[7] Shanxi DMD Corporation ("Shanxi DMD").
[8] Jacobi Carbons AB ("Jacobi")
[9] Jacobi filed its case brief under the one-day lag rule. <u>See</u> 19 CFR 351.303(c).
[10] <u>See</u> Letter to Huahui and Albemarle, dated June 16, 2011.
[11] Albemarle Corporation ("Albemarle").
[12] <u>See</u> Memorandum to the File, through Catherine Bertrand, Program Manager, Office 9, from Bob Palmer, Case Analyst, Office 9 re: Third Administrative Review of the Antidumping Duty on Certain Activated Carbon From the People's Republic of China: Industry Specific Surrogate Labor Rate and Surrogate Financial Ratio Adjustments, dated June 21, 2011 ("Labor Memo").
[13] <u>See</u> Memorandum to the File, through Catherine Bertrand, Program Manager, Office 9, from Bob Palmer, Case Analyst, Office 9 re: Third Administrative Review of the Antidumping Duty on Certain Activated Carbon From the People's Republic of China: Revision to Surrogate Financial Ratio Adjustments, dated July 7, 2011 ("Revised Labor Memo").

2

- While the Department acceded to the Court of International Trade's ("CIT") decision in Amanda Foods 2010[14] and assigned the de minimis margin to the separate rate respondents, it did so under protest.
- The facts at issue in this proceeding are distinguishable from the Brake Rotors[15] and Honey from Argentina cited by the Separate Rate Companies.[16]
- The margins calculated for Jacobi and CCT are not appropriate to calculate the separate rate because there is no basis to conclude that the Separate Rate Companies' production costs or pricing are similar to the mandatory respondents.
- Huahui's argument that previous separate rates should not be relied upon because they are subject to litigation is inconsistent with the Department's standard practice of relying on prior determinations until such time as they are conclusively overturned in subsequent litigation.
- The Department cannot use U.S. Customs and Border Protection ("CBP") data to confirm that the separate rate companies' pricing behavior is similar to that of the mandatory respondents, because there are no data on the administrative record concerning the prices at which the separate rate respondents sold subject merchandise in the United States during the POR.

*Separate Rate Companies' Arguments[17]*
- The Department should calculate the separate rate using zero or de minimis rates of the mandatory respondents in this administrative review because the statutory exclusion of zero, de minimis, and facts available rates from the separate rate calculation applies to investigations only.
- The CIT in Amanda Foods 2011,[18] explained that using the zero and de minimis rates received by individually reviewed respondents provides a reasonable methodology for assigning an estimated all others rate.
- The SAA[19] further supports the weight-averaging of zero and de minimis rates to calculate the separate rate.
- The Department should choose to average mandatory respondent de minimis rates because of homogeneity among the producing companies as it did in Brake Rotors[20] and Honey from Argentina.[21]

[14] See Amanda Foods 2010; see also, Final Results of Redetermination Pursuant to Court Remand, Amanda Foods (Vietnam) Ltd., and et. al. v. United States, Court No. 08-00301 Slip Op. 10-69 (CIT June 17, 2010), dated December 2, 2010, at 4.

[15] See Brake Rotors From the People's Republic of China: Final Results of 2006-2007 Administrative and New Shipper Reviews and Partial Rescission of 2006-2007 Administrative Review, 73 FR 32678 (June 10, 2008) ("Brake Rotors").

[16] See Honey from Argentina: Preliminary Results of Antidumping Duty Administration Review and Intent Not to Revoke in Part, 72 FR 73763 (December 28, 2007), unchanged in Honey from Argentina: Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke in Part, 73 FR 24220 (May 2, 2008) ("Honey From Argentina").

[17] Huahui, Shanxi DMD, and Shanxi Industry (collectively "Separate Rate Companies") argued the assignment of the separate rate in their case briefs. Their arguments are summarized together here.

[18] See Amanda Foods (Vietnam) Ltd. V. United States, 774 F. Supp. 2d 1286, 1290-92 (2011) ("Amanda Foods 2011") (citing Amanda Foods (Vietnam) Ltd. V. United States, 714 F. Supp. 2d 1282, 1291-92 (2010) ("Amanda Foods 2010")).

[19] See The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") H.R. Doc. No. 103-316, at 873 (1994), reprinted in 1994 U.S.C.A.A.N. 4040, 4201.

3

- A review of CBP data affirms that the U.S. sales prices of the separate rate respondents are in line with the mandatory respondents' prices and demonstrates that dumping is unlikely with the unselected companies.
- The Department has evidence in the current review which is more probative than previously calculated rates and has no factual basis to pass through the previously calculated separate rate.

**Department's Position:** We agree with Petitioners that the Department should not diverge from the practice of excluding zero and de minimis margins when calculating the separate rate margin. In the Preliminary Results, the Department assigned a 0.05 U.S. Dollar per kilogram ("USD/kg") rate calculated from CCT's preliminary margin as the separate rate for those companies receiving a separate rate in this administrative review. However, for the final results of this administrative review, the Department has calculated a de minimis margin for both mandatory respondents, CCT and Jacobi.

Generally, we have looked to section 735(c)(5) of the Tariff Act of the 1930, as amended ("the Act"), which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for respondents we did not individually examine in an administrative review. Section 735(c)(5)(A) of the Act instructs that we are not to calculate an all-others rate using any zero or de minimis margins or any margins based on total facts available.[20] Section 735(c)(5)(B) of the Act also provides that, where all margins are zero, de minimis, or based on total facts available, we may use "any reasonable method" for assigning the rate to non-selected respondents. One method that section 735(c)(5)(B) of the Act contemplates as a possibility is "averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated."

The statute and the Department's regulations do not directly address the establishment of a rate to be applied to individual companies not selected for individual examination where the Department limited its examination in an administrative review pursuant to section 777A(c)(2) of the Act. The Department's practice in this regard, in cases involving limited selection based on exporters accounting for the largest volumes of trade, has been to weight-average the rates for the selected companies, excluding zero and de minimis rates and rates based entirely on adverse facts available ("AFA"), in the most recently completed segment of the proceeding.[23] However, if any such nonselected company had its own calculated rate that is contemporaneous with or more recent than such prior determined rates, the Department has applied such individual rate to the nonselected company in the review in question.[24]

---

[20] See Brake Rotors, 73 FR 32678.

[21] See Honey from Argentina, 73 FR 24220.

[22] See, e.g., First Administrative Review of Steel Wire Garment Hangers From the People's Republic of China: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 76 FR 27994 (May 13, 2011).

[23] See e.g., Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 76 FR 56158 (September 12, 2011).

[24] See Certain Fish Fillets from the Socialist Republic of Vietnam: Notice of Preliminary Results of the New Shipper Review and Fourth Antidumping Duty Administrative Review and Partial Rescission of the Fourth Administrative Review, 73 FR 52015 (September 8, 2008) (changed in final results as final calculated rate for mandatory respondent was above de minimis, which remained unchanged in the amended final results); see also, Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results and Final Partial

4

Based on the facts of this case, we determine that a reasonable method for determining the margin for separate rate companies in this review is the average of the margins, other than those which are zero, de minimis, or based on total facts available, that we found for the most recent period in which there were such margins, i.e., Carbon AR 2.[25] While the statute contemplates that we may use an average of the zero, de minimis and AFA rates determined in an investigation, we have available in this review information that would not be available in an investigation, namely rates from prior proceedings. We have determined that it is more reasonable in this review to use a calculated rate from a previous segment, as this method constitutes a contemporaneous examination of individually-reviewed respondents exclusive of zero, de minimis and facts available margins, and reasonably reflects potential dumping margins for the non-selected companies.[26] The Department finds that these separate rate margins comport with the requirements of the relevant statute and the SAA, given that no data on the record exists to determine whether the non-selected companies' pricing behavior matches that of the mandatory respondents in the current review. While certain Separate Rate Companies have argued that producers of activated carbon share the similar input of coal and have similar production processes, they merely assert that such similarities result in the same level of dumping such that the Department should assign them a zero dumping margin without providing any analytical basis for this assertion. In this regard, there is no evidence on the record that demonstrates that the use of similar production processes or inputs results in similar pricing behavior or dumping practices.

We disagree with the Separate Rate Companies' argument that the SAA supports the weight-averaging of zero and de minimis rates to calculate the separate rate. The SAA states that if there are only zero or de minimis margins determined or rates based on the facts available (and there is no other entity to which a facts available margin has been applied), the Department "may use any reasonable method" to calculate the separate rate.[27] While the SAA provides an expected method in such situations – "to weight average the zero and de minimis margins and margins determined pursuant to facts available, provided that volume data is available" – the Department may depart from the expected methodology if it does not prove "feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers . . . ."[28] For the reasons explained in the immediately preceding paragraph, the Department does not consider the rates calculated in the current review to reasonably reflect the potential dumping margins of the separate rate companies. Therefore, in accordance with the guiding language of the SAA, the Department employed a distinct, reasonable method to calculate the separate rates in this review.

The Separate Rate Companies urge the Department to average the mandatory respondent de minimis rates and apply that as the separate rate because of homogeneity among the producing

---

Rescission of Antidumping Duty Administrative Review, 74 FR 47191, 47195 (September 15, 2009) and accompanying Issues and Decisions Memorandum ("IDM") at Comment 16.
[25] See Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review, 75 FR 70208, 70209 (November 17, 2010) ("Carbon AR2") and accompanying IDM at Comment 3.
[26] See SAA at 873.
[27] Id.
[28] Id.

5

companies, as it did in Brake Rotors.[29]  First, we do not find that "homogeneity among the producers" necessarily leads to the same level of dumping.  Second, as previously stated, no record evidence demonstrates that the use of similar production processes and inputs will result in similar pricing behavior or dumping margins.  Moreover, in Brake Rotors, the Department did request that respondents provide their "economic characteristics," but it was for the purpose of determining whether to use stratification when conducting sampling for respondent selection; this information was not used by the Department in determining which margin to assign to the separate rate companies.[30]  Huahui also argues that the Department should review the CBP data on the record and conclude that the U.S. sales prices of the separate rate respondents are in line with the mandatory respondents' normal values.  However, as Petitioners correctly point out, the CBP data on the record contains only quantity data and does not include information on entered values or any information pertaining to the separate rate companies' prices of subject merchandise entered into the United States.  Therefore, there is no information on the record to make the type of comparison that Huahui suggests.

We also note that, notwithstanding the methodology adopted in Honey from Argentina, the Department's more recent practice has been not to apply a de minimis rate as the "All Others" rate in market economy ("ME") cases or as the separate rate in non-market economy ("NME") cases.[31]  As seen in recent cases, the Department has found for case-specific reasons that using a calculated rate from a prior segment more reasonably reflects the potential dumping margins of non-selected companies than does a de minimis or zero rate from an ongoing segment because the margins from the previous review more accurately capture recent and potential pricing behavior of non-selected companies, given that these companies were not selected for individual examination and that there is no data on the record to determine whether the non-selected companies' pricing behavior matches that of the mandatory respondents in the ongoing review.  While the Separate Rate Companies correctly note that the Department assigned de minimis rates in Honey from Argentina, it is the only case in which the Department has done so in recent history.  In cases post-dating Honey from Argentina (Fish Fillets from Vietnam, Ball Bearings, PRC Shrimp), the Department has relied on other methodologies to determine the rate for non-reviewed companies.

Furthermore, in Amanda Foods 2010, the separate rate companies involved were assigned a de minimis margin only after the Department reopened the record, requested further information from the plaintiff, and performed additional data comparisons to information already on the record.[32]  The Department has not undertaken such steps in this case and, therefore, finds it

---

[29] See Brake Rotors, 73 FR 32678.

[30] See Brake Rotors From the People's Republic of China: Final Results and Partial Rescission of the 2004/2005 Administrative Review and Notice of Rescission of 2004/2005 New Shipper Review, 71 FR 66304 (November 14, 2006) and accompanying Issues and Decision Memorandum at Comment 1 (". . . the Department found no discernible variation in the respondents' economic characteristics that warranted stratification.").

[31] See e.g., Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Rescission of Reviews in Part, 73 FR 52823 (September 11, 2008) ("Ball Bearings") and accompanying IDM at Comment 16; Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews, 74 FR 11349 (March 17, 2009) and accompanying IDM at Comment 6 ("Fish Fillets from Vietnam"); Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review, 76 FR 51940, 51942 (August 19, 2011) ("PRC Shrimp").

[32] See Amanda Foods (Vietnam) Ltd., et al. v. United States, 774 F. Supp. 2d 1286, 1292 (2011).

6

inappropriate to rely on Amanda Foods 2011 as applicable precedent. Further, the Department complied with the Court's order to assign a de minimis separate rate under protest.[33]

Thus, we find that a reasonable method in the instant review is to assign to the non-reviewed company, Huahui, its most recent calculated rate and, for the other separate rate companies, to assign the most recent separate rate that was not calculated using zero, de minimis or rates based entirely on facts available. Pursuant to this method, we are assigning a rate of 0.44 U.S. USD/kg to Huahui, its assigned rate in Carbon AR 2. Additionally, we are assigning a rate of 0.28 USD/kg to the other companies that are eligible for a separate rate in this review, the separate rate assigned calculated in Carbon AR 2.

**Comment 2:   Ad Valorem Deposit Rates**

*Shanxi Industry and Shanxi DMD's Arguments*
- The Department should calculate ad valorem cash deposit rates for the separate rate companies because there is no rationale for extending this unusual method of establishing the deposit rate.
- Ad valorem rates would treat each company equally, taking the same percentage of the relative value of their products as an antidumping duty deposit.
- The per-unit rate benefit companies who sell premium goods at higher costs while low cost goods are penalized.

*Petitioners' Arguments*
- Because Jacobi represents a significant portion of entries in this review and in view of the difference between Jacobi's net U.S. prices and the entered values found by the Department in Carbon AR2[34], it is entirely appropriate for the Department to continue to use per-unit rates.
- In Carbon AR2, the Department has explicitly stated its intention to utilize per-unit assessment and cash deposit rates in all future proceedings.

**Department's Position:**  The Department will continue to utilize the per-unit assessments and cash deposit rates. In the last administrative review, the Department changed the cash deposit and assessment methodology from an ad valorem to a per-unit basis.[35] The Department' decision was based on a difference between one of the mandatory respondent's net unit price and the entered value reported to CBP.[36] The Department explained in Carbon AR2 that it would also apply this decision to "all future reviews of the order" and that "it would be extremely burdensome to determine whether to apply an ad valorem or a per-unit rate on a company-specific basis."[37] Further, we stated that this change in methodology to per-unit assessment rates will not negatively impact these companies because the total duties due will not change; they will only be allocated over quantity instead of over entered value.[38]

---

[33] See id., 774 F. Supp. 2d at 1289-90.

[34] See Carbon AR2, 75 FR at 70209  and accompanying IDM at Comment 3.

[35] Id.

[36] Id.

[37] Id.

[38] Id.

Section 736(a)(1) of the Act states that the Department shall direct "customs officers to assess an antidumping duty equal to the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise . . . ." Section 351.212(b)(1) of the Department's regulations provides that the Department "normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes."

While the Department normally directs CBP to collect cash deposits and liquidate entries on an ad valorem basis, we are not required to do so by statute or by our regulations, and have in the past used quantity-based rates where appropriate.[39] In addition, the Federal Circuit has upheld prior determinations where the Department has departed from the standard ad valorem methodology.[40] Relevant precedent from the Court of International Trade similarly teaches that the Department has the discretion to depart from this expected methodology under certain circumstances, such as when the Department learns that a respondent has undervalued its U.S. sales and would avoid the total duties due through such action.[41] In Carbon AR2, we found that the application of an ad valorem rate based on net U.S. price would yield an under-collection of duties, mostly due to undervaluing by the largest PRC exporter of the subject merchandise. In this review, despite their claims to the contrary, Shanxi Industry and Shanxi DMD do not provide any evidence or documentation, such as CF 7501, on the products they sold or the price at which they sold them. Therefore, without tangible evidence on the record, Shanxi Industry and Shanxi DMD cannot overcome the presumption that undervaluing has continued in this review and that they have engaged in such pricing behavior. In this regard, Jacobi, whose behavior was the basis for the Department to use per-unit assessment rates in Carbon AR 2, has not challenged the continued application of per-unit assessment rates in this review.

Shanxi DMD and Shanxi Industry also argue that the per-unit rate unfairly penalizes companies which have sales of low-priced products as opposed to companies which sell higher-priced premium products. As an initial matter and as discussed above, the statute permits assessment based on an ad valorem or per unit basis. Thus, there is no basis to claim a per-unit assessment and any greater payment of duties resulting from such an assessment as unfair or a penalty. Furthermore, we find that their argument is speculative, given that they have not pointed to any record evidence to support their claim that certain companies sell more low cost products as compared to other companies under review.

---

[39] See, e.g., Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review, 67 FR 19546, 19549-50 (April 22, 2002)("Crawfish 2002") and accompanying IDM; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Revocation of Orders in Part, 66 FR 36551, 36554 (July 12, 2001); Honey from the People's Republic of China: Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review, 70 FR 38873, 38880 and accompanying IDM at Comment 7; and Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 70 FR 34082, 34086 (June 13, 2005).
[40] See Thai Pineapple Canning Indus. Corp. v. United States, 273 F.3d 1077, 1084-85 (Fed. Cir. 2001).
[41] See Wuhan Bee Healthy Co. v. United States, No. 05-00438, slip op. at 9-11 (CIT May 29, 2008)

8

Therefore, the Department will continue to apply the per-unit cash deposit and assessment methodology and will direct CBP to collect cash deposits and assess antidumping duties on a per-kilogram basis for entries of subject merchandise from the PRC.

**Comment 3: Zeroing**

*Jacobi's Arguments*
- The Department wrongly calculated a dumping margin for Jacobi using the practice of "zeroing," in which any negative margins (where export price ("EP") or constructed export price ("CEP") exceeds normal value ("NV")) are treated as zero in calculating the weighted average dumping margin.
- The practice of zeroing was overturned by the U.S. Court of Appeals for the Federal Circuit ("CAFC") in Dongbu Steel[42] and, as a result, the Department should abandon the practice.
- In light of the decision of the CAFC in Dongbu Steel, the Department should recalculate potential dumping duties and dumping margins for Jacobi without zeroing.

*Petitioner's Arguments*
- Jacobi overstated the holding of the Federal Circuit in Dongbu Steel.
- The Department's policy is currently to apply the zeroing methodology in administrative reviews and should continue this practice.

**Department's Position:** We have not changed our calculation of the weighted-average dumping margin, as suggested by the Jacobi, in these final results.

Section 771(35)(A) of the Act defines "dumping margin" as the "amount by which the normal value exceeds the export price {EP} or {CEP} of the subject merchandise." Outside the context of antidumping investigations involving average-to-average comparisons, the Department interprets this statutory definition to mean that a dumping margin exists only when NV is greater than EP or CEP. We disagree with Jacobi that the Department's zeroing practice is an inappropriate interpretation of the Act. Because no dumping margins exist with respect to sales where NV is equal to or less than EP or CEP, the Department will not permit these non-dumped sales to offset the amount of dumping found with respect to other sales. The Federal Circuit has held that this is a reasonable interpretation of section 771(35) of the Act.[43]

Section 771(35)(B) of the Act defines weighted-average dumping margin as "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." The Department applies this section by aggregating all individual dumping margins, each of which is determined by the amount by which NV exceeds EP or CEP, and dividing this

---

[42] See Dongbu Steel Co. Ltd., et al. v. United States, 635 F.3d 1363 (Fed. Cir. 2011).

[43] See, e.g., Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) ("Timken"); see also, Corus Staal BV v. Department of Commerce, 395 F.3d 1343, 1347-49 (Fed. Cir. 2005), cert. denied; 126 S. Ct. 1023, 163 L. Ed. 2d 853 (Jan. 9, 2006) ("Corus I"); SKF USA, Inc. v. United States, 630 F.3d 1365, 1375 (Fed. Cir. 2011) ("SKF") ("Even after Commerce changed its policy with respect to original investigations, we have held that Commerce's application of zeroing to administrative reviews is not inconsistent with the statute.") (citation omitted).

9

amount by the value of all sales. The use of the term "aggregate dumping margins" in section 771(35)(B) of the Act is consistent with the Department's interpretation of the singular "dumping margin" in section 771(35)(A) of the Act, as applied on a comparison-specific level and not on an aggregate basis. At no stage of the process is the amount by which EP or CEP exceeds the NV permitted to offset or cancel the dumping margins found on other sales.

This does not mean that non-dumped transactions are disregarded in calculating the weighted-average dumping margin. It is important to note that the weighted-average margin will reflect any non-dumped transactions examined during the POR; the value of such sales is included in the denominator of the weighted-average dumping margin, while no dumping amount for non-dumped transactions is included in the numerator. Thus, a greater amount of non-dumped transactions results in a lower weighted-average margin.

The Federal Circuit explained in Timken that denial of offsets is a "reasonable statutory interpretation given that it legitimately combats the problem of masked dumping, wherein certain profitable sales serve to mask sales at less than fair value."[44] As reflected in that opinion, the issue of so-called masked dumping was part of the policy reason for interpreting the statute in the manner interpreted by the Department. No U.S. court has required the Department to demonstrate "masked dumping" before it is entitled to invoke this interpretation of the statute and deny offsets to dumped sales.[45]

In 2007, the Department implemented a modification of its calculation of weighted-average dumping margins when using average-to-average comparisons in antidumping investigations.[46] With this modification, the Department's interpretation of the statute with respect to non-dumped comparisons was changed within the limited context of investigations using average-to-average comparisons. Adoption of the modification pursuant to the procedure set forth in section 123(g) of the Uruguay Round Agreements Act was specifically limited to address adverse World Trade Organization ("WTO") findings made in the context of antidumping investigations using average-to-average comparisons. The Department's interpretation of the statute was unchanged in other contexts.

It is reasonable for the Department to interpret the same ambiguous language differently when using different comparison methodologies in different contexts. In particular, the use of the word "exceeds" in section 771(35)(A) of the Act can reasonably be interpreted in the context of an antidumping investigation to permit negative average-to-average comparison results to offset or reduce the amount of the aggregate dumping margins used in the numerator of the weighted-average dumping margin as defined in section 771(35)(B) of the Act. The average-to-average comparison methodology typically applied in antidumping duty investigations averages together high and low prices for directly comparable merchandise prior to making the comparison. This means that the determination of dumping necessarily is not made for individual sales, but rather at an "on average" level for the comparison. For this reason, the offsetting methodology adopted

---

[44] See Timken, 354 F.3d at 1342.
[45] See, e.g., Timken, 354 F.3d at 1343; see also, NSK Ltd. v. United States, 510 F.3d 1375, 1379-80 (Fed. Cir. 2007).
[46] See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification, 71 FR 77722 (December 27, 2006) ("Zeroing Notice").

10

in the limited context of investigations using average-to-average comparisons is a reasonable manner of aggregating the comparison results produced by this comparison method. Thus, with respect to how negative comparison results are to be regarded under section 771(35)(A) of the Act, and treated in the calculation of the weighted average dumping margin under section 771(35)(B) of the Act, it is reasonable for the Department to consider whether the comparison result in question is a product of an average-to-average comparison or an average-to-transaction comparison.

In U.S. Steel, the Federal Circuit considered the reasonableness of the Department's interpretation not to apply zeroing in the context of investigations using average-to-average comparisons, while continuing to apply zeroing in the context of investigations using average-to-transaction comparisons pursuant to the provision at section 777A(d)(1)(B) of the Act.[47] Specifically, in U.S. Steel, the Federal Circuit was faced with the argument that, if zeroing were never applied in investigations, then the average-to-transaction comparison methodology would be redundant because it would yield the same result as the average-to-average comparison methodology. The Court acknowledged that the Department intended to continue to use zeroing in connection with the average-to-transaction comparison method in the context of those investigations where the facts suggest that masked dumping may be occurring.[48] The Court then affirmed as reasonable the Department's application of its modified average-to-average comparison methodology in investigations in light of the Department's stated intent to continue zeroing in other contexts.[49]

In addition, the Federal Circuit recently upheld, as a reasonable interpretation of ambiguous statutory language, the Department's continued application of "zeroing" in the context of an administrative review completed after the implementation of the Zeroing Notice.[50] In that case, the Department had explained that the changed interpretation of the ambiguous statutory language was limited to the context of investigations using average-to-average comparisons and was made pursuant to statutory authority for implementing an adverse WTO report. We find that our determination in this administrative review is consistent with the Federal Circuit's recent decision in SKF.

Furthermore, in Corus I, the CAFC acknowledged the difference between antidumping duty investigations and administrative reviews, and held that section 771(35) of the Act was just as ambiguous with respect to both proceedings, such that the Department was permitted, but not required, to use zeroing in antidumping duty investigations.[51] That is, the Court explained that the holding in Timken -- that zeroing is neither required nor precluded in administrative reviews -- applies to antidumping duty investigations as well. Thus, Corus I does not preclude the use of zeroing in one context and not the other.

Moreover, we disagree with the Jacobi that the Federal Circuit's recent decision in Dongbu Steel requires the Department to change its methodology in this administrative review. The holding of

---

[47] See U.S. Steel Corp., v. United States, 621 F.3d 1351, 1362-63 (Fed. Cir. 2010) ("U.S. Steel").
[48] Id.
[49] Id.
[50] See SKF, 630 F.3d 1365.
[51] See Corus I, 395 F.3d at 1347.

11

Dongbu Steel, and the recent decision in JTEKT[52], was limited to finding that the Department had not adequately explained the different interpretations of section 771(35) of the Act in the context of investigations versus administrative reviews. The Federal Circuit did not hold that these differing interpretations were contrary to law. Importantly, the panels in neither Dongbu Steel nor JTEKT overturned prior Federal Circuit decisions affirming zeroing in administrative reviews, including SKF, which we discuss above, in which the Court affirmed zeroing in administrative reviews notwithstanding the Department's determination to no longer use zeroing in certain investigations. Unlike the determinations examined in Dongbu Steel and JTEKT, the Department here is providing additional explanation for its changed interpretation of the statute subsequent to the Final Modification for Antidumping Investigations[53] – whereby we interpret section 771(35) of the Act differently for certain investigations (when using average-to-average comparisons) and administrative reviews. For all these reasons, we find that our determination is consistent with the holdings in Dongbu Steel, JTEKT, U.S. Steel, and SKF.

Accordingly, and consistent with the Department's interpretation of the Act described above, in the event that any of the export transactions examined in this review are found to exceed NV, the amount by which the price exceeds NV will not offset the dumping found in respect of other transactions.

**Comment 4: Surrogate Values**

a. Energy Coal

*CCT's Arguments*
- The Department should use Coal India Limited ("CIL") data to value CCT's energy coal.
- In the Preliminary Results, the Department departed from past practice and rejected the use of CIL data, even where the Useful Heat Value ("UHV") was reported, but the supplier did not also report the ash content of the coal.
- The additional data sought by the Department on ash content is unnecessary and does not help determine where the Chinese suppliers' coal is classified in the Tata Energy Research Institute ("TERI") schemes, since TERI grades are completely defined on the basis of UHV.
- Even if ash content were relevant, CCT was not provided with a reasonable opportunity to place ash content data on the record.

*Albemarle's Arguments*
- The Department did request ash content of its coal input and CCT submitted ash content data.
- Because CCT's own energy coal has ash content levels that fall outside those correlating to the CIL data is proof why the information regarding ash content is relevant to selecting the appropriate surrogate value.

---

[52] See JTEKT Corporation v. US, Error! Main Document Only.642 F.3d 1378 (Fed. Cir. 2011) ("JTEKT").
[53] See i.e., Zeroing Notice, 71 FR at 77722; see also, Antidumping Proceedings: Calculation of the Weighted Average Dumping Margin During an Antidumping Investigation; Change in Effective Date of Final Modification, 72 FR 3783 (January 26, 2007) ("Final Modification for Antidumping Investigations").

- The Department was correct to value CCT's energy coal using the Global Trade Atlas ("GTA") data since this data covers CCT's input while the CIL non-coking coal pricing data do not.

**Department's Position:** The Department agrees with CCT that we should value CCT's various energy coal (also referred to as "non-coking coal" or "steam coal") inputs using CIL data. In the Preliminary Results, we valued CCT's energy coal inputs using GTA Indian import data under harmonized tariff schedule ("HTS") number 2701.19.20 "Steam Coal" because we found that CCT did not report the ash contents of its energy coal inputs.[54]

The Department's practice when selecting the best available information for valuing factors of production ("FOPs"), in accordance with section 773(c)(1) of the Act, is to select, to the extent practicable, surrogate values ("SV") which are product-specific, representative of a broad-market average, publicly available and contemporaneous with the POR, and tax/duty exclusive.[55] The Department undertakes its analysis of valuing the FOPs on a case-by-case basis, carefully considering the available evidence in light of the particular facts of each industry.[56] While there is no hierarchy for applying the SV selection criteria, "the Department must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' SV is for each input."[57]

Although we valued CCT's energy coal using GTA in the Preliminary Results, we have determined that using CIL data represents a better valuation as it is more specific to the input. We recognize that when we have used other sources of information to value energy coal, such as such as the Tata Energy Research Institute ("TERI") information, ash content was a separately identified indicator useful to the selection of an appropriate value.[58] However, CIL value information relies only on UHV values and does not require separate identification of ash content.[59] As CCT reported UHV values for its energy coal, we have identified the CIL value corresponding to the grade of energy coal CCT used, permitting a more specific match than the GTA permits.[60]

---

[54] See "Memorandum to the File through Catherine Bertrand, Program Manager, AD/CVD Operations, Office 9, from Katie Marksberry, International Trade Specialist, AD/CVD Enforcement, Office 9: Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Preliminary Results," dated April 22, 2011 ("Prelim SV Memo") at 7.

[55] See, e.g., First Administrative Review of Certain Polyester Staple Fiber From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 75 FR 1336 (January 11, 2010) ("PSF AR1") and accompanying IDM at Comment 1.

[56] See Glycine from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review, 70 FR 47176 (August 12, 2005) ("Glycine 2005") and accompanying IDM at Comment 1.

[57] See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 73 FR 55039 (September 24, 2008) ("PET Film") and accompanying IDM at Comment 2; see also, Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results of Antidumping Administrative Review, and Final Partial Recession of Antidumping Duty Administrative Review, 67 FR 19546 (April 22, 2002) ("Crawfish 2002") and accompanying IDM at Comment 2.

[58] See Carbon AR2, 75 FR 70208 and accompanying IDM at Comment 4b; see also, Carbon Remand at 12-14.

[59] See Letter from Jacobi, re: Jacobi's SV Comments, dated January 13, 2011 at 3 and SV-4; see also, Letter from CCT, re: CCT's SV Comments, dated January 14, 2011 at 1.

[60] See e.g., CCT's Supplemental Section D response, dated January 6, 2011 at B-15 and C-11; see also, CCT's Supplemental Section D response, dated January 14, 2011, at D-7

13

We disagree with Albemarle's argument that where CCT did provide ash content information, such ash content information suggests the less specific GTA data is a better match. In examining Albemarle's claim, we noted that CCT reported ash contents not for energy coal, the factor of production at issue here, but for bituminous coal, a raw material from which activated carbon is produced.[61] Accordingly, the reported ash contents have nothing to do with the selection of a proper surrogate value for energy coal.

Therefore, in accordance with section 773(c)(1) of the Act and Department practice,[62] we find it appropriate to value the energy coal reported by CCT using CIL data, because the CIL data are (1) specific to the types of energy coal used by CCT, (2) non-export values, (3) representative of India-wide prices, and (4) contemporaneous with the POR.

**b. Carbonized Material**

*Jacobi's Arguments*
- The Department should value carbonized material using coconut shell charcoal classified under HTS 4402.90.10.
- In valuing carbonized materials, the Department's decision should reflect the Department's Draft Remand Determination and the fact that cokes of coal are not used in the production of activated carbon.

**No other party commented on this issue.**

**Department's Position:** We agree with Jacobi that the Department should value carbonized materials using Indian imports under HTS number 4402.90.10 "Coconut Shell Charcoal." In the Preliminary Results, the Department valued respondents' carbonized material inputs using GTA Indian imports reported under HTS number 2704.00.90 "Other Cokes of Coal."[63]

In the Department's recent Carbon Remand,[64] the Department stated that coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon.[65] As we previously stated, it is the Department's practice to select SVs which are product specific.[66] Therefore, because Indian HTS number 4402.90.10 "Coconut Shell Charcoal" results in a better, input-specific price for coal-based carbonized materials, is contemporaneous and tax/duty exclusive, the Department will use Indian HTS

---

[61] See CCT's Supplemental Section D response, dated January 6, 2011 at B-15 and Exhibit HQ-32.
[62] See Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review, 75 FR 49460 (August 13, 2010) ("China Shrimp") and accompanying IDM at Comment 3; see also Certain Magnesia Carbon Bricks From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Critical Circumstances, 75 FR 45468 (August 2, 2010) and accompanying IDM at Comment 1A ("Magnesia Bricks") (where the Department sought SVs specific to the input in question).
[63] See Prelim SV Memo at 5.
[64] See "Final Results of Redetermination Pursuant to Court Remand," dated July 25, 2011, Carbon Remand, Slip Op. 11-21, at 10-11.
[65] Id. at 10.
[66] See PSF AR1, 75 FR 1336 and at Comment 1.

14

number 4402.90.10 "Coconut Shell Charcoal" to calculate the SV for CCT and Jacobi's carbonized material input.

**c. Surrogate Financial Ratios**

*CCT's Arguments*

- The Department should calculate the surrogate financial ratios using the 2009-2010 financial statement of Active Carbon India Private Limited ("Active Carbon") because it is publicly available, contemporaneous, audited, complete, and from a producer of comparable merchandise.
- The financial statements the Department used for the preliminary results are not contemporaneous with the POR.
- The Department should exclude "Freight & Hamali" because it is a freight expense. Further, there is no reason to believe that hamali is not a freight item otherwise, it would not be listed with freight.

*Albemarle's Arguments*

- If the Department uses Active Carbon's financial statement as submitted by CCT, the Department must correct errors in CCT's proposed calculation of the surrogate ratios.
- CCT improperly included "staff welfare" together with "salaries & wages" when these expenses are listed separately in Schedule 13 to Active Carbon's financial statement.
- "Packing Material" expense name is misrepresented. The actual name of the expense is "Packing Charges" and Active Carbon listed it as an Administrative expense in Schedule 15.
- "Sales Commission" was excluded by CCT, but should be included as it is consistent with Department practice to include such expenses.
- The Department should include "Freight & Hamali" in its overhead, selling, general and administrative ("SG&A") ratios calculation if it uses Active Carbon's financial statement in the final results.

**Department's Position:** Section 773(c)(1) of the Act states that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors...." In choosing surrogate financial ratios, it is the Department's practice to use data from MB surrogate companies based on the "specificity, contemporaneity, and quality of the data."[67] In the Preliminary Results, we calculated the surrogate financial ratios using the 2007-2008 financial statements of Kalpalka Chemicals Ltd. ("Kalpalka") and Quantum Active Carbon Pvt. Ltd. ("Quantum").[68] For the final results, the Department will use Active Carbon's 2009-2010 financial statement to calculate the surrogate financial ratio because Active Carbon's financial statement is audited, from a producer of the subject merchandise, and contemporaneous and, therefore, represents the best available information with which to calculate the surrogate financial ratios. In this regard, Active Carbon's 2009-2010 financial statement is more contemporaneous than the 2007-2008 financial statements used for the Preliminary Results.

---

[67] See Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China ,71 FR 29303 (May 22, 2006), and accompanying IDM at Comment 1.
[68] See Preliminary Results, 76 FR at 23988.

15

In deriving appropriate surrogate values for SG&A and profit, the Department typically examines the financial statements on the record of the proceeding and categorizes expenses as they relate to materials, labor, and equipment ("MLE"), factory overhead ("OH"), SG&A, and profit, and excludes certain expenses (e.g., movement expenses) consistent with the Department's practice of accounting for these latter expenses elsewhere.[69] However, in NME cases, it is impossible for the Department to further dissect the financial statements of a surrogate company as if the surrogate company were an interested party to the proceeding because the Department does not seek information from or verify the information from the surrogate company.[70] Therefore, in calculating surrogate overhead and SG&A ratios, it is the Department's practice to accept data from the surrogate producer's financial statements *in toto*, rather than performing a line-by-line analysis of the types of expenses included in each category.[71] As stated by the Court of International Trade, the Department is "neither required to 'duplicate the exact production experience of the Chinese manufacturers,' nor undergo 'an item-by-item analysis in calculating factory overhead.'"[72]

<u>Staff and Welfare</u>

We note that Albemarle's arguments regarding "staff and welfare" expenses were made before the Department updated its labor methodology. Therefore, we find Albemarle's case brief argument regarding "staff and welfare" expenses no longer relevant, given that the new methodology requires the Department to consider these labor expenses and that no party commented on this issue in response to the Department's Labor Memo.[73]

<u>Packing Charges</u>

We agree with Albemarle that "packing charges" should be included in the surrogate SG&A calculation. Because we do not go beyond the financial statements in determining the appropriateness of including an item in the financial ratio calculation, we seek information only within the financial statement itself to determine the nature of the activity generating the potential adjustment to determine whether a relationship exists between the activity claimed and the principal operations of the company.[74] In this instance, "packing charges" is listed under Schedule 15, "Administrative Expenditure" in Active Carbon's financial statement.[75] Further, there are no explanatory notes or footnotes explaining what charges are included in this expense. Therefore, because there is no clear description in Active Carbon's financial statement of the

---

[69] See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances 73 FR 40485 (July 15, 2008) ("Tires") and accompanying IDM at Comment 18A.

[70] Id.

[71] See Rhodia, Inc. v. United States, 240 F. Supp. 2d 1247, 1250 -1251 (CIT 2002); see also Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers From the People's Republic of China, 69 FR 20594 (April 16, 2004) and accompanying IDM at Comment 15.

[72] See Rhodia, 240 F. Supp. 2d at 1250 (citations omitted).

[73] See Labor Memo at 4-5 and attachment VII; see also, Letter from Albemarle, dated July 5, 2011 and Letter from CCT, dated July 12, 2011.

[74] See, e.g., Tires, 73 FR 40485 at Comment 18A.

[75] See Letter from CCT, re: Submission of Publically Available Information to Value Factors, dated May 19, 2011.

16

costs associated with "packing charges" that can be traced to a particular non-general operation of the company (such as packing labor or packing materials), in accordance with the Department's practice, "packing charges" should be reflected in the SG&A expense ratio for this company. Consequently, for the final results, we will classify "packing charges" as an SG&A expense.[76]

Freight & hamali

We agree with Albemarle that "freight & hamali" should be included in the surrogate SG&A calculation. Because we do not go beyond the financial statements in determining the appropriateness of including an item in the financial ratio calculation, we seek information only within the financial statement itself to determine the nature of the activity generating the potential adjustment to determine whether a relationship exists between the activity claimed and the principal operations of the company.[77] In this instance, "freight & hamali" is listed under Schedule 15, "Administrative Expenditure" in Active Carbon's financial statement.[78] Further, no explanatory notes or footnotes attached to this item explain what charges encompass the term "hamali" nor does the record contain information regarding this term or its usage. Therefore, because there is no clear definition in Active Carbon's financial statement of the costs associated with the phrase "freight & hamali" and no record evidence that can trace those costs to a particular non-general operation of the company (such as brokerage and handling or truck freight), in accordance with the Department's practice, "freight & hamali" should be reflected in the SG&A expense ratio for this company. Consequently, for the final results, we will classify "freight & hamali" as an SG&A expense.[79]

Sales commissions

We agree with Albemarle and will include sales commissions in the surrogate SG&A calculation consistent with Department practice, given that sales commissions represent standard selling expenses.[80]

**d. Labor Cost**

*CCT's Arguments*
- The Department inadvertently used the consumer price index data for Pakistan instead of the Philippines, causing the POR labor rate for the Philippines to be overstated.

**Department's Position:** We note that the Department has recently updated its labor methodology.[81] Therefore, we find CCT's case brief argument regarding labor no longer

---

[76] Id.
[77] See, e.g., Tires, 73 FR 40485 at Comment 18A.
[78] See Letter from CCT, re: Submission of Publically Available Information to Value Factors, dated May 19, 2011.
[79] Id.
[80] See First Administrative Review of Sodium Hexametaphosphate From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review, 75 FR 64695 (October 20, 2010) and accompanying IDM at Comment 4.
[81] See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 FR 36092 (June 21, 2011) ("Labor Methodologies").

17

relevant, given that the new methodology requires the Department to base its labor costs on a single country. Additionally, we note that in response to the Department's Labor Memo, Albemarle and CCT submitted comments and rebuttal comments concerning Active Carbon's financial statement.[82] However, these comments were not related to the new labor methodology. Specifically, Albemarle and CCT's comments concerned the expense "freight & hamali" in Active Carbon's financial statement, which we have addressed above.

## Comment 5:  Issues Regarding CCT

### a.  Hydrochloric Acid Purity Level Adjustment

*CCT's Arguments*
- In adjusting for the purity level of hydrochloric acid ("HCl") consumed by China National Nuclear General Company Ningxia Activated Carbon Factory ("NC"), the Department incorrectly applied the adjustment factor to the freight cost. The adjustment should only be applied to the input value.

**No other party commented on this issue.**

**Department's Position:**  The Department agrees with CCT that we incorrectly applied the purity level adjustment factor to NC's freight cost of HCl because freight is not a function of the HCl's purity.  Further, we note that we made a similar error in adjusting the purity level for one of Jacobi's suppliers. Therefore, for the final results, the Department will apply the HCl purity level adjustment only to the HCl surrogate input value for CCT and Jacobi.[83]

### b.  Freight Cost Calculation

*CCT's Arguments*
- The Department inadvertently applied incorrect weight conversion factors in calculating the freight cost for packing cover bags, envelopes, and rope.

**No other party commented on this issue.**

**Department's Position:**  The Department agrees with CCT that the Department incorrectly converted the weight conversion factor in calculating the freight cost for transporting packing cover bags, envelops and rope. The Department incorrectly converted the freight for these factors as if they were measured in kilograms. However, CCT reported these inputs measured in

---

[82] See Letter from Albemarle, dated July 5, 2011; see also, Letter from CCT, dated July 12, 2011.
[83] See Memorandum to the File, through Catherine Bertrand, Program Manager, AD/CVD Operations, Office 9, from Bob Palmer, Case Analyst, AD/CVD Operations, Office 9:  Final Results Analysis Memorandum for Calgon Carbon (Tianjin) in the Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China ("CCT's Final Analysis Memo"), dated concurrently with this memorandum; see also, Memorandum to the File, through Catherine Bertrand, Program Manager, AD/CVD Operations, Office 9, from Katie Marksberry, Case Analyst, AD/CVD Operations, Office 9:  Final Results Analysis Memorandum for Jacobi Carbons AB in the Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China ("Jacobi's Final Analysis Memo"), dated concurrently with this memorandum.

grams.[84] Therefore, for the final results, the Department will apply the correct weight conversion factor for these inputs.[85]

### c. Plastic Wrapping Weight Conversions

*CCT's Arguments*
- The Department improperly applied weight conversions to the reported factor consumption for plastic wrap and plastic wrapping film.

**No other party commented on this issue.**

**Department's Position:** The Department agrees with CCT that the Department inadvertently failed to apply correctly the reported weight conversion to plastic wrap and plastic wrapping film. Accordingly, for the final results, the Department will assign the surrogate value measured in square meters per metric ton ("MT") to the corresponding FOP and assign the surrogate value measured in kilograms per MT to its corresponding FOP.[86]

### d. Raw Material Reporting by CCT and JB

*Jacobi's Arguments*
- The Department utilized the usage rate of carbonized materials for Huarin Jinbei Chemical Co. Ltd. ("JB") in calculating CCT's margin; however, it did not consider that CCT failed to fully report JB's usage of raw activated carbon in the production of finished activated carbon and thus under-reported its usages rates for electricity, labor, water, energy coal, and maintenance labor.
- It is the Department's practice to require respondents to report all raw materials used in the production of subject merchandise.
- The Department should re-calculate CCT/JB's usage rates of raw activated carbon in the production of subject merchandise to fully account for CCT/JB's usage of electricity, labor, water, energy coal, and maintenance labor.

*Albemarle's Arguments*
- Albemarle agrees with Jacobi that CCT appears to have understated its costs for subject merchandise produced by JB.
- The Department can use available information on the record to recalculate CCT's usage rates of powdered activated carbon to fully account for JB's usage of all direct materials.

*CCT's Arguments*
- JB has relied on its accounting and production records to report its FOP data and all reported FOP data accurately accounts for JB's actual production and accounting records.
- JB did not use fines to produce the product sold to the U.S. market.
- JB correctly calculated the usage of all raw materials for this product.

---

[84] See CCT's Section D Questionnaire Response, dated February 11, 2011 at Exhibit 24.
[85] See CCT's Final Analysis Memo at 4.
[86] See CCT's Final Analysis Memo at 4.

19

- The generation and consumption of dust offset each other, which is why JB did not report dust as either and input or as a by-product.

**Department's Position:** We agree with Jacobi and Albemarle that CCT/JB has under-reported its consumption of raw materials used to produce the product sold to the United States. At issue is CCT/JB's reported factor usage information for two key stages of production: the activation stage, through which all its activated carbon passes, and the subsequent grinding stage, through which only a portion of its production passes. In the Preliminary Results, the Department relied on CCT/JB allocation of raw materials in these stages as reported. However, it is clear from the record that at the grinding stage of production, CCT/JB reported a greater volume produced than inputs going into that stage of production.[87] In essence, CCT/JB explains that this difference is accounted for by the addition at the grinding stage of activated carbon dust.[88] CCT/JB calculated a ratio, dividing the total volume of activated carbon used to manufacture the product JB sold to CCT by the output of the grinding stage for that product.[89] CCT/JB applied this ratio to the volume of inputs used at the activation stage "to convert the average consumption of various inputs in the activation stage to the final grinding stage."[90] The application of this ratio had the effect of reducing the actual volume of inputs used at the activation stage.

Although CCT/JB claims that the product in question "requires less carbonized material as an input into the grinding stage than the other products by JB," it qualifies that statement by first stating such is "consistent with that adjustment" i.e., the ratio.[91] Accordingly it is unclear whether CCT/JB is drawing an inference based on the adjustment, or stating a fact. More importantly, CCT/JB's grinding stage methodology does not account for the generation and re-use of dust at that stage. However, the immediately preceding stage of production, activation, does account for all inputs if left unadjusted.[92] As we are required by the statute to account for all inputs, the Department will use CCT/JB's FOP consumption ratios at the activation stage and add the labor and electricity used at the grinding stage.[93] For further details, see CCT's Final Analysis Memo at 4-5.

**Comment 6: Issues Regarding Jacobi**

**a. Brokerage and Handling**

*Jacobi's Arguments*
- The Department incorrectly deducted domestic brokerage and handling in calculating Jacobi's net U.S. prices.
- The Department should not add the surrogate value for brokerage and handling to the total domestic movement expenses in Jacobi's margin program.

---

[87] See CCT's Section D Questionnaire Response, dated January 6, 2011 at Exhibit C-33, Tables 3-4.

[88] See CCT's Section D Questionnaire Response, dated November 23, 2011 at JB-11; see also, CCT's Section D Questionnaire Response, dated January 6, 2011 at C-20, JB-20.

[89] See CCT's Section D Questionnaire Response, dated January 6, 2011 at Exhibit C-33, Tables 3-4.

[90] Id.

[91] See CCT's Rebuttal Brief, dated June 20, 20011 at 4; see also, CCT's Section D Questionnaire Response, dated January 6, 2011 at Exhibit JB-33, Tables 3-4.

[92] Id.

[93] See CCT's Section D Questionnaire Response, dated January 6, 2011 at Exhibit JB-33, Tables 3-4.

20

No other party commented on this issue.

**Department's Position:** The Department agrees with Jacobi that the Department incorrectly added the surrogate value for brokerage and handling to domestic movement expenses in its margin program. Accordingly, the Department has corrected this inadvertent error.[94]

**b. Adverse Facts Available for NXGH's Water Usage**

*Jacobi's Arguments*
- The Department must correct its application of the AFA water usage rate for Jacobi's sales produced by Ningxia Guanghua Activated Carbon Co., Ltd. ("NXGH").
- Based on the Department's note in Jacobi's margin program, the Department intended to apply the adverse usage rate to only those sales that passed through the acid washing workshop; however, it applied the adverse water usage rate to all NXGH sales regardless of whether they passed through the acid washing stage.

No other party commented on this issue.

**Department's Position:** The Department agrees with Jacobi that the Department intended to apply an adverse usage rate only to those sales that passed through the acid washing workshop. In the Preliminary Results, the Department explained that it intended to apply as AFA the highest single, per-unit consumption of water reported by any of Jacobi's suppliers as the water used by NXGH in the acid washing stage.[95] However, in Jacobi's margin program, the Department inadvertently applied partial AFA to all of NXGH's water. Therefore, for the final results, the Department will correct Jacobi's margin program pertaining to NXGH's water in the acid washing stage.[96]

---

[94] Because of the business proprietary information about this issue, see Jacobi's Final Analysis Memo at 2-3.
[95] See Preliminary Results, 76 FR at 23989.
[96] See Jacobi's Final Analysis Memo at 2.

21

## RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting all of the above changes and positions, and adjusting the margin calculation program accordingly. If accepted, we will publish the final results of review and the final dumping margins in the Federal Register.

AGREE _____✓_____          DISAGREE_____

*Ronald K. Lorentzen*
_____
Ronald K. Lorentzen
Deputy Assistant Secretary
   for Import Administration

*October 24, 2011*
_____
Date

22



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-904
ARP: 04/01/09 - 3/31/10
**Public Document**
IA/NME/9: RJP

October 25, 2011

MEMORANDUM TO:        The File

THROUGH:              Catherine Bertrand
                      Program Manager, Office 9
                      Import Administration

FROM:                 Bob Palmer
                      Case Analyst, Office 9
                      Import Administration

RE:                   Third Administrative Review of Certain Activated Carbon from
                      the People's Republic of China: Surrogate Values for the Final
                      Results

On April 29, 2011, the Department of Commerce ("Department") published the preliminary
results of the third administrative review of the antidumping duty order on certain activated
carbon from the People's Republic of China ("PRC"). See Certain Activated Carbon From the
People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative
Review, and Preliminary Rescission in Part, 76 FR 23978 (April 29, 2011) ("Preliminary
Results").

This memorandum covers any adjustments the Department made to the calculations of each of
the factor values used in the final results for the above-captioned review. For detailed analysis of
certain surrogate value changes, see "Certain Activated Carbon from the People's Republic of
China: Issues and Decision Memorandum for the Final Results of the Second Antidumping Duty
Administrative Review," dated concurrently with this memorandum ("Decision Memo"). Unless
discussed below, we used the same surrogate value data that we used in the Preliminary Results.

We excluded from our calculations imports from the countries identified in "The Third
Administrative Review of Certain Activated Carbon from the People's Republic of China:
Surrogate Values for the Preliminary Results," dated April 22, 2011 ("Prelim SV Memo"). See
Attachment 1 for the revised surrogate value spreadsheet used in these final results. The values
listed in the text of this memorandum are rounded to the nearest hundredth for convenience
purposes; however, the un-rounded values are used in the actual calculation.



B.     Carbonized Materials

In the Preliminary Results, we valued carbonized materials using Indian import statistics under Harmonized Tariff Schedule ("HTS") number 2704.00.90 "Other cokes of coal."[4]  However, in post-preliminary surrogate value comments, Jacobi requested we value carbonized material using Indian HTS number 4402.90.10 "Coconut Shell Charcoal."[5]  Consistent with Comment 4b of the Decision Memo, for the final results, the Department has valued carbonized materials using HTS number 4402.90.10 "Coconut Shell Charcoal" because coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon.[6]  See Attachment 3.

C.     Surrogate Financial Ratios

In the Preliminary Results, to value factory overhead, selling, general, and administrative expenses ("SG&A"), and profit, we used the average of the audited financial statements of two Indian activated carbon producing companies; those being, Quantum Active Carbon Co., Ltd. 2007/2008 ("Quantum") and Kalpalka Chemicals Ltd. 2007/2008 ("Kalpalka").[7]  However, in post-preliminary surrogate value comments, we receive Activated Carbon India Private Limited's 2009/2010 ("Active Carbon") financial statements.[8]  We have used the information contained in these Active Carbon's financial statement to determine the surrogate value financial ratios of factory overhead, SG&A, and profit, because they are public, audited, complete, and contemporaneous with the POR.[9]

Using this information the Department derived the following financial ratios:

Active Carbon 09-10:
Factory Overhead                            =     5.83%
Selling, General, and Administrative =     10.04%
Profit                                             =     1.69%

See Attachment 4.

---

[4] See Prelim SV Memo at 4.
[5] See Jacobi's Additional Surrogate Value Comments, dated May 19, 2011 at 2 and Exhibit 1.
[6] See Decision Memo at Comment 4b.
[7] See Prelim SV Memo at 10.
[8] See CCT's Submission of Publically Available Information to Value Factors, dated May 19, 2011.
[9] See Decision Memo at Comment 4c.

3

## ATTACHMENT LIST

| | |
|---|---|
| Attachment 1 | Surrogate Value Spreadsheet |
| Attachment 2 | Inflator Index |
| Attachment 3 | Coconut Shell Charcoal |
| Attachment 4 | Surrogate Financial Ratios |
| Attachment 5 | Labor |

4



| | Period to be reviewed |
|---|---|
| Jiangsu Weixi Group Co.<br>  Leader Metal Industry Co., Ltd. (aka Marmon Retail Services Asis)<br>  New King Shan (Zhu Hai) Co., Ltd. and its parent company King Shan Wire<br>Narrow Woven Ribbons with Woven Selvedge C–570–953 .................................................................................................<br>  Weifang Dongfang Ribbon Weaving Co., Ltd. | 9/01/10–12/31/10 |
| **Suspension Agreements** | |
| None. | |

During any administrative review covering all or part of a period falling between the first and second or third and fourth anniversary of the publication of an antidumping duty order under 19 CFR 351.211 or a determination under 19 CFR 351.218(f)(4) to continue an order or suspended investigation (after sunset review), the Secretary, if requested by a domestic interested party within 30 days of the date of publication of the notice of initiation of the review, will determine, consistent with *FAG Italia v. United States,* 291 F.3d 806 (Fed Cir. 2002), as appropriate, whether antidumping duties have been absorbed by an exporter or producer subject to the review if the subject merchandise is sold in the United States through an importer that is affiliated with such exporter or producer. The request must include the name(s) of the exporter or producer for which the inquiry is requested.

For the first administrative review of any order, there will be no assessment of antidumping or countervailing duties on entries of subject merchandise entered, or withdrawn from warehouse, for consumption during the relevant provisional-measures "gap" period, of the order, if such a gap period is applicable to the period of review.

Interested parties must submit applications for disclosure under administrative protective orders in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings; Documents Submission Procedures; APO Procedures,* 73 FR 3634 (January 22, 2008). Those procedures apply to administrative reviews included in this notice of initiation. Parties wishing to participate in any of these administrative reviews should ensure that they meet the requirements of these procedures (*e.g.,* the filing of separate letters of appearance as discussed at 19 CFR 351.103(d)).

Any party submitting factual information in an antidumping duty or countervailing duty proceeding must certify to the accuracy and completeness of that information. *See* section 782(b) of the Act. Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives in all segments of any antidumping duty or countervailing duty proceedings initiated on or after March 14, 2011. *See Certification of Factual Information to Import Administration During Antidumping and Countervailing Duty Proceedings: Interim Final Rule,* 76 FR 7491 (February 10, 2011) (*Interim Final Rule*), amending 19 CFR 351.303(g)(1) and (2). The formats for the revised certifications are provided at the end of the *Interim Final Rule.* The Department intends to reject factual submissions in any proceeding segments initiated on or after March 14, 2011 if the submitting party does not comply with the revised certification requirements.

These initiations and this notice are in accordance with section 751(a) of the Act (19 U.S.C. 1675(a)) and 19 CFR 351.221(c)(1)(i).

Dated: October 25, 2011.

**Christian Marsh,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2011–28160 Filed 10–28–11; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–570–904]**

**Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** On April 29, 2011, the Department of Commerce ("Department") published in the **Federal Register** the preliminary results of the third administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC").[1] We gave interested parties an opportunity to comment on the *Preliminary Results.* Based upon our analysis of the comments and information received, we made changes to the margin calculations for the final results. We find that the mandatory respondents have not sold subject merchandise at less than normal value during the period of review ("POR"), April 1, 2009, through March 31, 2010.

**DATES:** Effective Date: October 31, 2011.

**FOR FURTHER INFORMATION CONTACT:** Robert Palmer, AD/CVD Operations,

[3] If one of the above named companies does not qualify for a separate rate, all other exporters of Certain Lined Paper Products from the People's Republic of China ("PRC") who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part.

[4] If one of the above named companies does not qualify for a separate rate, all other exporters of Certain Magnesia Carbon Bricks from the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part.

[5] If one of the above named companies does not qualify for a separate rate, all other exporters of Certain New Pneumatic Off-the-Road Tires from the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part.

[6] If one of the above named companies does not qualify for a separate rate, all other exporters of Freshwater Crawfish Tail Meat from the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part.

[7] If one of the above named companies does not qualify for a separate rate, all other exporters of Kitchen Appliance Shelving and Racks from the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part.

[8] If one of the above named companies does not qualify for a separate rate, all other exporters of Narrow Woven Ribbons with Woven Selvedge from the PRC who have not qualified for a separate rate are deemed to be covered by this review as part of the single PRC entity of which the named exporters are a part.

[9] We will review subject merchandise exported by Yama Ribbons and Bows Co, Ltd. not otherwise covered by the exclusion. *See Narrow Woven Ribbons with Woven Selvedge from Taiwan and the People's Republic of China: Antidumping Duty Orders,* 75 FR 53632 (September 1, 2010).

[1] *See Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part,* 76 FR 23978 (April 29, 2011) ("*Preliminary Results*").

Office 9, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; *telephone:* (202) 482–9068.

**SUPPLEMENTARY INFORMATION:**

**Background**

On May 28, 2010, and June 30, 2010, the Department initiated this review with respect to 192 companies for which an administrative review was requested.[2] On August 11, 2010, pursuant to 19 CFR 351.213(d)(1), the Department rescinded the administrative review with respect to 128 companies, based upon Petitioners'[3] timely withdrawal of review requests.[4] On August 23, 2010, the Department rescinded the administrative review with respect to an additional 45 companies, based on Petitioners' timely withdrawal of review requests.[5] Thus, 19 companies remained subject to this review.[6]

On May 19, 2010, Jacobi Carbons AB ("Jacobi") and Calgon Carbon (Tianjin) Co., Ltd. ("CCT") and its parent company Calgon Carbon Corporation ("CCC"), the mandatory respondents in this review, submitted additional surrogate value ("SV") information.

In the *Preliminary Results,* we set the deadline for interested parties to submit case briefs and rebuttal briefs to May 30, 2011, and June 7, 2011, respectively. On

[2] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 75 FR 29976 (May 28, 2010); *see also, Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part,* 75 FR 37759 (June 30, 2010) (collectively, *"Initiation Notices").*

[3] Norit Americas Inc. and Calgon Carbon Corporation.

[4] *See Certain Activated Carbon From the People's Republic of China: Notice of Partial Rescission of Antidumping Duty Administrative Review,* 75 FR 48644 (August 11, 2010) ("First Rescission").

[5] *See Certain Activated Carbon from the People's Republic of China: Notice of Partial Rescission of Antidumping Duty Administrative Review,* 75 FR 51754 (August 23, 2010) ("Second Rescission").

[6] In the *Preliminary Results,* the Department mistakenly misstated the number of companies rescinded and the number of companies remaining under review. The remaining companies which were listed in *Initiation Notices* are: AmeriAsia Advanced Activated Carbon Products Co., Ltd.; Beijing Pacific Activated Carbon Products Co., Ltd.; Calgon Carbon (Tianjin) Co., Ltd.; Cherishmet Inc.; Datong Municipal Yunguang Activated Carbon Co., Ltd.; Jacobi Carbons AB; Jiangxi Hanson Import Export Co.; Langfang Winfield Filtration Co.; Mindong Lianyi Group; Ningxia Guanghua A/C Co., Ltd.; Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.; Ningxia Huahui Activated Carbon Co., Ltd.; Ningxia Lingzhou Foreign Trade Co, Ltd.; Shanxi DMD Corporation; Shanxi Industry Technology Trading Co., Ltd.; Shanxi Sincere Industrial Co., Ltd.; Tangshan Solid Carbon Co., Ltd.; Tianjin Jacobi International Trading Co., Ltd.; and Tianjin Maijin Industries Co., Ltd.

May 11, 2011, we extended the deadlines for case and rebuttal briefs to June 13, 2011, and June 20, 2011, respectively.[7] On June 13, 2011, Petitioners, CCT, and the separate rate respondents, Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"), Shanxi Industry Technology Trading Co., Ltd. ("Shanxi ITT") and Shanxi DMD Corporation ("Shanxi DMD") filed case briefs. On June 14, 2011, Jacobi filed its case brief.[8] On June 16, 2011, the Department rejected Huahui's case brief because it contained new information and provided Huahui until June 20, 2011, to re-file its case brief.[9] On June 20, 2011, Huahui re-filed its case brief. Also on June 20, 2011, Petitioners, CCT, Shanxi ITT, Shanxi DMD, and Albemarle filed rebuttal briefs.

On June 21, 2011, the Department placed data to value the input of labor on the record for comment by interested parties.[10] On July 5, 2011, Albemarle provided comments on the June 21, 2011, data. On July 7, 2011, the Department placed additional information regarding the labor rate calculation on the record for comment by interested parties.[11] On July 12, 2011, CCT filed rebuttal comments to Albemarle's July 5, 2011, labor data comments. On July 21, 2011, the Department extended the final results until October 26, 2011.[12] The Department did not hold a public hearing, pursuant to 19 CFR 351.310(d), as the hearing requests made by interested parties were withdrawn.

**Analysis of Comments Received**

All issues raised in the case and rebuttal briefs by parties to these reviews are addressed in the "Certain Activated Carbon from the People's Republic of China: Issues and Decision

[7] *See* Letter to Interested Parties, dated May 11, 2011.

[8] Jacobi filed its case brief under one-day late rule. *See* 19 CFR 351.303(c).

[9] *See* Letter to Huahui and Albemarle, dated June 16, 2011.

[10] *See* Memorandum to the File, through Catherine Bertrand, Program Manager, Office 9, from Bob Palmer, Case Analyst, Office 9 re: Third Administrative Review of the Antidumping Duty on Certain Activated Carbon From the People's Republic of China: Industry Specific Surrogate Labor Rate and Surrogate Financial Ratio Adjustments, dated June 21, 2011 ("Labor Memo").

[11] *See* Memorandum to the File, through Catherine Bertrand, Program Manager, Office 9, from Bob Palmer, Case Analyst, Office 9 re: Third Administrative Review of the Antidumping Duty on Certain Activated Carbon From the People's Republic of China: Revision to Surrogate Financial Ratio Adjustments, dated July 7, 2011 ("Revised Labor Memo").

[12] *See Certain Activated Carbon From the People's Republic of China: Extension of Time Limit for Final Results of the Third Antidumping Duty Administrative Review,* 76 FR 43654 (July 21, 2011).

Memorandum for the Final Results of the Third Antidumping Duty Administrative Review," which is dated concurrently with this notice ("Decision Memo"). A list of the issues which parties raised and to which we respond in the Decision Memo is attached to this notice as an Appendix. The Decision Memo is a public document and is on file in the Central Records Unit, main Commerce building, Room 7046, and is accessible on the Department's Web site at *http://www.trade.gov/ia.* The paper copy and electronic version of the memorandum are identical in content.

**Scope of the Order**

The merchandise subject to the order is certain activated carbon. Certain activated carbon is a powdered, granular, or pelletized carbon product obtained by "activating" with heat and steam various materials containing carbon, including but not limited to coal (including bituminous, lignite, and anthracite), wood, coconut shells, olive stones, and peat. The thermal and steam treatments remove organic materials and create an internal pore structure in the carbon material. The producer can also use carbon dioxide gas ($CO_2$) in place of steam in this process. The vast majority of the internal porosity developed during the high temperature steam (or $CO_2$ gas) activated process is a direct result of oxidation of a portion of the solid carbon atoms in the raw material, converting them into a gaseous form of carbon.

The scope of the order covers all forms of activated carbon that is activated by steam or $CO_2$, regardless of the raw material, grade, mixture, additives, further washing or post-activation chemical treatment (chemical or water washing, chemical impregnation or other treatment), or product form. Unless specifically excluded, the scope of the order covers all physical forms of certain activated carbon, including powdered activated carbon ("PAC"), granular activated carbon ("GAC"), and pelletized activated carbon.

Excluded from the scope of the order are chemically activated carbons. The carbon-based raw material used in the chemical activation process is treated with a strong chemical agent, including but not limited to phosphoric acid, zinc chloride sulfuric acid or potassium hydroxide, that dehydrates molecules in the raw material, and results in the formation of water that is removed from the raw material by moderate heat treatment. The activated carbon created by chemical activation has internal porosity developed primarily due to the action of the chemical dehydration

**67144**    Federal Register / Vol. 76, No. 210 / Monday, October 31, 2011 / Notices

agent. Chemically activated carbons are typically used to activate raw materials with a lignocellulosic component such as cellulose, including wood, sawdust, paper mill waste and peat.

To the extent that an imported activated carbon product is a blend of steam and chemically activated carbons, products containing 50 percent or more steam (or $CO_2$ gas) activated carbons are within the scope, and those containing more than 50 percent chemically activated carbons are outside the scope. This exclusion language regarding blended material applies *only* to mixtures of steam and chemically activated carbons.

Also excluded from the scope are reactivated carbons. Reactivated carbons are previously used activated carbons that have had adsorbed materials removed from their pore structure after use through the application of heat, steam and/or chemicals.

Also excluded from the scope is activated carbon cloth. Activated carbon cloth is a woven textile fabric made of or containing activated carbon fibers. It is used in masks and filters and clothing of various types where a woven format is required.

Any activated carbon meeting the physical description of subject merchandise provided above that is not expressly excluded from the scope is included within the scope. The products subject to the order are currently classifiable under the Harmonized Tariff Schedule of the United States ("HTSUS") subheading 3802.10.00. Although the HTSUS subheading is provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

## Changes Since the Preliminary Results

Based on a review of the record as well as comments received from parties regarding our *Preliminary Results,* we have made revisions to certain SVs and the margin calculations for CCT and Jacobi in the final results. Specifically, we have updated the SV for labor, coconut shell charcoal and the calculation of the surrogate financial ratios.[13] *See* Decision Memo at Comments 4b, 4c, and 4d and Final SV Memo [14]; *see also,* Labor Cost

[13] CCT submitted Active Carbon India Private Limited's ("Active Carbon") 2009–2010 financial statements in its post-preliminary SV submissions, which we will rely upon for the final results. *See* CCT's Post-Prelim SV Submission, dated May 19, 2011.

[14] *See* Memorandum to the File, through Catherine Bertrand, Program Manager, Office 9, from Bob Palmer, Case Analyst, Office 9 re: Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate

Methodology below. We have also corrected various errors in the *Preliminary Results* alleged by respondents. *See* Decision Memo at Comments 5a, 5b, 5c, 5d, 6a and 6b. For all changes to the margin calculations, *see* Decision Memo and the company specific analysis memoranda.

## Labor Cost Methodology

Pursuant to the Department's recent decision regarding it final labor methodology,[15] we have calculated a revised hourly labor rate to use in valuing CCT and Jacobi's reported labor. The revised surrogate value for labor is calculated by using labor cost data from India, the primary surrogate country, as published in "Chapter 6A: Labor Cost in Manufacturing" from the International Labor Organization ("ILO") Yearbook of Labor Statistics. Additionally, because the Department is now using Chapter 6A to calculate labor costs, the Department made certain adjustments in the surrogate financial ratio calculations regarding labor. *See* Labor Memo and Revised Labor Memo, for the details of the calculation and supporting data; *see also* Final SV Memo.

## Final Partial Rescission

In the *Preliminary Results,* the Department preliminarily rescinded this review with respect to Ningxia Lingzhou Foreign Trade Co., Ltd. ("Lingzhou") because the Department determined that it had no shipments of subject merchandise to the United States during the POR.

Subsequent to the *Preliminary Results,* no information was submitted on the record indicating that Lingzhou made sales to the United States of subject merchandise during the POR and no party provided written arguments regarding this issue. Thus, in accordance with 19 CFR 351.213(d)(3), and consistent with our practice, we are rescinding this review with respect to Lingzhou.

## Special Rule for Further Manufactured Products

In the *Preliminary Results,* we applied the "special rule" for merchandise with value-added after importation and excused CCT from reporting U.S. sales of subject merchandise further processed by CCC, CCT's U.S. parent company, and the U.S. further-processing cost information associated

Values for the Final Results, dated concurrently with this notice ("Final SV Memo") at 2–3.

[15] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor,* 76 FR 36092 (June 21, 2011) ("*Labor Methodologies*").

with those sales.[16] Further, we stated that we would apply the weight-averaged margin calculated based upon CCT's U.S. sales to the first unaffiliated customer as the surrogate margin to the transactions to which the "special rule" applied.[17] Because we have not received any information on the record that contradicts our preliminary finding, we shall continue to apply the weight-averaged margin as stated.

## Separate Rates

In our *Preliminary Results,* we determined that the following companies met the criteria for separate rate status: CCT; Jacobi; Beijing Pacific Activated Carbon Products Co., Ltd. ("Beijing Pacific"); Datong Municipal Yunguang Activated Carbon Co., Ltd.; Ningxia Guanghua Cherishment Activated Carbon Co., Ltd. ("GHC"); Huahui; Shanxi DMD Corporation; Shanxi Sincere Industrial Co., Ltd.; Shanxi Industry Technology Trading Co., Ltd.; Tangshan Solid Carbon Co., Ltd.; and Tianjin Maijin Industries Co., Ltd.[18] We have not received any information since the issuance of the *Preliminary Results* that provides a basis for reconsideration of these determinations. Therefore, the Department continues to find that the companies listed above meet the criteria for a separate rate.

Additionally, in the *Preliminary Results,* the Department inadvertently stated that Datong Juqiang Activated Carbon Co., Ltd.; Datong Yunguang Chemicals Plant; Hebei Foreign Trade and Advertising Corporation; Shanxi Newtime Co., Ltd.; and United Manufacturing International (Beijing) Ltd. were not rescinded from the administrative review and are considered as part of the PRC-Wide entity.[19] However, on August 11, 2010, and August 23, 2010, these companies were rescinded from this administrative review and, therefore, are no longer subject to this proceeding.[20]

These five companies, AmeriAsia Advanced Activated Carbon Products Co., Ltd.; Jiangxi Hansom Import Export co.; Langfang Winfield Filtration Co.; Mindong Lianyi Group; and Ningxia Guanghua A/C., Ltd.; companies upon which the Department initiated administrative reviews that have not been rescinded, did not submit either a separate rate application or certification. Therefore, because AmeriAsia

[16] *See Preliminary Results,* 76 FR at 23985–23986.
[17] *Id.*
[18] *See id.* at 23982–23984.
[19] *See id.* at 23983.
[20] *See First Rescission; see also, Second Rescission.*

Advanced Activated Carbon Products Co., Ltd.; Jiangxi Hansom Import Export co.; Langfang Winfield Filtration Co.; Mindong Lianyi Group; and Ningxia Guanghua A/C., Ltd. did not demonstrate their eligibility for separate rate status in a timely manner, we have determined it is appropriate to consider these companies as part of the PRC-wide entity.

## Rate For Non-Selected Companies

In the *Preliminary Results,* the Department assigned the separate rate companies the rate calculated for CCT. However, for the final results, the rate for both the individually examined respondents, CCT and Jacobi, are *de minimis* and accordingly, the Department has determined a reasonable method for assigning a rate to the companies eligible for a separate rate. *See* Decision Memo at Comment 1. Pursuant to this method, we are assigning a rate of 0.44 U.S. Dollars per kilogram ("USD/kg") to Huahui, its assigned rate in *Carbon AR 2.*[21] Additionally, we are assigning a rate of 0.28 USD/kg to the other companies eligible for a separate rate in this review, the separate rate calculated in *Carbon AR 2. See* Decision Memo at Comment 1.

## PRC-Wide Rate and PRC-Wide Entity

The Department used the PRC-Wide rate of 2.42 USD/kg in the most recently completed administrative review of this antidumping order.[22] Because we have not calculated a PRC-Wide rate greater than the PRC-wide rate from previous reviews in this proceeding and nothing on the record of the instant review calls into question the reliability of the PRC-Wide Rate, we find it appropriate to continue to apply the PRC-Wide rate of 2.42 USD/kg for the final results.[23]

In the *Preliminary Results,* the Department determined that those companies which did not demonstrate eligibility for a separate rate are properly considered part of the PRC-wide entity.[24] Since the *Preliminary*

*Results,* none of the companies which did not file separate rate applications or certifications submitted comments regarding these findings. Therefore, we continue to treat these entities as part of the PRC-wide entity.

## Final Results of Review

The dumping margins for the POR are as follows:

CERTAIN ACTIVATED CARBON FROM THE PEOPLE'S REPUBLIC OF CHINA

| Exporter | Margin |
|---|---|
| Jacobi Carbons AB[25] | $0.00/kg |
| Calgon Carbon (Tianjin) Co. Ltd. | 0.00/kg |
| Ningxia Huahui Activated Carbon Co., Ltd. | 0.44/kg |
| Datong Municipal Yunguang Activated Carbon Co., Ltd. | 0.28/kg |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.[26] | 0.28/kg |
| Shanxi DMD Corporation | 0.28/kg |
| Shanxi Industry Technology Trading Co., Ltd. | 0.28/kg |
| Shanxi Sincere Industrial Co., Ltd. | 0.28/kg |
| Tangshan Solid Carbon Co., Ltd. | 0.28/kg |
| Tianjin Maijin Industries Co., Ltd. | 0.28/kg |
| PRC-Wide rate[27] | 2.42/kg |

## Assessment

The Department will determine, and U.S. Customs and Border Protection

("CBP") shall assess, antidumping duties on all appropriate entries, pursuant to section 751(a)(2)(A) of the Act and 19 CFR 351.212(b). We have calculated importer-specific duty assessment rates on a per-unit basis.[28] As the Department stated in the most recent administrative review,[29] we will continue to direct CBP to assess importer-specific assessment rates based on the resulting per-unit (*i.e.,* per-kilogram) rates by the weight in kilograms of each entry of the subject merchandise during the POR. The Department intends to issue appropriate assessment instructions directly to CBP 15 days after publication of the final results of this administrative review.

## Disclosure

We will disclose the calculations performed within five days of the date of publication of this notice to parties in this proceeding in accordance with 19 CFR 351.224(b).

## Cash Deposit Requirements

The following cash deposit requirements will be effective upon publication of the final results of this administrative review for all shipments of the subject merchandise from the PRC entered, or withdrawn from warehouse, for consumption on or after the publication date, as provided for by section 751(a)(2)(C) of the Act: (1) For previously investigated or reviewed PRC and non-PRC exporters not listed above that have separate rates, the cash deposit rate will continue to be the exporter-specific rate published for the most recent period; (2) for all PRC exporters of subject merchandise which have not been found to be entitled to a separate rate, the cash deposit rate will be the PRC-wide rate established in the final results of this review (i.e., 2.42 per kilogram); and (3) for all non-PRC exporters of subject merchandise which have not received their own rate, the cash deposit rate will be the rate applicable to the PRC exporters that supplied that non-PRC exporter. These deposit requirements, when imposed, shall remain in effect until further notice.

## Notification to Importers

This notice also serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f) to file a certificate regarding the

---

[21] *See Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review,* 75 FR 70208, 70209 (November 17, 2010) ("*Carbon AR2*") and accompanying IDM at Comment 3.

[22] *See Carbon AR2,* 75 FR at 70209 and 70211.

[23] *See Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review,* 76 FR 51040 and 51942 (Dep't of Commerce August 19, 2011) where the Department used the PRC-Wide Rate from previous review.

[24] The companies considered part of the PRC-Wide entity are: AmeriAsia Advanced Activated Carbon Products Co., Ltd.; Jiangxi Hansom Import Export Co.; Langfang Winfield Filtration Co.;

Mindong Lianyi Group; and Ningxia Guanghua A/C Co., Ltd.

[25] In the *Preliminary Results,* we found that Jacobi Carbons Industry (Tianjin) ("JCC") and Tianjin Jacobi International Trading Co. Ltd. ("Tianjin Jacobi") both act as export facilitators for Jacobi Carbons AB. *See Preliminary Results,* 76 FR at 23960. Therefore, as we have done in earlier segments of this antidumping duty order, we are continuing to find it appropriate that Jacobi Carbons AB, Tianjin Jacobi and JCC to receive the antidumping duty rate assigned to Jacobi Carbons AB.

[26] As stated above, GHC is a single entity with Beijing Pacific and Ningxia Guanghua Activated Carbon Co., Ltd. Additionally, in a previous review, the Department found that Cherishmet Inc. is affiliated with GHC. *See* Carbon AR1, 74 FR at 57995 n.2. However, Cherishmet Inc. has not been found to be part of the single entity involving Beijing Pacific, GHC, and Ningxia Guanghua Activated Carbon Co., Ltd. *See* Memorandum to The File, from Robert Palmer, Case Analyst, through Catherine Bertrand, Program Manager, regarding First Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China: Affiliation Memorandum of Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., dated April 30, 2009.

[27] As discussed in the Separate Rates and PRC-Wide Entity sections of this notice, the PRC-Wide entity includes AmeriAsia Advanced Activated Carbon Products Co., Ltd.; Jiangxi Hansom Import Export Co.; Langfang Winfield Filtration Co.; Mindong Lianyi Group; and Ningxia Guanghua A/C Co., Ltd.

[28] We divided the total dumping margins (calculated as the difference between normal value and export price or constructed export price) for each importer by the total quantity of subject merchandise sold to that importer during the POR to calculate a per-unit assessment amount.

[29] *See Carbon AR2,* 75 FR at 70211.

reimbursement of antidumping duties prior to liquidation of the relevant entries during this POR. Failure to comply with this requirement could result in the Department's presumption that reimbursement of antidumping duties has occurred and the subsequent assessment of doubled antidumping duties.

## Administrative Protective Orders

This notice also serves as a reminder to parties subject to administrative protective order ("APO") of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305, which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

We are issuing and publishing this administrative review and notice in accordance with sections 751(a)(1) and 777(i) of the Act.

Dated: October 24, 2011.

Ronald K. Lorentzen,

*Deputy Assistant Secretary for Import Administration.*

## Appendix I—Decision Memorandum

### General Issues

*Comment 1:* Assignment of the Separate Rate.
*Comment 2:* Ad Valorem Deposit Rates.
*Comment 3:* Zeroing.
*Comment 4: Surrogate Values:*
a. Energy Coal.
b. Carbonized Material.
c. Surrogate Financial Ratios.
d. Labor Rate
*Comment 5: Issues Regarding CCT:*
a. Hydrochloric Acid Purity Level Adjustment.
b. Freight Cost Calculation.
c. Plastic Wrapping Weight Conversions.
d. Raw Material Reporting by CCT and JB.
*Comment 6: Issues Regarding Jacobi*
a. Brokerage and Handling.
b. Adverse Facts Available for NXGH's Water Usage.

[FR Doc. 2011–28158 Filed 10–28–11; 8:45 am]

BILLING CODE 3510–DS–P

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–475–828]

### Stainless Steel Butt-Weld Pipe Fittings From Italy; Extension of Time Limit for Preliminary Results of Antidumping Duty Administrative Review

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* October 31, 2011.

**FOR FURTHER INFORMATION CONTACT:** Edythe Artman or Angelica Mendoza, AD/CVD Operations, Office 7, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; *telephone:* (202) 482–3931 or (202) 482–3019, respectively.

**SUPPLEMENTARY INFORMATION:**

#### Background

On March 31, 2011, the Department of Commerce (the Department) published the initiation of the administrative review of the antidumping duty order on stainless steel butt-weld pipe fittings from Italy in the Federal Register. *See Initiation of Antidumping Duty Administrative Reviews, Requests for Revocation in Part, and Deferral of Administrative Review,* 76 FR 17825 (March 31, 2011). This review covers the period of February 1, 2010, to January 31, 2011. The current deadline for the preliminary results of the review is October 31, 2011.

#### Extension of Time Limits for Preliminary Results of Review

Section 751(a)(3)(A) of the Tariff Act of 1930, as amended (the Act), requires that the Department complete the preliminary results of an administrative review within 245 days after the last day of the anniversary month of an order for which a review is requested. However, if it is not practicable to complete the review within this time period, section 751(a)(3)(A) of the Act allows the Department to extend the 245-day time period for the preliminary results up to 365 days.

The Department finds that it is not practicable to complete the preliminary results of this review within the original time frame because it needs to obtain additional information from the respondent company, Tectubi Raccordi S.p.A., in order to complete its analysis. Because the Department requires additional time to obtain and analyze this information, it is not practicable to complete this review within the original

time limit (*i.e.,* October 31, 2011) and, accordingly, the Department is extending the time limit for completion of the preliminary results of this administrative review until no later than December 15, 2011, which is 290 days from the last day of the anniversary month of this order. We intend to issue the final results no later than 120 days after publication of the preliminary results notice.

This extension is issued and published in accordance with sections 751(a)(3)(A) and 777(i) of the Act.

Dated: October 24, 2011.

Christian Marsh,

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2011–28185 Filed 10–28–11; 8:45 am]

BILLING CODE 3510–DS–P

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–851]

### Certain Preserved Mushrooms From the People's Republic of China: Final Results of Antidumping Duty New Shipper Reviews

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** On August 2, 2011, the Department of Commerce (the Department) published in the **Federal Register** the preliminary results of the new shipper reviews (NSRs) of the antidumping duty order on certain preserved mushrooms from the People's Republic of China (PRC) for Guangxi Hengyong Industrial & Commercial Dev., Ltd. (Hengyong) and Zhangzhou Hongda Import & Export Trading Co., Ltd. (Co.) (Hongda).[1] *See Certain Preserved Mushrooms From the People's Republic of China: Preliminary Results of Antidumping Duty New Shipper Reviews,* 76 FR 46270 (August 2, 2011) (*Preliminary Results*). We gave interested parties an opportunity to comment on the preliminary results. We received a case brief from Hongda on August 31, 2011. We received no rebuttal briefs from any parties. Furthermore, as described further below, we also received various comments/responses from the parties on

---

[1] In its request for review, Hengyong certified that it was the exporter and Hengyong Industrial & Commercial Dev. Ltd. Hengxian Food Division (Hengxian) was the manufacturer. *See* September 24, 2010, submission from Hengyong. In its request for NSR, Hongda certified it was the exporter and Fujian Haishan Foods Co., Ltd. (Haishan) was the manufacturer. *See* September 24, 2010, submission from Hongda.

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| ALBEMARLE CORPORATION, ) | |
| ) | |
| Plaintiff, ) | Court No. 11-00451 |
| ) | (consol.) |
| ) | |
| v. ) | PUBLIC |
| ) | VERSION |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD BY
PLAINTIFF ALBEMARLE CORPORATION AND INTERVENOR-PLAINTIFF
NINGXIA HUAHUI ACTIVATED CARBON CO., LTD.

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Susan Lehman Brooks
Sarah M. Wyss
Keith F. Huffman*
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
202-688-3610 (ph)
202-595-8968 (fax)
trade@mowrygrimson.com
*Counsel to Albemarle Corporation and
Ningxia Huahui Carbon Co., Ltd.*

May 21, 2012

*Admitted only in New York; DC admission
pending. Practice directly supervised by
principals of the firm admitted to the DC
Bar

that are groundless and cannot be sustained, as explained below.[9]

In the Final Results, Commerce stated that "it is more reasonable in this review to use a calculated rate from a previous segment, as this method constitutes a <u>contemporaneous</u> examination of individually-review respondents .....and reasonably reflects potential dumping margins for the non-selected companies." I&D Mem. at Cmt. 1, p. 5 (P.R. 34723) (emphasis added). Commerce is flat wrong that a calculation from a prior review represents a so-called "contemporaneous examination" with respect to the current review period. The opposite is the case, namely, that a margin calculated from a prior review period is, by definition, not contemporaneous. During the administrative proceeding, Albemarle demonstrated that even the same mandatory respondent's antidumping margins varied from period to period, a fact that Commerce did not contest. <u>See id.</u> at Cmt. 1, p. 4-7; Letter from Mowry & Grimson to Commerce re: Re-Submission of Case Brief for Consideration Prior to Final Results at 8 (June 20, 2011) (Public Document) ("Huahui and Albemarle  Case Br.") (P.R. 2216).  Commerce's counter-intuitive assumption that old rates are representative of current dumping margins simply is not supported by the facts and, therefore, not supported by substantial evidence.

Considering that a calculation from a prior review period is, by definition, <u>not</u> contemporaneous, Commerce's finding that an older calculation "reasonably reflects potential dumping margins for the non-selected companies" in the current review has no factual basis whatsoever. Albemarle argued that Jacobi's rate is "reasonably reflective" of Huahui's separate rate because Huahui was one of Jacobi's suppliers during the third review. <u>See</u> Huahui and Albemarle Case Br. at 6 (P.R. 2216) (citing Jacobi's August 12, 2010 Section A Response at 19

---

[9] Although Commerce assigned several companies the PRC-Wide rate because they did not demonstrate eligibility for a separate rate, Commerce did not determine any respondent's antidumping rate based on total facts available. Thus, in this case, under the "expected method," Commerce should have averaged the zero/<u>de minimis</u> rates of Jacobi and CCT.

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| ALBEMARLE CORPORATION, | : | |
| Plaintiff, | : | |
| | : | |
| SHANXI DMD CORPORATION, BEIJING PACIFIC ACTIVATED CARBON PRODUCTS COMPANY, LTD., CHERISHMET INC., and NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON COMPANY, LTD., | : | |
| Consolidated Plaintiffs, | : | |
| and | : | |
| NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., | : | |
| Plaintiff-Intervenor, | : | |
| v. | : | Consol. Court No. 11-00451 |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| CALGON CARBON (TIANJIN) CO., LTD., CALGON CARBON CORPORATION, and NORIT AMERICAS INC., | : | |
| Defendant-Intervenors. | : | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S, CONSOLIDATED PLAINTIFFS', AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response to the motions for

judgment upon the agency record submitted by the following parties: (1) plaintiff Albemarle

particular, Commerce explained that there was no data on the record to determine whether the separate rate applications' pricing behavior was comparable to that of the mandatory respondents during the third administrative review. *Id.* In fact, there has never been a zero or *de minimis* rate assigned to mandatory respondents during the course of this order to support a finding that the separate rate respondents are entitled to that rate. Accordingly, Commerce determined that "using a calculated rate from a prior segment more reasonably reflects the potential dumping margins of non-selected companies than does a *de minimis* or zero rate from an ongoing segment." *Id.* at 6.

As Commerce explained, the reason that the rate from the previous segment provides a better indication of the separate rate respondents' dumping margins is that "the margins from the previous review more accurately capture recent and potential pricing behavior of non-selected companies." *Id.* at 6. The rates from the second administrative review reasonably reflect potential dumping margins because the second and third periods of review are at most separated by only 12 months; the second period of review ends in March 2009 and the third administrative review commences in April 2009. Commerce further explained that while the statute and the SAA anticipate that in market economy investigations that Commerce may average zero, *de minimis*, and margins based entirely on facts available, the administrative proceeding currently under review contained information not available in an investigation, "namely rates from prior proceedings." *Id.* at 5.

Commerce's approach of calculating separate rates based upon the average of the rates calculated in the most recently completed segment of the proceeding reflects the same methodology that Commerce has used in several other administrative proceedings with similar factual circumstances. *See, e.g., Certain Frozen Warmwater Shrimp from the People's Republic*

23

**UNITED STATES DEPARTMENT OF COMMERCE**
Office of the General Counsel
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

**PUBLIC DOCUMENT**

January 10, 2014

**FILED ELECTRONICALLY**

The Honorable Tina Potuto Kimble
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re:    *Albemarle Corp. et al. v. United States*, Consol. Court No. 11-00451

Dear Ms. Potuto Kimble:

Please find enclosed the U.S. Department of Commerce's (Commerce) final results of redetermination pursuant to court remand (Final Redetermination) in the above-referenced consolidated action. The enclosed public Final Redetermination does not contain confidential information.

Under separate cover, Commerce will file the index of the administrative record for the Final Redetermination, along with the necessary certification.

If you have any questions regarding this matter, please contact me at (202) 482-4044.

Respectfully submitted,

Devin S. Sikes
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce

cc:    (with Final Redetermination)

Jeffrey Sheldon Grimson
Jill A. Cramer
Kristin Heim Mowry
Rebecca Marie Janz
Sarah Marie Wyss
Susan Lehman Brooks
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015-2052
(202) 688-3610
Fax: (202) 595-8968

Gregory Stephen Menegaz
James Kevin Horgan
John Joseph Kenkel
DeKieffer & Horgan
729 Fifteenth Street, NW
Suite 800
Washington, DC 20005-2105
(202) 783-6900
Fax: (202) 783-6909

Francis J. Sailer
Andrew Thomas Schutz
Kavita Mohan
Mark E. Pardo
Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP
1201 New York Avenue, NW
Suite 650
Washington, DC 20005
(202) 783-6881
Fax: (202) 783-0405

Craig Anderson Lewis
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-8613
Fax: (202) 637-5910

R. Alan Luberda
David Alan Hartquist

2

John M. Herrmann, II
Kelley Drye & Warren, LLP
3050 K Street, NW
Suite 400
Washington, DC 20007-5108
(202) 342-8835
Fax: (202) 342-8451

Antonia Ramos Soares
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-7405
Fax: (202) 514-7965

3

Albemarle Corp., and Ningxia Huahui Activated Carbon Co., Ltd. v. United States, and Calgon Carbon (Tianjin) Co., Ltd., Calgon Carbon Corp., and Norit Americas Inc.

Consol. Court No. 11-00451, Slip Op. 13-106 (CIT August 15, 2013).

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

### A. SUMMARY

The Department of Commerce ("the Department") has prepared these final results of redetermination pursuant to the remand order of the Court of International Trade ("CIT" or "Court") in Albemarle Corp. et al. v. United States et al., Consol. Court No. 11-00451, Slip Op. 13-106 (August 15, 2013) ("Remand Opinion and Order"). These final remand results concern Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review, 76 FR 67142 (October 31, 2011) ("AR3 Final Results"), and the accompanying Issues and Decision Memorandum ("IDM"). The CIT remanded the following four aspects of the AR3 Final Results: (1) the surrogate value ("SV") for Calgon Carbon (Tianjin) Co., Ltd.'s ("CCT") carbonized material; (2) the SVs for CCT's coal and fine by-products; (3) the method used to calculate the rate assigned to Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC") and its affiliate Beijing Pacific Activated Carbon Products Co., Ltd. ("BPAC") (together, "Cherishmet"),[1] as well as Shanxi DMD Corporation ("Shanxi DMD"); and (4) the use of a per-unit, instead of ad valorem, assessment rate for Shanxi DMD.[2]

As set forth in detail below, pursuant to the CIT's Remand Opinion and Order, we have taken the following action in these final results: (1) for purposes of calculating the SV for CCT's

---

[1] The Department found GHC and BPAC to be affiliated and a single entity in First Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 74 FR 57995, 57998 (November 10, 2009).
[2] See Remand Opinion and Order at 27-28.

carbonized material, we placed on the record an expert study regarding the similarities between coconut shell charcoal and coal-based carbonized material, provided an opportunity for interested parties to comment on this study, and explained why we regard the study as supporting our selection of Indian Harmonized Tariff Schedule ("HTS") number 4402.00.10 "Coconut Shell Charcoal" as the best available information for this input; (2) we revised the SVs for CCT's coal and fines by-products; (3) under protest,[3] we reconsidered the rate (i.e., the separate rate) assigned to GHC, BPAC, and Shanxi DMD; and (4) we found the issue of assigning Shanxi DMD a per-unit assessment and cash deposit rate moot as a result of assigning zero dumping margins to Shanxi DMD. Consequently, the Department has revised the remand components of the margin calculations. Specifically, the Department has changed the SVs for CCT's coal and fines by-products and has applied these changes to the margin calculated for CCT.[4]

On November 29, 2013, the Department released its Draft Remand Results to interested parties. Calgon Carbon Corporation and Cabot Norit Americas Inc. (together, "Petitioners"), Albemarle/Huahui, CCT, GHC, BPAC, and Ningxia Guanghua Activated Carbon Co., Ltd. ("GH") filed comments on December 9, 2013.[5] The Department has addressed these comments below after discussing our analysis of the remanded issues.

---

[3] See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003) ("Viraj").
[4] See "Memorandum to the File, through Catherine Bertrand, Program Manager, Enforcement and Compliance, Office V, from Bob Palmer, Case Analyst, Enforcement and Compliance, Office V, re: Remand Redetermination Analysis Memorandum for Calgon Carbon (Tianjin) Co., Ltd. in the Antidumping Duty Review of Certain Activated Carbon from the People's Republic of China, dated November 29, 2013" ("CCT Remand Memo").
[5] See Letter from Petitioners, dated December 9, 2013; Letter from CCT, dated December 9, 2013; Letter from GHC, BPAC, and GH, dated December 9, 2013; and Letter from Albemarle/Huahui, dated December 9, 2013.

2

## B. REMANDED ISSUES

### 1. SV for CCT's Carbonized Materials

**Background**

In AR3 Preliminary Results, the Department valued carbonized materials used by CCT with publicly available prices from Global Trade Atlas ("GTA") data under Indian HTS number 2704.00.90 "Other Cokes of Coal."[6] In AR3 Final Results, the Department valued carbonized materials used by CCT with publicly available prices from GTA data under Indian HTS number 4402.00.10 "Coconut Shell Charcoal" because the Department had determined that coconut shell charcoal contained properties similar to those found in the coal-based carbonized materials used by the respondents.[7]

In litigation, Albemarle Corp. ("Albemarle") and Shanxi DMD claim that the Department's SV for carbonized material cannot be sustained because there is no evidence on the record to support a finding that the determination was based on the best available information. The Court agreed, stating during oral argument that the record appeared to lack the evidence on which the Department relied to determine the SV for carbonized materials.[8] The Department subsequently requested a voluntary remand to place this information on the record, accept comments from interested parties, and address comments in remand.[9] The CIT ultimately granted that request and remanded the AR3 Final Results with instructions to reconsider the SV for carbonized materials.[10]

---

[6] See Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part, 76 FR 23978 (April 29, 2011) ("AR3 Preliminary Results") and accompanying Decision Memorandum at Exhibit 1.
[7] See AR3 Final Results, and accompanying IDM at Comment 4b.
[8] See Remand Opinion and Order at 10.
[9] Id.
[10] Id. at 28.

3

**Comments from Interested Parties Prior to Draft Redetermination**

After the CIT issued the <u>Remand Opinion and Order</u>, the Department placed on the

record the Expert Report that it relied upon in the <u>AR3 Final Results</u> to determine which of the

record sources constituted the best available information for purposes of the SV for carbonized

materials.[11]  At that time, the Department also provided interested parties an opportunity to

comment on the Expert Report.[12]

On September 10, 2013, the Department received comments on the Expert Report from

Albemarle and Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui") (collectively,

"Albemarle/Huahui").[13]  Albemarle/Huahui argues that the Department should not use HTS

number 4402.00.10 "Coconut Shell Charcoal" to value CCT's carbonized material input.

Specifically, Albemarle/Huahui asserts that, even with the addition to the record of the Expert

Report, there is still no evidence to support the Department's conclusion that HTS number

4402.00.10 "Coconut Shell Charcoal" is the appropriate source with which to value CCT's

carbonized material input because CCT did not provide any information to support the

contention that "Coconut Shell Charcoal" is the best available information to value its

carbonized material input during the underlying proceeding, nor did it advocate for such a

change. Further, Albemarle/Huahui contend that the Department would be fully supported in

concluding that CCT waived its right to the coconut shell charcoal SV and that CCT's failure to

---

[11] See "Memorandum to the File, from Bob Palmer, Senior International Trade Analyst, Office 9, Import Administration, re: Certain Activated Carbon from the People's Republic of China, Placing Document on the Record of the Third Administrative Review," dated September 3, 2013 and attached "Similarities and Differences of Coal Based Carbonized Materials, Coconut Shell Based Charcoal and Low Ash Metallurgical Coke," by Lee S. Rigsby, President, Vanguard Solutions, Inc. (July 17, 2009) ("Expert Report").
[12] Id.
[13] See Letter from Albemarle/Huahui titled "Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China: Comments on the Use of New Record Information to Value CCT's Carbonized Materials," dated September 10, 2013.

4

argue for the change is an admission that its specific input was properly valued in AR3 Preliminary Results.

No other interested parties commented on the Expert Report. Moreover, no interested party placed any other factual information related to carbonized material on the record.

### Analysis

In accordance with the Remand Opinion and Order, and for the reasons set forth below, the Department continues to find Indian HTS 4402.00.10 "Coconut Shell Charcoal" is the best available information to value CCT's coal-based carbonized materials.

In a non-market economy proceeding, such as in this case, section 773(c)(1) of the Tariff Act of 1930, as amended ("the Act"), instructs the Department to value the factors of production ("FOPs") based upon the best available information from a market-economy country or countries that the Department considers appropriate. When considering what constitutes the best available information, the Department considers several criteria, including whether the SV data are contemporaneous, publicly available, tax and duty exclusive, represent a broad market average, and specific to the input.[14] The Department's preference is to satisfy the breadth of the aforementioned selection criteria.[15] Moreover, it is the Department's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing the FOPs.[16] The Department must weigh the available information with

---

[14] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products From the People's Republic of China, 71 FR 53079 (September 8, 2006), and accompanying IDM at Comment 3.

[15] See, e.g., Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China; Final Results and Partial Rescission of Antidumping Duty Administrative Review, 76 FR 51940, 51943 (August 19, 2011), and accompanying IDM at Comment 2.

[16] See Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review, 71 FR 40477 (July 17, 2006) ("Mushrooms"), and accompanying IDM at Comment 1; see also Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review, 67 FR 19546 (April 22, 2002), and accompanying IDM at Comment 2.

5

respect to each input value and make a product-specific and case-specific decision as to what constitutes the "best" available SV for each input.[17]

The record contains two potential sources that may be used to value CCT's carbonized material: (1) GTA import data under Indian HTS number 2704.00.90, "Other Cokes of Coal"; and (2) GTA import data under Indian HTS 4402.00.10, "Coconut Shell Charcoal." We examine each source in turn.

After reconsidering the available information on the record, the Department continues to find that Indian HTS 4402.00.10 "Coconut Shell Charcoal" constitutes the best available information on the record to value coal-based carbonized materials because it is most specific to the input used by CCT. In the underlying administrative review, CCT reported that its suppliers used the raw materials of coal and tar to produce carbonized material or that its suppliers purchased coal-based carbonized materials.[18] The Expert Report indicates that coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon.[19] Specifically, the Expert Report found that coal-based carbonized materials, similar to those used in the production of subject merchandise, and coconut shell charcoal are similar in porosity and adsorption,[20] both of which are properties essential in the production of activated carbon.[21] Thus, because (1) CCT reported that its suppliers either used or consumed coal-based carbonized materials and (2) the Expert Report

---

[17] See, e.g., Mushrooms, and accompanying IDM at Comment 1.

[18] See CCT's Section C and D Questionnaire Response, dated November 23, 2010, at Attachment D-2, page 12; Attachment D-6, page 11; Attachment D-7, page 12; and Attachment D-8, page 12. Jacobi Carbons AB ("Jacobi"), the other mandatory respondent in the third administrative review, made similar representations. See Jacobi's Section C and D Questionnaire Response, dated September 13, 2010, at Section D Questionnaire Response for Ningxia Guanghua Activated Carbon Co, Ltd., at page D-5 and Section D Questionnaire Response for Ningxia Huahui Activated Carbon Co., Ltd., at page 11.

[19] See Expert Report at 3-7.

[20] According to the Expert Report, "{p}orosity and absorption are required for the conversion of carbon to activated carbon." Id. In particular, "{p}orosity is necessary as it is a measure of internal surface area, which is the functional area that provides opportunity for adsorption to take place," while "{a}dsorption is a measure of how efficiently the carbon removes undesirable gases or liquids from desirable gas or liquid streams." Id.

[21] Id. at 5-7.

6

states that coal-based carbonized materials and coconut shell charcoal share similar essential properties, it is reasonable for the Department to rely upon the coconut shell charcoal data under Indian HTS 4402.00.10 as specific to the input used by CCT.[22]

In contrast, the data under Indian HTS number 2704.00.90, "Other Cokes of Coal," is not specific to the carbonized materials used by CCT. The Expert Report states that, unlike coconut shell charcoal, coke has no volume activity available for adsorption and low porosity.[23] As noted above, the Expert Report found these characteristics to be essential in the production of activated carbon. Thus, coke cannot be used in the production of coal-based carbonized materials or activated carbon because the process for manufacturing coke renders it useless for the purpose of activated carbon production.[24] Accordingly, because (1) CCT reported that its suppliers either used or consumed coal-based carbonized materials and (2) the Expert Report states that coke does not share similar essential properties with coal-based carbonized materials and activated carbon, we find that using Indian HTS number 2704.00.90, "Other Cokes of Coal" does not represent the best available information to value CCT's carbonized material input.

Turning to the comments raised by Albemarle/Huahui, the Department finds them unpersuasive. Contrary to Albemarle/Huahui's assertion, the record in fact includes evidence that CCT used coal-based carbonized materials.[25] Moreover, although CCT did not argue for the change or place any information on the record advocating for such a change, the Department

---

[22] Moreover, the data under Indian HTS 4402.00.10 satisfy the remaining SV criteria. In particular, the data are contemporaneous with the period of review. See Memorandum to the File, through Catherine Bertrand, Program Manager, Office 9, from Bob Palmer, Case Analyst, Office 9 re: "Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Final Results," dated October 25, 2011 ("Final SV Memo") at Attachment 3. The Department also has previously found that data from GTA, such as that on the record for the input at issue, are publicly-available, represent a broad market average, and are tax and duty exclusive. See, e.g., Certain Preserved Mushrooms from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 77 FR 55808 (September 11, 2012), and accompanying IDM at Comment 3. None of the interested parties challenge these findings.

[23] See Expert Report at 4-7.

[24] Id.

[25] See CCT's Section C and D Questionnaire Response, dated November 23, 2010, at Attachment D-2, page 12; Attachment D-6, page 11; Attachment D-7, page 12; and Attachment D-8, page 12.

nevertheless has a statutory obligation to use the best available information when selecting SVs to calculate normal value ("NV").[26]

Thus, the Department determines that Indian HTS number 4402.00.10 "Coconut Shell Charcoal" results in a better, input-specific price for coal-based carbonized materials. Therefore, the Department will continue to use Indian HTS number 4402.00.10 "Coconut Shell Charcoal" to calculate the SV for CCT's carbonized material input.

### 2. SVs for CCT's Coal and Fines By-Products

**Background**

In AR3 Final Results, the Department valued CCT's carbonized materials with publicly available prices from GTA data under Indian HTS number 4402.00.10 "Coconut Shell Charcoal" (with a value of 3,796.54 Rupees/Metric Ton ("Rs/MT")) and valued CCT's coal and fines by-products generated during the production of carbonized materials using two GTA sources – import data under Indian HTS number 2701.19.90 "Other Coal W/N Pulvrsd But Ntagldmrtd" (with a value of 4,860.88 Rs/MT) and Indian HTS number 2714.10 "Bituminous Or Oil Shale And Tar Sands" (with a value of 11,319.90 Rs/MT), respectively.[27]

In litigation, Albemarle argued that the SVs assigned to by-products are unreasonable because they exceed the value assigned to their main input, carbonized material. To correct this error, Albemarle argues that the Department should revert to Indian HTS number 2704.00.90 "Other Cokes of Coal" to correct this error. The Department requested a voluntary remand to re-determine the SVs used for these by-products. The Court granted that request and remanded the

---

[26] Section 773(c)(1) of the Act.
[27] See Final SV Memo at Exhibit 1; see also "Memorandum to the File, through Catherine Bertrand, Program Manager, Office 9, from Katie Marksberry, International Trade Specialist, Office 9, re: Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Preliminary Results," dated April 22, 2010 at Attachment 3.

8

AR3 Final Results with instructions that the Department must re-determine the SVs it applied to CCT's coal and fines by-products.[28]

  Analysis

  In response to the Remand Opinion and Order, the Department has revised the SVs used for CCT's reported coal and fines by-products in the AR3 Final Results. For the reasons set forth below, the Department finds that the SVs for the by-products should be capped at the SV for their main input, carbonized material.

  As stated above, section 773(c)(1) of the Act directs the Department to use the best available information when valuing a respondent's FOPs. However, in this final remand redetermination, the issue is not whether the underlying Indian HTS categories used by the Department to value these by-products are the best available information, but rather whether the values derived from the sources used – Indian HTS number 2701.19.90 "Other Coal W/N Pulvrsd But Ntagldmrtd" (with a value of 4,860.88 Rs/MT) and Indian HTS number 2714.10 "Bituminous Or Oil Shale And Tar Sands" (with a value of 11,319.90 Rs/MT) – are reasonable.[29] The Department finds that they are not.

  The Department has, in certain circumstances, capped the SV for a by-product at the SV for the main input of that by-product when the SV of the by-product exceeded the SV of the main input and the evidence indicated that a higher value for the by-product than the main input was not warranted.[30] In the underlying review, CCT reported that some of its suppliers produced carbonized material using as the main input a pre-carbonized, coal-based product produced by

---

[28] See Remand Opinion and Order at 28.

[29] Id., at 13-14.

[30] See, e.g., Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results and Partial Rescission of the Seventh Antidumping Duty Administrative Review, 77 FR 15039 (March 14, 2012), and accompanying IDM at Comment II.B.3; see also Final Determination Pursuant To The Remand Order From The U.S. Court of International Trade In Paslode Division of Illinois Tool Works, Inc. v. United States, Ct. No. 97-12-02161 (January 15, 1999).

9

Datong Carbon Corporation.[31]  CCT reported further that its coal and fines by-products are produced during the course of producing carbonized material and are by-products of carbonized material production.[32]  CCT did not report that the by-products undergo any further manufacturing or any other treatment, such that higher values than that of the main input may be considered reasonable SVs. Thus, nothing on the record indicates that the SVs for these by-products should exceed the SV for the main input.

In AR3 Final Results, the Department inadvertently did not cap the SV for coal and fines by-products when it determined to use a different SV for the main input, as would have been appropriate under these circumstances. Therefore, the Department will continue to use Indian HTS number 2701.19.90 "Other Coal W/N Pulvrsd But Ntagldmrtd" and Indian HTS number 2714.10 "Bituminous Or Oil Shale And Tar Sands" to calculate SVs for CCT's coal and fines by-products, but, in accordance with the Department's practice, will cap the values derived from those HTS categories at the value derived from the Indian HTS number 4402.00.10 "Coconut Shell Charcoal" – 3,796.54 Rs/MT.

In light of these revisions, the Department has recalculated CCT's weighted-average dumping margin. The resulting calculation continues to yield a de minimis weighted-average dumping margin for CCT (i.e., $0.004/kilogram ("kg")).

### 3. GHC, BPAC, and Shanxi DMD's Separate Rate

**Background**

In AR3 Final Results, the Department calculated zero and de minimis weighted-average dumping margins for Jacobi and CCT, respectively.[33]  For the companies not selected for

---

[31] See CCT's Section C and D Questionnaire Response, dated November 23, 2010 at Attachment D-2, page 14.
[32] See, e.g., id.
[33] See AR3 Final Results, 76 FR at 67145.

10

individual examination (i.e., separate rate companies) such as GHC, BPAC, and Shanxi DMD, the Department calculated rates of $0.28/kg and $0.44/kg.[34]

In AR3 Final Results, the Department explained that the statute and the Department's regulations do not directly address the establishment of a rate to be applied to companies not selected for individual examination where the Department has limited its examination in an administrative review pursuant to section 777A(c)(2) of the Act.[35] We further stated that in cases involving limited selection based on exporters accounting for the largest volumes of trade, the Department's practice has been to weight-average the rates for the selected companies, excluding zero and de minimis rates and rates based entirely on adverse facts available ("AFA"), in the most recently completed segment of the proceeding.[36] The Department further explained that if any such non-selected company had its own calculated rate that is contemporaneous with or more recent than such prior determined rates, the Department has applied such individual rate to the non-selected company in the review in question.[37]

The Department determined that using an average of the margins – other than those that were zero, de minimis or based on total facts available – calculated in the most recent period was a reasonable method for determining the dumping margin for companies not individually examined in this review.[38] As a result, consistent with the Department's methodology, the

---

[34] Id.

[35] Id. and accompanying IDM at Comment 1.

[36] Id. (citing Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 76 FR 56158 (September 12, 2011)).

[37] Id. (citing Certain Fish Fillets from the Socialist Republic of Vietnam: Notice of Preliminary Results of the New Shipper Review and Fourth Antidumping Review and Partial Rescission of the Fourth Administrative Review, 73 FR 52015 (September 8, 2008) (changed in final results as final calculated rate for mandatory respondent was above de minimis, which remained unchanged in the amended final results); Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 74 FR 47191, 47195 (September 15, 2009), and accompanying IDM at Comment 16).

[38] Id. (citing Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review, 75 FR 70208, 70209 (November 17, 2010) ("AR2 Final Results")).

Department assigned GHC, BPAC, and Shanxi DMD a separate rate of $0.28/kg, which is the margin calculated for separate rate respondents in the previous administrative review, because these respondents did not have their own prior or concurrently calculated margin.[39]

In litigation, GHC, BPAC, and Shanxi DMD challenged the Department's methodology, claiming that it was inconsistent with the statute and otherwise unsupported by substantial evidence.

In its Remand Opinion and Order, the Court found the Department's use of the $0.28/kg rate "arbitrary" and not reflective of "commercial reality" because it "was not based on data pertaining to any pricing behavior that occurred in the third POR. Nor was it based on any data pertaining to these respondents; instead {E&C} reverted to a margin it determined in *another review* for *other* respondents."[40] The Court also stated that, because the Department selected Jacobi and CCT as mandatory respondents based on their status as the largest exporters of subject merchandise, "the de minimis margins {calculated for them} must be considered more representative of industry-wide pricing behavior during the POR than the $0.28/kg calculation from the previous review . . . ."[41] The Court also rejected the Department's argument that nothing on the record indicates that the separate rate respondents engaged in pricing behavior similar to the mandatory respondents, finding that the state of the record stems from the Department's decision to examine only two respondents, not from the separate rate respondents' failure to submit evidence.[42] The Court ordered the Department to reconsider the method of determining the margins for GHC, BPAC, and Shanxi DMD.[43]

---

[39] Id.
[40] See Remand Opinion and Order at 18-19.
[41] Id. at 19.
[42] Id. at 20-21.
[43] Id. at 28.

12

JA101168

Analysis

The Department respectfully disagrees with the Court's holdings in this <u>Remand Opinion</u> <u>and Order</u>. However, under protest,[44] the Department has averaged the zero and <u>de minimis</u> rates calculated for Jacobi and CCT in this administrative review and assigned the resulting zero dumping margin to GHC, BPAC, and Shanxi DMD. In assigning GHC, BPAC, and Shanxi DMD zero dumping margins, we follow the Court's logic, under protest, to its natural conclusion -- because Jacobi and CCT's margins are "more representative of industry-wide pricing behavior during the POR" and "more contemporaneous" than the non-POR margins relied upon in <u>AR3</u> <u>Final Results</u>, applying the Jacobi and CCT's margins to GHC, BPAC, and Shanxi DMD will achieve a "more representative" result than would relying upon non-POR margins.

### 4.  Shanxi DMD's Assessment and Cash Deposit Rates

Background

In litigation, Shanxi DMD contested the Department's assignment of per-unit assessment and cash deposit rates to its entries in <u>AR3 Final Results</u>. The Department's decision to use per-unit rates in <u>AR3 Final Results</u> stemmed in part from findings made in the immediately-preceding review. Specifically, in <u>AR2 Final Results</u>, the Department began assessing rates on a per-unit basis because we found that Jacobi, a mandatory respondent in that review, had entered values that were below the ultimate net unit price.[45] Additionally, we stated that we would assign per-unit rates to all companies because it would be burdensome to concurrently assign per unit and <u>ad valorem</u> rates on a company-specific basis.[46] Further, we stated that the use of per-unit rates would not negatively impact companies because the total duties due would not change;

---

[44] See <u>Viraj</u>, 343 F.3d at 1376.
[45] See <u>AR2 Final Results</u>, 75 FR 70208, and accompanying IDM at Comment 3.
[46] <u>Id.</u>

13

rather they would only be allocated over quantity instead of over entered value.[47] In <u>AR3 Final Results</u>, we continued to use per-unit rates and supported our position using the same rationale articulated in <u>AR2 Final Results</u>.[48]

In its <u>Remand Opinion and Order</u>, the Court agreed with Shanxi DMD and instructed the Department to reconsider its decision to assign per-unit assessment and cash deposit rates to Shanxi DMD. Specifically, the Court ordered the Department to reconsider assigning rates to Shanxi DMD on a per-unit basis because (1) the decision was based on a finding of duty absorption that pertained to a different company and data from a different review; (2) the record evidence does not support finding that Shanxi DMD's importers "will not, under any circumstances, pay higher deposits and not be assessed higher duties than would occur under an <u>ad valorem</u> rate;" and (3) there is no evidence that determining Shanxi DMD's rate on an <u>ad valorem</u> basis would impose a "significant burden."[49]

Analysis

As explained above, the Department is assigning, under protest, a zero dumping margin to Shanxi DMD. Consequently, because the Department intends to instruct U.S. Customs and Border Protection ("CBP") to liquidate entries of subject merchandise without regard to duties, the issue of assigning Shanxi DMD per-unit assessment and cash deposit rates is moot.[50]

However, the Department respectfully notes that a few facts warrant clarification. As an initial matter, while the Department made a finding of duty absorption with respect to Jacobi in

_____

[47] <u>Id.</u>

[48] <u>See AR3 Final Results</u>, and accompanying IDM at Comment 2.

[49] <u>See Remand Opinion and Order</u> at 23-27.

[50] <u>See</u> section 751(a)(2)(c) of the Act (explaining that the final results of an administrative review shall be the basis for the assessment of antidumping duties and collection of cash deposits); 19 CFR 351.106(c)(2) (explaining that the Department will instruct U.S. Customs and Border Protection ("CBP") "to liquidate without regard to antidumping duties all entries of subject merchandise during the relevant period of review made by any person for which {the Department} calculates an assessment rate ... that is less than 0.5 percent <u>ad valorem</u>, or the equivalent specific rate.").

14

AR2 Final Results, we did not include duty absorption as a reason for the per-unit methodology in AR2 Final Results or in AR3 Final Results.[51] Rather, as explained above, the Department based its analysis on the fact that, in AR2 Final Results, Jacobi undervalued its imports.

Undervaluing occurs when the CBP entered value of the subject merchandise is substantially less than the net unit price, whereas duty absorption occurs when an affiliated importer absorbs duties that the unaffiliated purchaser should pay on the subject merchandise. When entries of subject merchandise are systematically undervalued, as were Jacobi's in AR2 Final Results, this can result in the under-collection of duties by CBP if the Department were to issue cash deposit instructions on an ad valorem basis.[52] In contrast, duty absorption occurs where the importer of record pays the antidumping duties and absorbs them as a cost of doing business, as opposed to passing the duties along to the unaffiliated customer.[53]

In short, the Department's determination to apply per-unit assessment and cash deposit rates in the underlying review was based on the undervaluation of entries, rather than a finding of duty absorption.[54]

---

[51] See AR2 Final Results, 75 FR 70208, and accompanying IDM at Comment 3; see also AR3 Final Results, and accompanying IDM at Comment 2.

[52] See Honey from the People's Republic of China: Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review, 70 FR 38873, 38880 (July 6, 2005), and accompanying IDM at Comment 7; Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review, 67 FR 19546, 19549 (April 22, 2002); Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Revocation of Orders in Part, 66 FR 36551, 36554 (July 12, 2001); and Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 70 FR 34082, 34086 (June 13, 2005).

[53] See Certain Activated Carbon From the People's Republic of China: Notice of Preliminary Results of the Second Antidumping Duty Administrative Review, and Preliminary Rescission in Part, 75 FR 26927, 26930 (May 13, 2010), unchanged in Carbon AR2 75 FR 70208, 70210; see also, e.g., Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent to Rescind in Part, 70 FR 39735, 39737 (July 11, 2005); unchanged in Notice of Final Results and Final Rescission in Part of Antidumping Duty Administrative Review: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 70 FR 73727 (December 13, 2005).

[54] Moreover, we respectfully disagree, under protest, that the Department must satisfy the heightened threshold articulated by the Court in Remand Opinion and Order before it can apply per unit assessment and cash deposit rates to entities under review. See Viraj, 343 F.3d at 1376.

15

**C. SUMMARY AND ANALYSIS OF LITIGANTS' COMMENTS ON DRAFT REMAND RESULTS**

Petitioners, Albemarle/Huahui, GHC, BPAC, and GH commented on the Department's decision to assign, under protest, zero dumping margins to GHC, BPAC, and Shanxi DMD. Albemarle/Huahui and CCT commented on the appropriate SVs for CCT's carbonized materials and for CCT's coal and fines by-products. No other interested parties filed comments on the Draft Remand Results.

As explained below, we continue to reach the same conclusions that we reached in the Draft Remand Results. We address each of the interested parties' comments and provide our analysis in turn.

**Issue 1: GHC, BPAC, Shanxi DMD, and Huahui's Separate Rate**

*Petitioners' Comments*

- The Department should defend the $0.28/kg SR assigned to GHC, BPAC, and Shanxi DMD because there is no evidence on the record that supports assigning zero dumping margins to these companies. Specifically, there is no record evidence which demonstrates that these companies share any of the same product mix, prices, sales expenses, or FOPs which resulted in zero dumping margins for the mandatory respondents. While CBP entry data for these companies is on the record, that information reflects the volume of subject merchandise exported by those companies to the United States during the POR; it does not contain information on the prices obtained for those shipments or even the entered value of those shipments.

- The CIT's assumptions that the zero dumping margins calculated for the mandatory respondents "are 'more representative of industry-wide pricing behavior during the POR'" and that these margins are "reflect{ive} {of} commercial realities" are unsupported. And, in

16

any event, the CIT stops short of requiring the Department to assign a zero margin to GHC, BPAC, and Shanxi DMD.

- Because the evidence on the record does not support assigning zero margins to GHC, BPAC, or Shanxi DMD, the Department should require Shanxi DMD and GHC to submit either (1) Section C responses (i.e., information on those companies' U.S. sales) or (2) quantity and value responses (i.e., the quantity and value of their sales of subject merchandise in the United States during the POR). The first option would permit the Department to evaluate whether the margins calculated for the mandatory respondents are representative of the sales reported by the separate rate respondents – both with respect to the physical characteristics of the merchandise sold in the United States, as well as the associating prices. The second option would allow the Department to draw general conclusions about the average value of subject sales, though it would prevent the Department from comparing sales of products with the most similar characteristics.

- If the Department believes that the dumping margins assigned to GHC, BPAC, and Shanxi DMD in the AR3 Final Results were correct, it should request that this issue be certified for appeal to the Court of Appeals for the Federal Circuit ("Federal Circuit").

- The Department should specifically address the $0.44/kg rate assigned to Huahui.

*GHC, BPAC, and GH's Comments*

- The Department should eliminate the "under protest" language from the final remand redetermination and confirm the calculated margins of the mandatory respondents are representative of industry-wide pricing behavior and are contemporaneous.

17

*Albemarle/Huahui Comments*

- While the draft remand does not conflict with the Court's order, the Court left the option open to the Department to reconsider Huahui's rate. The Department did not do so and failed to provide any explanation for that decision. Albemarle/Huahui reserve comment on Huahui's rate until the final remand redetermination is filed with the Court.

**Department's Position:** Pursuant to section 735(c)(5)(B) of the Act, we continue to find, in light of the Court's opinion, that assigning GHC, BPAC, and Shanxi DMD zero dumping margins is a reasonable method for calculating the rate for exporters not individually investigated. Moreover, pursuant to that same provision, we continue to find that assigning Huahui a dumping margin of $0.44/kg is reasonable.

When calculating dumping margins, generally, the Department determines individual margins for each known exporter or producer pursuant to section 777A(c)(1) of the Act. However, "[i]f it is not practicable" to calculate individual dumping margins for all exporters or producers due to the large number of such exporters or producers, the Department may examine a reasonable number of respondents pursuant to section 777A(c)(2) of the Act. The statute "is silent as to the method for establishing the rate for non-selected respondents."[55] Thus, the Department possesses broad discretion to select any reasonable methodology.[56]

When calculating separate rates, the Department generally relies upon section 735(c)(5) of the Act, which provides the methodology for calculating the "all-others" rate in market economy antidumping investigations.[57] This provision directs the Department to calculate the all-others rate by averaging the margins calculated for exporters and producers individually

---

[55] *See Longkou Haimeng Mach. Co. v. United States,* 581 F. Supp. 2d 1344, 1359 (Ct. Int'l Trade 2008) ("*Longkou*"); *accord Coal. for Pres. of Am. Brake Drum & Rotor Aftermkt. Mfrs. v. United States,* 44 F. Supp. 2d 229, 250 (Ct. Int'l Trade 1999)
[56] *See United States v. Eurodif S.A.,* 555 U.S. 305, 316 (2009).
[57] *See Longkou,* 581 F. Supp. 2d at 1354.

investigated, "excluding any zero and <u>de minimis</u> margins" and any margins based entirely upon facts available.[58]  The statute further provides that if the rates for the individually investigated companies "are zero or <u>de minimis</u> margins, or are determined entirely" upon facts available, then the Department "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated . . . ."[59]

With respect to the separate rate assigned to GHC, BPAC, and Shanxi DMD, the Department continues to find, under protest, that it is appropriate to assign these companies a zero dumping margin as "any reasonable method."  In this remand redetermination, the Department continues to calculate zero and <u>de minimis</u> margins for the two mandatory respondents – CCT and Jacobi.  As the CIT explained, the mandatory respondents' margins are "more representative of industry-wide pricing behavior during the POR" and "more contemporaneous" than the non-POR margins relied upon in <u>AR3 Final Results</u>, such that applying the mandatory respondents' margins to GHC, BPAC, and Shanxi DMD will achieve a "more representative" result than would relying upon non-POR margins.  Moreover, the contemporaneity of the mandatory respondents' dumping margins – the only margins calculated during this POR – demonstrates that these margins reasonably reflect potential dumping margins for companies not individually investigated (without a company-specific rate calculated in the immediately preceding review) during the same time.  Contrary to Petitioners' argument, this is the basis for the Court's finding that the zero dumping margins calculated for the mandatory respondents "are 'more representative of industry-wide pricing behavior during the POR'" and that these margins are "reflect{ive} {of} commercial realities."  Notably, Petitioners have not demonstrated that the mandatory respondents' zero dumping margins are unrepresentative of

---

[58] <u>See</u> section 735(c)(5)(A) of the Act.
[59] <u>See</u> section 735(c)(5)(B) of the Act.

19

pricing behavior during the POR. Therefore, in light of the Court's opinion, the Department continues to assign GHC, BPAC, and Shanxi DMD zero dumping margins under protest.

While we agree with Petitioners that the Department appropriately assigned GHC, BPAC, and Shanxi DMD a dumping margin of $0.28/kg in the AR3 Final Results, the Court already has rejected our previous determination as unreasonable. Specifically, the Court has rejected our findings that dumping margins from the immediately-preceding review reasonably reflected the potential dumping margins of GHC, BPAC, and Shanxi DMD in this review because the record did not contain any evidence on whether those companies' pricing behavior mirrored that of the mandatory respondents in this review.[60] Instead, the Court made substantive assessments that the margins calculated for the mandatory respondents in the instant review are "'more representative of industry-wide pricing behavior during the POR'" and, therefore, more appropriately reflect "commercial realities prevailing in the pertinent POR."[61] Thus, in light of these specific, substantive assessments, we disagree with Petitioners that the CIT has left us other options to pursue on remand.

Additionally, we agree with Petitioners' remark that there is no record evidence which demonstrates that these companies share any of the same product mix, prices, sales expenses, or FOPs which resulted in zero dumping margins for the mandatory respondents.[62] However, the

---

[60] See Remand Opinion and Order at 18-23.

[61] Id. at 19.

[62] Petitioners correctly note that the record contains only CBP entry data for these companies and that this information reflects the volume of subject merchandise exported by those companies to the United States during the POR; it does not contain information on the prices obtained for those shipments or even the entered value of those shipments. See Memorandum to the File, from Katie Marksberry, International Trade Specialist, Office 9, Import Administration, re: Customs Data of U.S. Imports of Certain Activated Carbon, dated May 28, 2010, at Attachment I.

20

Department made these findings in the <u>AR3 Final Results</u>,[63] and the CIT did not find them

relevant to the separate rate calculation.[64]

The Department disagrees with Petitioners that we should require GHC, BPAC, and

Shanxi DMD to submit responses to Section C of the Department's non-market economy

questionnaire or quantity and value responses in order to obtain pricing data. The Department

has previously stated that we do not have the resources to individually review more than two

respondents.[65] While obtaining pricing information from GHC, BPAC, and Shanxi DMD would

provide information on U.S. sales, obtaining this information would consume resources which

we previously stated we do not have. Notably, Petitioners' suggested approaches were not

ordered by the Court. Therefore, we will not obtain Section C responses or quantity and value

information from GHC, BPAC, and Shanxi DMD.

With respect to Petitioners' argument that the Department should request that this issue

be certified for appeal to the Federal Circuit, we decline to take such action at this time. Once

the CIT has entered judgment in this litigation, we will consider whether to appeal the issue.

Additionally, we disagree with GHC, BPAC, and GH's argument that we should remove

the "under protest" language from our remand redetermination. As an initial matter, the

Department may protest when ordered to make a remand redetermination.[66] In this litigation, we

continue to disagree with the Court's holding in the <u>Remand Opinion and Order</u> and,

consequently, have conducted this remand redetermination under protest.

---

[63] See <u>AR3 Final Results</u> and accompanying IDM at 5-6.
[64] See <u>Remand Opinion and Order</u> at 18-23.
[65] See Memorandum to James Doyle, Director, Office 9, Import Administration, from Jamie Blair-Walker and Kabir Archuleta, International Trade Analysts, Office 9, re: "Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China: Selection of Respondents for Individual Review," dated July 21, 2010, at 2-6; <u>see also</u> Memorandum to James Doyle, Director, Office 9, Import Administration, through Catherine Bertrand, Program Manager, Office 9, from Katie Marksberry, International Trade Analyst, re: "Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China: Selection of Additional Mandatory Respondent," dated September 29, 2010, at 2-5.
[66] See, <u>e.g.</u>, <u>Viraj</u>, 343 F.3d 1371.

21

With regard to the dumping margin assigned to Huahui, the Court provided us with the discretion to decline to address Huahui's margin. We decline to reconsider Huahui's dumping margin and continue to find that, for the reasons provided in the IDM and the Government's response in opposition to the summary judgment motions, the margin assigned to Huahui is reasonably reflective of potential dumping margins during the POR, especially given that (1) the margin is specific to Huahui and temporally proximate to the third administrative review (i.e., separated at most by twelve months) and (2) zero or de minimis dumping margins had never previously been calculated for mandatory respondents during the course of the subject antidumping duty order. However, for purposes of clarity, we note we are not changing the $0.44/kg dumping margin assigned to Huahui in the AR3 Final Results in this final remand redetermination.

**Issue 2: SV for CCT's Carbonized Materials**

*Albemarle/Huahui*

- Albemarle/Huahui reiterate their previous arguments made on September 10, 2013, and contend that the Department erred in using GTA import data under Indian HTS 4402.00.10, "Coconut Shell Charcoal," to calculate the SV for CCT's carbonized material because CCT did not object to the use of GTA import data under Indian HTS number 2704.00.90, "Other Cokes of Coal," after the preliminary result of the underlying review.

*CCT's Comments*

- No interested party in this remand proceeding disputed the validity of the Expert Report and its core findings that coconut shell charcoal has characteristics of "absorption" and "volume activity" that are similar to that of coal-based carbonized materials.

- It is irrelevant that CCT did not ask the Department to value this input using a different data source after the preliminary results of the underlying review; rather, the Department has a statutory duty to use the best available information when selecting SVs to calculate NV.

- The record shows that CCT's suppliers used coal-based carbonized materials to produce subject merchandise during the POR; thus, the Indian import data on coconut shell charcoal is the best available information to value this input.

**Department's Position:** The Department continues to find that GTA import data under Indian HTS 4402.00.10, "Coconut Shell Charcoal," is the best available information to value CCT's carbonized material.

In the Court's <u>Remand Opinion and Order</u>, the Court granted the Department's voluntary remand request to place the Expert Report on the record, to accept comments on that report, and to reconsider the SV for CCT's coal-based carbonized materials.[67] We have complied with the Court's <u>Remand Opinion and Order</u> and accepted and addressed comments on this issue from Albemarle/Huahui on the Expert Report, as well as on the Draft Remand Results. Notably, Albemarle/Huahui's comments remain unchanged from those submitted on the Expert Report, and we addressed them fully in the Draft Remand Results.

As noted by CCT, no interested party has disputed the validity of the Expert Report or its core findings, summarized above. Moreover, no interested party has contested our finding above that the import data under Indian HTS 4402.00.10, "Coconut Shell Charcoal," is specific to the input used by CCT. Finally, as explained above, it is of no moment that CCT did not ask the Department to value this input using different data after the preliminary results of the review; rather, the Department has a statutory obligation to use the best available information when

---

[67] <u>See Remand Opinion and Order</u> at 10.

23

selecting SVs to calculate NV.[68] Therefore, we continue to find, based on evidence on the record, that GTA import data under Indian HTS 4402.00.10, "Coconut Shell Charcoal," is the best available information to value CCT's coal-based carbonized materials.

**Issue 3: SVs for CCT's Coal and Fines By-Products**

*CCT's Comments*

- CCT does not contest the results of the draft remand redetermination

*Albemarle/Huahui's Comments*

- Albemarle/Huahui concurs with the Department's methodology used in the draft remand ·results.

No other interested party commented on this issue.

**Department's Position:** Because no interested party contests the Department's draft remand results on this issue, for the reasons provided above, we continue to cap the SVs for CCT's by-products at the SV for their main input, carbonized material, consistent with the Department's practice under similar factual scenarios.

**Issue 4: Shanxi DMD's Per-Unit Assessment and Cash Deposit Rates**

No interested party commented on this issue.

**Department's Position:** Because no interested party contests the Department's draft remand results on this issue, we continue to find this issue is moot because the Department is assigning, under protest, a zero dumping margin to Shanxi DMD.[69]

---

[68] See Section 773(c)(1) of the Act.
[69] See, e.g., Roses, Inc. et al. v. United States, 774 F. Supp. 1376, 1381-82 (CIT 1991) (upholding the Department's decision not to address issue on remand after finding it moot as a result of other decisions made during remand redetermination).

24

**RESULTS OF REDETERMINATION**

    We have implemented all changes discussed above. First, we continue to determine that

GTA import data under Indian HTS 4402.00.10, "Coconut Shell Charcoal," constitutes the best

available information to value CCT's carbonized material. Second, we continue to find that,

consistent with the Department's practice, it is appropriate to cap the SVs for CCT's by-products

at the SV for their main input, carbonized material. As a result of this final remand

redetermination, we continue to calculate a de minimis weighted-average dumping margin for

CCT and Jacobi.

    Turning to the last two remanded issues, we continue to assign GHC, BPAC, and Shanxi

DMD, under protest, weighted-average dumping margins of zero. Finally, we continue to find

that the issue of assigning Shanxi DMD a per-unit assessment is moot in light of that company's

revised weighted-average dumping margin of zero.


_____
Paul Piquado
Assistant Secretary
  for Enforcement and Compliance

    9 JANUARY 2014
_____
Date

25

JA101181

Barcode:3172940-01 A-570-904 REM - Remand    -    Slip Op 11-00451



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-904
Remand
ARP: 04/01/2009-03/31/2010
~~Proprietary Document~~
E&C/V: RJP
**PUBLIC VERSION**

January 10, 2014

MEMORANDUM TO:     File

THROUGH:     Catherine Bertrand
Program Manager
AD/CVD Operations, Office V

FROM:     Bob Palmer
Senior Case Analyst
AD/CVD Operations, Office V

SUBJECT:     Remand Redetermination Analysis Memorandum for Calgon
Carbon (Tianjin) Co., Ltd. in the Antidumping Duty Review of
Certain Activated Carbon from the People's Republic of China

---

## I.    REMAND DRAFT RESULTS

The Department of Commerce ("Department") has prepared these remand redetermination
changes to the margin calculation for Calgon Carbon (Tianjin) Co., Ltd. ("CCT") in Albemarle
Corp., et al., v. United States, et al., Consol. Court No. 11-00451, Slip Op. 13-106 (August 15,
2013) ("Remand Opinion and Order").

| | | |
|---|---|---|
| Quantity Sold | [ | ] MT |
| Total Value U.S. Sales | $[ | ] |
| Total PUDD | $[ | ] |
| Weight-Average Margin | $0.004/Kilogram | (de minimis) |

Databases Used:
CCT U.S. Sales:     calus03.sas7bdat
CCT FOP:     calfop04_v2.sas7bdat

See Attachment I for a summary of the surrogate values, Attachment II for the printout of the
SAS log, and Attachment III for the printout of the SAS output generated in calculating the
dumping margin.



INTERNATIONAL
**TRADE**
ADMINISTRATION

Barcode:3172940-01 A-570-904 REM - Remand - Slip Op 11-00451

Attachment 1

**Summary of CCT's Surrogate Values for 2nd Administrative Review Remand**

| Category | Factor Input Name | HTS Number | Source Of Data | Period Data From | Source Value | Source Unit | Reported Unit for Factor Usage | Conversion Needed? | Unit Conversion Factor | Inflator/ Deflator | Variable Name | Surrogate Value | Converted Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Materials | Anthracite Coal | 27011100 | an Import Stats | POR | 6584.63814 | Rs / MT | MT/MT | No | | 1.000 | ANCOALSV | 6584.6381 | Rs/MT |
| | Coal Tar | 27082010 | an Import Stats | POR | 20.8631784 | Rs / Kg | MT/MT | Yes | 1000 | 1.000 | TARSV | 20863.1778 | Rs/MT |
| | Bituminous Coal (coking coal) | 27011910 | an Import Stats | POR | 8170.950006 | Rs / MT | MT/MT | No | 1 | 1.000 | CCKINGCOALSV | 8170.9501 | Rs/MT |
| | Carbonized Material | 44029010 | an Import Stats | POR | 3796.541667 | Rs / MT | MT/MT | No | 1 | 1.000 | CARBMATSV | 3796.5417 | Rs/MT |
| | Hydrochloric Acid | | Chemical Week | POR | 5.02886172 | Rs / Kg | MT/MT | Yes | 1000 | 1.000 | HCL2SV | 5028.8617 | Rs/MT |
| | Potassium Hydroxide | 28152000 | an Import Stats | POR | 53.51543418 | Rs / Kg | MT/MT | Yes | 1000 | 1.000 | KOHSV | 53510.4342 | Rs/MT |
| | Sodium Hydroxide (Caustic Soda) Solid | 28151012 | an Import Stats | POR | 31.97417024 | Rs / Kg | MT/MT | Yes | 1000 | 1.000 | CAUSTICSV | 31974.1702 | Rs/MT |
| | Salt | 250100 | an Import Stats | POR | 2.16702097 | Rs / Kg | MT/MT | Yes | 1000 | 1.000 | SALTSV | 2167.0210 | Rs/MT |
| | Pitch | 270810 | an Import Stats | POR | 13.88559662 | Rs / Kg | MT/MT | Yes | 1000 | 1.000 | PITCHSV | 13865.5966 | Rs/MT |
| | Iron | 28011110 | an Import Stats | POR | 4305.282776 | Rs / MT | MT/MT | No | 1 | 1.000 | IRONSV | 4805.2828 | Rs/MT |
| Packing Materials | Plasterboard | 441192 | an Import Stats | POR | 33.70542316 | Rs / Kg | PCS/MT | Yes | n/a | 1.000 | BOARDSV | | PCS/MT |
| | Paint | 320820 | an Import Stats | POR | 309.8409876 | Rs / Kg | Kg/MT | Yes | | 1.000 | PAINTSV | 309.8410 | Kg/MT |
| | Paint (Aerosol) | 320820 | an Import Stats | POR | 309.8409876 | Rs / Kg | Bottles/MT | Yes | | 1.000 | AEROSOLSV | | Bottles/MT |
| | Drums | 481990 | an Import Stats | POR | 116.551341 | Rs / Kg | PCS/MT | Yes | | 1.000 | DRUMSSV | | PCS/MT |
| | Drumliners | 481950 | an Import Stats | POR | 116.551341 | Rs / Kg | PCS/MT | Yes | | 1.000 | DRUMLINERSV | | PCS/MT |
| | Plastic (PE) Stretch Film | 39201012 | an Import Stats | POR | 89.3711307 | Rs / Kg | Kg/MT | Yes | n/a | 1.000 | PLASWRAPSV | 89.3711 | Kg/MT |
| | Plastic (PE) Stretch Film | 39301012 | an Import Stats | POR | 89.3711307 | Rs / Kg | Kg/MT | Yes | | 1.000 | PEFILMSV | | M2/MT |
| | Wooden Pallet | 44152000 | an Import Stats | POR | 111.6793571 | Rs / Pc | U2/MT | Yes | n/a | 1.000 | PALLETSV | 111.6793 | PCS/MT |
| | Paper Labels | 442190 | an Import Stats | POR | 220.1270945 | Rs / Kg | PCS/MT | Yes | | 1.000 | PAPERLBSV | | PCS/MT |
| | PE Bags | 39232100 | an Import Stats | POR | 127.4711147 | Rs / Kg | PCS/MT | Yes | | 1.000 | PEBAGS25SV | | PCS/MT |
| | PE Bags 2 | 39232100 | an Import Stats | POR | 127.4711147 | Rs / Kg | PCS/MT | Yes | | 1.000 | PEBAGS5SV | | PCS/MT |
| | Envelopes | 32061099 | an Import Stats | POR | 1462.511907 | Rs / Kg | PCS/MT | Yes | | 1.000 | ENVLOPSV | | PCS/MT |
| | Super Sacks | 63053300 | an Import Stats | POR | 287.7274899 | Rs / Kg | PCS/MT | Yes | | 1.000 | PSACKSV | | PCS/MT |
| | Coverbags* | 63053300 | an Import Stats | POR | 287.7274939 | Rs / Kg | PCS/MT | Yes | | 1.000 | COVERBAGSV | | PCS/MT*** |
| | PP Bags | 63053300 | an Import Stats | POR | 287.7274899 | Rs / Kg | PCS/MT | Yes | | 1.000 | PPBAGSV | | PCS/MT*** |
| | Lined Sacks | 63053300 | an Import Stats | POR | 287.7274909 | Rs / Kg | PCS/MT | Yes | | 1.000 | BAGLINEDSV | | PCS/MT*** |
| | Plastic Rope** | 560749 | an Import Stats | POR | 488.0591216 | Rs / Kg | Meter/MT | Yes | | 1.000 | ROPESV | | Material/MT** |
| Energy | Electricity | | CEA of India | Mar-09 | 3.8000 | Rs / Kwh | MTH/Kwh | No | | 1.000 | ELECSV | 3.8000 | Rs/KwH |
| | Steam | | Intratec | 4/08 + 3/09 | 204.0000 | Rs / MT | MT/MT | No | | 1.205774382 | STEAMSV | 211.2817 | Rs/MT |
| | Steam Coal | | an Import Stats | POR | 4313.133786 | Rs / MT | MT/MT | No | | 1.000 | STCOALSV | 4313.1338 | Rs/MT |
| | Grade B Steam Coal | 27011920 | coal India Limited | POR | 1587.1428 | Rs / MT | MT/MT | No | 1 | 1.000 | GDBSTCOALSV | 1587.1428 | Rs/MT |
| | Grade C Steam Coal | | | | 1374.2857 | Rs / MT | MT/MT | No | | 1.000 | GDCSTCOALSV | 1374.2857 | Rs/MT |
| | Grade D Steam Coal | | | | 1167.1428 | Rs / MT | MT/MT | No | | 1.000 | GDDSTCOALSV | 1167.1428 | Rs/MT |
| | Grade E Steam Coal | | | | 992.5000 | Rs / MT | MT/MT | No | | 1.000 | GDESTCOALSV | 992.5000 | Rs/MT |
| | Water | | http://indiclindia.o | 4/08+12/09 | 15.9275 | Rs / m3 | MT/MT | Yes | 1000 | 1.000 | WATERSV | 15.9275 | Rs/MT |
| Financial Ratios | Overhead | | Doing Business see Attachment | | 5.83% | % | | | | | OVRHDSV | 0.0583 | % as decimal |
| | SG&A | | | | 10.04% | % | | | | | SGASV | 0.1004 | % as decimal |
| | Profit | | | | 1.69% | % | | | | | PROFITSV | 0.0169 | % as decimal |
| By-Products | Coal By-Product | 27011920 | Indian Import Statistics | POR | 3796.541667 | Rs / MT | MT | No | 1 | 1.000 | COALBYSV | 3796.541667 | Rs/MT |
| | Fines By-Product | 271410 | Indian Import Statistics | POR | 3796.541667 | Rs / MT | MT | No | 1 | 1.000 | FINESBYSV | 3796.541667 | Rs/MT |
| Labor | Labor | | See Attachment | | 74.5786 | Rs / Hr | Hr | No | | 1.000 | LABORSV | 74.5786 | Rs/Hr |
| Transportation | Truck Freight | | http://www.infobanc. | POR | 1.50 | Rs / MT | MT / Km | No | | 1.00 | TRUCKSV | 1.50 | Rs/MT/Km |
| | Brokerage & Handling | | Doing Business see Attachment | | 0.0331 | USD / Kg | Kg | Yes | 1000 | Multiple | DBROKUSV | 33.1356 | USD/MT |

*See CCT Prelim Analysis Memo for conversion
**See CCT Prelim Analysis Memo for conversion
***See CCT Prelim Analysis Memo for conversion

Filed By: robert palmer, Filed Date: 1/10/14 10:54 AM, Submission Status: Approved

FOR OFFICIAL FILE

LAW OFFICES OF
DEKIEFFER & HORGAN
SUITE 800
729 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005
Affiliated Office
Saarbrücken, Germany

TELEPHONE
(202) 783-6900
GREGORY S. MENEGAZ

FACSIMILE
(202) 783-6909
gmenegaz@dhlaw.com

RECEIVED
JUL 21 2010
DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

July 21, 2010

A-570-904
Page: 01

HAND-DELIVERED

Honorable Gary Locke
Secretary
Room 1870
U.S. Dept. of Commerce
Washington, D.C. 20230

*1855*

Admin Rev.
April 1, 2009-March 31, 2010
AD/CVD Operations
Office 9

**Public Version**
Business Proprietary Information
has been deleted/redacted
contained within brackets in
Exhibits: 1-2

**May Be Released Under APO**

PUBLIC VERSION

RE:   Certain Activated Carbon from the People's Republic of China from the People's
      Republic of China: *Shanxi DMD Corporation's Separate Rate Certification*

Dear Secretary Locke:

On behalf of Shanxi DMD Corporation, an exporter of activated carbon from the People's

Republic of China, attached hereto is their Separate Rate Certification in the above captioned

review.

Certain information contained herein is business confidential data that is proprietary to

the above interested parties. This information is enclosed with brackets ("[ ]"). Disclosure of

this information would cause substantial competitive and commercial harm to the above

interested parties. Such data is marked "Contains Proprietary Information." Confidential   090067

treatment, subject to administrative protective order, is requested pursuant to 19 C.F.R. § 351.105(c)(4)&(11). Therefore, we request that this information be treated as business proprietary information pursuant to 19 C.F.R. § 351.304(a)(1)(i).

    Information marked as business proprietary has been so marked for one or more of the following reasons, in accordance with 19 C.F.R. § 351.105(c):

(1) Business or trade secrets concerning the nature of a product or production process;
(2) Production costs (but not the identity of the production components unless a particular component is a trade secret);
(3) Distribution costs and channels of distribution;
(4) Terms of sale (but not terms of sale offered to public);
(5) Prices of individual sales, likely sales, or other offers (but not components of prices, such as transportation, if based on published schedules, dates of sale, product descriptions except business or trade secrets described in term 1 above, or order numbers);
(6) Names of particular customers, distributors, or suppliers (but not destination of sale or designation of type of customer, distributor, or supplier, unless the designation of designation would reveal the name);
(7) In an antidumping proceeding, the exact amount of the dumping margin on individual sales;
(8) In a countervailing duty proceeding, *** {not applicable}
(9) the names of particular persons from whom business proprietary information was obtained;
(10) {not applicable...omitted}
(11) Any other specific business information the release of which to the public would cause substantial harm to the competitive position of the submitter.

    The following lists the pages in which the business proprietary information appears and the reason (referenced by the same number as listed above) that proprietary treatment is requested for such information.

| Exhibit: | Reason Number: |
|---|---|
| 1-2 | 11 |

    In accordance with the Department's instructions, we are submitting an original and six copies of the proprietary APO response; the APO response is identical to the proprietary version.

2

**JA101208**

On behalf of the above interested party we have summarized data in the public version in accordance with the Department's regulations. We are delivering APO versions to all counsel on the APO list, who have not waived service. Public versions from which business proprietary information is deleted or ranged will be served on parties to the public service list.

The undersigned counsel certifies pursuant to 19 C.F.R. § 351.303(g), that I, Gregory S. Menegaz, of deKieffer & Horgan, counsel to the Shanxi DMD Corporation, (1) have read the attached submission, and (2) based on the information made available to me by this company, I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Please let us know if you have any questions concerning this submission.

Sincerely,

Gregory S. Menegaz
John J. Kenkel
J. Kevin Horgan

Attachments

3

JA101209



SHANXI DMD CORPORATION

SHANXI DMD CORPORATION
NO.169 FUXI STREET
TAIYUAN
SHANXI, P.R. CHINA

## CERTIFICATION

I, Zhaopenghao, Operations Manager of Shanxi DMD Corporation, certify that (1)
I have read the attached submission, and (2) the information contained in this submission
is, to the best of my knowledge, complete and accurate.

Signature: _____

Zhaopenghao, Operations Manager

**OFFICE OF AD/CVD OPERATIONS**

**PEOPLE'S REPUBLIC OF CHINA ("PRC")**

## SEPARATE RATE CERTIFICATION
### FOR FIRMS PREVIOUSLY AWARDED SEPARATE RATE STATUS*

\* Firms that do not currently hold a separate rate may **not** use this Certification and **must** instead submit an Application for separate rate status (posted on the Department's website at http://trade.gov/ia/index.asp, "Decisions and Data").

**REQUESTER(S):**         Shanxi DMD Corporation ("Shanxi DMD")

**REPRESENTATION:**       Gregory S. Menegaz
                         deKieffer & Horgan
                         729 15th Street NW
                         Suite 800
                         Washington, D.C. 20005
                         Phone: 202-783-6900
                         Fax: 202-783-6909
                         Email: gmenegaz@dhlaw.com

**CASE:**                Activated Carbon from PRC

**PERIOD OF REVIEW:**    4/1/09-3/31/10

**DEADLINE FOR SUBMISSION:**  30 days from publication date of the initiation
                         notice, See http://ia.ita.doc.gov/frn/index.html.


**FILING ADDRESS:**

U.S. Department of Commerce
International Trade Administration
APO/Dockets Unit, Room 1870
1401 Constitution Avenue, N.W.
Washington, DC 20230

**FILING INSTRUCTIONS:**  See "General Instructions" section at Appendix I.
                         See also http://ia.ita.doc.gov/filing/index.html

## SEPARATE RATE BACKGROUND

The Department assigns a separate rate in non-market economy ("NME") cases only if the firm can demonstrate an absence of government control, both in law *(de jure)* and in fact *(de facto)*, over its export activities in accordance with the separate-rate test criteria.   The Department limits its separate rate consideration to firms that exported or sold subject merchandise to the United States during the period of review ("POR") in a commercial transaction.

- Completion of this Certification does not guarantee separate rate status for this POR.

- If your responses to the questions in this Certification do not demonstrate your eligibility for separate rate status, you will not be granted a separate rate for this POR.

- <u>Each</u> firm seeking separate rate status must submit a separate Certification regardless of any common ownership or affiliation between firms and regardless of foreign ownership.

- Firms whose Certifications are untimely, incomplete or otherwise deficient may be denied a separate rate in the administrative review.

- By completing the Certification, firms certify that they have relevant supporting documents and can submit them to the Department upon request.   If a firm that has completed this form is not able to furnish supporting documents as requested by the Department, the Department may conclude the firm is not eligible for a separate rate.

- Along with requesting supporting documentation, the Department may issue questionnaires for clarification purposes.   All information submitted and representations made by your firm are subject to verification.

- There is a possibility that your firm may be selected as a mandatory respondent, in which case your firm will be required to respond to the Department's antidumping questionnaire in full in order to retain eligibility for consideration of separate rate status.

- Companies who had changes to corporate structure, ownership, or to the official company name may not file a Separate Rate Certification but must instead file a Separate Rate Application.   Please note that, as explained in the bullet point below and in Question 7, changes to trade names are allowed.   Only changes to the official company name *(i.e.,* the name appearing on the business license and other registration documents) require the filing of a Separate Rate Application.

- The firm name provided to the Department in this Certification must be the name that appears on the firm's business license/registration documents. All shipments to the United States declared to U.S. Customs and Border Protection must identify the firm by its legal business name, and this name must match the name that appears on the firm's business/registration documents.   If your firm is assigned separate rate status, your firm will only be able to ship

under your separate rate under names that are included on your business license/registration documents, or for which you have explained are otherwise permitted *(see* question 7 below).

- Firms owned wholly by entities located in market-economy countries, provided that the ultimate owners are also located in market-economy countries, ("wholly market-economy owned firms"), need not respond to questions marked with an asterisk ("*").

## SEPARATE RATE CERTIFICATION

**APPLICANT INFORMATION:**

1.    Please provide the full name and contact information (including address, telephone, fax, and e-mail address) of the firm, previously granted separate status, which is seeking separate rate status for this administrative review.

**Response:**

**Name: Shanxi DMD Corporation**

**ADD : NO.169 FUXI STREET, TAIYUAN ,SHANXI, P.R. CHINA**

**TEL : 0086-351-5602525**

**e-mail address:linda@sxdmd.com**

2.    I certify that during the POR, the firm was owned (select one):

    √    wholly or partially by a domestic entity/entities located the PRC

    □    100% by a foreign entity/entities[1] located in (identify country or countries)

**FIRM OFFICIAL AND REPRESENTATIVE CERTIFICATIONS:**

3.    I, (Firm official name and title), currently employed by (Firm), certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

**Response:  See Attached Certification.**

4.    I, (Legal counsel or representative name), of (law firm or other entity), counsel or representative to (Firm), certify that: (1) I have read the certifications contained in this submission; and (2) based on the information made available to me by (person), I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

**Response:  See Attached Certification in transmittal letter.**

**GENERAL CERTIFICATIONS:[2]**

5.    I certify that (Firm) was previously granted separate rate status as part of the final determination/results in the (insert investigation/review and period of investigation/review); published in Federal Register (insert citation), that the separate rate status is currently applicable, and the separate rate status has not been revoked.

**Response:  See Attached Certification.**

1.  Wholly market-economy owned firms need not respond to questions marked with an asterisk ("*").

2   If you cannot certify to each question in this section, please contact the official in charge.

6.    I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude the firm is not eligible for a separate rate.

**Response: See Attached Certification.**

**EXPORT CERTIFICATIONS (check any that apply):**

7.    I certify that during the POR, the firm conducted business under the following (please include a list of all trade names)[3]:

  √  only the same trade names as identified in the segment of investigation or review in which the firm was granted a separate rate ("previous Granting Period").

  ☐  the same trade names as identified in the previous Granting Period, as well as new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

  ☐  only new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

If a trade name is not listed on the company's business license/registration documents, please provide an explanation and any evidence as to how the company is permitted to use that trade name.

8.  √  I certify the firm possesses an official government business license/registration documents for each trade name listed in response to question 7, above, valid during the POR. (list each trade name, the corresponding document and its expiration date).[4]

**Response: Shanxi DMD Corporation possesses an official government business license valid during the POR the expiry date of which is Mar, 15th , 2017.**

---

 3 Trade names are other names under which the firm does business. It does not include product brand names or the names of any other entities in the firm's "group," affiliated or otherwise. Note that if the Department determines that your firm is eligible for separate rate status, the separate rate will only apply to the firm as named in your business license/registration documents and not to any alternative or trade names that are not included in your business license/registration documents or not otherwise permitted, as explained in your response to this question.

 4 It is the Department's understanding that a valid business license/registration documents with clearly defined periods of validity issued by the appropriate licensing authority is required for all business activity. A firm submitting a business license without an

expiration date must provide an explanation in order for the Department to consider its Certification.

9.    √    I certify the firm exported or sold subject merchandise to the United States during the POR.

## CERTIFICATIONS OF ABSENCE OF *DE JURE* CONTROL (check any that apply):

10.    √    * I certify that during the POR, as with the previous Granting Period, there were no government laws or regulations, at either national and sub-national *(e.g., provincial, local)* levels of government, that controlled the firm's export activities.

11.    √    I certify that during the POR, the ownership under which the firm registered itself with the official government business license issuing authority remains the same as for the previous Granting Period.[5]

12.    √    * I certify that during the POR, the firm had valid PRC Export Certificate(s) of Approval.[6]

13.    √    * I certify that during the POR, as with the previous Granting Period, in order to conduct export activities, the firm was not required by any national, provincial, or local government law or regulation to possess additional certificates or other documents related to the legal status and/or operation of its business beyond those discussed above.

14.    √    * I certify that during the POR, the PRC government laws and legislative enactments applicable to the firm seeking a separate rate remained the same as for the previous Granting Period.

## CERTIFICATIONS OF ABSENCE OF *DE FACTO* CONTROL (check any that apply):

15.    √    * I certify that during the POR, the largest 10 individual/entity shareholders of the firm and all of their shareholders had no significant relationship[7] with any of the following:[8]
- PRC state asset management company (government-owned and/or private chartered);

---

5 If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

6 If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

7 A significant relationship would include ownership, control, affiliation, significant transactions, *etc.*

8 If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

- The PRC national government and/or its ministries/agencies;
- PRC provincial governments;
- PRC local/municipal/village governments)/agency(ies).

16.     √     * I certify that during the POR, the firm's export prices were not set by, subject to the approval of, or in any way controlled by a government entity at any level *(e.g., national, provincial, local)*.[9]

17.     √     I certify that during the POR, the firm had independent authority to negotiate and sign export contracts and other agreements *(i.e., the firm conducted independent price negotiation)*.[10]

18.     √     I certify that during the POR, the firm had autonomy from all levels of the government *(e.g., national, provincial, local)* and from any government entities in making decisions regarding the selection of management.

19.     √     I certify that during the POR, the firm did not have to submit for approval any of its candidates for managerial positions within the firm to any government entity at any level *(e.g., national, provincial, local)*.

20.     √     * I certify that during the POR, the firm retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or financing of losses.

## SALES & AFFILIATION:

21.     I certify the firm made at least one export or sale to the United States during the POR to (select only one):

    ☐     affiliated[11] parties only.

    √     unaffiliated parties only.

    ☐     both affiliated and unaffiliated parties.

---

9 This includes, but is not limited to, the presence of government officials at any meeting where export and pricing decisions are discussed.

10 The authority to conduct independent price negotiation refers to the ability of an NME firm to set its own export prices independently of the government at any level (national, provincial, local) and without the approval of any government entity.

11 See Section 771(33) of the Tariff Act of 1930, as amended, for a definition of affiliation. For the purposes of control under the definition of affiliation, the Department will consider a person to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

**ADDITIONAL DOCUMENTATION:**

22.    Please provide copies of the following documentation:
- The firm's business license(s)/ registration document(s) valid during the POR;
- * The firm's PRC Export Certificate(s) of Approval valid during the POR.

**Response:**    **Please see Exhibit 1 the business license valid during the POR and Exhibit 2 the Export Certificate of Approval valid during the POR.**

# EXHIBIT 1

## Business License

# 企业法人营业执照

（副　本）

注册号　140030100084772(2/1)

名　称　　鞍山恒途钢铁经贸发展有限公司

住　所　　鞍山市鞍海平阳路283号

法定代表人姓名

注册资本　16,000,000

实收资本　16,000,000

公司类型　有限责任公司

经营范围

钢材零售批发、废旧物品、矿产品、焦炭等。（法律、法规禁止的不得经营；法律、法规限制的取得许可证后方可经营。）

成立日期　2000年03月27日

营业期限　2000年03月27日至2017年03月16日

PUBLIC VERSION

须知

1、企业法人应当按照核准登记的经营范围从事经营活动。

2、企业法人应当妥善保管营业执照，不得伪造、涂改、出租、出借、转让。

3、企业法人应按规定接受年度检验。

4、企业法人应当在住所地办理税务登记、开户、刻章。

5、企业法人变更登记事项，应当按规定到登记机关申请变更登记。

6、每年3月1日至6月30日，应当进行年度检验。

7、企业法人领取营业执照后，无正当理由超过六个月未开业的。

8、企业法人登记注册的事项发生变更，应当申请变更登记。

9、企业法人应当接受企业登记机关的监督检查，在企业登记机关依法检查时。

登记机关盖章



# BUSINESS LICENSE OF CORPORATE LEGAL PERSON

## (Duplicate)

Registration No. 140000100084772 (2/1)

PUBLIC VERSION

**Designation:** Shanxi DMD Corporation

**Domicile:** No. 288, Pingyang Road, Taiyuan

**Legal Representative:** Zhao Panghao

**Registered capital:** RMB 16,000,000

**Paid-in-capital:** RMB 16,000,000

**Type of the Enterprise:** Limited Liability Company

**Business Scope:** Wholesale and Retail of Computer, Household Appliances,

Steel, Chemical Product( except Dangerous Goods ), Handicraft Article( except Bullion Accessories ) , Articles of Daily Use , Standard Machinery , Electrical Appliance, Textil, Toy, Industrial Mine Accessories, Fitting for Automobiles, Metallic Material(except Precious and Sparse Metal) , Clothing, Computer Software Development. Freightage. Information Consultant Service for Coal. Self-supporting and Agenting Kinds of Import and Export Business of Products and Technique, but apart from Products and Technique Restricted to Manage and Prohibited from Importing and Exporting by State.

**Date of Foundation:** March 27, 2000

**Operation Period:** From March 27, 2000 to March 15, 2017

---

## Need-To-Know

1. Business License of Corporate Legal Person is the credence with which the enterprise has obtained its legal personality and lawful operations.
2. Business License of Corporate Legal Person have its original and duplicates and both have equal force of law.
3. The original of Business License of Corporate Legal Person shall be put in the eye-catching place in the domicile of the legal person.
4. Business License of Corporate Legal Person shall not be forged, altered, rented or assigned.
5. Legal person of the enterprise shall apply for registration alteration with the original registration organ and apply for a new license upon occurence of changes in its registered items.
6. From March 1 to June 30 every year, the registration organ shall carry out annual survey to the legal persons of enterprises.
7. In case the business license is withdrawn, the company shall not run any activity except liquidation.
8. The enterprise shall return the original and duplicates of the license upon cancellation of registration by the company.
9. In case the business license is destroyed or lost, the enterprise shall declare cancellation on the appointed press and apply for new one.

### The Annual Inspection

Industry and Commerce
Administration Bureau of
Shanxi Province
Annual Inspection
(Sealed)
Jun12,2009

Industry and Commerce Administration Bureau of Shanxi Province
(Sealed)    Jun12, 2009

JA101223

# EXHIBIT 2

# Registration Form For Foreign Trade Operator

**PUBLIC VERSION**

# 对外贸易经营者备案登记表

备案登记表编号：00015713                进出口企业代码：1400715993288

| 经营者中文名称 | 山西龙枫科技经贸发展有限公司 | | |
|---|---|---|---|
| 经营者英文名称 | SHANXI DMD CORPORATION | | |
| 组织机构代码 | 715993288 | 经营者类型<br>（由备案登记机关填写） | 有限责任公司 |
| 住　所 | 太原市南内环街480号 | | |
| 经营场所（中文） | 山西省太原市南内环街480号 | | |
| 经营场所（英文） | NO.480 NANNEIHUAN STREET, TAIYUAN, SHANXI, CHINA | | |
| 联系电话 | 0351-5602525 | 联系传真 | 0351-5602513 |
| 邮政编码 | 030002 | 电子邮箱 | DMD@SXDMD.COM |
| 工商登记注册日期 | 2000-3-27 | 工商登记注册号 | 1400001008477 |

依法办理工商登记的企业还须填写以下内容

| 企业法定代表人姓名 | | 有效证件号 | |
|---|---|---|---|
| 注册资金 | | | （折美元） |

依法办理工商登记的外国（地区）企业或个体工商户（独资经营者）还须填写以下内容

| 企业法定代表人/<br>个体工商负责人姓名 | | 有效证件号 | |
|---|---|---|---|
| 企业资产/个人财产 | | | （折美元） |

| 备注 | | |
|---|---|---|
| | | |

填表前请认真阅读背面的条款，并由企业法定代表人或个体工商负责人签字、盖章。



JA101225                              2005 年 11 月 西 日

PUBLIC VERSION

## Registration Form for Foreign Trade Operator

No. 00015713                          Code of import and export enterprise: 1400715993288

| Name of foreign trade operator in Chinese | 山西龙枫科技经贸发展有限公司 | | |
|---|---|---|---|
| Name of foreign trade operator in English | SHANXI DMD CORPORATION | | |
| Code of organization framework | 715993288 | Type of the Operator (Filed by the registered authority) | limited liability company |
| Address | NANNEIHUAN STREET NO.480,TAIYUAN | | |
| Site for business operation in Chinese | 山西省太原市南内环街 480 号 | | |
| Site for business operation in English | No.480 NANNEIHUAN STREET,TAIYUAN,SHANXI,CHINA | | |
| Telephone | 0351-5602525 | Fax | 0351-5602513 |
| Post code | 030002 | E-mail | DMD@SXDMD.COM |
| Date of industrial and commercial registration | 2000-3-27 | Industrial and commercial registration number | 1400001008477 |

The registered company shall also provide the following information:

| Name of the legal representative of the company | | No. of perfect instrument | |
|---|---|---|---|
| Registered capital | 16,000,000 | Equal to: | USD |

The registered foreign/region company or Small business of industry and commerce (sole proprietorship) shall also provide the following information:

| Name of the legal representative of the company | | No. of perfect instrument | |
|---|---|---|---|
| Capital of the company | | Equal to: | USD |

| Remark: | The document has been renovated | |
|---|---|---|

Be sure to read the article of the back and sign and seal by the legal representative of the company.

Sealed by the Registered Authority

November 7 ,2005

JA101226

## PUBLIC CERTIFICATE OF SERVICE

### Activated Carbon from the People's Republic of China
### A-570-904
### Administrative Review 4/1/09-3/31/10

The undersigned hereby certifies that on July 21, 2010, the attached document was served upon the following via hand delivery or first-class mail as follows:

**Hand Delivery:**

R. Alan Luberda, Esq.
**Kelley Drye & Warren LLP**
3050 K Street, NW
Washington, DC 20007-5108

**First-Class Mail:**

Craig A. Lewis, Esq.
**Hogan & Hartson**
555 13th, NW
Washington, DC 20004

Francis J. Sailer, Esq.
**Grunfeld, Desiderio, Lebowitz,**
**Silverman & Klestadt LLP**
1201 New York Avenue, NW
Suite 650
Washington, DC 20005

Ronald M. Wisla, Esq.
**Kutak Rock LLP**
1101 Connecticut Avenue, NW
Suite 1000
Washington DC 20036-2488

Daniel L. Porter, Esq.
**Winston & Strawn LLP**
1700 K Street, NW
Washington, DC 20006

Matthew J. McConkey, Esq.
**Mayer Brown LLP**
1999 K Street, NW
Washington, DC 20006-1101

Jeffrey S. Grimson, Esq.
**Mowry International Group, LLC**
7201 Wisconsin Ave.
Suite 450
Bethesda, MD 20814

Kerry Horgan

JA101227



**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-904
ARP: 4/1/09-3/31/10
**Proprietary Document**
IA/NME/IX: JBW/KJA
**Public Version**

**FOR OFFICIAL FILE**

*1873*

July 21, 2010

MEMORANDUM TO:      James Doyle
                    Director, Office 9
                    Import Administration

FROM:               Jamie Blair-Walker
                    International Trade Compliance Analyst, Office 9

                    Kabir Archuletta
                    International Trade Compliance Analyst, Office 9

RE:                 Antidumping Duty Administrative Review of Certain Activated
                    Carbon from the People's Republic of China:  Selection of
                    Respondents for Individual Review

<u>Summary</u>

On May 28, 2010, the Department of Commerce ("Department") initiated an administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC").  See <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 75 FR 29976 (May 28, 2010) ("<u>Initiation Notice</u>").  The Department initiated an administrative review for 186 exporters of subject merchandise.  See <u>Initiation Notice</u>, 75 FR at 29978-29980.  Due to the significant number of companies requested to be reviewed, the Department is unable to calculate an individual weighted-average dumping margins for all exporters and producers involved in the review.  Based on the Department's current resource constraints, we recommend limiting the number of respondents selected for individual examination to the two largest exporters and/or producers by U.S. import entry volume for which a review has been requested.  The period of review ("POR") is April 1, 2009, to March 31, 2010.

<u>Background</u>

In the <u>Initiation Notice</u>, the Department notified all interested parties that should it limit the number of respondents for individual examination, it intended to select respondents based on U.S. Customs and Border Protection ("CBP") data for entries of the subject merchandise during the POR.

We provided the CBP data under administrative protective order ("APO") to all interested parties that obtained access to information covered by the APO.  We also invited comments regarding the CBP data and respondent selection.  On June 7, 2010, Calgon Carbon Corporation and Norit Americas Inc. ("Petitioners"), Albemarle Corporation ("Albemarle"), and Jacobi Carbons AB 0 0 0 0 7 0 and its affiliates, Tianjin Jacobi International Trading Co. Ltd. and Jacobi Carbons, Inc.

JA101228



By selecting the top two exporters/producers of the subject merchandise according to submitted sales and entry data for the POR, the Department maintains past established practices[6] and, in light of its resource constraints, accounts for the largest number of exporters of subject merchandise from the PRC during the POR that can reasonably be examined. Because unresolved questions exist regarding the companies under review, the Department finds that selecting Jacobi at this time, and the remaining top exporter/producer at a later date, is the most expedient avenue towards meeting the Department's statutory deadlines. This selection will represent the exporter/producer accounting for the largest or second largest volume of subject merchandise that can be reasonably examined. See section 777(A)(c)(2) of the Act.

Recommendation

Considering the factors discussed above, we recommend selecting one of the two largest exporters/producers for individual examination for this third administrative review, and a second pending the outcome of unresolved issues regarding Albemarle's review request.[7] Specifically, we recommend selecting Jacobi at this time because it is either the largest or second largest exporter by volume of total U.S. entries during the POR of certain activated carbon from the PRC under review. See Attachment 1.

_____ ✓_____                    _____
Agree                               Disagree

**Issue 3: Whether to Review Voluntary Respondents**

On June 8, 2010, the Department received a voluntary respondent request from GHC. Section 782(a) of the Act directs the Department to calculate individual rates for exporters/producers that provide information voluntarily, except where the number of such respondents is so large that the calculation of individual dumping margins for all such respondents would be unduly burdensome and would prevent the timely completion of the review. However, for the same reasons noted above, it would not be practicable for the Department to investigate more than the two above-named mandatory respondents in this review. That is, calculation of individual dumping margins for any additional respondents would be unduly burdensome and would prevent the timely completion of this review. Therefore, as long as the selected respondents cooperate in this review, the Department will not be able to calculate individual rates for voluntary respondents.

---

[6] See Steel Wire Garment Hangers From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, 73 FR 53188 (September 15, 2008); see also Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 74 FR 36656 (July 24, 2009).
[7] If, after selection of mandatory respondents, the Department finds that any submitted Q&V data are incomplete, inaccurate or deficient to the extent the Department considers them to be false or non-responsive, the Department, pursuant to section 776 of the Act, may rely upon the facts available, including using information that is adverse to the company's interest, in conducting its analysis.

6

FOR OFFICIAL FILE

# GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

### COUNSELORS AT LAW

1201 NEW YORK AVENUE, N.W. • SUITE 650

WASHINGTON, DC 20005

TEL (202) 783-6881

OFFICES:
NEW YORK • BOSTON
LOS ANGELES • WASHINGTON, D.C.
HONG KONG
AFFILIATED OFFICES:
SHANGHAI • BEIJING

FAX (202) 783-0405
www.gdlsk.com

WRITER'S DIRECT DIAL NUMBER

July 27, 2010

RECEIVED
JUL 27 2010
DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

_Case No. A-570-904_

Total Number of Pages: 20
Administrative Review: 04/01/09 – 03/31/10
Pursuant to Section 751(a)(1) of the Act

1861

Business Proprietary Information Has Been
Ranged or Deleted on Narrative Page 3 and in
Exhibits 3-4

### PUBLIC VERSION

**VIA HAND DELIVERY**
Secretary of Commerce
Attention: Import Administration
APO/Dockets Unit
Room 1870
U.S. Department of Commerce
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

    Attn: Catherine Bertrand and Katie Marksberry

    Re: Separate Rate Certification for Ningxia Guanghua Cherishmet Activated Carbon Co.,
Ltd. in the Third Administrative Review of Certain Activated Carbon from People's
Republic of China, Case No. A-570-904

Dear Mr. Secretary:

    On behalf of our client, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.

("GHC"), we hereby respond to the Department's Separate Rate Certification Questionnaire

issued in the above referenced administrative review.

000073

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

The undersigned certify pursuant to 19 C.F.R. §351.303(g), that we have read the attached submission, and based on the information made available to us by GHC, we have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Should you have any questions or require further information, please do not hesitate to contact the undersigned. Thank you for your consideration of this matter.

Respectfully submitted,

Francis J. Sailer /EFW

Francis J. Sailer
Elaine F. Wang

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2010, a copy of the foregoing document was deposited in the United States mail, first-class, postage prepaid, addressed to the following interested parties:

R. Alan Luberda, Esq.
**Kelley Drye & Warren LLP**
3050 K Street, NW
Washington, DC 20007-5108

Daniel L. Porter, Esq.
**Winston & Strawn LLP**
1700 K Stsreet, NW
Washington, DC 20006-3817

Gregory S. Menegaz, Esq.
**deKieffer & Horgan**
729 Fifteenth Street, NW
Suite 800
Washington, DC 20005

Matthew J. McConkey, Esq.
**Mayer Brown LLP**
1999 K Street NW
Washington, DC 20006-1101

Jeffrey S. Grimson, Esq.
**Mowry & Grimson PLLC**
7201 Wisconsin Avenue, NW
Suite 450
Bethesda, MD 20814

Craig A. Lewis, Esq.
**Hogan Lovells US LLP**
555 Thirteenth Street NW
Washington, DC 20004

Ronald M. Wisla, Esq.
**Kutak Rock LLP**
Suite 1000
1101 Connecticut Ave., NW
Washington, DC 20036-4374

_____
Bruce Lockard

429246_1

## OFFICE OF AD/CVD OPERATIONS

### PEOPLE'S REPUBLIC OF CHINA ("PRC")
# SEPARATE RATE CERTIFICATION
## FOR FIRMS PREVIOUSLY AWARDED SEPARATE RATE STATUS*

* Firms that do not currently hold a separate rate may *not* use this Certification and *must* instead submit an Application for separate rate status (posted on the Department's website at http://trade.gov/ia/index.asp, "Decisions and Data").

| | |
|---|---|
| **REQUESTER(S):** | Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. |
| **REPRESENTATION:** | Francis J. Sailer<br>Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP<br>1201 New York Ave., N.W., Suite 650<br>Washington, D.C. 20005<br>Tel.: (202) 783-6881<br>Fax: (202) 783-0405 |
| **CASE:** | Certain Activated Carbon from the People's Republic of China |
| **CASE NO.:** | A- 570-904 |
| **PERIOD OF REVIEW:** | April 1, 2009 through March 31, 2010 |

**DEADLINE FOR SUBMISSION OF CERTIFICATION: July 27, 2010**

**FILING ADDRESS:**

> U.S. Department of Commerce
> International Trade Administration
> APO/Dockets Unit, Room 1870
> 1401 Constitution Avenue, N.W.
> Washington, DC 20230

**FILING INSTRUCTIONS:**

> See the "General Instructions" section at Appendix I.
> See also http://ia.ita.doc.gov/filing/index.html

## SEPARATE RATE CERTIFICATION

**APPLICANT INFORMATION:**

1.     Please provide the full name and contact information (including address, telephone, fax, and e-mail address) of the firm, previously granted separate status, which is seeking separate rate status for this administrative review.

> Name: Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC")
> Address: Taisha Industrial Zone, Pingluo, Ningxia, P.R. China.
> Telephone: 86-951-410-8128
> Fax: 86-951-410-5300
> Email: ghcarbon@126.com

2.     I certify that during the POR, the firm was owned (select one):
[X] wholly or partially by a domestic entity/entities located in the PRC
[  ] 100% by a foreign entity/entities [1] located in (identify country or countries)

**FIRM OFFICIAL AND REPRESENTATIVE CERTIFICATIONS:**

3.     I, (Firm official name and title), currently employed by (Firm), certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

<div align="center">(Firm official signature)</div>

**Answer**: Please see **Exhibit 1**.

4.     I, (Legal counsel or representative name), of (law firm or other entity), counsel or representative to (Firm), certify that: (1) I have read the certifications contained in this submission; and (2) based on the information made available to me by (person), I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

<div align="center">(Legal counsel or representative signature)</div>

**Answer**: Please see **Exhibit 2**.

**GENERAL CERTIFICATIONS:**[2]

---

[1] Wholly market-economy owned firms need not respond to questions marked with an asterisk ("*").

5.    I certify that (Firm) was previously granted separate rate status as part of the final determination/results in the (insert investigation/review and period of investigation/review) ; published in Federal Register (insert citation) , that the separate rate status is currently applicable, and the separate rate status has not been revoked.

<div align="center">(Firm official, legal counsel or representative signature)</div>

**Answer**: Please see **Exhibit 1.**

6.    I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude the firm is not eligible for a separate rate.

<div align="center">(Firm official, legal counsel or representative signature)</div>

**Answer**: Please see **Exhibit 1.**

## EXPORT CERTIFICATIONS (check any that apply):

7.    I certify that during the POR, the firm conducted business under the following (please include a list of all trade names) [3]

[X].  only the same trade names as identified in the segment of investigation or review in which the firm was granted a separate rate ("previous Granting Period").

**Answer**: GHC's trade name is "Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd."

[ ]  the same trade names as identified in the previous Granting Period, as well as new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

[ ]  only new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

If a trade name is not listed on the company's business license/registration documents, please provide an explanation and any evidence as to how the company is permitted to use that trade name.

---

[2] If you cannot certify to each question in this section, please contact the official in charge.

[3]  Trade names are other names under which the firm does business. It does not include product brand names or the names of any other entities in the firm's "group," affiliated or otherwise. Note that if the Department determines that your firm is eligible for separate rate status, the separate rate will only apply to the firm as named in your business license/registration documents and not to any alternative or trade names that are not included in your business license/registration documents.

**PUBLIC VERSION**

8.    [X] I certify the firm possesses an official government business license/registration documents for each trade name listed in response to question 7, above, valid during the POR. (list each trade name, the corresponding document and its expiration date).[4]

**Answer:**

| Trade Name | Corresponding Document | Expiration Date |
|---|---|---|
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. | Business License (see **Exhibit 3**) | [          ] |

9.    [X]    I certify the firm exported or sold subject merchandise to the United States during the POR.

**CERTIFICATIONS OF ABSENCE OF *DE JURE* CONTROL (check any that apply):**

10.    [X].  * I certify that during the POR, as with the previous Granting Period, there were no government laws or regulations, at either national and sub-national (*e.g.*, provincial, local) levels of government, that controlled the firm's export activities.

11.    [X]. I certify that during the POR, the ownership under which the firm registered itself with the official government business license issuing authority remains the same as for the previous Granting Period.[5]

12.    [X].  * I certify that during the POR, the firm had valid PRC Export Certificate(s) of Approval.[6]

13.    [X].  * I certify that during the POR, as with the previous Granting Period, in order to conduct export activities, the firm was not required by any national, provincial, or local government law or regulation to possess additional certificates or other documents related to the legal status and/or operation of its business beyond those discussed above.

14.    [X].* I certify that during the POR, the PRC government laws and legislative enactments applicable to the firm seeking a separate rate remained the same as for the previous Granting Period.

**CERTIFICATIONS OF ABSENCE OF *DE FACTO* CONTROL (check any that apply):**

15.    [X].  * I certify that during the POR, the largest 10 individual/entity shareholders of the firm and all of their shareholders had no significant relationship[7] with any of the following:[8].

---

[4] It is the Department's understanding that a valid business license/registration documents with clearly defined periods of validity issued by the appropriate licensing authority is required for all business activity. A firm submitting a business license without an expiration date must provide an explanation in order for the Department to consider its application.
[5] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.
[6] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.
[7] A significant relationship would include ownership, control, affiliation, significant transactions, *etc.*
[8] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

- PRC state asset management company (government-owned and/or private chartered);
- The PRC national government and/or its ministries/agencies;
- PRC provincial governments;
- PRC local/municipal/village government(s)/agency(ies).

16.    [X]* I certify that during the POR, the firm's export prices were not set by, subject to the approval of, or in any way controlled by a government entity at any level (*e.g.*, national, provincial, local).[9]

17.    [X] I certify that during the POR, the firm had independent authority to negotiate and sign export contracts and other agreements (*i.e.* the firm conducted independent price negotiation).[10]

18.    [X] I certify that during the POR, the firm had autonomy from all levels of the government (*e.g.*, national, provincial, local) and from any government entities in making decisions regarding the selection of management.

19.    [X] I certify that during the POR, the firm did not have to submit for approval any of its candidates for managerial positions within the firm to any government entity at any level (*e.g.*, national, provincial, local).

20.    [X]. * I certify that during the POR, the firm retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or financing of losses.

## SALES & AFFILIATION:

21.    I certify the firm made at least one export or sale to the United States during the POR to (select only one):

[X] affiliated[11] parties only.
[ ] unaffiliated parties only.
[ ] both affiliated and unaffiliated parties.

## ADDITIONAL DOCUMENTATION:

22.    Please provide copies of the following documentation: ·
The firm's business license(s)/ registration document(s) valid during the POR; · * The firm's PRC Export Certificate(s) of Approval valid during the POR.

**Answer**: Please see a copy of GHC's business license valid during the POR and its English translation attached as **Exhibit 3**. Please see a copy of GHC's Certificate of Approval for Establishment of

---

[9] This includes, but is not limited to, the presence of government officials at any meeting where export and pricing decisions are discussed.
[10] The authority to conduct independent price negotiation refers to the ability of an NME firm to set its own export prices independently of the government at any level (national, provincial, local) and without the approval of any government entity.
[11] *See* Section 771(33) of the Tariff Act of 1930, as amended, for a definition of affiliation. For the purposes of control under the definition of affiliation, the Department will consider a person to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

4

Enterprises with Foreign Investment in the People's Republic of China valid during the POR and its English translation attached as **Exhibit 4**.

428899_1

# EXHIBIT 1

宁 夏 广 华 奇 思 活 性 炭 有 限 公 司
## NINGXIA GUANGHUA-CHERISHMET ACTIVATED CARBON CO., LTD
TAISHA INDUSTRIAL ZONE, PINGLUO, NINGXIA, CHINA
TEL: 0086 951 4108128 / 4100116    FAX: 0086 951 4105300

## CERTIFICATIONS

I, Gao Jianzhong, general manager, currently employed by **Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.**, certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

I certify that **Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.**, ("GHC") was previously granted separate rate status as part of the final determination/results in the first administrative review (POR: 10/11/06- 03/31/08) published in the Federal Register as *First Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 57995-57999 (November 10, 2009), as amended as *Certain Activated Carbon from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 66952-66954 (December 17, 2009), that the separate rate status is currently applicable, and the separate rate status has not been revoked.

I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude that **Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.** is not eligible for a separate rate.

Gao Jianzhong

**JA101246**

# EXHIBIT 2

## ATTORNEY CERTIFICATION

I, Elaine F. Wang, of Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, counsel to Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC"), certify that (1) I have read the certifications contained in this submission; and 2) based on the information made available to me by GHC, I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

_Elaine F. Wang, Esq._

_7/26/10_
Date

429223_1

# EXHIBIT 3

PUBLIC VERSION

# 企业法人营业执照
（副 本）

注册号 [ ]  1-1

编号: NO: [ ]

名 称　宁夏广华昌活性炭有限公司
住 所　宁夏平罗太沙工业园区
法定代表人 [ ]
注册资本 [ ]
实收资本 [ ]
公司类型 [ ]
经营范围 [ ]

股东（发起人） [ ]
营业期限 [ ]
成立日期 [ ]

第 须知

1. 企业法人营业执照》是企业法人享有法定经营资格的凭证。
2. 企业法人营业执照》分为正本和副本，正本和副本具有同等法律效力。
3. 企业法人营业执照》正本应置于住所的醒目位置。
4. 企业法人营业执照》不得伪造、涂改、出租、出借、转让。
5. 登记事项如有变更，应向有公司登记机关申请变更登记。逾期不办理。
   企业法人执照》
6. 每年三月一日至六月三十日，应参加年度检验。
7. 企业法人营业执照》被吊销、不得从事经营活动。
8. 办理注销登记后，应当缴回《企业法人营业执照》正本和副本。
9. 企业法人营业执照》遗失或毁坏的，应当向公司登记机关申请补办或更换。

年度检验情况

登记机关







# PUBLIC VERSION

### Enterprise Legal Person Business license

**(Duplicate)**

**Registration No.** [                    ]

**Name:** Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.

**Domicile:** Taisha Industrial Zone, Pingluo, Ningxia

**Legal Representative:** [                    ]

**Registered Capital:** [                    ]

**Paid-in Capital:** [                    ]

**Type of Company:** [                                              ]

**Scope of Business:** [

                                        ]

**Shareholder (Initiators):** [

                                        ]

**Term of Operation:** [                    ]

**Date of Establishment:** [                    ]

**No:** [                    ]

**Notes:**

1. The business license is the certificate to qualify an enterprise legal person and the certificate for legal operation of business.
2. The business license has original and duplicate which bear the same legal effect.
3. The original should be put in an eyeball catching place in the legal address of the enterprise.
4. No forgery, altering, subletting, lending, transferring of the business license is allowed.
5. If the registered items change, the change of registration needs to be done with the registration authority to have new business license.
6. The registration authority conducts annual inspection to enterprise legal person from March 1 to June 30.
7. When the enterprise legal person business license is revoked, no business activities other than the liquidation are allowed.

**PUBLIC VERSION**

8. The original and duplicate business license should be turned in when the registration of cancellation is done.
9. In case of any loss or damage to the business license, invalidation should be claimed on newspaper designated by the registration authority and application for re-issuance of the business license should be done with the registration authority.


Status of annual inspection

[                    ]


Registration authority: Ningxia Hui Autonomous Region Administration for Industry and Commerce

[        ]

429224_1

# EXHIBIT 4

PUBLIC VERSION

副本2

中华人民共和国外商投资企业

批准证书

CERTIFICATE OF APPROVAL
FOR ESTABLISHMENT OF ENTERPRISES WITH FOREIGN
INVESTMENT IN THE PEOPLE'S REPUBLIC OF CHINA

No.

| 企业名称 NAME OF ENTERPRISE | 中文 CHINESE | 宁夏广华富恒活性炭有限责任公司 |
| | 英文 ENGLISH | |
| 企业地址 ADDRESS | | 宁夏平罗太沙工业园区 |
| 企业类型 TYPE OF BUSINESS | | |
| 投资总额 TOTAL INVESTMENT | | |
| 注册资本 REGISTERED CAPITAL | | |
| 经营范围 BUSINESS SCOPE | | |
| 经营年限 DURATION OF OPERATION | | |
| 投资者名称（中、英文）NAME OF INVESTORS (IN CHINESE AND ENGLISH) | 注册地 PLACE OF REGISTRATION | 出资额 CAPITAL CONTRIBUTION |
| | | |

批准号 APPROVAL NUMBER

进出口企业代码 CODE FOR IMPORT AND EXPORT ENTERPRISE

批准日期 DATE OF APPROVAL

发证日期 DATE OF ISSUE

发证序号

JA101254

# CERTIFICATE OF APPROVAL

**FOR ESTABLISHMENT OF ENTERPRISES WITH FOREIGN INVESTMENT IN THE PEOPLE'S REPUBLIC OF CHINA**

Approval Number: [            ]

Code for Import and Export Enterprise: [            ]

Date of Approval:[            ]

Date of issuance: [            ]

Number of Issuance:[            ]

Ningxia Hui Autonomous Region Peoples' Government (seal)

| | | | | | | |
|---|---|---|---|---|---|---|
| Name of Enterprise | Chinese | 宁夏广华奇思活性炭有限公司 | | | | |
| | English | | | | | |
| Address | | Taisha Industrial Zone, Pingluo, Ningxia. | | | | |
| Type of Business | | [        ] | | | Duration of Operation | [        ] |
| Total Investment | | [        ] | [        ] | | | |
| Registered Capital | | [        ] | [        ] | | | |
| Business Scope | | [        ] | | | | |
| Name of Investors (in Chinese and English) | | | Place of Registration | | Capital Contribution | |
| [        ] | | | | | [        ] | |
| [        ] | | | | | [        ] | |
| [        ] | | | | | [        ] | |

429249_1

JA101255

FOR OFFICIAL FILE

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

COUNSELORS AT LAW

1201 NEW YORK AVENUE, N.W. • SUITE 650

WASHINGTON, DC 20005

TEL (202) 783-6881

FAX (202) 783-0405

www.gdlsk.com

WRITER'S DIRECT DIAL NUMBER

OFFICES:
NEW YORK • BOSTON
LOS ANGELES • WASHINGTON, D.C.
HONG KONG
AFFILIATED OFFICES:
SHANGHAI • BEIJING



RECEIVED
JUL 27 2010
DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

July 27, 2010

**Case No. A-570-904**

1864

Total Number of Pages: 19
Administrative Review: 04/01/09 – 03/31/10
Pursuant to Section 751(a)(1) of the Act

Business Proprietary Information Has Been
Ranged or Deleted on Narrative Page 3 and in
Exhibits 3-4

**PUBLIC VERSION**

**VIA HAND DELIVERY**
Secretary of Commerce
Attention: Import Administration
APO/Dockets Unit
Room 1870
U.S. Department of Commerce
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

    Attn: Catherine Bertrand and Katie Marksberry

    Re: Separate Rate Certification for Beijing Pacific Activated Carbon Products Co., Ltd.
in the Third Administrative Review of Certain Activated Carbon from People's Republic
of China, Case No. A-570-904

Dear Mr. Secretary:

    On behalf of our client, Beijing Pacific Activated Carbon Products Co., Ltd. ("BPACP"),

we hereby respond to the Department's Separate Rate Certification Questionnaire issued in the

above referenced administrative review.

    As we have advised the Department by our June 7, 2010 Comments on CBP Data and

**JA101256**

000075

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

Mandatory Respondent Selection and July 27, 2010 No Shipment Letter, that BPACP did not have exports or sales of the subject merchandise to the United States during the POR. However, the CBP data released by the Department may infer that BPACP was the exporter of subject merchandise entered during the POR. Since the Department has yet to reach a formal decision with respect to BPACP's no shipment claim, BPACP, out of an abundance of caution, is submitting this Separate Rate Certification.

The undersigned certify pursuant to 19 C.F.R. §351.303(g), that we have read the attached submission, and based on the information made available to us by BPACP, we have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Should you have any questions or require further information, please do not hesitate to contact the undersigned. Thank you for your consideration of this matter.

Respectfully submitted,

Francis J. Sailer /EFW

Francis J. Sailer
Elaine F. Wang

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2010, a copy of the foregoing document was deposited in the United States mail, first-class, postage prepaid, addressed to the following interested parties:

R. Alan Luberda, Esq.
**Kelley Drye & Warren LLP**
3050 K Street, NW
Washington, DC 20007-5108

Daniel L. Porter, Esq.
**Winston & Strawn LLP**
1700 K Stsreet, NW
Washington, DC 20006-3817

Gregory S. Menegaz, Esq.
**deKieffer & Horgan**
729 Fifteenth Street, NW
Suite 800
Washington, DC 20005

Matthew J. McConkey, Esq.
**Mayer Brown LLP**
1999 K Street NW
Washington, DC 20006-1101

Jeffrey S. Grimson, Esq.
**Mowry & Grimson PLLC**
7201 Wisconsin Avenue, NW
Suite 450
Bethesda, MD 20814

Craig A. Lewis, Esq.
**Hogan Lovells US LLP**
555 Thirteenth Street NW
Washington, DC 20004

Ronald M. Wisla, Esq.
**Kutak Rock LLP**
Suite 1000
1101 Connecticut Ave., NW
Washington, DC 20036-4374

Bruce Lockard

429260_1

## OFFICE OF AD/CVD OPERATIONS

### PEOPLE'S REPUBLIC OF CHINA ("PRC")
# SEPARATE RATE CERTIFICATION
### FOR FIRMS PREVIOUSLY AWARDED SEPARATE RATE STATUS*

\* Firms that do not currently hold a separate rate may *not* use this Certification and *must* instead submit an Application for separate rate status (posted on the Department's website at http://trade.gov/ia/index.asp, "Decisions and Data").

| REQUESTER(S): | Beijing Pacific Activated Carbon Products Co., Ltd. |
|---|---|
| REPRESENTATION: | Francis J. Sailer<br>Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP<br>1201 New York Ave., N.W., Suite 650<br>Washington, D.C. 20005<br>Tel.: (202) 783-6881<br>Fax: (202) 783-0405 |
| CASE: | Certain Activated Carbon from the People's Republic of China |
| CASE NO.: | A- 570-904 |
| PERIOD OF REVIEW: | April 1, 2009 through March 31, 2010 |

**DEADLINE FOR SUBMISSION OF CERTIFICATION: July 27, 2010**

**FILING ADDRESS:**

> U.S. Department of Commerce
> International Trade Administration
> APO/Dockets Unit, Room 1870
> 1401 Constitution Avenue, N.W.
> Washington, DC 20230

**FILING INSTRUCTIONS:**

> See the "General Instructions" section at Appendix I.
> See also http://ia.ita.doc.gov/filing/index.html

## SEPARATE RATE CERTIFICATION

**APPLICANT INFORMATION:**

1.    Please provide the full name and contact information (including address, telephone, fax, and e-mail address) of the firm, previously granted separate status, which is seeking separate rate status for this administrative review.

**Answer:** The full name and contact information of the exporter, previously granted separate status, that is seeking separate rate status for this administrative review are as follows:

> **Name:** **Beijing Pacific Activated Carbon Products Co., Ltd. ("BPACP")**
> **Address:** **Room 5-202, Building 19, Yilin Jiayuan, Lincui Road, Chaoyang District, Beijing 100192, China**
> **Telephone: +86 10 82735550/1**
> **Fax:**     **+86 10 82735559**
> **Email:**    liming@bpacp.com

2.    I certify that during the POR, the firm was owned (select one):
   [X] wholly or partially by a domestic entity/entities located in the PRC
   [  ] 100% by a foreign entity/entities [1] located in (identify country or countries)

**FIRM OFFICIAL AND REPRESENTATIVE CERTIFICATIONS:**

3.    I, (Firm official name and title), currently employed by (Firm), certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

(Firm official signature)

**Answer:** Please see **Exhibit 1**.

4.    I, (Legal counsel or representative name), of (law firm or other entity), counsel or representative to (Firm), certify that: (1) I have read the certifications contained in this submission; and (2) based on the information made available to me by (person), I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

(Legal counsel or representative signature)

**Answer:** Please see **Exhibit 2**.

**GENERAL CERTIFICATIONS:** [2]

---

[1] Wholly market-economy owned firms need not respond to questions marked with an asterisk ("*").

5.    I certify that (Firm) was previously granted separate rate status as part of the final determination/results in the (insert investigation/review and period of investigation/review); published in Federal Register (insert citation) , that the separate rate status is currently applicable, and the separate rate status has not been revoked.

(Firm official, legal counsel or representative signature)

**Answer**: Please see **Exhibit 1**.

6.    I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude the firm is not eligible for a separate rate.

(Firm official, legal counsel or representative signature)

**Answer**: Please see **Exhibit 1**.

**EXPORT CERTIFICATIONS (check any that apply):**

7.    I certify that during the POR, the firm conducted business under the following (please include a list of all trade names) [3]

[X].  only the same trade names as identified in the segment of investigation or review in which the firm was granted a separate rate ("previous Granting Period").

**Answer**: BPACP's trade name is "Beijing Pacific Activated Carbon Products Co., Ltd."

[  ]   the same trade names as identified in the previous Granting Period, as well as new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

[  ]   only new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

If a trade name is not listed on the company's business license/registration documents, please provide an explanation and any evidence as to how the company is permitted to use that trade name.

---

[2] If you cannot certify to each question in this section, please contact the official in charge.

[3]   Trade names are other names under which the firm does business. It does not include product brand names or the names of any other entities in the firm's "group," affiliated or otherwise. Note that if the Department determines that your firm is eligible for separate rate status, the separate rate will only apply to the firm as named in your business license/registration documents and not to any alternative or trade names that are not included in your business license/registration documents.

PUBLIC VERSION

8.    [X] I certify the firm possesses an official government business license/registration documents for each trade name listed in response to question 7, above, valid during the POR. (list each trade name, the corresponding document and its expiration date).[4]

**Answer**:

| Trade Name | Corresponding Document | Expiration Date |
|---|---|---|
| Beijing Pacific Activated Carbon Products Co., Ltd. | Business License (see **Exhibit 3**) | [ ] |

9.    [ ]    I certify the firm exported or sold subject merchandise to the United States during the POR.

**Answer**: Based on BPACP's records, it did not export or sell the subject merchandise to the United States during the POR. However, the CBP data released by the Department may infer that BPACP was the exporter of subject merchandise entered during the POR. Since the Department has yet to reach a formal decision with respect to BPACP's no shipment claim, BPACP, out of an abundance of caution, is submitting this Separate Rate Certification.

**CERTIFICATIONS OF ABSENCE OF *DE JURE* CONTROL (check any that apply):**

10.    [X].  * I certify that during the POR, as with the previous Granting Period, there were no government laws or regulations, at either national and sub-national (*e.g.*, provincial, local) levels of government, that controlled the firm's export activities.

11.    [X]. I certify that during the POR, the ownership under which the firm registered itself with the official government business license issuing authority remains the same as for the previous Granting Period.[5]

12.    [X]. * I certify that during the POR, the firm had valid PRC Export Certificate(s) of Approval.[6]

13.    [X]. * I certify that during the POR, as with the previous Granting Period, in order to conduct export activities, the firm was not required by any national, provincial, or local government law or regulation to possess additional certificates or other documents related to the legal status and/or operation of its business beyond those discussed above.

14.    [X].* I certify that during the POR, the PRC government laws and legislative enactments applicable to the firm seeking a separate rate remained the same as for the previous Granting Period.

**CERTIFICATIONS OF ABSENCE OF *DE FACTO* CONTROL (check any that apply):**

---

[4] It is the Department's understanding that a valid business license/registration documents with clearly defined periods of validity issued by the appropriate licensing authority is required for all business activity. A firm submitting a business license without an expiration date must provide an explanation in order for the Department to consider its application.
[5] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.
[6] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

15.    [X]. * I certify that during the POR, the largest 10 individual/entity shareholders of the firm and all of their shareholders had no significant relationship[7] with any of the following:[8].

- PRC state asset management company (government-owned and/or private chartered);
- The PRC national government and/or its ministries/agencies;
- PRC provincial governments;
- PRC local/municipal/village government(s)/agency(ies).

16.    [X]* I certify that during the POR, the firm's export prices were not set by, subject to the approval of, or in any way controlled by a government entity at any level (*e.g.*, national, provincial, local).[9]

17.    [X] I certify that during the POR, the firm had independent authority to negotiate and sign export contracts and other agreements (*i.e.* the firm conducted independent price negotiation).[10]

18.    [X] I certify that during the POR, the firm had autonomy from all levels of the government (*e.g.*, national, provincial, local) and from any government entities in making decisions regarding the selection of management.

19.    [X]  I certify that during the POR, the firm did not have to submit for approval any of its candidates for managerial positions within the firm to any government entity at any level (*e.g.*, national, provincial, local).

20.    [X]. * I certify that during the POR, the firm retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or financing of losses.

**SALES & AFFILIATION:**

21.    I certify the firm made at least one export or sale to the United States during the POR to (select only one):

[  ] affiliated[11] parties only.
[  ] unaffiliated parties only.
[  ] both affiliated and unaffiliated parties.

**Answer:** Based on BPACP's records, it did not export or sell the subject merchandise to the United States during the POR. However, the CBP data released by the Department may infer that BPACP was the exporter of subject merchandise entered during the POR. Since the Department has yet to reach a

---

[7] A significant relationship would include ownership, control, affiliation, significant transactions, *etc.*

[8] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

[9] This includes, but is not limited to, the presence of government officials at any meeting where export and pricing decisions are discussed.

[10] The authority to conduct independent price negotiation refers to the ability of an NME firm to set its own export prices independently of the government at any level (national, provincial, local) and without the approval of any government entity.

[11] *See* Section 771(33) of the Tariff Act of 1930, as amended, for a definition of affiliation. For the purposes of control under the definition of affiliation, the Department will consider a person to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

formal decision with respect to BPACP's no shipment claim, BPACP, out of an abundance of caution, is submitting this Separate Rate Certification.

**ADDITIONAL DOCUMENTATION:**

22.      Please provide copies of the following documentation: ·
         The firm's business license(s)/ registration document(s) valid during the POR; · * The firm's
         PRC Export Certificate(s) of Approval valid during the POR.

**Answer**: Please see a copy of BPACP's business license valid during the POR and its English translation attached as **Exhibit 3**. Please see a copy of BPACP's Certificate of Approval for Establishment of Enterprises with Foreign Investment in the People's Republic of China valid during the POR and its English Translation attached as **Exhibit 4**.

428869_1

# EXHIBIT 1



# 北京太平洋活性炭制品有限公司

## BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD.

## <u>CERTIFICATIONS</u>

I, Ni Liming, general manager, currently employed by **Beijing Pacific Activated Carbon Products Co., Ltd.**, certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

I certify that **Beijing Pacific Activated Carbon Products Co., Ltd.** ("BPACP") was previously granted separate rate status as part of the final determination/results in the first administrative review (POR; 10/11/06- 03/31/08) published in the Federal Register *as First Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 57995-57999 (November 10, 2009), as amended as *Certain Activated Carbon from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 66952-66954 (December 17, 2009), that the separate rate status is currently applicable, and the separate rate status has not been revoked.

I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude that **Beijing Pacific Activated Carbon Products Co., Ltd.** is not eligible for a separate rate.

Ni Liming

# EXHIBIT 2

## ATTORNEY CERTIFICATION

I, Elaine F. Wang, of Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, counsel to Beijing Pacific Activated Carbon Products Co., Ltd. ("BPACP"), certify that (1) I have read the certifications contained in this submission; and 2) based on the information made available to me by BPACP, I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Elaine F. Wang, Esq.

7/26/10
Date

429251_1

**JA101268**

# EXHIBIT 3

PUBLIC VERSION

# 企业法人营业执照

（副　本）（2-1）

注册号：

编号：NO

| | |
|---|---|
| 名　　称 | 北京太平洋悟性炭制品有限公司 |
| 住　　所 | 北京市大兴区亦庄乡芦城路甲1号北京百利威科技发展中心116室 |
| 法定代表人 | |
| 注册资本 | |
| 实收资本 | |
| 公司类型 | |
| 经营范围 | |

服务（发起人）

营业期限

成立日期

**须　知**

1. 企业法人营业执照是企业法人取得合法经营资格凭证。
2. 企业法人营业执照分为正本和副本，正本和副本具有同等法律效力。
3. 企业法人营业执照正本应当置于住所的醒目位置。
4. 企业法人营业执照不得涂改、出租、出借、转让。
5. 登记事项发生变化，应当向公司登记机关申请变更登记，换领企业法人营业执照。
6. 每年三月一日至六月三十日，应当参加年度检验。
7. 企业法人营业执照被吊销后，不得开展经营活动与年检。
8. 未经核准登记，应当受理依法办理注销人登记名应当缴回本营业执照。正本和副本。
9. 企业法人营业执照遗失或者毁坏的，应当登公司登记机关申请补领。

年度检验情况

验　发（换发）

登记机关

（工商行政管理局印章）

JA101270

**PUBLIC VERSION**

No. [

## Enterprise Legal Person Business License

**(Duplicate)  (2-1)**

Registration No: [                    ]

**Name:** BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD.
**Address:** ROOM 116, BEIJING BAILIWEI SEIENCE AND
TECHNOLOGY DEVELOPMENT CENTER, JIA NO.1, LUHUA
ROAD, LUCHENGXIANG DAXING DISTRICT, BEIJING

Legal representative: [                    ]
Registered Capital: [                    ]
Paid-in Capital:  [                    ]
Type of Enterprise: [                    ]

Business  Scope:  [                    ]

Shareholders (investors):
[                    ]

Business Term: From [        ] to [        ]

Date of Establishment: [                    ]

### Statement

1.  The business license is the certificate to qualify an enterprise legal person and the certificate for legal operation of business.
2.  The business license has original and duplicate which bear the same legal effect.
3.  The original should be put in an eyeball catching place in the legal address of the enterprise.
4.  No forgery, altering, subletting, lending, transferring of the business license is allowed.
5.  If the registered items change, the change of registration needs to be done with the registration authority to have new business license.
6.  The registration authority conducts annual inspection to enterprise legal person from March 1 to June 30.
7.  When the enterprise legal person business license is revoked, no business activities other than the liquidation are allowed.
8.  The original and duplicate business license should be turned in when the registration of cancellation is done.
9.  In case of any loss or damage to the business license, invalidation should be claimed on newspaper designated by the registration authority and application for re-issuance of the business license should be done with the registration authority.

**Legal Person Annual Check**

Registration Authority: BEIJING ADMINSTRATION FOR INDUSTRY
AND COMMERCE (seal)

[        ]

JA101271

429262_1

# EXHIBIT 4



PUBLIC VERSION

**PUBLIC VERSION**

BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD.
Certificate of Approval (translation)

# CERTIFICATE OF APPROVAL

## FOR ESTABLISHMENT OF ENTERPRISES WITH FOREIGN INVESTMENT IN THE PEOPLE'S REPUBLIC OF CHINA

Approval Number: [                    ]

Code for Import and Export Enterprise: [                    ]

Date Of Approval: [          ]

Date Of Issuance: [          ]

Number of Issuance: [          ]

---

Name (Chinese): 北京太平洋活性碳制品有限公司

Name (English):

Address: ROOM 116, BEIJING BAILIWEI SCIENCE AND TECHNOLOGY
DEVELOPMENT CENTER, JIA NO.1, LUHUA ROAD,
LUCHENGXIANG, DAXING DISTRICT, BEIJING

Type of Business: [                    ]

Duration of Operation: [          ]

Total Investment: [          ]

Registered Capital: [          ]

Business Scope: [                    ]

| Name of Investors (in Chinese and English) | Place of Registration | Capital Contribution |
|---|---|---|
| [          ] | [          ] | [          ] |
| [          ] | | |

JA101274



FOR OFFICIAL FILE

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-904
ARP: 4/1/09-3/31/10
**Proprietary Document**
**PUBLIC VERSION**
IA/NME/IX: KM

September 29, 2010

*1928*

| | |
|---|---|
| MEMORANDUM TO: | James Doyle<br>Director<br>AD/CVD Operations, Office 9 |
| THROUGH: | Catherine Bertrand<br>Program Manager<br>AD/CVD Operations, Office 9 |
| FROM: | Katie Marksberry<br>International Trade Specialist<br>AD/CVD Operations, Office 9 |
| RE: | Antidumping Duty Administrative Review of Certain Activated<br>Carbon from the People's Republic of China:  Selection of<br>Additional Mandatory Respondent |

Background

On May 28, 2010, the Department of Commerce ("Department") initiated a review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC").[1]  On April 30, 2010, Albemarle Corporation ("Albemarle") requested a review of Calgon Carbon (Tianjin) ("CCT").  On May 27, 2010, Calgon Carbon Corporation and Norit Americas Inc. ("Petitioners") submitted comments disputing Albemarle's status as a domestic interested party.  On June 2, 2010, the Department issued a questionnaire to Albemarle requesting further information regarding its status as a wholesaler of the domestic like product. Albemarle submitted its response to the Department's questionnaire on June 18, 2010. Petitioners submitted additional comments regarding Albemarle's response on June 28, 2010.

On July 21, 2010, the Department selected one company as a mandatory respondent in the above referenced review based on section 777(c)(2)(B) of the Tariff Act of 1930, as amended ("Act"), and determined that it has the resources to fully investigate the two largest companies (based upon United States import entry volume) for which a review has been requested.[2]  In the

---

[1] See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 75 FR 29976 (May 28, 2010) ("Initiation Notice").
[2] See Memorandum to James C. Doyle, Director, Office IX, from Jamie Blair-Walker, International Trade Compliance Analyst, Office 9, and Kabir Archuletta, International Trade Compliance Analyst, Office 9; regarding

the activated carbon are irrelevant. Albemarle has stated that it is located in warehouse offices that are not intended to attract sales from the general public and are not set up to handle walk-in customers. Therefore, Albemarle reasonably fits the NAICS definition and the Census Bureau clarification memorandum which cite the type of facility operated by the company as a central consideration in determining whether a company is a wholesaler. In addition, we find that the documentation submitted by Albemarle indicates that it made purchases and sales of domestically-produced, steam-activated carbon. Therefore, we can conclude that Albemarle is a wholesaler of the domestic-like product and its request for review of CCT is in accordance with the statute and our regulations.

Furthermore, in response to the argument that wholesaling represents an insufficient proportion of Albemarle's commercial activity, Albemarle cited to the Department's decision in Furniture to consider Kimball, an importer that also manufactured sample pieces of furniture, as a producer of subject merchandise.[10] Consistent with the Department's decision in Furniture, we recommend finding that Albemarle is a wholesaler of a domestic like product even though it also imports subject merchandise. As such, Albemarle qualifies as a wholesaler and thus, a domestic interested party. Finally, with regard to the argument that Albemarle does not have a "sufficient stake" in the industry to be considered properly an interested party, we note that neither the statute, the regulations, nor our past practice require us to determine whether a domestic interested party has a "sufficient stake" in the industry to request an administrative review.

As discussed above, in the Department's Respondent Selection Memo, we stated that we were selecting the two producers/exporters with the largest export volume during the period of review ("POR"). By selecting the largest known producers or exporters, the Department is able to individually examine the companies involved in producing and exporting the largest possible volume of merchandise under consideration, pursuant to 19 CFR 351.204.

Therefore, the Department is now selecting as a mandatory respondent, in addition to Jacobi who was previously selected, the largest producer/exporter for which a review has been requested.[11] An analysis of the U.S. Customs and Border Protection data reveals that the largest producer/exporter is CCT.[12] The Department is hereby selecting CCT as a mandatory respondent. The Department will issue CCT a full copy of the questionnaire for this review and set deadlines for it to respond to each section of the questionnaire.

---

[10] Memorandum from Wendy Frankel to Edward C. Yang: Whether Kimball International, Inc., Kimball Furniture Group, Inc., and Kimball Hospitality Inc. (collectively, "Kimball") is a U.S. Producer of Wooden Bedroom Furniture: Administrative Review of Wooden Bedroom Furniture from the People's Republic of China ("PRC"), A-570-890; November 4, 2008.

[11] See Respondent Selection Memo.

[12] See id at Attachment I.

5

1

UNITED STATES COURT
OF INTERNATIONAL TRADE

2

3  ------------------------------X
   :
4  ALBEMARLE CORPORATION,        :   **CONFIDENTIAL HEARING**
   et al.,                       :
5                                :   11-00451
            Plaintiffs,          :
6                                :   One Federal Plaza
         v.                      :   New York, New York
7                                :
   UNITED STATES OF AMERICA,     :   December 13, 2012
8                                :
9  ------------------------------X

10          TRANSCRIPT OF ORAL ARGUMENT
        BEFORE THE HONORABLE TIMOTHY C. STANCEU

11

12  For Plaintiff              JEFFREY S. GRIMSON, ESQ.
13  Albemarle Corp. and        Mowry & Grimson, PLLC
    and Plaintiff-intervenor   5335 Wisconsin Avenue NW
14  Ningxia Huahui:            Suite 810
                               Washington, D.C.  20015

15
16  For Consolidated           MARK E. PARDO, ESQ.
    Plaintiffs Beijing         Grunfeld Desiderio Lebowitz
    Pacific and Cherishmet:    Silverman & Klestadt, LLP
17                             1201 New York Avenue NE
                               Suite 650
18                             Washington, D.C.  20005

19  For Consolidated           GREGORY STEPHEN MENEGAZ, ESQ.
    Plaintiff Shanxi DMD:      DeKieffer & Horgan
20                             729 15th Street NW
                               Suite 800
21                             Washington, D.C.  20005

22  For the Government:        ANTONIA R. SOARES, ESQ.
23                             U.S. Department of Justice
                               707 13th Street NW, Suite A
                               Washington, D.C.  20005

24  CONFIDENTIAL               (Appearances continue on next page.)
25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
 1                     .                                                2

 2

 3    APPEARANCES (Continued):

 4    For Defendant-              CRAIG A. LEWIS, ESQ.
      Intervenor Calgon          Hogan Lovells US LPP
 5    Carbon (Tianjin):          Columbia Square
                                 595 13th Street NW
 6                               Washington, D.C.  20004

 7    For Defendant-             JOHN M. HERMANN, II, ESQ.
      Intervenor Calgon          KELLEY DRYE & WARREN, LLP
 8    Carbon Corporation         Washington Harbour
      and Norit Americas:        3050 K Street NW
 9                               Suite 400
                                 Washington, D.C.  20007

10

11
      Court Transcriber:         RUTH ANN HAGER, C.E.T.**D-641
12                               TypeWrite Word Processing Service
                                 211 N. Milton Road
13                               Saratoga Springs, New York 12866

14

15

16

17

18

19

20

21

22

23

24

25
```



**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230          A-570-904
ARP: 4/1/09-3/31/10
**Proprietary Document**
[A/NME/IX]: JBW/KJA
**Public Version**

RECEIVED
JUL 2 1 2010
BY _____

FOR OFFICIAL FILE

July 21, 2010

MEMORANDUM TO:     James Doyle
                   Director, Office 9
                   Import Administration

FROM:              Jamie Blair-Walker
                   International Trade Compliance Analyst, Office 9

                   Kabir Archuletta
                   International Trade Compliance Analyst, Office 9

RE:                Antidumping Duty Administrative Review of Certain Activated
                   Carbon from the People's Republic of China: Selection of
                   Respondents for Individual Review.

---

## Summary

On May 28, 2010, the Department of Commerce ("Department") initiated an administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC"). See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 75 FR 29976 (May 28, 2010) ("Initiation Notice"). The Department initiated an administrative review for 186 exporters of subject merchandise. See Initiation Notice, 75 FR at 29978-29980. Due to the significant number of companies requested to be reviewed, the Department is unable to calculate an individual weighted-average dumping margins for all exporters and producers involved in the review. Based on the Department's current resource constraints, we recommend limiting the number of respondents selected for individual examination to the two largest exporters and/or producers by U.S. import entry volume for which a review has been requested. The period of review ("POR") is April 1, 2009, to March 31, 2010.

## Background

In the Initiation Notice, the Department notified all interested parties that should it limit the number of respondents for individual examination, it intended to select respondents based on U.S. Customs and Border Protection ("CBP") data for entries of the subject merchandise during the POR.

We provided the CBP data under administrative protective order ("APO") to all interested parties that obtained access to information covered by the APO. We also invited comments regarding the CBP data and respondent selection. On June 7, 2010, Calgon Carbon Corporation and Norit Americas Inc. ("Petitioners"), Albemarle Corporation ("Albemarle"), and Jacobi Carbons AB and its affiliates, Tianjin Jacobi International Trading Co. Ltd. and Jacobi Carbons, Inc.



(collectively, "Jacobi"), submitted comments on the selection of respondents. On June 14, 2010, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC") and its affiliated U.S. reseller Cherishmet Inc. ("Cherishmet") submitted rebuttal comments and supplemental clarification comments.[1]

RESPONDENT SELECTION ISSUES

**Issue 1: Limiting Examination to a Reasonable Number of Companies**

A.     Applicable Statutory Provision

Section 777A(c)(1) of the Tariff Act of 1930, as amended ("Act"), directs the Department to calculate individual antidumping margins for each known exporter and producer of the subject merchandise. However, section 777A(c)(2) of the Act gives the Department discretion, when faced with a large number of exporters/producers, to limit its examination to a reasonable number of such companies if it is not practicable to examine all companies. When the Department determines it is not practicable to examine all companies individually, section 777A(c)(2) of the Act permits the Department to determine margins for a reasonable number of exporters or producers by limiting its examination through either a sampling of exporters, producers or types of products, or by selecting the exporters and producers accounting for the largest volume of the subject merchandise. The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") interprets this provision to mean that the authority to select respondents, whether by using a "statistically valid" sample or by examining respondents accounting for the largest volume of subject merchandise, rests exclusively with the Department. See SAA, H.R. Doc. No. 103-316, vol. 1 at 872 (1994).

Analysis

In determining whether to limit the number of respondents to examine, the Department is directed to determine whether there are a large number of exporters or producers involved in the proceeding. In this case, there are requests for review of 186 exporters or producers of subject merchandise. The Department determines that 186 is a large number such that it would be impracticable to individually calculate dumping margins for all requested companies and complete the administrative review within the time limits prescribed by the statute. Additionally, based on the resources that would be necessary to individually examine all sixteen of the producers and/or exporters eligible for individual examination in this investigation, we find that this number of companies is too large to examine each company individually. Investigating all exporters and/or producers would require significant resources because it would require the Department to analyze each company's corporate structure, accounting and selling practices, and production information.

---

[1] In addition, the Department has received a number of comments with respect to Albemarle's request for review of Calgon Carbon (Tianjin). Albemarle's standing as a "domestic interested party" has been questioned by Petitioners, therefore, this issue is pending.

2

In determining whether the number of requested companies is too large to examine, the Department also considers its resources, including its current and anticipated workload, and deadlines coinciding with the segment of the proceeding in question. After consideration of our resources, we conclude that it would not be practicable in this review to examine all producers/exporters of the subject merchandise for which we have received a request for review. Office 9, AD/CVD Operations, the office to which this administrative review is assigned, does not have the resources to examine all such exporters/producers. This office is conducting numerous concurrent antidumping proceedings, which place a constraint on the number of analysts that can be assigned to this case. Currently, Office 9 is conducting complex investigations and administrative reviews, such as the prior segment of this proceeding, drill pipe from the PRC, certain frozen warmwater shrimp from the PRC, honey from the PRC, certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam"), and certain frozen warmwater shrimp from Vietnam. Moreover, Office 9 is also concurrently conducting a multitude of changed circumstance reviews and scope ruling requests. Not only do these other cases present a significant workload, but the deadlines for a number of the cases coincide and/or overlap with deadlines in this antidumping proceeding. In addition, because of the significant workload throughout Import Administration, we cannot anticipate receiving any additional resources to devote to this antidumping proceeding.

Therefore, after careful consideration of our resources and the number of companies for which a review was requested, we believe that it would not be practicable in this administrative review to examine all producers/exporters of subject merchandise and still complete the review within the statutory timeframe. The Department determines that we will limit the number of exporters/producers of activated carbon from the PRC that are individually examined in the current review.

<u>Recommendation</u>

Based on the factors explained above, we recommend limiting the number of respondents, based on the largest volume of imports, for individual examination in the current review, as we do not have the resources to fully examine all of the companies for which we have received a request for review.

_____✓_____          _____
Agree                                Disagree

**Issue 2: Selection and Number of Respondents**

A.    Applicable Statutory Provision

Where it is not practicable to examine all known exporters/producers of subject merchandise, section 777A(c)(2)(A) and (B) of the Act permits the Department to examine either (a) a sample of exporters, producers, or types of products that is statistically valid based on the information available at the time of selection, or (b) exporters and producers accounting for the largest volume of the subject merchandise that can be reasonably examined.

3

B.    Arguments by Interested Parties

In comments to our release of CBP data, Petitioners stated that the Department should select the greatest number of the largest exporters that the Department could reasonably examine.[2] Petitioners suggested the Department select at a minimum, three exporters as mandatory respondents, as was done in the investigation and the first administrative review.  Additionally, Petitioners requested the Department select producers/exporters that have not previously been subject to individual examination and account for significant volumes of subject merchandise entering the United States.  Petitioners state that the companies that have not been subject to a review have obtained separate rates that understate the true margins at which they are selling subject merchandise in the United States.  Specifically, Petitioners urge the Department to select [                                                    ], [                                          ], or [                            ] as mandatory respondents, as these companies are the [                                                                                    ] largest exporters of subject merchandise to the United States during the third POR according to CBP entry data.  Should a mandatory respondent selected by the Department not participate in the review, Petitioners strongly urge the Department to select the next largest exporter as a mandatory respondent.

Jacobi, an exporter of certain activated carbon and an interested party in this proceeding, argues, among other things, that the Department should select three mandatory respondents for this review for three reasons:  1) to conform to established practice in this case; 2) to ensure an accurate rate is calculated for all respondents, and 3) to allow the Department to capture more than [   ] percent of the total volume of shipments of activated carbon from the PRC during the POR.[3]

Jacobi further argues that a return to the selection of three mandatory respondents is necessary. Jacobi states that in the second review, the Department selected only two mandatory respondents, as no review was requested for the affiliate of the petitioner who was also an exporter of the subject merchandise.  In the third review, though, the petitioner's subsidiary is a potential respondent, and review of CBP data shows that this company [                                                                                                        ].  As the petitioner [                                                      ], Jacobi requests that the Department once again choose the three largest companies by volume as mandatory respondents.  Furthermore, Jacobi acknowledges that selection of the three largest companies by volume as mandatory respondents would account for over [   ] percent of the total volume and would avoid undue influence over the separate rate.

Albemarle, a domestic interested party, provided additional comments on the CBP data regarding the 10-digit codes unique to exporters.  Albemarle urges the Department to continue to sort and rank the transactions from the CBP extracts according to the 10-digit codes unique to exporters.[4] Albemarle states that this would total the imports according to the entity acting as exporter in the PRC.  Using this practice, Albemarle demonstrates that [

---

[2]  See Letter from Petitioners to the Department (June 7, 2010).
[3]  See Letter from Jacobi to the Department (June 7, 2010).
[4]  See Letter from Albemarle to the Department (June 7, 2010).

4

]. Thus, Albemarle reiterates its request that the Department select CCT as a mandatory respondent. Albemarle further states that it has no position on the number of exporters selected as respondents.

In rebuttal, GHC concurs with Jacobi's position.[5] Noting that CCT, being an affiliate of one of the petitioners, could affect the proceeding to create a higher average rate for separate rate companies in the review, GHC requested that the Department select more than the typical two or three mandatory respondents for the review. GHC also agreed with the petitioners' comments urging the Department to select the largest amount of exporters for review, but disagreed with the insistence that the exporters be companies that were not selected in previous reviews.

Analysis

As provided in section 777A(c)(2) of the Act, in cases in which the Department determines that it is not practicable to individually examine all companies for which a review is requested, the Department may choose respondents by either a sampling of exporters, producers or types of products, or by selecting the exporters or producers accounting for the largest volume of subject merchandise. In selecting respondents in this antidumping proceeding, the Department finds that, given its limited resources, it is most appropriate to choose the largest producers/exporters, pursuant to section 777A(c)(2)(B) of the Act.

After an analysis of the data received, consideration of the comments submitted by Petitioners and exporters/producers of activated carbon, and consideration of our resource constraints, the Department determines that examining the two largest companies by volume of entries into the United States during the POR is appropriate in this review. See Attachment 1. With respect to Jacobi and Petitioners' argument that the Department should select three mandatory respondents in order to capture more than [ ] percent of the volume of shipments from the PRC during the POR and to limit the influence of Petitioners on this proceeding, the Department notes that the selection of respondents accounting for the largest volume of subject merchandise that can reasonably be examined is made irrespective of a specific percentage of total volume of shipments or ultimate ownership and affiliations. Further, in light of its limited resources, as discussed above, and statutory discretion, the Department has determined to limit the number of respondents to two for this review.

Currently, the request to review CCT, [                                ], is being contested by Petitioners. The Department has requested additional information from Albemarle regarding its status as a domestic interested party and requires more time to review Albemarle's response and the evidence on the record to determine whether the request to review CCT is proper. The CBP data indicate that Jacobi is the [                    ] exporter. Because Jacobi is either the [                        ] exporter under review, dependent on whether CCT is under review, we recommend selecting Jacobi as a mandatory respondent at this time. We recommend selecting a second mandatory respondent once we are able to determine whether the request to review CCT is valid.

---

[5] See Letter from GHC to the Department (June 14, 2010).

5

By selecting the top two exporters/producers of the subject merchandise according to submitted sales and entry data for the POR, the Department maintains past established practices[6] and, in light of its resource constraints, accounts for the largest number of exporters of subject merchandise from the PRC during the POR that can reasonably be examined. Because unresolved questions exist regarding the companies under review, the Department finds that selecting Jacobi at this time, and the remaining top exporter/producer at a later date, is the most expedient avenue towards meeting the Department's statutory deadlines. This selection will represent the exporter/producer accounting for the largest or second largest volume of subject merchandise that can be reasonably examined. See section 777(A)(c)(2) of the Act.

<u>Recommendation</u>

Considering the factors discussed above, we recommend selecting one of the two largest exporters/producers for individual examination for this third administrative review, and a second pending the outcome of unresolved issues regarding Albemarle's review request.[7] Specifically, we recommend selecting Jacobi at this time because it is either the largest or second largest exporter by volume of total U.S. entries during the POR of certain activated carbon from the PRC under review. See Attachment 1.

_____✓_____          _____
Agree                          Disagree

**Issue 3:  Whether to Review Voluntary Respondents**

On June 8, 2010, the Department received a voluntary respondent request from GHC. Section 782(a) of the Act directs the Department to calculate individual rates for exporters/producers that provide information voluntarily, except where the number of such respondents is so large that the calculation of individual dumping margins for all such respondents would be unduly burdensome and would prevent the timely completion of the review. However, for the same reasons noted above, it would not be practicable for the Department to investigate more than the two above-named mandatory respondents in this review. That is, calculation of individual dumping margins for any additional respondents would be unduly burdensome and would prevent the timely completion of this review. Therefore, as long as the selected respondents cooperate in this review, the Department will not be able to calculate individual rates for voluntary respondents.

---

[6] See <u>Steel Wire Garment Hangers From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value</u>, 73 FR 53188 (September 15, 2008); <u>see also</u> <u>Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Determination of Sales at Less Than Fair Value</u>, 74 FR 36656 (July 24, 2009).
[7] If, after selection of mandatory respondents, the Department finds that any submitted Q&V data are incomplete, inaccurate or deficient to the extent the Department considers them to be false or non-responsive, the Department, pursuant to section 776 of the Act, may rely upon the facts available, including using information that is adverse to the company's interest, in conducting its analysis.

6

**Recommendation:**

The Department recommends not calculating individual dumping margins for any non-selected companies that may place full responses on the record. If, however, a mandatory respondent fails to cooperate, and companies that wish to be treated as voluntary respondents have submitted complete and timely responses, the Department may select a voluntary respondent under the following conditions:

1.  Pursuant to section 782(a) of the Act, the voluntary respondent must have met filing deadlines for information requested (and otherwise comply with all other regulatory deadlines);

2.  If there is more than one potential voluntary respondent, the Department will select the voluntary respondent based on the order in which written requests to be accepted as voluntary respondents are submitted. See Antidumping Duties; Countervailing Duties: Final Rule, 62 FR 27296, 27310 (May 19, 1997).

3.  Once selected, a voluntary respondent that subsequently fails to cooperate in the review will be treated in the same manner as a mandatory respondent who fails to cooperate. See section 776 of the Act and 19 CFR 351.204(d)(2).

Finally, pursuant to section 19 CFR 351.204(d)(3), the Department will exclude any individually calculated rates for voluntary respondents from the calculation of the all-others rate under section 735(c)(5) of the Act.

_____✓_____                   _____
Agree                             Disagree

~~James Doyle~~
James Doyle
Director, Office 9
Import Administration

__7/21/10__
Date

7

Attachment 1

| Company Name (Listed in Alphabetical Order) | | Entry Volume in Kilograms | |
|---|---|---|---|
| Calgon Carbon (Tianjin) | [ | | ] |
| Datong Juqiang Activated Carbon Co., Ltd. | [ | | ] |
| Datong Locomotive Coal & Chemicals Co., Ltd. | [ | | ] |
| Datong Municipal Yunguang Activated Carbon Co., Ltd. | [ | | ] |
| Datong Yunguang Chemicals Plant | [ | | ] |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. | [ | | ] |
| Hebei Foreign Trade and Advertising Corporation | [ | | ] |
| Ningxia Huahui Activated Carbon Co., Ltd. | [ | | ] |
| Jacobi Carbons AB | [ | | ] |
| Shanxi DMD Corporation | [ | | ] |
| Shanxi Industry Technology Trading Co., Ltd. | [ | | ] |
| Shanxi Sincere Industrial Co., Ltd. | [ | | ] |
| Shanxi Xuanzhong Chemical Industry Co., Ltd. | [ | | ] |
| Tangshan Solid Carbon Co., Ltd. | [ | | ] |
| Tianjin Maijin Industries Co., Ltd. | [ | | ] |
| Xi'an Shuntong International Trade & Industrials Co., Ltd. | [ | | ] |
| **Total of All Companies/Groups** | [ | | ] |

8



**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-904
ARP: 4/1/09-3/31/10
Proprietary Document
PUBLIC VERSION
IA/NME/IX: KM

September 29, 2010

MEMORANDUM TO:    James Doyle
                 Director
                 AD/CVD Operations, Office 9

THROUGH:         Catherine Bertrand
                 Program Manager
                 AD/CVD Operations, Office 9

FROM:            Katie Marksberry
                 International Trade Specialist
                 AD/CVD Operations, Office 9

RE:              Antidumping Duty Administrative Review of Certain Activated
                 Carbon from the People's Republic of China: Selection of
                 Additional Mandatory Respondent

_RECEIVED SEP 30 2010_

_Background_

On May 28, 2010, the Department of Commerce ("Department") initiated a review of the
antidumping duty order on certain activated carbon from the People's Republic of China
("PRC").[1]  On April 30, 2010, Albemarle Corporation ("Albemarle") requested a review of
Calgon Carbon (Tianjin) ("CCT").  On May 27, 2010, Calgon Carbon Corporation and Norit
Americas Inc. ("Petitioners") submitted comments disputing Albemarle's status as a domestic
interested party.  On June 2, 2010, the Department issued a questionnaire to Albemarle
requesting further information regarding its status as a wholesaler of the domestic like product.
Albemarle submitted its response to the Department's questionnaire on June 18, 2010.
Petitioners submitted additional comments regarding Albemarle's response on June 28, 2010.

On July 21, 2010, the Department selected one company as a mandatory respondent in the above
referenced review based on section 777(c)(2)(B) of the Tariff Act of 1930, as amended ("Act"),
and determined that it has the resources to fully investigate the two largest companies (based
upon United States import entry volume) for which a review has been requested.[2]  In the

---

[1] See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 75 FR 29976 (May 28, 2010)
("Initiation Notice").
[2] See Memorandum to James C. Doyle, Director, Office IX, from Jamie Blair-Walker, International Trade
Compliance Analyst, Office 9, and Kabir Archuletta, International Trade Compliance Analyst, Office 9; regarding

Respondent Selection Memo, the Department stated that Petitioners and CCT were challenging Albemarle's status as a domestic interested party, and consequently, Albemarle's request for a review of CCT. Because the Department was considering the parties' submissions on that issue, the Department selected Jacobi Carbons AB as a mandatory respondent and stated that it would select a second mandatory respondent pending the Department's decision on whether Albemarle could be considered a domestic interested party and, therefore, request a review of CCT.

On August 11, 2010, the Department sent an additional questionnaire to Albemarle requesting further information regarding its status as a wholesaler of the domestic like product. Albemarle submitted its response on August 18, 2010. On August 26, 2010, CCT submitted comments in response to Albemarle's additional questionnaire response and on August 27, 2010, Norit Americas ("Norit") submitted comments as well.

**Issue 1: Methodology for Selecting an Additional Mandatory Respondent**

Applicable Statutory Provision:

Section 351.213 of the Department's regulations governs the procedures for requesting administrative reviews. Pursuant to 19 CFR 351.213(b)(1), each year during the anniversary month of the publication of an antidumping duty order, "a domestic interested party" may request an administrative review of specified individual exporters or producers covered by an order. Section 351.102(b)(17) of the Department's regulations defines a domestic interested party as "an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 771 (9) of the Act." Section 771(9)(C) of the Act defines an interested party as a "manufacturer, producer, or wholesaler in the United States of a domestic like product." Pursuant to 19 CFR 351.213(b)(3), an importer of subject merchandise may request an administrative review of only an exporter or producer of the subject merchandise imported by that importer.

As explained in the Respondent Selection Memo, section 777A(c)(1) of the Act, directs the Department to calculate individual dumping margins for each known exporter and producer of the subject merchandise.[3] However, when it is not practicable to examine all known producers/exporters of subject merchandise because of the large number of exporters/producers involved, section 777A(c)(2) of the Act permits the Department to determine margins for a reasonable number of exporters or producers by limiting the number of companies to be individually examined by either sampling or selecting the largest respondents by volume. The Department announced in the Respondent Selection Memo that, because of the large number of exporters/producers involved, it would select two individual exporters or producers to individually review.

Interested Parties' Comments:

*Comments from Norit:* Norit Americas Inc. ("Norit") argues that Albemarle has defined itself as an importer and seller in all previous submissions and is only now characterizing itself as a

---

Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China, dated July 21, 2010 ("Respondent Selection Memo").
[3] See also 19 CFR 351.204(c).

2

wholesaler in order to be able to request a review of CCT. Additionally, Norit argues that Albemarle does not have a significant interest in the domestic market. Norit cites <u>Certain Portable Electric Typewriters from Singapore</u>[4] and argues that the Department should use six criteria in evaluating Albemarle's stake in the industry. These criteria include: "(1) extent and source of capital investment; (2) technical expertise; (3) U.S. value-added; (4) employment levels; (5) quantity and types of domestically sourced parts; and (6) other costs and activities leading to production of the like product." Norit also adds that in an effort to follow the President's new National Export Initiative, as announced by the Department on August 26, 2010, the Department should use random sampling for respondent selection.

*Comments from Calgon Carbon (Tianjin) and Calgon Carbon Corporation (collectively, "Calgon"):* Calgon objects to Albemarle's request for an administrative review on the grounds that Albemarle is not an interested party as defined by the antidumping statute. Calgon states that 19 CFR 351.102(b)(17) defines a domestic interested party as "an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 771 (9) of the Act." Section 771(9)(C) of the Act defines a domestic interested party as "a manufacturer, producer, or wholesaler in the United States of a domestic like product." Calgon argues, citing <u>Black's Law Dictionary</u>, that a wholesaler is one who sells to a middleman or a retailer, <u>i.e.,</u> distributor, not to the end consumer. Because Albemarle sells subject merchandise to an end-user, Calgon argues that it does not qualify as a wholesaler, and therefore is not a domestic interested party that may request an administrative review of any producer or exporter of subject merchandise. Additionally, Calgon questions whether the carbon purchased by Albemarle is steam-activated carbon and whether the thermal activation process claimed by Albemarle results in virgin, steam-activated carbon that falls within the scope of the Order. Calgon also argues that Albemarle does not have a sufficient stake in the industry.[5] Calgon states that Albemarle is [        ] an importer and is [        ] purchaser of domestic product. Furthermore, Calgon states that [   ]% of Albemarle's total POR purchases [        ]. Finally, CCT points out that the 2007 US Census Bureau definition states that a wholesaler can be defined as one who resells "raw and intermediate materials and supplies used in production." However, the activated carbon sold by Albemarle, as Albemarle stated in its questionnaire responses, is a final product used by electric companies, rather than a raw or intermediate material.

*Comments from Albemarle Corporation:* Albemarle asserts that it is a wholesaler, and, therefore, a domestic interested party within 19 CFR 351.213(b)(1). Albemarle explains that it sells virgin, domestically-produced, steam-activated carbon to industrial end-users who use the product in the production of electrical power. In its response, Albemarle submits the United States Census Bureau's 2007 North American Industry Classification System ("NAICS") definition of wholesaler. Albemarle submits that this definition clearly shows that the wholesaling process "is an intermediate step in the distribution of merchandise," and includes activities such as selling or arranging the purchase or sale of, among other things, "raw and

---

[4] <u>See Rescission of Initiation of Antidumping Duty Investigation and Dismissal of Petition: Certain Portable Electric Typewriters From Singapore</u>, 56 FR 49880 (October 2, 1991) ("<u>Certain Portable Electric Typewriters from Singapore</u>").
[5] Citing <u>Save Domestic Oil, Inc. v. United States</u>, 357F.3d 1278 (Fed. Cir. 2004).

3

intermediate materials and supplies used in production." Albemarle cites a number of additional definitions of the term "wholesaler" in support of its argument that wholesalers do sell to end-users at the industrial level in addition to selling goods to retailers.[6] Additionally, in its supplemental questionnaire response, Albemarle stated that it clearly fits into the NAICS definition in many respects, including the fact that it is located in warehouse offices and is not designed to attract walk-in customers.

<u>Analysis:</u>

Whether Albemarle may request a review of CCT depends upon its status as a domestic interested party. In this instance, that status depends upon whether Albemarle is a "wholesaler in the United States of a domestic like product." Section 771(9)(C) of the Act.

Because there is no statutory definition of the term "wholesaler," in the Act, we find that using the Census Bureau's NAICS definition of "wholesaler," Albemarle is a wholesaler of the domestic like product.[7] The Census Bureau's NAICS definition of wholesaler is the most appropriate to apply in defining the term wholesaler because it is a source specifically used for defining industries by the U.S. government. In addition, the Supreme Court has cited this definition of wholesaler in <u>Roland Electrical Co. v. Walling</u>, 326 U.S. 657 (1945). The NAICS definition describes the wholesaling process as "an intermediate step in the distribution of merchandise. Wholesalers are organized to sell or arrange the purchase or sale of (a) goods for resale (<u>i.e.</u>, goods sold to other wholesalers or retailers), (b) capital or durable nonconsumer goods, and (c) raw and intermediate materials and supplies used in production." Furthermore, the fundamental characteristic of a wholesaler, based on the NAICS definition, is that it is not set up to attract walk-in business, but operates out of warehouses and sales offices that are distinct from retail store locations. In addition, the Census Bureau issued a clarification memorandum for its wholesaler definition.[8] According to this clarification, "For NAICS, it is how merchandise is sold not what is sold or how it is used.... Both wholesalers and retailers sell merchandise as their primary activity. Between these two sectors, the chief distinction for NAICS is on whether the facilities are open to the general public or not."[9]

Using this definition, we find that Albemarle's commercial activities are consistent with those of a wholesaler because it sells "raw and intermediate materials and supplies used in production." Furthermore, contrary to CCT's arguments, we find that activated carbon can be considered a raw or intermediate material and supply used in production in accordance with the NAICS clarification memorandum. Under that clarification memorandum, the questions of whether Albemarle sells a "raw" or "intermediate" material or how Albemarle's customers ultimately use

[6] Citing <u>Roland Electrical Co. v. Walling</u>, 326 U.S. 657 (1945); <u>Montgomery Ward & Co. v. United States</u>, 26 Cust. Ct. 642, 646 (Cust. Ct. 1951); and <u>Lyons Export & Import, Inc. v. United States</u>, 59 C.C.P.A. 142, 144-145 (C.C.P.A. 1972).
[7] <u>See</u> U.S. Census Bureau: 2007 NAICS Definition at Attachment 1.
[8] <u>See</u> U.S. Census Bureau Clarification Memorandum No. 1, NAICS Sector 42 - Wholesale Trade, Scope and Implementation Guidelines for U.S. Statistical Agencies at Attachment II. Full document including attachments available at http://www.census.gov/eos/www/naics/history/docs/cm_1.pdf.
[9] <u>See</u> id.

4

the activated carbon are irrelevant. Albemarle has stated that it is located in warehouse offices that are not intended to attract sales from the general public and are not set up to handle walk-in customers. Therefore, Albemarle reasonably fits the NAICS definition and the Census Bureau clarification memorandum which cite the type of facility operated by the company as a central consideration in determining whether a company is a wholesaler. In addition, we find that the documentation submitted by Albemarle indicates that it made purchases and sales of domestically-produced, steam-activated carbon. Therefore, we can conclude that Albemarle is a wholesaler of the domestic-like product and its request for review of CCT is in accordance with the statute and our regulations.

Furthermore, in response to the argument that wholesaling represents an insufficient proportion of Albemarle's commercial activity, Albemarle cited to the Department's decision in Furniture to consider Kimball, an importer that also manufactured sample pieces of furniture, as a producer of subject merchandise.[10] Consistent with the Department's decision in Furniture, we recommend finding that Albemarle is a wholesaler of a domestic like product even though it also imports subject merchandise. As such, Albemarle qualifies as a wholesaler and thus, a domestic interested party. Finally, with regard to the argument that Albemarle does not have a "sufficient stake" in the industry to be considered properly an interested party, we note that neither the statute, the regulations, nor our past practice require us to determine whether a domestic interested party has a "sufficient stake" in the industry to request an administrative review.

As discussed above, in the Department's Respondent Selection Memo, we stated that we were selecting the two producers/exporters with the largest export volume during the period of review ("POR"). By selecting the largest known producers or exporters, the Department is able to individually examine the companies involved in producing and exporting the largest possible volume of merchandise under consideration, pursuant to 19 CFR 351.204.

Therefore, the Department is now selecting as a mandatory respondent, in addition to Jacobi who was previously selected, the largest producer/exporter for which a review has been requested.[11] An analysis of the U.S. Customs and Border Protection data reveals that the largest producer/exporter is CCT.[12] The Department is hereby selecting CCT as a mandatory respondent. The Department will issue CCT a full copy of the questionnaire for this review and set deadlines for it to respond to each section of the questionnaire.

---

[10] Memorandum from Wendy Frankel to Edward C. Yang: Whether Kimball International, Inc., Kimball Furniture Group, Inc., and Kimball Hospitality Inc. (collectively, "Kimball") is a U.S. Producer of Wooden Bedroom Furniture: Administrative Review of Wooden Bedroom Furniture from the People's Republic of China ("PRC"), A-570-890; November 4, 2008.

[11] See Respondent Selection Memo.

[12] See id at Attachment I.

5

Recommendation:

Considering the factors described above, we recommend selecting CCT as a mandatory respondent in this review.

_____ ✓                    _____
Agree                                 Disagree

_Call Deut for_

James C. Doyle
Director
AD/CVD Operations, Office 9

_9/29/2010_
Date

6

# Attachment 1

U.S. Census Bureau: 2007 NAICS Definition

## 42 Wholesale Trade

The Sector as a Whole

The Wholesale Trade sector comprises establishments engaged in wholesaling merchandise, generally without transformation, and rendering services incidental to the sale of merchandise. The merchandise described in this sector includes the outputs of agriculture, mining, manufacturing, and certain information industries, such as publishing.

The wholesaling process is an intermediate step in the distribution of merchandise. Wholesalers are organized to sell or arrange the purchase or sale of (a) goods for resale (i.e., goods sold to other wholesalers or retailers), (b) capital or durable nonconsumer goods, and (c) raw and intermediate materials and supplies used in production.

Wholesalers sell merchandise to other businesses and normally operate from a warehouse or office. These warehouses and offices are characterized by having little or no display of merchandise. In addition, neither the design nor the location of the premises is intended to solicit walk-in traffic. Wholesalers do not normally use advertising directed to the general public. Customers are generally reached initially via telephone, in-person marketing, or by specialized advertising that may include Internet and other electronic means. Follow-up orders are either vendor-initiated or client-initiated, generally based on previous sales, and typically exhibit strong ties between sellers and buyers. In fact, transactions are often conducted between wholesalers and clients that have long-standing business relationships.

This sector comprises two main types of wholesalers: merchant wholesalers that sell goods on their own account and business to business electronic markets, agents, and brokers that arrange sales and purchases for others generally for a commission or fee.

(1) Establishments that sell goods on their own account are known as wholesale merchants, distributors, jobbers, drop shippers, and import/export merchants. Also included as wholesale merchants are sales offices and sales branches (but not retail stores) maintained by manufacturing, refining, or mining enterprises apart from their plants or mines for the purpose of marketing their products. Merchant wholesale establishments typically maintain their own warehouse, where they receive and handle goods for their customers. Goods are generally sold without transformation, but may include integral functions, such as sorting, packaging, labeling, and other marketing services.

(2) Establishments arranging for the purchase or sale of goods owned by others or purchasing goods, generally on a commission basis are known as business to business electronic markets, agents and brokers, commission merchants, import/export agents and brokers, auction companies, and manufacturers' representatives. These establishments operate from offices and

7

generally do not own or handle the goods they sell.

Some wholesale establishments may be connected with a single manufacturer and promote and sell the particular manufacturers' products to a wide range of other wholesalers or retailers. Other wholesalers may be connected to a retail chain, or limited number of retail chains, and only provide a variety of products needed by that particular retail operation(s). These wholesalers may obtain the products from a wide range of manufacturers. Still other wholesalers may not take title to the goods, but act as agents and brokers for a commission.

Although, in general, wholesaling normally denotes sales in large volumes, durable nonconsumer goods may be sold in single units. Sales of capital or durable nonconsumer goods used in the production of goods and services, such as farm machinery, medium and heavy duty trucks, and industrial machinery, are always included in wholesale trade.

8

## Attachment II

**Clarification Memorandum No. 1**

**NAICS Sector 42 - Wholesale Trade**

**Scope and Implementation Guidelines for U.S. Statistical Agencies**

**Introduction** - As with all sectors, NAICS defines the boundary and scope of the trade sectors using production terminology. For wholesale trade, the interpretation of this terminology and its implementation by U.S. statistical agencies has raised issues that the Economic Classification Policy Committee (ECPC) through the Administrative Subcommittee has seen fit to address. This document is a clarification of the scope of NAICS Sector 42, Wholesale Trade. It also presents approved implementation guidelines for classifying establishments to this sector.
The ECPC is aware that there will be a significant change to the content of wholesale trade (as presently constituted under the SIC rules) with NAICS implementation. Retail-like establishments primarily selling to business customers (classified as wholesale in the SIC) will move to retail trade. These shifts were discussed during the preparation of the manual. The ECPC is also aware that NAICS implementation for the 1997 economic census will not be complete because the forms as designed do not ask the right questions. This will be corrected for the 2002 Census.
**NAICS Manual** - According to the U.S. NAICS manual, "the Wholesale Trade sector comprises establishments engaged in wholesaling merchandise, generally without transformation, and rendering services incidental to the sale of merchandise."
The wholesaling process is an intermediate step in the distribution of merchandise. Wholesalers are organized to sell or arrange the purchase of (a) goods for resale (i.e., goods sold to other wholesalers or retailers), (b) capital or durable nonconsumer goods, and (c) raw and intermediate materials and supplies used in production.
Wholesalers sell merchandise to other businesses and normally operate from a warehouse or office. These warehouses and offices are characterized by having little or no display of merchandise. In addition, neither the design nor the location of the premises is intended to solicit walk-in traffic. Wholesalers do not normally use advertising directed to the general public. Customers are generally reached initially by telephone, in-person marketing, or by specialized advertising that may include Internet and other electronic means. Follow-up orders are either vendor-initiated or client-initiated, generally based on previous sales, and typically exhibit strong ties between sellers and buyers. In fact, transactions are often conducted between wholesalers and clients that have long-standing relationships......
Although, in general, wholesaling normally denotes sales in large volumes, durable nonconsumer goods may be sold in single units. Sales of capital or durable nonconsumer goods used in the production of goods and services, such as farm machinery, medium and heavy duty trucks, and industrial machinery, are always included in wholesale trade." (NAICS United States 1997 page 375)
With regard to retail trade, the manual says: "The Retail Trade sector comprises establishments engaged in retailing merchandise, generally without transformation, and rendering services incidental to the sale of merchandise.
The retailing process is the final step in the distribution of merchandise; retailers are, therefore,

<div align="center">9</div>

organized to sell merchandise in small quantities to the general public. This sector comprises two main types of retailers: store and nonstore retailers.

Store retailers operate fixed point of sale locations, located and designed to attract a high volume of walk-in customers. In general, retail stores have extensive displays of merchandise and use mass-media advertising to attract customers. They typically sell merchandise to the general public for personal or household consumption, but some also serve businesses and institutional clients. These include establishments, such as office supply stores, computer and software stores, building materials dealers, plumbing supply stores, and electrical stores. Catalog showrooms, gasoline service stations, automotive dealers, and mobile home dealers are treated as store retailers.

In addition to retailing merchandise, some types of store retailers are also engaged in the provision of after-sale services, such as repair and installation. For example, new automobile dealers, electronic and appliance stores, and musical instrument and supply stores often provide repair services. As a general rule, establishments engaged in retailing merchandise and providing after-sale services are classified in this sector.....

The buying of goods for resale is a characteristic of retail trade establishments that particularly distinguishes them from establishments in the agriculture, manufacturing, and construction industries...." (NAICS United States 1997, page 411)

"Wholesalers also engage in the buying of goods for resale, but they are usually not organized to serve the general public. They typically operate from a warehouse or office and neither the design nor the location of these premises is intended to solicit a high volume of walk-in traffic." (NAICS United States 1997, page 412)

**Criteria for Classification** - Once an establishment has been classified as primarily engaged in retailing or wholesaling merchandise, it must be determined if it is in retail or wholesale trade. Although there were concerns expressed about the length of the descriptions, the ECPC agrees that the following wording will meet the conceptual criteria for splitting wholesale trade as defined in the SIC and NAICS.

For the wholesale portion of an industry in SIC major groups 50 and 51:

Selling {insert appropriate description} using facilities not open to the general public. These establishments typically require commercial accounts, proof of business license or tax ID, or similar qualifications for sales; generally price their goods for resale rather than final use; and typically do not cater to or allow walk-in customers from the general public. Include establishments selling to retailers, and brokers, agents, import/export agents or brokers, and manufacturers' representatives. DO NOT INCLUDE warehouse clubs, membership buyers clubs, or stores and sales areas selling to the general public.

For the retail portion of an industry in SIC major groups 50 and 51:

Selling {insert appropriate description} using facilities open to the general public. These establishments can be in shopping centers, industrial parks, or in similar areas where they are open to the general public. "General public" means walk-in customers typically served with counter sales, displayed merchandise, cash registers or credit card equipment. Include membership buyers clubs, warehouse clubs, and stores and sales areas selling to business or commercial customers and the general public.

Exceptions: Agents, brokers, exporters, importers, manufacturer's sales representatives, and grain elevators are wholesale even if their facilities are open to the general public.

Furthermore: sellers primarily selling farm machinery; construction and mining machinery; and manufacturing, oil well, and warehouse machinery are wholesale even if they sell using facilities open to the general public.

10

open to the general public.

Facilities were designated in these questions because activities may occur in a store or nonstore environment. The definition of nonstore in both wholesale and retail trade will be further refined during NAICS 2002 completion work. As a general example, nonstore activities could include catalog sales, Internet sales, and similar activities that do not take place in a traditional wholesale or retail environment. Attachment 1 provides a list of some of the characteristics that were not accepted as exclusive criteria for classification and the shortcomings associated with each.

**Implementation** - Before the NAICS manual was completed the Census Bureau prepared a set of questions to be used for the classification for the economic census. Subsequently, they found that there were numerous problems with their questions. These problems prompted the Administrative Subcommittee and the ECPC to review this area in terms of both definition and implementation. For statistical comparability, consistency in classifying trade establishments is essential. The Census Bureau will not fully implement NAICS until the 2002 Economic Census.

**Impact** - NAICS, as a system, defines industries based on the production function of establishments. Often establishments have multiple production functions. A trade establishment may have a small storefront and sell to the general public and also have a warehouse and sell to businesses. These activities are separate and distinct production functions. The first is retail; the second is wholesale. Similar situations occur in manufacturing. We often see establishments that cast iron, machine the rough castings, and assemble a final product.

In general, NAICS classifies combined activities (or vertically integrated operations) based on the final step of production. Thus the manufacturing establishment would be classified to the industry of the final assembled good. Likewise the combined presence of the wholesale trade and retail trade production functions at the establishment level, would classify the establishment to retail trade, since retail trade is the "final step in the distribution of merchandise."

The ECPC realizes that there will be significant changes to the content of Wholesale Trade with NAICS implementation. Many retail-like establishments that primarily sell to business customers were classified to Wholesale trade in the SIC and will move to Retail Trade in NAICS. There will not be a corresponding move from Retail Trade. Attachment 2 identifies the SIC areas that will not be impacted by this decision.

ss of the selling characteristics of the establishment

11





RECEIVED
JUL 2 1 2010

**Mowry & Grimson, PLLC**

5335 Wisconsin Avenue, NW
Suite 440
Washington, DC 20015
202.730.1255

7201 Wisconsin Avenue
Suite 450
Bethesda, MD 20814
301.652.1630
301.652.3350 (fax)
www.mowrygrimson.com

July 20, 2010

**VIA HAND DELIVERY**
Secretary of Commerce
Attn: Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

Case No.: A-570-904
Total Pages: 27
Administrative Review (§751)
4/1/09-03/31/10
IA/NME/9

**PUBLIC VERSION**
**Business Proprietary Info. Deleted**
**From SR Cert and Exhibits 2 & 3**

Attn: Catherine Bertrand & Jamie Blair-Walker, AD/CVD Enforcement, NME Unit

> **Re:    Third Administrative Review of the Antidumping Duty Order on Certain
> Activated Carbon from the People's Republic of China:    Separate Rate
> Certification of Ningxia Huahui Activated Carbon Co., Ltd.**

Dear Secretary Locke:

On behalf of Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"), an exporter of the

subject merchandise in the above-captioned administrative review, we hereby submit Huahui's

Separate Rate Certification.

July 20, 2010
Page 2

On May 28, 2010, the Department of Commerce (the "Department") initiated an administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 75 Fed. Reg. 29,976 (Dept. of Commerce May 28, 2010). Huahui was named as a respondent party in the above-captioned review. As Huahui is subject to the above-captioned administrative review, Huahui is required to furnish the Department with a certification that it is entitled to an antidumping duty rate separate from that of the PRC-wide antidumping duty rate.[1]

Some of the information contained herein is business proprietary information. Pursuant to 19 C.F.R. §§ 351.304(a)(1)(i), 351.105(c) and 351.303 (2009), Huahui hereby requests that the Department grant confidential treatment to the information so designated. Huahui consents to the release of information contained in this submission to the extent required by the Department under a valid administrative protective order ("APO").

---

[1] Due to the fact that Huahui has been previously granted separate rate status by the Department, the Separate Rate Certification is the appropriate response to file.

July 20, 2010
Page 3

This document has been served in accordance with the attached certificate of service. If you have any questions concerning this submission, please do not hesitate to contact the undersigned.

Respectfully submitted,

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Susan E. Lehman*
Jodi B. Herman
MOWRY & GRIMSON, PLLC

*Counsel to Ningxia Huahui Activated Carbon Co., Ltd.*

* Admitted only in Maryland; practice directly supervised by principals of the firm admitted to the D.C. Bar.

July 20, 2010
Page 4

## Explanation of Requests for Proprietary Treatment

Pursuant to 19 C.F.R. § 351.105(c), Ningxia Huahui Activated Carbon Co., Ltd. hereby requests that the Department accord confidential treatment to the information so designated. For each request, we have provided an explanation of why the information qualifies for proprietary treatment under one or more of the factors identified in the Department's regulations at 19 C.F.R. § 351.105(c).

### Separate Rate Certification

The narrative response and Exhibit 2 and 3 contain specific business information the release of which to the public would cause substantial harm to the competitive position of Ningxia Huahui Activated Carbon Co., Ltd.

July 20, 2010
Page 5

## ATTORNEY CERTIFICATION

I, Jeffrey S. Grimson, of Mowry & Grimson, PLLC, counsel to Ningxia Huahui Activated Carbon Co., Ltd., certify that: (1) I have read the attached submission; and (2) based on the information made available to me by Ningxia Huahui Activated Carbon Co., Ltd. I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Jeffrey S. Grimson
Mowry & Grimson, PLLC

*Counsel to Ningxia Huahui Activated Carbon Co., Ltd.*

 宁夏华辉活性炭股份有限公司
Ningxia Huahui Activated Carbon Company Limited
Tele: +86-951-5070220    Fax: +86-951-5070221

I, Yang Dong, currently employed as General Manager by Ningxia Huahui Activated Carbon Co., Ltd., certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

Yang, Dong

Yang Dong, General Manager

地址: 宁夏银川市高新技术开发区，科技创新园A座1号，邮编：750002
Address: No.A1 Chuangxin Yuan, High Tech Developing Zone, Yinchuan Ningxia China
Post Code: 750002 E-mail: mail@huahui-carbon.com Web: http://www.huahui-carbon.com

**Public Service List: A-570-904**
**Certain Activated Carbon from People's Republic of China**
**Third Administrative Review: 4/1/2009-3/31/2010**

I, Jeffrey S. Grimson, certify that a copy of the attached submission was served this 20th day of July 2010 by hand delivery, Federal Express or first class mail to the following parties:

R. Alan Luberda, Esq.
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, DC 20007-5108
(Via Fed Ex)

Daniel Porter, Esq.
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006-3817

Francis J. Sailer, Esq.
Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP
1201 New York Avenue, NW
Suite 650
Washington, DC 20005

Gregory S. Menegaz, Esq.
deKieffer & Horgan
729 15th Street, NW
Suite 800
Washington, DC 20005

Craig A. Lewis, Esq.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

Ronald M. Wisla, Esq.
Kutak Rock LLP
Suite 1000
1101 Connecticut Ave., NW
Washington, DC 20036

Matthew J. McConkey, Esq.
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006-1101

Jeffrey S. Grimson

**OFFICE OF AD/CVD OPERATIONS**

**PEOPLE'S REPUBLIC OF CHINA ("PRC")**
**SEPARATE RATE CERTIFICATION**
**FOR FIRMS PREVIOUSLY AWARDED SEPARATE RATE STATUS\***

\* Firms that do not currently hold a separate rate may **not** use this Certification and **must** instead submit an Application for separate rate status (posted on the Department's website at http://trade.gov/ia/index.asp, "Decisions and Data").

| | |
|---|---|
| **REQUESTER(S):** | NINGXIA HUAHUI ACTIVATED CARBON CO., LTD. |
| **REPRESENTATION:** | Jeffrey S. Grimson<br>Mowry & Grimson PLLC<br>5335 Wisconsin Avenue, NW<br>Suite 440<br>Washington, DC 20015-2052 |
| **CASE:** | Activated Carbon (A-570-904) |
| **PERIOD OF REVIEW:** | April 1, 2009 – March 31, 2010 |
| **DEADLINE FOR SUBMISSION:** | 60 days from publication date of the initiation notice, *See* http://ia.ita.doc.gov/frn/index.html. |

**FILING ADDRESS:**

U.S. Department of Commerce
International Trade Administration
APO/Dockets Unit, Room 1870
1401 Constitution Avenue, N.W.
Washington, DC 20230

**FILING INSTRUCTIONS:**     *See* "General Instructions" section at Appendix I.
*See* also http://ia.ita.doc.gov/filing/index.html

## SEPARATE RATE CERTIFICATION

### APPLICANT INFORMATION:

1.    Please provide the full name and contact information (including address, telephone, fax, and e-mail address) of the firm, previously granted separate status, which is seeking separate rate status for this administrative review.

Response:

| | |
|---|---|
| Name: | Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui") |
| Address: | No. A Chuangxin Yuan<br>High Tech Developing Zone<br>Yinchuan, Ningxia, PRC |
| Telephone: | 0951-5070220 |
| Fax: | 0951-5070221 |
| E-mail: | info@huahui-carbon.com |

2.    I certify that during the POR, the firm was owned (select one):

☑ wholly or partially by a domestic entity/entities located the PRC

☐ 100% by a foreign entity/entities[1] located in

### FIRM OFFICIAL AND REPRESENTATIVE CERTIFICATIONS:

3. I, (Firm official name and title), currently employed by (Firm), certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

(Firm official signature)

Response:  The signed certification is provided in Exhibit 1.

4. I, (Legal counsel or representative name), of (law firm or other entity), counsel or representative to (Firm), certify that: (1) I have read the certifications contained in this submission; and (2) based on the information made available to me by (person), I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

(Legal counsel or representative signature)

---

[1] Wholly market-economy owned firms need not respond to questions marked with an asterisk ("*").

**Response:** The signed certification is provided in Exhibit 1.

### GENERAL CERTIFICATIONS:[2]

5. I certify that (Firm) was previously granted separate rate status as part of the final determination/results in the (insert investigation/review and period of investigation/review), published in Federal Register (insert citation), that the separate rate status is currently applicable, and the separate rate status has not been revoked.

(Firm official, legal counsel or representative signature)

**Response:** The signed certification is provided in Exhibit 1.

6. I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude the firm is not eligible for a separate rate.

(Firm official, legal counsel or representative signature)

**Response:** The signed certification is provided in Exhibit 1.

### EXPORT CERTIFICATIONS (check any that apply):

7. I certify that during the POR, the firm conducted business under the following (please include a list of all trade names)[3]:

    ☑ only the same trade names as identified in the segment of investigation or review in which the firm was granted a separate rate ("previous Granting Period").

    the same trade names as identified in the previous Granting Period, as well as new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

---

[2] If you cannot certify to each question in this section, please contact the official in charge.

[3] Trade names are other names under which the firm does business. It does not include product brand names or the names of any other entities in the firm's "group," affiliated or otherwise. Note that if the Department determines that your firm is eligible for separate rate status, the separate rate will only apply to the firm as named in your business license/registration documents and not to any alternative or trade names that are not included in your business license/registration documents or not otherwise permitted, as explained in your response to this question.

only new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

If a trade name is not listed on the company's business license/registration documents, please provide an explanation and any evidence as to how the company is permitted to use that trade name.

8.    ☑    I certify the firm possesses an official government business license/registration documents for each trade name listed in response to question 7, above, valid during the POR. (list each trade name, the corresponding document and its expiration date).[4]

Response:

| | |
|---|---|
| Trade Name: | **Ningxia Huahui Activated Carbon Co., Limited** |
| Document: | **Business License (see Exhibit 2)** |
| Expiration Date: | **December 30, 2053** |

9.    ☑    I certify the firm exported or sold subject merchandise to the United States during the POR.

**CERTIFICATIONS OF ABSENCE OF *DE JURE CONTROL* (check any that apply):**

10.    ☑    * I certify that during the POR, as with the previous Granting Period, there were no government laws or regulations, at either national and sub-national (e.g., provincial, local) levels of government, that controlled the firm's export activities.

11.    ☐    I certify that during the POR, the ownership under which the firm registered itself with the official government business license issuing authority remains the same as for the previous Granting Period.[5]

Response:    **In the last month of the review period, there was a change in Huahui's shareholders, as follows, as a result of an increase in Huahui's capital:**

---

[4] It is the Department understands that a valid business license/registration documents with clearly defined periods of validity issued by the appropriate licensing authority is required for all business activity. A firm submitting a business license without an expiration date must provide an explanation in order for the Department to consider its Certification.

[5] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

PUBLIC VERSION
Proprietary Information
Deleted

| Description Before Modification | Description After Modification |
|---|---|
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |

[

]

Notwithstanding  [
] Huahui's ability to set prices and make business decisions independent from government control.   In POR 2, the Department was aware of [

]

PUBLIC VERSION
Proprietary Information
Deleted

12.    ☑ * I certify that during the POR, the firm had valid PRC Export Certificate(s) of Approval.[6]

**Response:**    Huahui had a Foreign Trade Operator certificate (see Exhibit 2), which document replaced the Export Certificate of Approval following the amendments to the Foreign Trade Law of July 2004.

13.    ☑ * I certify that during the POR, as with the previous Granting Period, in order to conduct export activities, the firm was not required by any national, provincial, or local government law or regulation to possess additional certificates or other documents related to the legal status and/or operation of its business beyond those discussed above.

14.    ☑ * I certify that during the POR, the PRC government laws and legislative enactments applicable to the firm seeking a separate rate remained the same as for the previous Granting Period.

**CERTIFICATIONS OF ABSENCE OF DE FACTO CONTROL (check any that apply):**

15.    ☐ * I certify that during the POR, the largest 10 individual/entity shareholders of the firm and all of their shareholders had no significant relationship [7] with any of the following:[8]

- PRC state asset management company (government-owned and/or private chartered);

- The PRC national government and/or its ministries/agencies;

- PRC provincial governments;

- PRC local/municipal/village government(s)/agency(ies).

**Response:** Huahui so certifies with respect to bullet points 2-4 above. With respect to asset management companies, for the first eleven months of the POR, Huahui's relationship was very indirect, relating to a minority shareholding in a shareholder of one of Huahui's shareholders, as discussed in detail in POR 2 when Huahui was a mandatory respondent. In the last month of POR 3, [            ] in Huahui. During that last month of the POR, neither investor had any role in the day-to-day decision-making of the company, and played no part in setting prices, costs, etc.

---

[6] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

[7] A significant relationship would include ownership, control, affiliation, significant transactions, etc.

[8] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

**Huahui is a Limited Liability Company and enjoys full autonomy in making its business decisions. See response to question 11 above.**

16.  ☑ * I certify that during the POR, the firm's export prices were not set by, subject to the approval of, or in any way controlled by a government entity at any level (e.g., national, provincial, local).[9]

17.  ☑ I certify that during the POR, the firm had independent authority to negotiate and sign export contracts and other agreements (i.e., the firm conducted independent price negotiation).[10]

18.  ☑ I certify that during the POR, the firm had autonomy from all levels of the government (e.g., national, provincial, local) and from any government entities in making decisions regarding the selection of management.

19.  ☑ I certify that during the POR, the firm did not have to submit for approval any of its candidates for managerial positions within the firm to any government entity at any level (e.g., national, provincial, local).

20.  ☑ * I certify that during the POR, the firm retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or financing of losses.

**SALES & AFFILIATION:**

21.  I certify the firm made at least one export or sale to the United States during the POR to (select only one):

affiliated[11] parties only.

☑ unaffiliated parties only.

both affiliated and unaffiliated parties.

**ADDITIONAL DOCUMENTATION:**

22.  Please provide copies of the following documentation:

---

[9] This includes, but is not limited to, the presence of government officials at any meeting where export and pricing decisions are discussed.
[10] The authority to conduct independent price negotiation refers to the ability of an NME firm to set its own export prices independently of the government at any level (national, provincial, local) and without the approval of any government entity.

[11] See Section 771(33) of the Tariff Act of 1930, as amended, for a definition of affiliation. For the purposes of control under the definition of affiliation, the Department will consider a person to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

- The firm's business license(s)/ registration document(s) valid during the POR;
- *The firm's PRC Export Certificate(s) of Approval valid during the POR.

Response:    Please see Exhibit 3 for Huahui's business licenses in force during the POR. The first license was issued on October 7, 2008 and reflects the stamp for the 2008 annual inspection. The second license was issued on March 1, 2010 and reflects the stamp for the 2009 annual inspection. These two licenses cover the entire POR.

We provide in Exhibit 2 Huahui's Foreign Trade Operator Record. In the Foreign Trade Law of July 1, 2004, the Export Certificate of Approval was replaced by the Foreign Trade Operator license. Exhibit 3 fulfills the same function as the Export Certificate of Approval, conferring upon Huahui the right to export goods. The license was issued November 7, 2008 and remained in effect during the whole POR until it was renewed in late April 2010.

# Exhibit 1

 宁夏华辉活性炭股份有限公司
Ningxia Huahui Activated Carbon Company Limited
Tele: +86-951-5070220    Fax: +86-951-5070221

**Certification for Question 3:**

I, Yang Dong, currently employed as General Manager by Ningxia Huahui Activated Carbon Co., Ltd., certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

Yang Dong, General Manager

**Certification for Question 6:**

I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude the firm is not eligible for a separate rate.

Yang Dong, General Manager

地址: 宁夏银川市高新技术开发区, 科技创新园A座1号, 邮编: 750002
Address: No.A1 Chuangxin Yuan, High Tech Developing Zone, Yinchuan Ningxia China
Post Code: 750002 E-mail: mail@huahui-carbon.com Web: http://www.huahui-carbon.com

## CERTIFICATION FOR QUESTION 4

I, Jeffrey S. Grimson, of Mowry & Grimson, PLLC, counsel or representative to Ningxia Huahui Activated Carbon Co., Ltd., certify that: (1) I have read the certifications contained in this submission; and (2) based on the information made available to me by Ningxia Huahui Activated Carbon Co., Ltd., I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Jeffrey S. Grimson
Mowry & Grimson, PLLC
*Counsel to Ningxia Huahui Activated Carbon Co., Ltd.*

CERTIFICATION FOR QUESTION 5

I certify that <u>Ningxia Huahui Activated Carbon Co., Ltd.</u> was previously granted separate rate status as part of the original investigation 72 Fed. Reg. 20988 (April 27, 2007) and was again granted a separate rate in the final results of the first administrative review published in Federal Register, 74 Fed. Reg. 57995 (November 10, 2009), that the separate rate status is currently applicable, and the separate rate status has not been revoked.

Jeffrey S. Grimson
Mowry & Grimson, PLLC
*Counsel to Ningxia Huahui Activated Carbon Co., Ltd.*

# Exhibit 2

PUBLIC VERSION
Proprietary Information
Deleted

PUBLIC VERSION
Proprietary Information
Deleted

## Registration Form for Foreign Trade Operator Record

Serial No. for Registration Form: [          ]          Import & Export Code: [          ]

| | | | |
|---|---|---|---|
| Name of Operator (Chinese) | | | |
| Name of Operator (English) | Ningxia Huahui Activated Carbon Co., Ltd. | | |
| Organization Code | 624901288 | Business Type (Fill in by the Agency) | Limited Liability Company |
| Registered Address (Chinese) | | | |
| Operation Address (Chinese) | | | |
| Operation Address (English) | No. A Chuangxin Yuan, High Tech Developing Zone, Yinchuan, Ningxia | | |
| Telephone | 0951-5070220 | Fax | 0951-5070221 |
| Zip Code | 750002 | E-mail | info@huahui-carbon.com |
| Industrial & Commercial Registration Date | 6/18/1992 | Industrial & Commercial Registration No. | [          ] |

Please also fill out the following if your business registered under the law

| | | | |
|---|---|---|---|
| Name of Enterprise Legal Representative | Yang, Dong | Identification No. | [          ] |
| Registered Capital | [          ] | | |

Please fill out the following if your business registered as foreign enterprise or as individual business (sole proprietor) under the law.

| | | | |
|---|---|---|---|
| Name of Enterprise Legal Representative/ Name of Individual Business Leader | | ID | |
| Total Assets/ Individual Assets | | Converted to USD | |

| | |
|---|---|
| Note: Changing of legal Representative and Industrial & Commercial Registration No., change registration form | No imported goods distribution business |

Please read carefully about the items in the back of the form, and also have legal representative OR Individual business leader sign with company seal

Sealed by Ningxia Foreign Trade Operator Record Office
11/7/2008

# Exhibit 3

PUBLIC VERSION
Proprietary Information
Deleted

# Enterprise with Legal Representative Business License

(Carry on Copy)

Registration No. [    ]

**Company Name:** Ningxia Huahui Activated Carbon Co., Ltd.

**Registered Office:** No. A Chuangxin Yuan, High Tech Developing Zone, Yinchuan, Ningxia, China

**Legal Representative:** Yang Dong

**Registered Capital:** [    ]

**Paid-up Capital:** [    ]

**Enterprise Type:** Joint-stock limited company

**Business Scope:** Manufacture, operation and sales of all grades, specifications and types of activated carbon and its products; production and sales of coal products, filtration products and other chemical products; for exports of products manufactured by the Company and imports of mechanical equipments, accessories, and raw and supplement materials needed by the Company, but those restricted or forbidden exporting and importing products or technologies will be excluded. Production and sales of carbon additive and packing materials

**Date of Incorporation:** June 18th, 1992

**Business Operation Tenure:** June 18, 1992 – December 30th, 2053

## Description

1. <Enterprise with Legal Representative Business License> is a document to certify an enterprise in obtaining its Enterprise with Legal Representative status and legal approval for business operation

2. There are 2 copies of <Enterprise with Legal Representative Business License> i.e. main copy and duplicate copy. Both copies have the same legal effect.

3. The main copy of <Enterprise with Legal Representative Business License> shall be displayed in an obvious place within the registered office of the enterprise.

4. <Enterprise with Legal Representative Business License> shall not be forged, amended, leased out, lended and transferred.

5. Togo enterprise shall apply to the Registrar of Industrial & Commercial Administration Bureau to amend the content of business when there are changes in the registered information of the enterprise.

6. The Registrar of Industrial & Commercial Administration Bureau will conduct annual inspection on all enterprise with legal representative from March 1 to June 30 every year.

7. The enterprise shall not undertake any activity which is not related to liquidation once <Enterprise with Legal Representative Business License> has been revoked.

8. The enterprise who de-register from operation shall surrender its main copy and duplicate copy of <Enterprise with Legal Representative Business License>

9. The enterprise shall notify on newspaper with approval by Registrar of Industrial & Commercial Administration Bureau if its <Enterprise with Legal Representative Business License> has been destroyed or lost.

| Annual Inspection Status |  |  |
|---|---|---|
| 2009 Inspection |  |  |

License issued by: Ningxi Hui Autonomous Region Industrial & Commercial Administration Bureau
March 1st, 2010

PUBLIC VERSION
Proprietary Information
Deleted

JA200051

PUBLIC VERSION
Proprietary Information
Deleted

# Enterprise Legal Person Business License

### (Carry on Copy)

Registered Number: [    ]

Name: Ningxia Huahui Activated Co., Ltd.

Domicile: No. A Chuangxin Yuan, High Tech Developing Zone, Yinchuan, Ningxia, China

Legal representative: Yang Dong

Registered Capital: [    ]

Nature: Joint-stock limited company

Business Scope: Manufacture, operation and sales of all grades, specifications and types of activated carbon and its products; production and sales of coal products, filtration products and other chemical products; for exports of products manufactured by the Company and imports of mechanical equipments, accessories, and raw and supplement materials needed by the Company, but those restricted or forbidden exporting and importing products or technologies will be excluded. Production and sales of carbon additive and packing materials.

All business subjecting to policy of certification of approval shall be conducted under the certification required.

Establishing Date: June 18, 1992
Operating period: From June 18, 1992 to December 30, 2053

## Note

1. Enterprise Legal Person Business license (ELP) is the certificate proving that the enterprise gains the qualification of enterprise legal person and operates legitimately.
2. The ELPB have original copy and carry-on copy. Both of them have the same force and effect.
3. The original copy shall be put in a striking position of the enterprise's domicile.
4. It is forbidden to fake, alter, rent, lend or transfer the business license.
5. When the registered content is changed, the enterprise legal person shall apply to the registration agency to re-make ELPB.
6. The registration agency will inspect the enterprise annually during March 1st to June 30th every year.
7. After ELPB is revoked, the enterprise shall not operate business not related to liquidations.
8. When revoking the registration, the enterprise shall return the original and carry-on copy of the license.
9. The ELPB is lost or damaged, the enterprise shall put notice on papers appointed by registration authority to announce the cancellation of the ELPB, and apply for new a ELPB.

The situation of yearly review of the legal entity

| (Passed annual inspection of 2008) | | | |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

Provide all the materials necessary for yearly review between March 1 and June 30 every year, and there shall be no other notification.

Registration Authority: Ningxia Hui Autonomous Region Industrial and Commercial Administration Bureau

October 7, 2008

Proprietary Information Deleted

LAW OFFICES OF
DeKIEFFER & HORGAN
SUITE 800
729 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005
Affiliated Office
Saarbrücken, Germany

RECEIVED
JUL 2 1 2010

TELEPHONE
(202) 783-6900
GREGORY S. MENEGAZ

FACSIMILE
(202) 783-6909
gmenegaz@dhlaw.com

July 21, 2010

A-570-904
Pages: 24

HAND-DELIVERED

Honorable Gary Locke
Secretary
Room 1870
U.S. Dept. of Commerce
Washington, D.C. 20230

Admin Rev.
April 1, 2009-March 31, 2010
AD/CVD Operations
Office 9

**Public Version**
Business Proprietary Information
has been deleted/redacted
contained within brackets in
Exhibits: 1-2

**May Be Released Under APO**

**PUBLIC VERSION**

RE:   Certain Activated Carbon from the People's Republic of China from the People's
      Republic of China: *Shanxi DMD Corporation's Separate Rate Certification*

Dear Secretary Locke:

On behalf of Shanxi DMD Corporation, an exporter of activated carbon from the People's

Republic of China, attached hereto is their Separate Rate Certification in the above captioned

review.

Certain information contained herein is business confidential data that is proprietary to

the above interested parties. This information is enclosed with brackets ("[ ]"). Disclosure of

this information would cause substantial competitive and commercial harm to the above

interested parties. Such data is marked "Contains Proprietary Information." Confidential

treatment, subject to administrative protective order, is requested pursuant to 19 C.F.R. §

351.105(c)(4)&(11). Therefore, we request that this information be treated as business

proprietary information pursuant to 19 C.F.R. § 351.304(a)(1)(i).

Information marked as business proprietary has been so marked for one or more of the

following reasons, in accordance with 19 C.F.R. § 351.105(c):

(1)  Business or trade secrets concerning the nature of a product or production process;
(2)  Production costs (but not the identity of the production components unless a
     particular component is a trade secret);
(3)  Distribution costs and channels of distribution;
(4)  Terms of sale (but not terms of sale offered to public);
(5)  Prices of individual sales, likely sales, or other offers (but not components of prices,
     such as transportation, if based on published schedules, dates of sale, product
     descriptions except business or trade secrets described in term 1 above, or order
     numbers);
(6)  Names of particular customers, distributors, or suppliers (but not destination of sale
     or designation of type of customer, distributor, or supplier, unless the designation of
     designation would reveal the name);
(7)  In an antidumping proceeding, the exact amount of the dumping margin on
     individual sales;
(8)  In a countervailing duty proceeding, *** {not applicable}
(9)  the names of particular persons from whom business proprietary information was
     obtained;
(10)  {not applicable…omitted}
(11)  Any other specific business information the release of which to the public would
      cause substantial harm to the competitive position of the submitter.

The following lists the pages in which the business proprietary information appears and

the reason (referenced by the same number as listed above) that proprietary treatment is requested

for such information.

Exhibit:                              Reason Number:

1-2                                   11

In accordance with the Department's instructions, we are submitting an original and six

copies of the proprietary APO response; the APO response is identical to the proprietary version.

2

On behalf of the above interested party we have summarized data in the public version in accordance with the Department's regulations. We are delivering APO versions to all counsel on the APO list, who have not waived service. Public versions from which business proprietary information is deleted or ranged will be served on parties to the public service list.

The undersigned counsel certifies pursuant to 19 C.F.R. § 351.303(g), that I, Gregory S. Menegaz, of deKieffer & Horgan, counsel to the Shanxi DMD Corporation, (1) have read the attached submission, and (2) based on the information made available to me by this company, I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Please let us know if you have any questions concerning this submission.

Sincerely,

Gregory S. Menegaz
John J. Kenkel
J. Kevin Horgan

Attachments

3



SHANXI DMD CORPORATION

SHANXI DMD CORPORATION
NO.169 FUXI STREET
TAIYUAN
SHANXI, P.R. CHINA

<u>CERTIFICATION</u>

I, Zhaopengbao, Operations Manager of Shanxi DMD Corporation, certify that (1)
I have read the attached submission, and (2) the information contained in this submission
is, to the best of my knowledge, complete and accurate.

Signature: _____
Zhaopengbao, Operations Manager

## OFFICE OF AD/CVD OPERATIONS

### PEOPLE'S REPUBLIC OF CHINA ("PRC")
# SEPARATE RATE CERTIFICATION
### FOR FIRMS PREVIOUSLY AWARDED SEPARATE RATE STATUS*

\* Firms that do not currently hold a separate rate may **not** use this Certification and **must** instead submit an Application for separate rate status (posted on the Department's website at http://trade.gov/ia/index.asp, "Decisions and Data").

**REQUESTER(S):**        Shanxi DMD Corporation ("Shanxi DMD")

**REPRESENTATION:**      Gregory S. Menegaz
                        deKieffer & Horgan
                        729 15th Street NW
                        Suite 800
                        Washington, D.C. 20005
                        Phone: 202-783-6900
                        Fax: 202-783-6909
                        Email: gmenegaz@dhlaw.com

**CASE:**                Activated Carbon from PRC

**PERIOD OF REVIEW:**    4/1/09-3/31/10

**DEADLINE FOR SUBMISSION:**  30 days from **publication** date of the initiation
                        notice, *See* http://ia.ita.doc.gov/frn/index.html.

**FILING ADDRESS:**

U.S. Department of Commerce
International Trade Administration
APO/Dockets Unit, Room 1870
1401 Constitution Avenue, N.W.
Washington, DC 20230

**FILING INSTRUCTIONS:**      *See* "General Instructions" section at Appendix I.
                             *See also* http://ia.ita.doc.gov/filing/index.html

1

## SEPARATE RATE BACKGROUND

The Department assigns a separate rate in non-market economy ("NME") cases only if the firm can demonstrate an absence of government control, both in law *(de jure)* and in fact *(de facto)*, over its export activities in accordance with the separate-rate test criteria.   The Department limits its separate rate consideration to firms that exported or sold subject merchandise to the United States during the period of review ("POR") in a commercial transaction.

- Completion of this Certification does not guarantee separate rate status for this POR.

- If your responses to the questions in this Certification do not demonstrate your eligibility for separate rate status, you will not be granted a separate rate for this POR.

- Each firm seeking separate rate status must submit a separate Certification regardless of any common ownership or affiliation between firms and regardless of foreign ownership.

- Firms whose Certifications are untimely, incomplete or otherwise deficient may be denied a separate rate in the administrative review.

- By completing the Certification, firms certify that they have relevant supporting documents and can submit them to the Department upon request.   If a firm that has completed this form is not able to furnish supporting documents as requested by the Department, the Department may conclude the firm is not eligible for a separate rate.

- Along with requesting supporting documentation, the Department may issue questionnaires for clarification purposes.   All information submitted and representations made by your firm are subject to verification.

- There is a possibility that your firm may be selected as a mandatory respondent, in which case your firm will be required to respond to the Department's antidumping questionnaire in full in order to retain eligibility for consideration of separate rate status.

- Companies who had changes to corporate structure, ownership, or to the official company name may not file a Separate Rate Certification but must instead file a Separate Rate Application.   Please note that, as explained in the bullet point below and in Question 7, changes to trade names are allowed.   Only changes to the official company name *(i.e.,* the name appearing on the business license and other registration documents) require the filing of a Separate Rate Application.

- The firm name provided to the Department in this Certification must be the name that appears on the firm's business license/registration documents. All shipments to the United States declared to U.S. Customs and Border Protection must identify the firm by its legal business name, and this name must match the name that appears on the firm's business/registration documents.   If your firm is assigned separate rate status, your firm will only be able to ship

2

under your separate rate under names that are included on your business license/registration documents, or for which you have explained are otherwise permitted *(see* question 7 below).

- Firms owned wholly by entities located in market-economy countries, provided that the ultimate owners are also located in market-economy countries, ("wholly market-economy owned firms"), need not respond to questions marked with an asterisk ("*").

3

## SEPARATE RATE CERTIFICATION

**APPLICANT INFORMATION:**

1.     Please provide the full name and contact information (including address, telephone, fax, and e-mail address) of the firm, previously granted separate status, which is seeking separate rate status for this administrative review.

**Response:**

**Name: Shanxi DMD Corporation**
**ADD : NO.169 FUXI STREET, TAIYUAN ,SHANXI, P.R. CHINA**
**TEL :  0086-351-5602525**
**e-mail address:linda@sxdmd.com**

2.     I certify that during the POR, the firm was owned (select one):

   √     wholly or partially by a domestic entity/entities located the PRC

   ☐     100% by a foreign entity/entities[1] located in (identify country or countries)

**FIRM OFFICIAL AND REPRESENTATIVE CERTIFICATIONS:**

3.     I, (Firm official name and title), currently employed by (Firm), certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

**Response:  See Attached Certification.**

4.     I, (Legal counsel or representative name), of (law firm or other entity), counsel or representative to (Firm), certify that: (1) I have read the certifications contained in this submission; and (2) based on the information made available to me by (person), I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

**Response:  See Attached Certification in transmittal letter.**

**GENERAL CERTIFICATIONS:[2]**

5.     I certify that (Firm) was previously granted separate rate status as part of the final determination/results in the (insert investigation/review and period of investigation/review); published in Federal Register (insert citation), that the separate rate status is currently applicable, and the separate rate status has not been revoked.

**Response:  See Attached Certification.**

4

1. Wholly market-economy owned firms need not respond to questions marked with an asterisk ("*").
2. If you cannot certify to each question in this section, please contact the official in charge.

6.    I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review.   I understand that if I cannot furnish these documents, the Department may conclude the firm is not eligible for a separate rate.

**Response: See Attached Certification.**

**EXPORT CERTIFICATIONS (check any that apply):**

7.    I certify that during the POR, the firm conducted business under the following (please include a list of all trade names)[3]:

    √    only the same trade names as identified in the segment of investigation or review in which the firm was granted a separate rate ("previous Granting Period").

    ☐    the same trade names as identified in the previous Granting Period, as well as new trade names.   For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

    ☐    only new trade names.   For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

If a trade name is not listed on the company's business license/registration documents, please provide an explanation and any evidence as to how the company is permitted to use that trade name.

8.    √    I certify the firm possesses an official government business license/registration documents for each trade name listed in response to question 7, above, valid during the POR. (list each trade name, the corresponding document and its expiration date).[4]

**Response: Shanxi DMD Corporation possesses an official government business license valid during the POR the expiry date of which is Mar, 15th, 2017.**

---

3  Trade names are other names under which the firm does business.   It does not include product brand names or the names of any other entities in the firm's "group," affiliated or otherwise.   Note that if the Department determines that your firm is eligible for separate rate status, the separate rate will only apply to the firm as named in your business license/registration documents and not to any alternative or trade names that are not included in your business license/registration documents or not otherwise permitted, as explained in your response to this question.

4  It is the Department's understanding that a valid business license/registration documents with clearly defined periods of validity issued by the appropriate licensing authority is required for all business activity. A firm submitting a business license without an

6

expiration date must provide an explanation in order for the Department to consider its Certification.

7

9.  √  I certify the firm exported or sold subject merchandise to the United States during the POR.

**CERTIFICATIONS OF ABSENCE OF *DE JURE* CONTROL (check any that apply):**

10.  √  * I certify that during the POR, as with the previous Granting Period, there were no government laws or regulations, at either national and sub-national *(e.g., provincial, local)* levels of government, that controlled the firm's export activities.

11.  √  I certify that during the POR, the ownership under which the firm registered itself with the official government business license issuing authority remains the same as for the previous Granting Period.[5]

12.  √  * I certify that during the POR, the firm had valid PRC Export Certificate(s) of Approval.[6]

13.  √  * I certify that during the POR, as with the previous Granting Period, in order to conduct export activities, the firm was not required by any national, provincial, or local government law or regulation to possess additional certificates or other documents related to the legal status and/or operation of its business beyond those discussed above.

14.  √  * I certify that during the POR, the PRC government laws and legislative enactments applicable to the firm seeking a separate rate remained the same as for the previous Granting Period.

**CERTIFICATIONS OF ABSENCE OF *DE FACTO* CONTROL (check any that apply):**

15.  √  * I certify that during the POR, the largest 10 individual/entity shareholders of the firm and all of their shareholders had no significant relationship[7] with any of the following:[8]
- PRC state asset management company (government-owned and/or private chartered);

---

5 If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

6 If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

7 A significant relationship would include ownership, control, affiliation, significant transactions, *etc.*

8 If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

8

- The PRC national government and/or its ministries/agencies;
- PRC provincial governments;
- PRC local/municipal/village governments)/agency(ies).

16.   √   * I certify that during the POR, the firm's export prices were not set by, subject to the approval of, or in any way controlled by a government entity at any level *(e.g.,* national, provincial, local).[9]

17.   √   I certify that during the POR, the firm had independent authority to negotiate and sign export contracts and other agreements *(i.e.,* the firm conducted independent price negotiation).[10]

18.   √   I certify that during the POR, the firm had autonomy from all levels of the government *(e.g.,* national, provincial, local) and from any government entities in making decisions regarding the selection of management.

19.   √   I certify that during the POR, the firm did not have to submit for approval any of its candidates for managerial positions within the firm to any government entity at any level *(e.g.,* national, provincial, local).

20.   √   * I certify that during the POR, the firm retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or financing of losses.

SALES & AFFILIATION:

21.   I certify the firm made at least one export or sale to the United States during the POR to (select only one):

   □   affiliated[11] parties only.
   √    unaffiliated parties only.
   □   both affiliated and unaffiliated parties.

---

9 This includes, but is not limited to, the presence of government officials at any meeting where export and pricing decisions are discussed.

10 The authority to conduct independent price negotiation refers to the ability of an NME firm to set its own export prices independently of the government at any level (national, provincial, local) and without the approval of any government entity.

11 *See* Section 771(33) of the Tariff Act of 1930, as amended, for a definition of affiliation. For the purposes of control under the definition of affiliation, the Department will consider a person to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

9

**ADDITIONAL DOCUMENTATION:**

22.    Please provide copies of the following documentation:
- The firm's business license(s)/ registration document(s) valid during the POR;
- * The firm's PRC Export Certificate(s) of Approval valid during the POR.

<u>**Response:**</u>  **Please see Exhibit 1 the business license valid during the POR and Exhibit 2 the Export Certificate of Approval valid during the POR.**

10

# EXHIBIT 1

## Business License



# BUSINESS LICENSE OF CORPORATE LEGAL PERSON

## (Duplicate)

Registration No. 14000010084772 (2/1)

Designation: Shanxi DMD Corporation

Domicile: No. 288, Pingyang Road, Taiyuan

Legal Representative: Zhao Penghao

Registered capital: RMB 16,000,000

Paid-in-capital: RMB 16,000,000

PUBLIC VERSION

Type of the Enterprise: Limited Liability Company

Business Scope: Wholesale and Retail of Computer, Household Appliances,

Steel, Chemical Product( except Dangerous Goods ), Handicraft Article( except

Bullion Accessories ) , Articles of Daily Use , Standard Machinery , Electrical

Appliance, Textil , Toy, Industrial Mine Accessories, Fitting for Automobiles,

Metallic Material(except Precious and Spare Metal) , Clothing, Computer

Software Development, Freightage, Information Consultant Service for Coal

Self-supporting and Agenting Kinds of Import and Export Business of Products

and Technique, but apart from Products and Technique Restricted to Manage

and Prohibited from Importing and Exporting by State.

Date of Foundation: March 27, 2000

Operation Period: from March 27, 2009 to March 15, 2017

## Need-To-Know

1. Business License of Corporate Legal Person is the credence with which the enterprise has obtained its legal personality and lawful operations.

2. Business License of Corporate Legal Person have its original and duplicates and both have equal force of law.

3. The original of Business License of Corporate Legal Person shall be put in the eye-catching place in the domicile of the legal person.

4. Business License of Corporate Legal Person shall not be forged, altered, rented or assigned.

5. Legal person of the enterprise shall apply for the registration alteration with the original registration organ and apply for a new license upon occurrence of changes in its registered items.

6. From March 1 to June 30 every year, the registration organ shall carry out annual survey to the legal persons of enterprises.

7. In case the business license is withdrawn, the company shall not run any activity except liquidation.

8. The enterprise shall return the original and duplicates of the license upon cancellation of registration by the company.

9. In case the business license is destroyed or lost, the enterprise shall declare cancellation on the appointed press and apply for new one.

## The Annual Inspection

| Industry and Commerce Administration Bureau of Shanxi Province Annual Inspection | Jun12,2009 | (Sealed) | |
|---|---|---|---|

Industry and Commerce Administration Bureau of Shanxi Province
(Sealed)

Jun12, 2009

# EXHIBIT 2

## Registration Form For Foreign Trade Operator

# 对外贸易经营者备案登记表

PUBLIC VERSION

备案登记表编号：00015713    进出口企业代码：1400716993288

| 经营者中文名称 | 山西龙枫科技经贸发展有限公司 | | |
|---|---|---|---|
| 经营者英文名称 | SHANXI DMD CORPORATION | | |
| 组织机构代码 | 715993288 | 经营者类型<br>（由备案登记机关填写） | 有限责任公司 |
| 住所 | 太原市南内环街480号 | | |
| 经营场所（中文） | 山西省太原市南内环街480号 | | |
| 经营场所（英文） | NO.480 NANNEIHUAN STREET, TAIYUAN, SHANXI, CHINA | | |
| 联系电话 | 0351-5602525 | 联系传真 | 0351-5602513 |
| 邮政编码 | 030002 | 电子邮箱 | DMD@SXDMD.COM |
| 工商登记注册日期 | 2000-3-27 | 工商登记注册号 | 1400001008477 |

依法办理工商登记的企业还须填写以下内容

| 企业法定代表人姓名 | | 有效证件号 | |
|---|---|---|---|
| 注册资金 | | | （折美元） |

依法办理工商登记的外国（地区）企业或个体工商户（独资经营者）还须填写以下内容

| 企业法定代表人/<br>个体工商负责人姓名 | | 有效证件号 | |
|---|---|---|---|
| 企业资产/个人财产 | | | （折美元） |

| 备注 | |
|---|---|
| | |

填表前请认真阅读背面的条款、并由企业法定代表人或个体工商负责人签字、盖章。



2005    年  月（山西）日

PUBLIC VERSION

## Registration Form for Foreign Trade Operator

No. 00015713                    Code of import and export enterprise: 1400715993288

| Name of foreign trade operator in Chinese | 山西龙枫科技经贸发展有限公司 | | |
|---|---|---|---|
| Name of foreign trade operator in English | SHANXI DMD CORPORATION | | |
| Code of organization framework | 715993288 | Type of the Operator (Filed by the registered authority) | limited liability company |
| Address | NANNBIHUAN STREET NO.480,TAIYUAN | | |
| Site for business operation in Chinese | 山西省太原市南内环街 480 号 | | |
| Site for business operation in English | No.480 NANNBIHUAN STREET,TAIYUAN,SHANXI,CHINA | | |
| Telephone | 0351-5602525 | Fax | 0351-5602513 |
| Post code | 030002 | E-mail | DMD@SXDMD.COM |
| Date of industrial and commercial registration | 2000-3-27 | Industrial and commercial registration number | 1400001008477 |

The registered company shall also provide the following information:

| Name of the legal representative of the company | . | No. of perfect instrument | |
|---|---|---|---|
| Registered capital | 161,000,000 | Equal to: | USD |

The registered foreign/region company or Small business of industry and commerce (sole proprietorship) shall also provide the following information:

| Name of the legal representative of the company | | No. of perfect instrument | |
|---|---|---|---|
| Capital of the company | | Equal to: | USD |

| Remark: The document has been renovated | |
|---|---|

Be sure to read the article of the back and sign and seal by the legal representative of the company.

Sealed by the Registered Authority

November 7 ,2005

## GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

COUNSELORS AT LAW

1201 NEW YORK AVENUE, N.W. • SUITE 650

WASHINGTON, DC 20005

TEL (202) 783-6881

FAX (202) 783-0405

www.gdlsk.com

OFFICES:
NEW YORK • BOSTON
LOS ANGELES • WASHINGTON, D.C.
HONG KONG
AFFILIATED OFFICES:
SHANGHAI • BEIJING

July 27, 2010

RECEIVED
JUL 27 2010

WRITER'S DIRECT DIAL NUMBER

*Case No. A-570-904*

Total Number of Pages: 20
Administrative Review: 04/01/09 — 03/31/10
Pursuant to Section 751(a)(1) of the Act

Business Proprietary Information Has Been
Ranged or Deleted on Narrative Page 3 and in
Exhibits 3-4

**PUBLIC VERSION**

**VIA HAND DELIVERY**
Secretary of Commerce
Attention: Import Administration
APO/Dockets Unit
Room 1870
U.S. Department of Commerce
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

Attn: Catherine Bertrand and Katie Marksberry

Re: Separate Rate Certification for Ningxia Guanghua Cherishmet Activated Carbon Co.,
Ltd. in the Third Administrative Review of Certain Activated Carbon from People's
Republic of China, Case No. A-570-904

Dear Mr. Secretary:

On behalf of our client, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.

("GHC"), we hereby respond to the Department's Separate Rate Certification Questionnaire

issued in the above referenced administrative review.

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

The undersigned certify pursuant to 19 C.F.R. §351.303(g), that we have read the attached submission, and based on the information made available to us by GHC, we have no reason to believe that this submission contains any material misrepresentation or omission of fact.

Should you have any questions or require further information, please do not hesitate to contact the undersigned. Thank you for your consideration of this matter.

Respectfully submitted,

*Francis J. Sailer /EFW/*

Francis J. Sailer
Elaine F. Wang

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2010, a copy of the foregoing document was deposited in the United States mail, first-class, postage prepaid, addressed to the following interested parties:

R. Alan Luberda, Esq.
**Kelley Drye & Warren LLP**
3050 K Street, NW
Washington, DC 20007-5108

Jeffrey S. Grimson, Esq.
**Mowry & Grimson PLLC**
7201 Wisconsin Avenue, NW
Suite 450
Bethesda, MD 20814

Daniel L. Porter, Esq.
**Winston & Strawn LLP**
1700 K Stsreet, NW
Washington, DC 20006-3817

Craig A. Lewis, Esq.
**Hogan Lovells US LLP**
555 Thirteenth Street NW
Washington, DC 20004

Gregory S. Menegaz, Esq.
**deKieffer & Horgan**
729 Fifteenth Street, NW
Suite 800
Washington, DC 20005

Ronald M. Wisla, Esq.
**Kutak Rock LLP**
Suite 1000
1101 Connecticut Ave., NW
Washington, DC 20036-4374

Matthew J. McConkey, Esq.
**Mayer Brown LLP**
1999 K Street NW
Washington, DC 20006-1101

Bruce Lockard

429246_1

## OFFICE OF AD/CVD OPERATIONS

### PEOPLE'S REPUBLIC OF CHINA ("PRC")
## SEPARATE RATE CERTIFICATION
### FOR FIRMS PREVIOUSLY AWARDED SEPARATE RATE STATUS*

\* Firms that do not currently hold a separate rate may *not* use this Certification and *must* instead submit an Application for separate rate status (posted on the Department's website at http://trade.gov/ia/index.asp, "Decisions and Data").

| | |
|---|---|
| **REQUESTER(S):** | Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. |
| **REPRESENTATION:** | Francis J. Sailer<br>Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP<br>1201 New York Ave., N.W., Suite 650<br>Washington, D.C. 20005<br>Tel.: (202) 783-6881<br>Fax: (202) 783-0405 |
| **CASE:** | Certain Activated Carbon from the People's Republic of China |
| **CASE NO.:** | A- 570-904 |
| **PERIOD OF REVIEW:** | April 1, 2009 through March 31, 2010 |

**DEADLINE FOR SUBMISSION OF CERTIFICATION: July 27, 2010**

**FILING ADDRESS:**

> U.S. Department of Commerce
> International Trade Administration
> APO/Dockets Unit, Room 1870
> 1401 Constitution Avenue, N.W.
> Washington, DC 20230

**FILING INSTRUCTIONS:**

> See the "General Instructions" section at Appendix I.
> See also http://ia.ita.doc.gov/filing/index.html

## SEPARATE RATE CERTIFICATION

**APPLICANT INFORMATION:**

1.      Please provide the full name and contact information (including address, telephone, fax, and e-mail address) of the firm, previously granted separate status, which is seeking separate rate status for this administrative review.

> Name: Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC")
> Address: Taisha Industrial Zone, Pingluo, Ningxia, P.R. China.
> Telephone: 86-951-410-8128
> Fax: 86-951-410-5300
> Email: ghcarbon@126.com

2.      I certify that during the POR, the firm was owned (select one):
[X] wholly or partially by a domestic entity/entities located in the PRC
[  ] 100% by a foreign entity/entities [1] located in (identify country or countries)

**FIRM OFFICIAL AND REPRESENTATIVE CERTIFICATIONS:**

3.      I, (Firm official name and title) , currently employed by (Firm) , certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

(Firm official signature)

Answer: Please see **Exhibit 1.**

4.      I, (Legal counsel or representative name) , of (law firm or other entity) , counsel or representative to (Firm) , certify that: (1) I have read the certifications contained in this submission; and (2) based on the information made available to me by (person) , I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

(Legal counsel or representative signature)

Answer: Please see **Exhibit 2.**

**GENERAL CERTIFICATIONS:**[1]

---

[1] Wholly market-economy owned firms need not respond to questions marked with an asterisk ("*").

1

5.    I certify that (Firm) was previously granted separate rate status as part of the final determination/results in the (insert investigation/review and period of investigation/review) ; published in Federal Register (insert citation) , that the separate rate status is currently applicable, and the separate rate status has not been revoked.

<div align="center">(Firm official, legal counsel or representative signature)</div>

**Answer**: Please see **Exhibit 1**.

6.    I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude the firm is not eligible for a separate rate.

<div align="center">(Firm official, legal counsel or representative signature)</div>

**Answer**: Please see **Exhibit 1**.

## EXPORT CERTIFICATIONS (check any that apply):

7.    I certify that during the POR, the firm conducted business under the following (please include a list of all trade names) [3]

[X].   only the same trade names as identified in the segment of investigation or review in which the firm was granted a separate rate ("previous Granting Period").

**Answer**: GHC's trade name is "Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd."

[ ]   the same trade names as identified in the previous Granting Period, as well as new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

[ ]   only new trade names. For new trade names, please provide evidence that these names were used during the POR, and that the trade names are permitted by the firm's business license/registration documents.

If a trade name is not listed on the company's business license/registration documents, please provide an explanation and any evidence as to how the company is permitted to use that trade name.

---

[2] If you cannot certify to each question in this section, please contact the official in charge.
[3] Trade names are other names under which the firm does business. It does not include product brand names or the names of any other entities in the firm's "group," affiliated or otherwise. Note that if the Department determines that your firm is eligible for separate rate status, the separate rate will only apply to the firm as named in your business license/registration documents and not to any alternative or trade names that are not included in your business license/registration documents.

<div align="center">2</div>

**PUBLIC VERSION**

8.     [X] I certify the firm possesses an official government business license/registration documents for each trade name listed in response to question 7, above, valid during the POR. (list each trade name, the corresponding document and its expiration date) .[4]

Answer:

| Trade Name | Corresponding Document | Expiration Date |
|---|---|---|
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. | Business License (see **Exhibit 3**) | [          ] |

9.     [X]     I certify the firm exported or sold subject merchandise to the United States during the POR.

**CERTIFICATIONS OF ABSENCE OF *DE JURE* CONTROL (check any that apply):**

10.     [X].  * I certify that during the POR, as with the previous Granting Period, there were no government laws or regulations, at either national and sub-national (*e.g.*, provincial, local) levels of government, that controlled the firm's export activities.

11.     [X]. I certify that during the POR, the ownership under which the firm registered itself with the official government business license issuing authority remains the same as for the previous Granting Period.[5]

12.     [X]. * I certify that during the POR, the firm had valid PRC Export Certificate(s) of Approval.[6]

13.     [X]. * I certify that during the POR, as with the previous Granting Period, in order to conduct export activities, the firm was not required by any national, provincial, or local government law or regulation to possess additional certificates or other documents related to the legal status and/or operation of its business beyond those discussed above.

14.     [X].* I certify that during the POR, the PRC government laws and legislative enactments applicable to the firm seeking a separate rate remained the same as for the previous Granting Period.

**CERTIFICATIONS OF ABSENCE OF *DE FACTO* CONTROL (check any that apply):**

15.     [X]. * I certify that during the POR, the largest 10 individual/entity shareholders of the firm and all of their shareholders had no significant relationship[7] with any of the following:[8] ·

---

[4] It is the Department's understanding that a valid business license/registration documents with clearly defined periods of validity issued by the appropriate licensing authority is required for all business activity. A firm submitting a business license without an expiration date must provide an explanation in order for the Department to consider its application.

[5] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

[6] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

[7] A significant relationship would include ownership, control, affiliation, significant transactions, *etc.*

[8] If you cannot certify to this statement, leave the box unchecked and provide a short narrative explanation.

3

- PRC state asset management company (government-owned and/or private chartered);
- The PRC national government and/or its ministries/agencies;
- PRC provincial governments;
- PRC local/municipal/village government(s)/agency(ies).

16.    [X]* I certify that during the POR, the firm's export prices were not set by, subject to the approval of, or in any way controlled by a government entity at any level (*e.g.*, national, provincial, local).[9]

17.    [X] I certify that during the POR, the firm had independent authority to negotiate and sign export contracts and other agreements (*i.e.* the firm conducted independent price negotiation).[10]

18.    [X] I certify that during the POR, the firm had autonomy from all levels of the government (*e.g.*, national, provincial, local) and from any government entities in making decisions regarding the selection of management.

19.    [X] I certify that during the POR, the firm did not have to submit for approval any of its candidates for managerial positions within the firm to any government entity at any level (*e.g.*, national, provincial, local).

20.    [X]. * I certify that during the POR, the firm retained the proceeds of its export sales and made independent decisions regarding the disposition of profits or financing of losses.

**SALES & AFFILIATION:**

21.    I certify the firm made at least one export or sale to the United States during the POR to (select only one):

[X] affiliated[11] parties only.
[ ] unaffiliated parties only.
[ ] both affiliated and unaffiliated parties.

**ADDITIONAL DOCUMENTATION:**

22.    Please provide copies of the following documentation: ·
The firm's business license(s)/ registration document(s) valid during the POR; · * The firm's PRC Export Certificate(s) of Approval valid during the POR.

**Answer**: Please see a copy of GHC's business license valid during the POR and its English translation attached as **Exhibit 3**. Please see a copy of GHC's Certificate of Approval for Establishment of

---

[9] This includes, but is not limited to, the presence of government officials at any meeting where export and pricing decisions are discussed.
[10] The authority to conduct independent price negotiation refers to the ability of an NME firm to set its own export prices independently of the government at any level (national, provincial, local) and without the approval of any government entity.
[11] *See* Section 771(33) of the Tariff Act of 1930, as amended, for a definition of affiliation. For the purposes of control under the definition of affiliation, the Department will consider a person to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

4

Enterprises with Foreign Investment in the People's Republic of China valid during the POR and its English translation attached as **Exhibit 4.**

428899_1

5

# EXHIBIT 1

宁 夏 广 华 奇 思 活 性 炭 有 限 公 司

## NINGXIA GUANGHUA-CHERISHMET ACTIVATED CARBON CO., LTD

TAISHA INDUSTRIAL ZONE, PINGLUO, NINGXIA, CHINA

TEL: 0086 951 4108128 / 4100116     FAX: 0086 951 4105300

## CERTIFICATIONS

I, Gao Jianzhong, general manager, currently employed by **Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.**, certify that: (1) I have read the attached submission; and (2) the certifications contained in this submission are, to the best of my knowledge, complete and accurate.

I certify that **Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.,** ("GHC") was previously granted separate rate status as part of the final determination/results in the first administrative review (POR: 10/11/06- 03/31/08) published in the Federal Register as *First Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 57995-57999 (November 10, 2009), as amended as *Certain Activated Carbon from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 66952-66954 (December 17, 2009), that the separate rate status is currently applicable, and the separate rate status has not been revoked.

I certify that I will provide, to the best of my ability, any and all documents requested by the Department in support of separate rate status for this administrative review. I understand that if I cannot furnish these documents, the Department may conclude that **Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.** is not eligible for a separate rate.

Gao Jianzhong

# EXHIBIT 2

## ATTORNEY CERTIFICATION

I, Elaine F. Wang, of Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, counsel to Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC"), certify that (1) I have read the certifications contained in this submission; and 2) based on the information made available to me by GHC, I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

_____
Elaine F. Wang, Esq.

_____
Date  7/26/10

429223_1

# EXHIBIT 3



PUBLIC VERSION

企业法人营业执照
（副本）

注册号[ ]                                    编号：NO[ ]

名　　称　宁夏广华有思活性炭有限公司

住　　所　宁夏平罗太沙工业园区

法定代表人[ ]

注册资本[ ]

实收资本[ ]

公司类型

经营范围

股东（发起人）

营业期限

成立日期

登记机关

# PUBLIC VERSION

### Enterprise Legal Person Business license

**(Duplicate)**

**Registration No.** [                    ]

**Name:** Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.

**Domicile:** Taisha Industrial Zone, Pingluo, Ningxia

**Legal Representative:** [                    ]

**Registered Capital:** [                    ]

**Paid-in Capital:** [                    ]

**Type of Company:** [                              ]

**Scope of Business:** [

                              ]

**Shareholder (Initiators):** [

                              ]

**Term of Operation:** [                    ]

**Date of Establishment:** [              ]

**No:** [        ]

**Notes:**

1. The business license is the certificate to qualify an enterprise legal person and the certificate for legal operation of business.
2. The business license has original and duplicate which bear the same legal effect.
3. The original should be put in an eyeball catching place in the legal address of the enterprise.
4. No forgery, altering, subletting, lending, transferring of the business license is allowed.
5. If the registered items change, the change of registration needs to be done with the registration authority to have new business license.
6. The registration authority conducts annual inspection to enterprise legal person from March 1 to June 30.
7. When the enterprise legal person business license is revoked, no business activities other than the liquidation are allowed.

# PUBLIC VERSION

8. The original and duplicate business license should be turned in when the registration of cancellation is done.
9. In case of any loss or damage to the business license, invalidation should be claimed on newspaper designated by the registration authority and application for re-issuance of the business license should be done with the registration authority.

Status of annual inspection

[                    ]

Registration authority: Ningxia Hui Autonomous Region Administration for Industry and Commerce

[        ]

429224_1

# EXHIBIT 4



PUBLIC VERSION

中华人民共和国外商投资企业

批 准 证 书

CERTIFICATE OF APPROVAL

FOR ESTABLISHMENT OF ENTERPRISES WITH FOREIGN
INVESTMENT IN THE PEOPLE'S REPUBLIC OF CHINA

№ [

| | |
|---|---|
| 企 业 名 称 NAME OF ENTERPRISE | 中 文 CHINESE 宁夏广华商业清洁能源有限责任公司 |
| | 英 文 ENGLISH |
| 企 业 地 址 ADDRESS | 宁夏平罗太沙工业园区 |
| 企 业 类 型 TYPE OF BUSINESS | 经 营 年 限 DURATION OF OPERATION |
| 投 资 总 额 TOTAL INVESTMENT | |
| 注 册 资 本 REGISTERED CAPITAL | |
| 经 营 范 围 BUSINESS SCOPE | |
| 投 资 者 名 称（中、英 文） NAME OF INVESTORS (IN CHINESE AND ENGLISH) | 注 册 地 出 资 额 PLACE OF REGISTRATION CAPITAL CONTRIBUTION |

批 准 号 APPROVAL NUMBER

进出口企业代码 CODE FOR IMPORT AND EXPORT ENTERPRISE

批 准 日 期 DATE OF APPROVAL

发 证 日 期 DATE OF ISSUE

发 证 序 号

副本2

# CERTIFICATE OF APPROVAL
## FOR ESTABLISHMENT OF ENTERPRISES WITH FOREIGN INVESTMENT IN THE PEOPLE'S REPUBLIC OF CHINA

Approval Number: [ ]

Code for Import and Export Enterprise: [ ]

Date of Approval:[ ]

Date of issuance: [ ]

Number of issuance:[ ]

Ningxia Hui Autonomous Region Peoples' Government (seal)

| Name of Enterprise | Chinese | 宁夏一华荷恩话往东有限公司 | | |
| --- | --- | --- | --- | --- |
| | English | | | |
| Address | Taisha Industrial Zone, Pingluo, Ningxia | | | |
| Type of Business | [ ] | Duration of Operation | [ ] | [ ] |
| Total Investment | [ ] | [ ] | | |
| Registered Capital | [ ] | [ ] | | |
| Business Scope | [ ] | | | |
| Name of Investors (in Chinese and English) | | Place of Registration | Capital Contribution | |
| [ ] | | [ ] | [ ] | |
| [ ] | | [ ] | [ ] | |
| [ ] | | [ ] | [ ] | |

42249_1

JA200094

*Antidumping Duty Administrative Review,* 73 FR 77610, 77612 (December 19, 2008). In addition, the Department finds that it is more consistent with the May 2003 clarification not to rescind the review in these circumstances but, rather, to complete the review with respect to Marsan and issue appropriate instructions to CBP based on the final results of the review. *See Magnesium Metal From the Russian Federation: Final Results of Antidumping Duty Administrative Review,* 75 FR 56989, 56989–56990 (September 17, 2010). *See also the Assessment Rates* section of this notice below.

**Disclosure**

The Department will disclose these preliminary results to the parties within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

**Comments**

Interested parties are invited to comment on the preliminary results and may submit case briefs and/or written comments within 30 days of the date of publication of this notice. *See* 19 CFR 351.309(c)(1)(ii). Rebuttal briefs, limited to issues raised in the case briefs, will be due five days later, pursuant to 19 CFR 351.309(d). Parties who submit case or rebuttal briefs in this proceeding are requested to submit with each argument (1) a statement of the issue, and (2) a brief summary of the argument. Parties are requested to provide a summary of the arguments not to exceed five pages and a table of statutes, regulations, and cases cited. *See* 19 CFR 351.309(c)(2). Additionally, parties are requested to provide their case brief and rebuttal briefs in electronic format (*e.g.,* Microsoft Word, pdf, etc.). Interested parties, who wish to request a hearing or to participate if one is requested, must submit a written request to the Assistant Secretary for Import Administration within 30 days of the date of publication of this notice. Requests should contain: (1) The party's name, address, and telephone number; (2) the number of participants; and (3) a list of issues to be discussed. *See* 19 CFR 351.310(c). Issues raised in the hearing will be limited to those raised in case and rebuttal briefs. The Department will issue the final results of this review, including the results of its analysis of issues raised in any such written briefs or at the hearing, if held, not later than 120 days after the date of publication of this notice.

**Assessment Rates**

The Department intends to issue appropriate assessment instructions

directly to CBP 15 days after the publication of the final results of this review.

Normally, the Department instructs CBP to liquidate any entries from the no-shipment producer at the deposit rate in effect on the date of entry. However, in this case, because there was only a request for review of the reseller and not the producer, we intend to liquidate entries at the producer's rate. However, because Birlik does not have its own rate, we intend to instruct CBP to liquidate entries at the "all others" rate from the investigation of 51.49 percent, in accordance with the reseller policy.

**Cash Deposit Requirements**

The following deposit rates will be effective upon publication of the final results of this administrative review for all shipments of certain pasta from Turkey entered, or withdrawn from warehouse, for consumption on or after the publication date, as provided by section 751(a)(2)(C) of the Act for Marsan, and for previously reviewed or investigated companies, the cash deposit rate will continue to be the company-specific rate published for the most recent final results in which that manufacturer or exporter participated; (2) if the exporter is not a firm covered in these reviews, a prior review, or the original less-than-fair-value (LTFV) investigation, but the manufacturer is, the cash deposit rate will be the rate established for the most recent final results for the manufacturer of the merchandise; and (3) if neither the exporter nor the manufacturer is a firm covered in this or any previous review or the LTFV conducted by the Department, the cash deposit rate will be 51.49 percent, the all-others rate established in the LTFV. *See Amended Final Determination.* These cash deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers**

This notice serves as a preliminary reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping and countervailing duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of antidumping and countervailing duties occurred and the subsequent assessment of double antidumping and countervailing duties.

These preliminary results of review are issued and published in accordance

with sections 751(a)(1) and 777(i) of the Act and 19 CFR 351.221(b)(4).

Dated: April 22, 2011.

**Paul Piquado,**
*Acting Deputy Assistant Secretary for Import Administration.*

[FR Doc. 2011–10434 Filed 4–28–11; 8:45 am]

BILLING CODE 3510-DS-P

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

[A–570–904]

**Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce ("Department") is conducting the third administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC") for the period April 1, 2009, through March 31, 2010. The Department has preliminarily determined that sales have not been made below normal value ("NV") by the respondents examined in this administrative review. If these preliminary results are adopted in our final results of this review, the Department will instruct U.S. Customs and Border Protection ("CBP") to assess antidumping duties on all appropriate entries of subject merchandise during the period of review.

**DATES:** *Effective Date:* April 29, 2011.

**FOR FURTHER INFORMATION CONTACT:** Bob Palmer or Katie Marksberry, AD/CVD Operations, Office 9, Import Administration, International Trade Administration, Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, DC 20230; *telephone:* (202) 482–9068 or (202) 482–7906, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

The Department received timely requests from Petitioners [1] and certain PRC and other companies, in accordance with 19 CFR 351.213(b), during the anniversary month of April, to conduct a review of certain activated carbon exporters from the PRC. On May 28, 2010, and June 30, 2010, the

---

[1] Collectively, Norit Americas Inc. ("Norit") and Calgon Carbon Corporation.

providing the information and meeting the requirements established by the Department; and (5) the information can be used without undue difficulties.

However, section 776(b) of the Act states that if the Department "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission * * *, in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."[21] Adverse inferences are appropriate "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." *Id.* An adverse inference may include reliance on information derived from the petition, the final determination in the investigation, any previous review, or any other information placed on the record. *See* section 776(b) of the Act.

### Jacobi's Excluded Producers

On August 2, 2010, Jacobi requested to be excused from reporting FOP data for certain Chinese producers. On August 9, 2010, Petitioners submitted comments on Jacobi's request. On August 13, 2010, the Department notified Jacobi that due to the large number of producers that supplied Jacobi during the POR, Jacobi would be excused from reporting certain FOP data.[22] Specifically, the Department did not require Jacobi to report FOP data for its five smallest producers. Additionally, the Department notified Jacobi that it was not required to report FOP data for products that were purchased and not produced by Jacobi's suppliers, as indicated in Jacobi's August 2, 2010 letter. Thus, the Department determined that upon Jacobi's acceptance of the exclusion terms, the Department would determine the appropriate facts available to apply, in lieu of the actual FOP data, to the corresponding U.S. sales of subject merchandise.

### CCT's Excluded Producers

On October 14, 2010, CCT requested to be excused from reporting FOP data for certain Chinese producers as well as FOP data for products that were

produced prior to the POR, but were sold during the POR. On October 29, 2010, the Department notified CCT that due to the large number of producers that supplied CCT during the POR, CCT would be excused from reporting certain FOP data.[23] Specifically, the Department did not require the CCT to report FOP data for its eight smallest producers. Additionally, the Department notified CCT that it was not required to report FOP data for products that were purchased and not produced by CCT's suppliers, as indicated in CCT's October 14, 2010 letter. Furthermore, the Department notified CCT that it would not be required to report FOP data for products that were produced prior to the POR, except for those products blended by CCT during the current POR. Thus, the Department determined that upon CCT's acceptance of the exclusion terms, the Department would determine the appropriate facts available to apply, in lieu of the actual FOP data, to the corresponding U.S. sales of subject merchandise.

In accordance with section 776(a)(1) of the Act, the Department is applying facts available to determine the NV for the sales corresponding to the FOP data that Jacobi and CCT were excused from reporting. As facts available, the Department is applying the calculated average normal value of Jacobi and CCT's reported sales to the sales produced by the excluded producers. These issues are addressed in separate company-specific memoranda where a detailed explanation of the facts available calculation is provided.[24]

### Separate Rates

A designation of a country as an NME remains in effect until it is revoked by the Department.[25] In proceedings involving NME countries, it is the Department's practice to begin with a rebuttable presumption that all companies within the country are subject to government control and thus

should be assessed a single antidumping duty rate.[26]

In the *Initiation Notices,* the Department notified parties of the application process by which exporters and producers may obtain separate rate status in NME reviews.[27] It is the Department's policy to assign all exporters of merchandise subject to investigation in an NME country this single rate unless an exporter can affirmatively demonstrate that it is sufficiently independent so as to be entitled to a separate rate.[28] Exporters can demonstrate this independence through the absence of both *de jure* and *de facto* government control over export activities." The Department analyzes each entity exporting the subject merchandise under a test arising from the *Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China,* 56 FR 20588 (May 6, 1991) ("*Sparklers*"), as further developed in *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China,* 59 FR 22585 (May 2, 1994) ("*Silicon Carbide*"). However, if the Department determines that a company is wholly foreign-owned or located in a market economy ("ME"), then a separate rate analysis is not necessary to determine whether it is independent from government control.[30]

Excluding the companies selected for individual review, the Department received separate rate applications or certifications from the following companies: Beijing Pacific Activated Carbon Products Co., Ltd.; Datong Municipal Yunguang Activated Carbon Co., Ltd.; Ningxia Guanghua Cherishment Activated Carbon Co., Ltd.; Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"); Shanxi DMD Corporation; Shanxi Sincere Industrial Co., Ltd.; Shanxi Industry Technology Trading Co., Ltd.; Tangshan Solid Carbon Co., Ltd.; and Tianjin Maijin Industries Co., Ltd.

Additionally, the Department received completed responses to the

---

[21] *See also Statement of Administrative Action accompanying the Uruguay Round Agreements Act,* H.R. Rep. No. 103–316, Vol. 1, at 870 (1994) ("*SAA*"), reprinted in 1994 U.S.C.C.A.N. 4040, 4198–99.

[22] *See* the Department's Letter to Jacobi dated August 13, 2010.

[23] *See* the Department's letter to CCT dated October 29, 2010.

[24] *See* Memorandum to Catherine Bertrand, Program Manager, AD/CVD Operations, Office 9, from Katie Marksberry, Case Analyst, AD/CVD Operations, Office 9: Preliminary Results Analysis Memorandum for Jacobi Carbons AB in the Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China, dated concurrently with this notice ("Jacobi Prelim Analysis Memo"); *see also* Memorandum to Catherine Bertrand, Program Manager, AD/CVD Operations, Office 9, from Bob Palmer, Case Analyst, AD/CVD Operations, Office 9: Preliminary Results Analysis Memorandum for Calgon Carbon (Tianjin) Co. in the Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China, dated concurrently with this notice ("CCT Prelim Analysis Memo").

[25] *See* section 771(18)(c)(i) of the Act.

[26] *See Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products From the People's Republic of China,* 71 FR 53079, 53080 (September 8, 2006); *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China,* 71 FR 29303, 29307 (May 22, 2006).

[27] *See Initiation Notices.*

[28] *See id.*

[29] *See id.*

[30] *See, e.g., Final Results of Antidumping Duty Administrative Review: Petroleum Wax Candles from the People's Republic of China,* 72 FR 52355, 52356 (September 13, 2007).

Section A portion of the NME questionnaire from CGT and Jacobi, which contained information pertaining to the companies' eligibility for a separate rate. However, Datong Juqiang Activated Carbon Co., Ltd.; Datong Yunguang Chemicals Plant; Hebei Foreign Trade and Advertising Corporation; Shanxi Newtime Co., Ltd.; and United Manufacturing International (Beijing) Ltd.; companies upon which the Department initiated administrative reviews that have not been rescinded, did not submit either a separate-rate application or certification. Therefore, because Datong Juqiang Activated Carbon Co., Ltd.; Datong Yunguang Chemicals Plant; Hebei Foreign Trade and Advertising Corporation; Shanxi Newtime Co., Ltd.; and United Manufacturing International (Beijing) Ltd. did not demonstrate their eligibility for separate rate status in a timely manner, we have determined it is appropriate to consider these companies as part of the PRC-wide entity.

Ningxia Huahui Activated Carbon Co., Ltd.'s Status as a Separate Rate Company

On December 23, 2010, Huahui submitted its separate rate application to the Department.[31] On January 3, 2011, Petitioners submitted comments on Huahui's application.[32] On January 21, 2011, the Department issued a supplemental questionnaire to Huahui regarding its separate rate application, and on February 22, 2011, Huahui submitted its response to the Department.[33] On March 3, 2011, Petitioners submitted additional comments to the Department regarding Huahui's application for a separate rate.[34] On March 11, 2011, the Department issued a second supplemental questionnaire to Huahui regarding its separate rate application, and on March 23, 2011, Huahui submitted a response to the

Department.[35] On April 5, 2011, Petitioners submitted additional comments on Huahui's second supplemental questionnaire.

The Department has analyzed Huahui's separate rate application and supplemental responses and, for these preliminary results, we find that Huahui has demonstrated both de jure and de facto independence from the PRC government with respect to its export activities. Consistent with the Department's requirements on exporters requesting a separate rate, Huahui placed numerous documents on the record that have been examined for these preliminary results. Specifically, Huahui demonstrated an absence of de jure government control by the absence of restrictive stipulations associated with its business license and export certificate of approval, and through submission of pertinent legislative enactments that protect the operational and legal independence of companies incorporated in the PRC.[36] With respect to de facto government control, Huahui: (1) Certified that its export prices are neither set by or subject to the approval of a government agency;[37] (2) placed on the record documents that demonstrate an absence of government control over the negotiation and signing of contracts including documents related to price negotiation for U.S. sales, and complete sales and export documentation;[38] (3) certified that it retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits and financing of losses and provided financial statements with record evidence from its Articles of Association demonstrating the independent distribution of profit;[39] and (4) certified that it has autonomy from all levels of government and government entities in making decisions regarding the selection of management and placed on the record its Articles of Association, a number of board resolutions and an internal management selection proposal, which demonstrate the independent selection of management by the Board of Directors.[40]

Although Petitioners have argued that Huahui should be denied a separate rate

because it does not fulfill the criteria for establishing autonomy from de facto government control of its selection of management and disposition of profits, the evidence on the record of this review demonstrates that Huahui does have the ability, and has exercised its ability, to appoint its managers and control the disposition of its profits through its Board of Directors. With respect to the selection of management, the Department has previously found that management selected and appointed by an independent board of directors is sufficiently removed from government-controlled shareholders for the purpose of demonstrating the absence of de facto government control.[41] Furthermore, the Articles of Association submitted by Huahui clearly state that its shareholders have the right to approve profit distributions by voting according to the number of shares owned.[42] In this case, Petitioners have provided information that addresses speculative and potential control by government entities over Huahui, which the Department has found is not sufficient evidence to support denying a separate rate.[43] There is no evidence on the record of actual government control of individual export decisions of Huahui during the POR, or evidence demonstrating that government owned or controlled shareholders actually controlled the selection of Huahui's management in greater proportion to their proportion of the voting shares. Furthermore, the Department has previously determined that government ownership alone does not warrant denying a company a separate rate.[44] Therefore, based on an analysis of all of the information placed on the record of this review by Huahui and Petitioners, we preliminarily find that Huahui is eligible for a separate rate, and we are granting Huahui separate rate status for these preliminary results.

---

[31] See Separate Rate Application of Ningxia Huahui Activated Carbon Co., Ltd., dated December 23, 2010, ("Huahui Separate Rate Application").

[32] See Letter from Petitioners to the Department re: Third Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China: Petitioners' Initial Comments on Ningxia Huahui's Separate Rate Application, dated January 3, 2011.

[33] See Huahui's Supplemental Questionnaire Regarding the December 23, 2010 Separate Rate Application of Ningxia Huahui Activated Carbon Co., Ltd., dated February 22, 2011.

[34] See Letter from Petitioners to the Department re: Third Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China: Petitioners' Pre-Preliminary Comments on Ningxia Huahui's Separate Rate Application, dated March 3, 2011.

[35] See Huahui's Second Supplemental Questionnaire Regarding the December 23, 2010 Separate Rate Application of Ningxia Huahui Activated Carbon Co., Ltd., dated March 23, 2011 ("Huahui Second Separate Rate Supplemental").

[36] See Huahui Separate Rate Application at 8–11 and Exhibits 5 and 6.

[37] See id. at 17.

[38] See id. at Exhibits 2 and 3.

[39] See id. at 20 and Exhibits 9 and 11.

[40] See id. at 13 and Exhibit 13; see also Huahui Second Separate Rate Supplemental at 2–3 and Exhibits 1 and 2.

[41] See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 FR 40485 (July 15, 2008) and accompanying Issues and Decision Memorandum at Comment 25.

[42] See Huahui Second Separate Rate Supplemental at 9; see also Huahui Separate Rate Application at Exhibit 9.

[43] See Certain Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 74 FR 14514 (March 31, 2009), and accompanying Issues and Decision Memorandum at Comment 11.

[44] See e.g. Lightweight Thermal Paper From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 73 FR 57329 (October 2, 2008) and accompanying Issues and Decision Memorandum at Comment 7.

*Separate Rate Recipients*

**1. Wholly Foreign-Owned**

Jacobi reported that it is wholly owned by a company located in an ME country, Sweden.[45] Additionally, CCT reported that it is wholly owned by a company located in the United States.[46] Therefore, there is no PRC ownership of Jacobi or CCT and, because the Department has no evidence indicating that Jacobi or CCT are under the control of the PRC, a separate rates analysis is not necessary to determine whether they are independent from government control.[47] Additionally, one of the exporters under review not selected for individual review, Tangshan Solid Carbon Co., Ltd., demonstrated in its separate-rate certification that it is 100 percent market-economy foreign owned.[48] Accordingly, the Department has preliminarily granted separate rate status to Jacobi, CCT, and Tangshan Solid Carbon Co. Ltd.

**2. Joint Ventures Between Chinese and Foreign Companies or Wholly Chinese-Owned Companies**

Eight [49] of the separate rate applicants in this administrative review stated that they are either joint ventures between Chinese and foreign companies or are wholly Chinese-owned companies. In accordance with its practice, the Department has analyzed whether the separate-rate applicants have demonstrated the absence of *de jure* and *de facto* governmental control over their respective export activities.

a. Absence of De Jure Control

The Department considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate: (1) An absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) any other formal measures by the government decentralizing control of companies.[50] The evidence provided by the eight separate rate applicants supports a preliminary finding of *de jure* absence of government control based on the following: (1) An absence of restrictive stipulations associated with the individual exporter's business and export licenses; (2) there are applicable legislative enactments decentralizing control of the companies; and (3) there are formal measures by the government decentralizing control of companies.[51]

b. Absence of De Facto Control

Typically the Department considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions: (1) Whether the export prices are set by or are subject to the approval of a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.[52] The Department has determined that an analysis of *de facto* control is critical in determining whether respondents are, in fact, subject to a degree of government control which would preclude the Department from assigning separate rates. The evidence provided by the eight separate rate applicants supports a preliminary finding of *de facto* absence of government control based on the following: (1) The companies set their own export prices independent of the government and without the approval of a government authority; (2) the companies have authority to negotiate and sign contracts and other agreements; (3) the companies have autonomy from the government in making decisions regarding the selection of management; and (4) there is no restriction on any of the companies' use of export revenue.[53]

Rate for Non-Selected Companies

As stated previously, this review covers eighteen companies. Of those, the Department selected two exporters, CCT and Jacobi, as mandatory respondents. As stated above, five companies, Datong Juqiang Activated Carbon Co., Ltd.; Datong Yunguang Chemicals Plant; Hebei Foreign Trade and Advertising Corporation; Shanxi Newtime Co., Ltd.; and United Manufacturing International (Beijing) Ltd. are part of the PRC–Wide entity and, thus, are not entitled to a separate rate. Additionally, we are preliminarily rescinding the review with respect to Ningxia Lingzhou Foreign Trade Co., Ltd. because we determined that it had no shipments of subject merchandise to the United States during the POR. The remaining eight companies submitted timely information as requested by the Department and remain subject to this review as cooperative separate rate respondents.

The statute and the Department's regulations do not address the establishment of a rate to be applied to individual companies not selected for examination where the Department limited its examination in an administrative review pursuant to section 777A(c)(2) of the Act. Generally we have looked to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for respondents we did not examine in an administrative review. Section 735(c)(5)(A) of the Act instructs that we are not to calculate an all-others rate using any zero or *de minimis* margins or any margins based entirely on facts available. Accordingly, the Department's practice in this regard, in reviews involving limited respondent selection based on exporters accounting for the largest volume of trade, has been to average the rates for the selected companies, excluding zero and *de minimis* rates and rates based entirely on facts available.[54] Section 735(c)(5)(B)

[45] *See* Jacobi's Section A Questionnaire Response dated August 11, 2010, at 3.

[46] *See* CCT's Section A Questionnaire Response dated October 27, 2010 at A–2.

[47] *See Brake Rotors From the People's Republic of China: Preliminary Results and Partial Rescission of the Fourth New Shipper Review and Rescission of the Third Antidumping Duty Administrative Review,* 66 FR 1303, 1306 (January 8, 2001), unchanged in *Brake Rotors From the People's Republic of China: Final Results and Partial Rescission of Fourth New Shipper Review and Rescission of Third Antidumping Duty Administrative Review,* 66 FR 27063 (May 16, 2001); *Notice of Final Determination of Sales at Less Than Fair Value: Creatine Monohydrate From the People's Republic of China,* 64 FR 71104 (December 20, 1999).

[48] *See* Tangshan Solid Carbon Co. Ltd.'s Separate Rate Certification dated July 27, 2010, at Attachment 1.

[49] These companies are: Beijing Pacific Activated Carbon Products Co., Ltd.; Datong Municipal Yunguang Activated Carbon Co., Ltd.; Ningxia Guanghua Cherishmeet Activated Carbon Co., Ltd.; Ningxia Huahui Activated Carbon Co., Ltd.; Shanxi DMD Corporation; Shanxi Sincere Industrial Co., Ltd.; Shanxi Industry Technology Trading Co., Ltd.; and Tianjin Maijin Industries Co., Ltd.

[50] *See Sparklers,* 56 FR at 20589.

[51] *See, e.g.,* Shanxi Industry Technology Trading Co., Ltd.'s Separate Rate Certification dated July 21, 2010, at 8; and Shanxi DMD Corporation's Separate Rate Certification dated July 21, 2010, at 8.

[52] *See Silicon Carbide,* 59 FR at 22586–87; *see also Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol From the People's Republic of China,* 60 FR 22544, 22545 (May 8, 1995).

[53] *See, e.g.,* Shanxi Industry Technology Trading Co., Ltd.'s Separate Rate Certification dated July 21, 2010, at 8–9; and Shanxi DMD Corporation's Separate Rate Certification dated July 21, 2010, at 8–9. Therefore, the Department preliminarily finds that Huahui and nine separate-rate applicants have established that they qualify for a separate rate under the criteria established by *Silicon Carbide* and *Sparklers.*

[54] *See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review,* 73 FR 52273, 52276

of the Act also provides that, where all margins are zero, *de minimis*, or based entirely on facts available, we may use "any reasonable method" for assigning the rate to non-selected respondents, including "averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." In this instance, consistent with our practice, we have preliminarily established a margin for the separate rate respondents based on the rate we calculated for the mandatory respondent whose rate was not *de minimis*.[85] For the PRC-wide entity, we have assigned the entity's current rate and only rate ever determined for the entity in this proceeding.

## Date of Sale

CCT and Jacobi reported the invoice date as the date of sale because they claim that for their U.S. sales of subject merchandise made during the POR, the material terms of sale were established on the invoice date. In accordance with 19 CFR 351.401(i) and the Department's long-standing practice of determining the date of sale,[86] the Department preliminarily determines that the invoice date is the most appropriate date to use as CCT's and Jacobi's date of sale.

## Fair Value Comparisons

To determine whether sales of certain activated carbon to the United States by CCT and Jacobi were made at less than normal value, the Department compared constructed export price ("CEP") to NV, as described in the "U.S. Price," and "Normal Value" sections below.

## U.S. Price

### Constructed Export Price

For all of CCT and Jacobi's sales, the Department based U.S. price on CEP in accordance with section 772(b) of the Act, because sales of Chinese-origin merchandise were made on behalf of the companies located in the PRC by a U.S. affiliate to unaffiliated purchases in the United States. For these sales, the Department based CEP on prices to the first unaffiliated purchaser in the United States. Where appropriate, the Department made deductions from the starting price (gross unit price) for foreign movement expenses, international movement expenses, U.S. movement expenses, and appropriate selling adjustments, in accordance with section 772(c)(2)(A) of the Act.

In accordance with section 772(d)(1) of the Act, the Department also deducted those selling expenses associated with economic activities occurring in the United States. The Department deducted, where appropriate, commissions, inventory carrying costs, interest revenue, credit expenses, warranty expenses, and indirect selling expenses. For those expenses that were provided by an ME provider and paid for in an ME currency, the Department used the reported expense. Due to the proprietary nature of certain adjustments made to U.S. price, for a detailed description of all adjustments made to U.S. price for each company, *see* the company specific analysis memoranda, dated concurrently with this notice.

CCT also requested that the Department apply the "special rule" for merchandise with value added after importation and excuse CCT from reporting U.S. re-sales of subject merchandise further processed by Calgon Carbon Corporation ("CCC"), CCT's U.S. parent company, in the United States and the U.S. further-processing cost information associated with those re-sales. CCT made this request with respect to all categories of U.S. sales with further manufacturing and provided further-processing cost data.[87]

The Department preliminarily determines to apply the "special rule" under section 772(e) of the Act for merchandise with value added after importation to the sales made by CCC in the United States. Section 772(e) of the Act provides that, when the subject merchandise is imported by an affiliated person and the value-added in the United States by the affiliated person is likely to exceed substantially the value of the subject merchandise, the Department shall determine the CEP for such merchandise using the price to an unaffiliated party of identical or other subject merchandise if there is a sufficient quantity of sales to provide a reasonable basis for comparison, and the Department determines that the use of such sales is appropriate. If there is not

a sufficient quantity of such sales or if the Department determines that using the price to an unaffiliated party of identical or other subject merchandise is not appropriate, the Department may use any other reasonable basis to determine the CEP.

To determine whether the value-added is likely to exceed substantially the value of the subject merchandise, the Department estimated the value added based on the difference between the averages of the prices charged to the first unaffiliated purchaser for the merchandise as sold in the United States and the averages of the prices paid for the subject merchandise by the affiliated purchaser, CCC. Based on the information provided by CCT and the Department's analysis of this information, the Department determined that the estimated value added in the United States by CCC accounted for at least 65 percent of the price charged to the first unaffiliated customer for the merchandise as sold in the United States.[88] Therefore, the Department preliminarily determines that the value added is likely to exceed substantially the value of the subject merchandise.

For CCT, the Department preliminarily determines that the remaining quantity of sales of identical or other subject merchandise to unaffiliated persons are sufficient to provide a reasonable basis for comparison and that the use of these sales is appropriate as a basis for calculating margins of dumping on the further processed merchandise.[89]

Accordingly, the Department has determined to apply the "special rule" to CCT's sales of subject merchandise that were further processed by CCC in the United States. Furthermore, the Department has excused CCT from reporting these U.S. sales and the U.S. further-processing cost information associated with the sales. In the Special Rule Memo, the Department stated that it would apply the weight-averaged margin from CCT's non-further manufactured U.S. sales to the quantity

---

[85] (September 9, 2008) and accompanying Issues and Decision Memorandum at Comment 6.

[85] *See, e.g., Forth Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Preliminary Results, Preliminary Partial Rescission of Antidumping Duty Administrative Review and Intent Not To Revoke, in Part,* 75 FR 11855 (March 12, 2010).

[86] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From Thailand,* 69 FR 76918 (December 23, 2004), and accompanying Issues and Decision Memorandum at Comment 10.

[87] *See* CCT's Section A Questionnaire Response dated October 27, 2010, at Exhibit 11; *see also* CCT's Supplemental Section A Questionnaire Response dated December 9, 2010 at Exhibit A–14.

[88] *See* 19 CFR 351.402(c); *see also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom Final Results of Antidumping Duty Administrative Reviews and Revocation of Orders in Part,* 66 FR 36551, 36555 (July 12, 2001) and accompanying Issues and Decision Memorandum at Comment 28 ("AFBs").

[89] *See* section 772(e) of the Act; *see also AFBs;* Memorandum to James C. Doyle, Director, AD/CVD Operations, Office 9, through Catherine Bertrand, Program Manager, AD/CVD Operations, Office 9, from Bob Palmer, Case Analyst, Office 9; Special Rule for Merchandise with Value Added after Importation for the Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China, dated January 5, 2011 ("Special Rule Memo").

those factors or including them in the cost build-up of subject merchandise.

Additionally, in CCT's questionnaire response for TX, it claimed that there are four products (coal slurry, foam, middlings, and tailings), which are by-products of the production process of anthracite coal. However, it is the Department's practice to only grant by-product credits for by-products that are produced directly as a result of the production process of the subject merchandise.[104] Therefore, for these preliminary results, we are not granting CCT a by-product offset for the four products produced by TX in the production of anthracite coal.[105]

**Currency Conversion**

Where appropriate, the Department made currency conversions into U.S. dollars, in accordance with section 773A(a) of the Act, based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

**Preliminary Results of Review**

The Department preliminarily determines that the following weighted-average dumping margins exist:

| Exporter | Margin (dollars per kilogram)[106] |
|---|---|
| Jacobi Carbons AB[107] | *0.00 |
| Calgon Carbon (Tianjin) Co., Ltd. | 0.05 |
| Beijing Pacific Activated Carbon Products Co., Ltd. | 0.05 |
| Datong Municipal Yunguang Activated Carbon Co., Ltd | 0.05 |
| Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.[108] | 0.05 |
| Ningxia Huahui Activated Carbon Co., Ltd. | 0.05 |
| Shanxi DMD Corporation | 0.05 |
| Shanxi Sincere Industrial Co., Ltd | 0.05 |
| Shanxi Industry Technology Trading Co., Ltd | 0.05 |
| Tangshan Solid Carbon Co., Ltd | 0.05 |
| Tianjin Maijin Industries Co., Ltd | 0.05 |
| PRC-Wide Rate[109] | 2.42 |

*(de minimis).

**Disclosure and Public Hearing**

The Department will disclose to parties the calculations performed in connection with these preliminary results within five days of the date of publication of this notice.[110] Interested parties may submit case briefs and/or written comments no later than 30 days after the date of publication of these preliminary results of review.[111] Rebuttal briefs and rebuttals to written comments, limited to issues raised in such briefs or comments may be filed no later than five days after the deadline for filing case briefs.[112] Parties who submit case briefs or rebuttal briefs in this proceeding are requested to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[113]

In accordance with 19 CFR 351.301(c)(3)(ii), for the final results of this administrative review, interested parties may submit publicly available information to value FOPs within 20 days after the date of publication of these preliminary results. Interested parties must provide the Department with supporting documentation for the publicly available information to value each FOP. Additionally, pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, or to participate if one is requested, must submit a written request to the Assistant Secretary for Import Administration, Room 1117, within 30 days of the date

of publication of this notice. Requests should contain: (1) The party's name, address and telephone number; (2) the number of participants; and (3) a list of issues to be discussed. Issues raised in the hearing will be limited to those raised in the respective case and rebuttal briefs. The Department will issue the final results of this administrative review, including the results of its analysis of the issues raised in any written briefs, not later than 120 days after the date of publication of this notice, pursuant to section 751(a)(3)(A) of the Act.

**Assessment Rates**

Upon issuance of the final results, the Department will determine, and CBP shall assess, antidumping duties on all appropriate entries covered by this review. The Department intends to issue assessment instructions to CBP 15 days after the publication date of the final results of this review. In accordance with 19 CFR 351.212(b)(1), we calculated exporter/importer (or customer)-specific assessment rates for the merchandise subject to this review. In this and future reviews, we will direct CBP to assess importer-specific assessment rates based on the resulting per-unit (i.e., per-kilogram) rates by the weight in kilograms of each entry of the subject merchandise during the POR. For the companies receiving a separate rate that were not selected for individual review, we will assign an assessment rate based on rates calculated in previous reviews as discussed above.

For those companies for which this review has been preliminarily rescinded, the Department intends to assess antidumping duties at rates equal to the cash deposit of estimated antidumping duties required at the time of entry, or withdrawal from warehouse, for consumption, in accordance with 19 CFR 351.212(c)(2), if the review is rescinded for these companies. The Department intends to issue appropriate assessment instructions directly to CBP 15 days after publication of this notice.

**Cash Deposit Requirements**

The following cash deposit requirements will be effective upon publication of the final results of this administrative review for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date, as provided for by section 751(a)(2)(C) of the Act: (1) For the exporters listed above, the cash deposit rate will be calculated in the final results of this review (except, if the rate is zero or de minimis, i.e., less than 0.5

---

[104] See e.g. Id and accompanying Issues and Decision Memorandum at Comment 5; see also Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China, 62 FR 61964 (November 20, 1997) and accompanying Issues and Decision Memorandum at Comment 44.

[105] For more detail, see CCT Prelim Analysis Memo.

[106] In the second administrative review of this order the Department determined that it would calculate per-unit assessment and cash deposit rates for all future reviews. See Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review, 75 FR 70208 (November 17, 2010).

[107] The Department is assigning this rate to Jacobi Carbons AB and Tianjin Jacobi International Trading Co. Ltd.

[108] In Activated Carbon AR1, the Department found Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. and Ningxia Guanghua Activated Carbon Co., Ltd. are a single entity and, because there were no changes from the previous review, we continue to find these companies to be part of a single entity. Therefore, we will assign this rate to the companies in the single entity. See Certain Activated Carbon From the People's Republic of China: Notice of Preliminary Results of the Antidumping Duty Administrative Review and Extension of Time Limits for the Final Results, 74 FR 21317 (May 7, 2009), unchanged in First Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 74 FR 57995 (November 10, 2009).

[109] The PRC-Wide entity includes Datong Juqiang Activated Carbon Co., Ltd.; Datong Yunguang Chemicals Plant; Hebei Foreign Trade and Advertising Corporation; Shanxi Newtime Co., Ltd.; and United Manufacturing International (Beijing) Ltd.

[110] See 19 CFR 351.224(b).

[111] See 19 CFR 351.309(c)(ii).

[112] See 19 CFR 351.309(d).

[113] See 19 CFR 351.309(c) and (d).

**PUBLIC VERSION**

Case no.:     A-570-904

Total No. of Pages:    80

Status: AD Administrative Review
      (04/01/09 – 3/31/10)

Office of AD/CVD Enforcement, Office 9

The proprietary version of this document contains
**BUSINESS PROPRIETARY INFORMATION**
on pages 4-10, 21-24, 26, 28, 31, 36 and 39, and in
Exhibits C-1 to C-12. This information has been
ranged, rounded, or deleted in the public version of
this submission.

The proprietary version of this submission may be
released under APO.

### SECTION C RESPONSE OF JACOBI CARBONS
*Certain Activated Carbon From China – Antidumping Administrative Review*

Daniel L. Porter
Michael Ferrier (Advisor)

Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006-3817
202-282-5100

Dated: September 13, 2010

DC:652954.1

Public Version

<u>ANSWER:</u>    We have reported this field as instructed above.  Sales made from coconut shell

and [        ] are coded as [   ]; sales made from char from [                    ] coal are

coded as [   ]; and sales made from anthracite coal [                ] are coded as [   ].

**FIELD NUMBER 3.2**    **Form**

    FIELD NAME:        FORMU

    DESCRIPTION:       Specify the product form:

                1    =    Granular (GAC)
                2    =    Pelletized/Extruded AC
                3    =    Powdered (PAC)
                4    =    Other (please specify)

<u>ANSWER:</u>    Jacobi has reported this field as instructed above.  The description is self-evident.

**FIELD NUMBER 3.3**    **GAC Particle Oversize**

    FIELD NAME:        OSIZEU

    DESCRIPTION:       Create and report a two-digit numeric code to specify the
                     oversize mesh designation based on ASTM D2862, U.S. Standard
                     Sieve Sizes.  For example, "04" = U.S. Sieve # 4 (0.187
                     inch = 4.75mm).  For PAC or Pelletized report "00".

<u>ANSWER:</u>    Jacobi has reported this field as instructed above.  The description is self-evident.

**FIELD NUMBER 3.4**    **GAC Undersize Mesh Code**

    FIELD NAME:        USIZEU

    DESCRIPTION:       Create and report a two-digit numeric code to specify the
                     undersize mesh designation based on ASTM D2862, U.S. Standard

5

DC:652954.1



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

November 23, 2010

Case No. A-570-904
52 Pages and 29 Attachments
§ 751(a) Review
Review Period: 04/01/09 – 03/31/10
AD/CVD Operations, Office NME 9
Calgon's business proprietary information removed
from Pages 10, 27 and 31 of the Section C narrative
response, and in Attachments A-13, C-1 through C-
17, C-19, C-20 and D-1 through D-8, and the CD.

**PUBLIC VERSION**

*BY HAND DELIVERY*

The Honorable Gary Locke
Secretary of Commerce
U.S. Department of Commerce
Import Administration
Central Records, Room 1870
14th Street & Constitution Avenue, N.W.
Washington, D.C.  20230

Re:    **Activated Carbon from the People's Republic of China – Sections C and D
       Questionnaire Responses**

Dear Secretary Locke:

On behalf of Calgon Carbon Corporation and Calgon Carbon (Tianjin) Co., Ltd. and its affiliates
(collectively "Calgon"), mandatory respondent in the above-captioned Administrative Review, we
hereby submit an original and two copies of the public version of Calgon's response to Sections C
and D of the Department's questionnaire. 1/

Pursuant to 19 C.F.R. § 351.304(a)(1)(i), Calgon respectfully requests proprietary treatment of the
bracketed information contained in this response.  Calgon specifically requests proprietary treatment

---

1/      Letter from the U.S. Department of Commerce to Hogan Lovells US LLP, Case No. A-570-904 (Sep. 30,
2010)("AD Questionnaire").  By letter dated October 28, 2010, the Department granted CCT an extension until
November 23, 2010 to file this response.  See Letter from the U.S. Department of Commerce to Hogan Lovells US
LLP, Case No. A-570-904 (October 28, 2010).

\\\DC - 028806/000007 - 3173355 v2

JA.200111

FIELD NUMBER 3.2          FORM

    FIELD NAME:          FORMU

    DESCRIPTION:          Specify the product form:

        1  =  Granular (GAC)
        2  =  Pelletized/Extruded AC
        3  =  Powdered (PAC)
        4  =  Other (please specify)

      __ANSWER__: Calgon has reported the product form in field FORMU using the codes

listed above.

FIELD NUMBER 3.3          GAC PARTICLE OVERSIZE

    FIELD NAME:          OSIZEU

    DESCRIPTION:          Create and report a two-digit numeric code to specify the
                      oversize mesh designation based on ASTM D2862, U.S.
                      Standard Sieve Sizes. For example, "04" = U.S. Sieve # 4 (0.187
                      inch = 4.75mm). For PAC or Pelletized report "00".

      __ANSWER__: For granular activated carbon products ("GAC") Calgon has reported the

oversize mesh designation based on ASTM D2862, U.S. Standard Sieve Size in field OSIZEU.

Calgon has reported these designations using a two-digit code (_e.g._, "04" – U.S. Sieve # 4 (0.187

inch – 4.75mm)). For powdered activated carbon ("PAC") and pelletized product this field has been

coded "00". This data is reported based on the manufacturing specification for the product.

FIELD NUMBER 3.4          GAC Undersize Mesh Code

    FIELD NAME:          USIZEU

    DESCRIPTION:          Create and report a two-digit numeric code to specify the
                      undersize mesh designation based on ASTM D2862, U.S.
                      Standard Sieve Sizes. For example, "05" U.S. Sieve # 5 (0.157
                      inch = 4.00mm). For PAC or Pelletized report "00".

      __ANSWER__: For GAC Calgon has reported the undersize mesh designation based on

ASTM D2862, U.S. Standard Sieve Size in field USIZEU. Calgon has reported these designations

using a two-digit code (_e.g._, "05" – U.S. Sieve # 5 (0.157 inch – 4.00mm)). For PAC and pelletized

6



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-904
ARP: 04/01/2009 – 03/31/2010
PUBLIC VERSION
IA/NME Office 9: RJP

October 25, 2011

| | |
|---|---|
| MEMORANDUM TO: | The File |
| THROUGH: | Catherine Bertrand *CJO*<br>Program Manager, Office 9<br>Import Administration |
| FROM: | Bob Palmer *BP*<br>International Trade Specialist, Office 9<br>Import Administration |
| SUBJECT: | Final Results Analysis Memorandum for Jacobi Carbons AB in the Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China |

On April 29, 2011, the Department of Commerce ("Department") published in the <u>Federal Register</u> the preliminary results of the third administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC").[1]

In addition, changes to surrogate values used for these final results are detailed in the "Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Final Results", dated October 25, 2011 ("Final Surrogate Value Memo") and Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Third Antidumping Duty Administrative Review, dated October 24, 2011 ("Decision Memo").

## I.    PRELIMINARY RESULTS

| | |
|---|---|
| Quantity Sold | [        ] MT |
| Total Value U.S. Sales | $ [        ] |
| Total PUDD | $ [        ] |
| Weighted-Average Margin | 0.01% |
| Per-Unit Margin | 0.00 $/Kg |

---

[1] See Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part, 76 FR 23978 (April 29, 2011) ("Preliminary Results").

1



Databases Used:
    Jacobi U.S. Sales:        jacus02.sas7bdat
    Jacobi FOPs:           allfactors2.sas7bdat
    Jacobi Packing FOPs:    jactj02.sas7bdat

See Attachment I for the printout of the SAS log, Attachment II for the printout of the SAS output, generated in calculating the dumping margin, and Attachment III for a summary of the surrogate values.

## II.    CHANGES SINCE THE PRELIMINARY RESULTS:

### A.    Programming Changes

#### Hydrochloric Acid ("HCl") Conversion

In the Preliminary Results, the Department adjusted the Chemical Weekly value for Ningxia Guanghua Activated Carbon Co., Ltd.'s ("NXGH") using a ratio of its reported concentration level to the concentration level in Chemical Weekly to achieve a surrogate value that is specific to NXGH's reported purity of its HCl. However, the Department inadvertently applied the adjustment also to NXGH's freight for HCl. Accordingly, the following changes have been made to Jacobi's margin program:[2]

Lines (1011-1012):

```
IF COMPRESS(MFRU) IN ('NXGH') THEN
                    HCL2SV_USD = HCL2SV_USD * 0.999999999;
```

#### Adverse Fact Available NXGH Water

In the Preliminary Results, the Department found it appropriate to apply adverse facts available to NXGH's water usage in the acid stage.[3] However, in Jacobi's margin program, the Department inadvertently applied partial adverse facts available to all of NXGH's water. Accordingly, the following changes have been made to Jacobi's margin program:[4]

Lines (1111-1120):

```
DATA INPUTS;
        SET INPUTS;
        IF _N_ = 1 THEN
        SET HIGHESTWATER (DROP = HWATER1 HWATER2 HWATER3);

        IF COMPRESS(MFRU) IN ('NXGH') AND WASHU NE '00' OR IMPREGU NE '0' THEN
/*See I&D Memo Comment 6b.*/
                AFAWATER = HIGHESTWATER;
        ELSE
```

---

[2] See Decision Memo at Comment 5a.
[3] See Preliminary Results, 76 FR at 23989.
[4] See Decision Memo at Comment 6b.

2

```
        AFAWATER = 0;
RUN;
```

Brokerage and Handling

In the Preliminary Results, the Department incorrectly applied a surrogate value to domestic brokerage and handling ("DBROKU") charges. However, Jacobi reported [    ] in its U.S. sales database under DBROKU. Accordingly, the following changes have been made to Jacobi's margin program:[5]

Line (1240):

```
        DCMMOVEU = HMFREIGHT /*+ DBROKUSV*/;
```

**B.    Surrogate Value Changes**

Labor

In the Preliminary Results, we calculated an hourly wage rate to use in valuing Jacobi's reported labor input by averaging industry-specific earnings and/or wages in countries that are economically comparable to the PRC and that are significant producers of comparable merchandise. However, pursuant to the Department's recent decision regarding its final labor methodology,[6] for the final results, we used industry-specific labor cost data from India, the primary surrogate country in this proceeding, is the best approach for valuing the labor input. Additionally, we converted the inflation-adjusted hourly labor cost data, which was denominated in Indian Rupees, to U.S. dollars in the margin program calculation.[7]

Lines (1061-1063, and 1076-1078):

```
LDIRLAB    = DIRLAB * LABORSV_USD;/*See Comment 4d*/
LINDLAB    = INDLAB * LABORSV_USD;/*See Comment 4d*/
LPACKLAB   = PAKLAB * LABORSV_USD;/*See Comment 4d*/

PJTPACKLAB1 = JTPACKLAB1 * LABORSV_USD; /*See Comment 4d*/
PJTPACKLAB2 = JTPACKLAB2 * LABORSV_USD;/*See Comment 4d*/
PJTINDLAB   = JTINDLAB * LABORSV_USD;/*See Comment 4d*/
```

Carbonized Materials

In the Preliminary Results, we valued carbonized materials using Indian import statistics under Harmonized Tariff Schedule ("HTS") number 2704.00.90 "Other cokes of coal." However, for the final results, the Department has determined to valued carbonized materials using HTS number 4402.90.10 "Coconut Shell Charcoal" because coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the

---

[5] See Decision Memo at Comment 6a.
[6] See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 FR 36092 (June 21, 2011) ("Labor Methodologies").
[7] See Final Surrogate Value Memo at 2.

production of activated carbon.[8]

Financial Ratios

In the Preliminary Results, we used the average of the audited financial statements of two Indian activated carbon producing companies; those being, Quantum Active Carbon Co., Ltd. 2007/2008 ("Quantum") and Kalpaka Chemicals Ltd. 2007/2008 ("Kalpaka").[9] See Prelim Surrogate Value Memo at 12. We have used the information contained in these Active Carbon's financial statement to determine the surrogate value financial ratios of factory overhead, SG&A, and profit, because they are public, audited, complete, and contemporaneous with the POR.[10]

Using this information the Department derived the following financial ratios:

Active Carbon 09-10:

| | | |
|---|---|---|
| Factory Overhead | = | 5.83% |
| Selling, General, and Administrative | = | 10.04% |
| Profit | = | 1.69% |

---

[8] See Decision Memo at Comment 4b; see also, Final Surrogate Value Memo at 3.
[9] See "Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Preliminary Results," dated April 22, 2010 ("Prelim SV Memo") at 10.
[10] See Decision Memo at Comment 4c.

4

Attachment I

SAS Log

*(Business Proprietary Information–not subject to public summary)*

5

Attachment II

SAS Output

*(Business Proprietary Information–not subject to public summary)*

6

Attachment III

Surrogate Values Used for Jacobi

*(Contains Business Proprietary Information)*

7

A-570-904
Activated Carbon from the PRC
3rd Administrative Review
POR: 04/01/2009 - 3/31/2010

Attachment 1

Summary of General Surrogate Values

| Category | Factor Input Name | HTS Number | Source Of Data | Period Data From | Source Value | Source Unit | Reported Unit for Factor Usage | Conversion Needed? | Unit Conversion Factor | Inflator/ Deflator | Variable Name | MS Purchase or Surrogate Value | Converted Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Materials | Anthracite Coal | 27011100 | Import Sta | POR | 8584.63614 | Rs / MT | | No | 1 | 1.000 | ANCOALSV | 8584.6361 | Rs/MT |
| | Alkali | 28061900 | Import Sta | POR | 1892.811511 | Rs / Kg | | Yes | 1000 | 1.000 | ALKALISV | 1892811.5109 | Rs/MT |
| | Coal Tar | 27060010 | Import Sta | POR | 20.86311764 | Rs / Kg | | Yes | 1000 | 1.000 | TARSV | 20863.1176 | Rs/MT |
| | Bituminous Coal (coking coal) | 27011910 | Import Sta | POR | 8170.850058 | Rs / MT | | No | 1 | 1.000 | COKINGCOALSV | 8170.8501 | Rs/MT |
| | Carbonized Material | 44029010 | Import Sta | POR | 3796.541667 | Rs / MT | | No | 1 | 1.000 | CARBMATSV | 3796.5417 | Rs/MT |
| | Hydrochloric Acid | 28061000 | Import Sta | POR | 185.1240798 | Rs / Kg | | Yes | 1000 | 1.000 | HCLSV | 185124.0798 | Rs/MT |
| | Hydrochloric Acid | | Chemical Wee | POR | 5.02688172 | Rs / Kg | | Yes | 1000 | 1.000 | HCL2SV | 5026.8817 | Rs/MT |
| | Magnesium Oxide | 25199040 | Import Sta | POR | 52.88150035 | Rs / Kg | | Yes | 1000 | 1.000 | MGOSV | 52881.5003 | Rs/MT |
| | Phosphoric Acid | 28092010 | Import Sta | POR | 24.92740664 | Rs / Kg | | Yes | 1000 | 1.000 | HPOSV | 24927.4066 | Rs/MT |
| | Potassium Hydroxide | 28152000 | Import Sta | POR | 53.51043418 | Rs / Kg | | Yes | 1000 | 1.000 | KOHSV | 53510.4342 | Rs/MT |
| | Potassium Iodide | 28276010 | Import Sta | POR | 777.5184761 | Rs / Kg | | Yes | 1000 | 1.000 | KISV | 777518.4761 | Rs/MT |
| | Potassium Permanganate | 28416100 | Import Sta | POR | 76.96778191 | Rs / Kg | | Yes | 1000 | 1.000 | KMNOSV | 76967.7819 | Rs/MT |
| | Sodium Hydroxide (Caustic Soda) Solid | 28151100 | Import Sta | POR | 31.87417024 | Rs / Kg | | Yes | 1000 | 1.000 | CAUSTICSV | 31874.1702 | Rs/MT |
| | Disodium Carbonate | 283620 | Import Sta | POR | 10.41915358 | Rs / Kg | | Yes | 1000 | 1.000 | NA2CO3SV | 10419.1536 | Rs/MT |
| | Salt | 250100 | Import Sta | POR | 2.16760097 | Rs / Kg | | Yes | 1000 | 1.000 | SALTSV | 2167.6010 | Rs/MT |
| | Pitch | 270810 | Import Sta | POR | 13.86595862 | Rs / Kg | | Yes | 1000 | 1.000 | PITCHSV | 13865.9568 | Rs/MT |
| | Iron | 2601110 | Import Sta | POR | 4805.282776 | Rs / MT | | No | 1 | 1.000 | IRONSV | 4805.2828 | Rs/MT |
| | Urea | 310210 | Import Sta | POR | 11.12728061 | Rs / Kg | | Yes | 1000 | 1.000 | UREASV | 11127.2806 | Rs/MT |
| | Sulphur | 250300 | Import Sta | POR | 4.459613328 | Rs / Kg | | Yes | 1000 | 1.000 | SULSV | 4459.6133 | Rs/MT |
| Packing Materials | Buckle | 72111990 | Import Sta | POR | 20.32767855 | Rs / Kg | | No | 1000 | 1.000 | BUCKLESV | 20327.6766 | Rs/Kg |
| | Fiberboard | 441192 | Import Sta | POR | 33.76542316 | Rs / Kg | | No | 1000 | 1.000 | BOARDSV | 33765.4232 | Rs/kg |
| | Paint | 320820 | Import Sta | POR | 309.8409876 | Rs / Kg | | No | 1000 | 1.000 | PAINTSV | 309840.9876 | Rs/kg |
| | Drums | 481950 | Import Sta | POR | 116.551341 | Rs / Kg | | No | 1000 | 1.000 | DRUMSSV | 116551.3410 | Rs/kg |
| | Plastic Strip | 39209219 | Import Sta | POR | 315.0135027 | Rs / Kg | | No | 1000 | 1.000 | PSTRAPSV | 315013.5027 | Rs/kg |
| | Plastic (PE) Stretch Film | 39201012 | Import Sta | POR | 89.3711307 | Rs / Kg | | No | 1000 | 1.000 | PEFILMSV | 89371.1307 | Rs/kg |
| | Wooden Pallet | 44152000 | Import Sta | POR | 111.6757571 | Rs / Pc | | No | 1 | 1.000 | PALLETSV | 111.6758 | Rs/Pc |
| | Paper Labels | 482190 | Import Sta | POR | 220.1270945 | Rs / Kg | | No | 1000 | 1.000 | PAPERLBSV | 220127.0945 | Rs/Kg |
| | Typewriter Ribbon | 961210 | Import Sta | POR | 204.3634418 | Rs / Pc | | No | 1 | 1.000 | RIBBONSV | 204.3634 | Rs/Pc |
| | PE Bags | 39232100 | Import Sta | POR | 127.4711147 | Rs / Kg | | No | 1000 | 1.000 | PEBAGSSV | 127471.1147 | Rs/Kg |
| | PE Bags | | MEP | POR | [ ] | | Pc/Kg | No | 1 | 1.000 | PEBAGS_MEP | [ ] | Euro/Kg |
| | Envelopes | 39261099 | Import Sta | POR | 140.5117897 | Rs / Kg | | No | 1000 | 1.000 | ENVLOPSV | 140511.7897 | Rs/Kg |
| | Super Sacks | 63053300 | Import Sta | POR | 287.7274808 | Rs / Kg | | No | 1000 | 1.000 | PSACKSV | 287727.4808 | Rs/Kg |
| | Polypro Bags* | 63053300 | Import Sta | POR | 287.7274808 | Rs / Kg | Pc/Kg | No | [ ] | 1.000 | PSACK2SV | [ ] | Rs/Pc |
| | Plastic Rope | 560749 | Import Sta | POR | 466.0691216 | Rs / Kg | | No | 1000 | 1.000 | ROPESV | 466069.1216 | Rs/Kg |
| Energy | Electricity | | CEA of India | Mar-08 | 3.8000 | Rs / KWH | | No | | 1.000 | ELECSV | 3.8000 | Rs/KWH |
| | Steam | | Hindalco | 4/08 - 3/09 | 204.0000 | Rs / MT | | No | | 1.035744 | STEAMSV | 211.2917 | Rs/MT |
| | Steam Coal | 27011920 | Import Sta | POR | 4313.133786 | Rs / MT | | No | | 1.000 | STCOALSV | 4313.1338 | Rs/MT |
| | Grade B Steam Coal | | Coal India Lim | POR | 1587.1429 | Rs / MT | | No | | 1.000 | GDBSTCOALSV | 1587.1429 | Rs/MT |
| | Grade C Steam Coal | | Coal India Lim | POR | 1374.2857 | Rs / MT | | No | | 1.000 | GDCSTCOALSV | 1374.2857 | Rs/MT |
| | Grade D Steam Coal | | Coal India Lim | POR | 1167.1429 | Rs / MT | | No | | 1.000 | GDDSTCOALSV | 1167.1429 | Rs/MT |
| | Grade E Steam Coal | | Coal India Lim | POR | 992.5000 | Rs / MT | | No | | 1.000 | GDESTCOALSV | 992.5000 | Rs/MT |
| | Grade F Steam Coal | | Coal India Lim | POR | 822.500 | Rs / MT | | No | | 1.000 | GDFSTCOALSV | 822.5000 | Rs/MT |
| | Water | | http://midcindia | 4/09-12/09 | 15.4275 | Rs / m3 | | No | | 1.000 | WATERSV | 15.9275 | Rs/MT |
| Financial Ratios | Overhead | | Active Carbon | 2009-2010 | 5.83% | % | | | | 1.000 | OVRHDSV | 0.0583 | % as decimal |
| | SG&A | | | | 10.04% | % | | | | 1.000 | SGASV | 0.1004 | % as decimal |
| | Profit | | | | 1.69% | % | | | | 1.000 | PROFITSV | 0.0169 | % as decimal |
| By-Products | Coal By-Product | 27011990 | Indian Import Statistics | POR | 4860.879206 | Rs / MT | | No | 1 | 1.000 | COALBYSV | 4860.2792 | Rs/MT |
| | Fines By-Product | 271410 | Indian Import Statistics | POR | 11.31960354 | Rs / Kg | | Yes | 1000 | 1.000 | FINESBYSV | 11319.6035 | Rs/Kg |
| Labor | Labor | | See Attachment | to Attachment | 74.57836161 | Rs / Hr | | No | | 1.000 | LABORSV | 74.5786 | Rs/Hr |
| Transportation | Truck Freight | | http://www.infobor | POR | 1.80 | Rs / MT / Km | | No | | 1.000 | TRUCKSV | 1.80 | Rs/MT/Km |



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-904
ARP: 04/01/09-03/31/10
PUBLIC VERSION
IA/NME/9: RJP

October 25, 2011

| | |
|---|---|
| MEMORANDUM TO: | File |
| THROUGH: | Catherine Bertrand<br>Program Manager, Office 9<br>Import Administration |
| FROM: | Bob Palmer<br>International Trade Specialist, Office 9<br>Import Administration |
| SUBJECT: | Final Results Analysis Memorandum for Calgon Carbon (Tianjin) Co., Ltd. ("CCT") in the Third Administrative Review of Certain Activated Carbon from the People's Republic of China |

---

On April 29, 2011, the Department of Commerce ("Department") published in the Federal Register the preliminary results of the third administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC").[1]

In addition, changes to surrogate values used for these final results are detailed in the "Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Final Results", dated October 25, 2011 ("Final Surrogate Value Memo") and Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Third Antidumping Duty Administrative Review, dated October 24, 2011 ("Decision Memo").

**I. FINAL RESULTS**

Calgon Carbon (Tianjin) Co., Ltd. ("CCT"):

| | |
|---|---|
| Quantity Sold | [    ] MT |
| Total Value U.S. Sales | $[    ] |
| Total PUDD | $[    ] |
| Weighted-Average Margin | 0.10% (de minimis) |
| Per-Unit Margin | $0.00/Kg |

---

[1] See Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part, 76 FR 23978 (April 29, 2011) ("Preliminary Results").

Databases Used:
    CCT Sales:        calus03.sas7bdat
    CCT FOP:       calfop04_v2.sas7bdat

See Attachment I for a summary of the surrogate values, Attachment II for the printout of the SAS log, Attachment III for the printout of the SAS output, generated in calculating the dumping margin.

## II.    CHANGES SINCE THE <u>PRELIMINARY RESULTS</u>

### A.    Surrogate Value Changes

<u>Energy Coal</u>

As we stated in the <u>Issues and Decision Memo</u>, the Department will use Coal India Limited as the source to value steam coal for because CCT has provided Useful Heat Value for its energy coal inputs.[2] Thus, because CCT has reported energy coal based on specific Useful Heat Values[3], we have updated the surrogate values for Energy Coal 1, Energy Coal 2, Energy Coal 3, and Energy Coal 4 as follows:[4]

| Grade | Useful Heat Value (UHV )Range | Reported by CCT | Surrogate Value |
|-------|-------------------------------|-----------------|-----------------|
| A | Exceeding 6200 kcal/kg | n/a | 1757.14 |
| B | 5600-6200 kcal/kg | Energy Coal 4 | 1587.14 |
| C | 4940-5600 kcal/kg | Energy Coal 3 | 1374.29 |
| D | 4200-4940 kcal/kg | Energy Coal 2 | 1167.14 |
| E | 3360-4200 kcal/kg | Energy Coal 1 | 992.50 |
| F | 2400-3360 kcal/kg | n/a | 822.50 |
| G | 1300-2400 kcal/kg | n/a | 647.50 |

Accordingly, we made the following changes regarding energy coal surrogate values ("SV") in CCT's margin program:

Lines 1022-1025:

```
ENERGYCOAL1EN    =    ENERGYCOAL_1_QTY * (GDESTCOALSV_USD +
ENERGYCOAL1FT) ;/*See I&D Memo at 4a */
ENERGYCOAL2EN    =    ENERGYCOAL_2_QTY * (GDSTCOALSV_USD + ENERGYCOAL2FT) ;
ENERGYCOAL3EN    =    ENERGYCOAL_3_QTY * (GDCSTCOALSV_USD + ENERGYCOAL3FT) ;
ENERGYCOAL4EN    =    ENERGYCOAL_4_QTY * (GDBSTCOALSV_USD + ENERGYCOAL4FT) ;
```

Additionally, we have used the weight-averaged distance to the supplier(s) of the input as

---

[2] See Decision Memo at 4a.
[3] See e.g., CCT's Supplemental Section D response, dated January 6, 2011 at B-15 and C-11; see also, CCT's Supplemental Section D response, dated January 14, 2011, at D-7.
[4] See "Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Values for the Preliminary Results," dated April 22, 2010 ("Prelim SV Memo") at 7 and Attachment 10.

2

reported by CCT in its FOP database in accordance with Sigma Corporation v. United States, 117 F.3d 1401 (Fed. Cir. 1997).

Lines 953-956:

```
ENERGYCOAL1FT = (ENERGYCOAL_1_DIST * TRUCKSV_USD); /*See Final Analysis
Memo*/
ENERGYCOAL2FT = (ENERGYCOAL_2_DIST * TRUCKSV_USD); /*See Final Analysis
Memo*/
ENERGYCOAL3FT = (ENERGYCOAL_3_DIST * TRUCKSV_USD); /*See Final Analysis
Memo*/
ENERGYCOAL4FT = (ENERGYCOAL_4_DIST * TRUCKSV_USD); /*See Final Analysis
Memo*/
```

Labor

In the Preliminary Results, we calculated an hourly wage rate to use in valuing CCT's reported labor input by averaging industry-specific earnings and/or wages in countries that are economically comparable to the PRC and that are significant producers of comparable merchandise. However, pursuant to the Department's recent decision regarding its final labor methodology,[5] for the final results, we used industry-specific labor cost data from India, the primary surrogate country in this proceeding, is the best approach for valuing the labor input. Additionally, we converted the inflation-adjusted hourly labor cost data, which was denominated in Indian Rupees, to U.S. dollars in the margin program calculation.[6]

Lines 1033 and 1037:

```
LABOR =    (DIRLAB * LABORSV_USD) + (INDLAB * LABORSV_USD) + (WHSLAB *
LABORSV_USD);/*See I&D Memo at Comment 4d*/

(PACKLAB * LABORSV_USD)+ /*See I&D Memo at Comment 4d*/
```

Carbonized Materials

In the Preliminary Results, we valued carbonized materials using Indian import statistics under Harmonized Tariff Schedule ("HTS") number 2704.00.90 "Other cokes of coal." However, for the final results, the Department has determined to valued carbonized materials using HTS number 4402.90.10 "Coconut Shell Charcoal" because coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon.[7]

Financial Ratios

In the Preliminary Results, we used the average of the audited financial statements of two Indian activated carbon producing companies; those being, Quantum Active Carbon Co., Ltd.

---

[5] See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 FR 36092 (June 21, 2011) ("Labor Methodologies").
[6] See Final Surrogate Value Memo at 2.
[7] See Decision Memo at Comment 4b; see also, Final Surrogate Value Memo at 3.

3

2007/2008 ("Quantum") and Kalpaika Chemicals Ltd, 2007/2008 ("Kalpaika").[8] See Prelim Surrogate Value Memo at 12. We have used the information contained in these Active Carbon's financial statement to determine the surrogate value financial ratios of factory overhead, SG&A, and profit, because they are public, audited, complete, and contemporaneous with the POR.[9]

Using this information the Department derived the following financial ratios:

Active Carbon 09-10:
Factory Overhead                         =    5.83%
Selling, General, and Administrative =    10.04%
Profit                                          =    1.69%

**B.      Ministerial Error Corrections**

The Department has corrected ministerial errors alleged by CCT regarding application of the hydrochloric acid ("HCl") purity level adjustment to freight; the unit of measure for inland freight for coverbags, envelops and rope; weight conversions for plastic wrap ("PACK_WRAPFILM_QTY") and plastic wrapping film ("PLASTIC_WRAPFILM_QTY").[10]

For the HCl adjustment, inland freight, and plastic wrap and plastic wrapping film,

HCl Correction (lines 989-990):

```
IF COMPRESS (MFRU) IN ('NC') THEN
            HCL2SV_USD = HCL2SV_USD * 1.111111;  /*See I&D Memo at Comment 5a
*/
```

Domestic Inland Freight (lines 974-976):

```
COVERBAGSFT = (COVERBAG_CAP * TRUCKSV_USD)*((1/1000)/1000); /*See I&D Memo at
5b*/
ENVELOPFT = (PLASTIC_ENVELOPE_CAP * TRUCKSV_USD) * ((1/1000)/1000);/*See I&D
Memo at 5b*/
ROPEFT = (PLASTIC_ROPE_CAP * TRUCKSV_USD) * ((1/1000)/1000);/*See I&D Memo at
5b*/
```

Plastic wrap and plastic wrapping film (lines 1046 and 1058):

```
PACK_WRAPFILM_QTY * (PKFILMSV_USD + PACKWRAPFILMFT))+  /*See I&D Memo at 5c*/
(PLASTIC_WRAPFILM_QTY * (PLASWRAPSV_USD + PLSTICWRAPFT));  /*See I&D Memo at
5c*/
```

**C.      Correction of Factor Usage Rates for Huarin Jinbei Chemical Co, Ltd, ("JB")**

As discussed in the Decision Memo at Comment 5d, the Department has determined that it is

---

[8] See Prelim SV Memo at 10.
[9] See Decision Memo at Comment 4c.
[10] See Decision Memo at Comments 5a, 5b and 5c respectively.

4

necessary to re-calculate the manner in which CCT's producer JB determined its consumption of its raw material inputs to produce the subject merchandise. In the Preliminary Results, the Department relied on CCT/JB allocation of raw materials in the grinding stage as reported. At the grinding stage of production, CCT/JB reported a greater volume produced than inputs going into that stage of production.[11] CCT/JB explains that this difference is accounted for by the addition at the grinding stage of activated carbon dust.[12] CCT/JB calculated the [ ] ratio of activated carbon used in the grinding stage by dividing the [ ] metric ton ("MT") input volume by the [ ] MT output volume.[13] CCT/JB then applied this ratio to each raw material FOP reported in the activation stage, which under-reported the FOPs at the activation stage where the subject merchandise is produced.[14] The Department has determined that as a result of the improperly applied usage ratio calculated at the grinding stage, the FOP consumption was decreased,[15] when instead the FOP consumption levels should have remained the same except for the addition of labor and electricity used in the grinding stage.[16] Therefore, CCT/JB's grinding stage methodology does not account for the generation and re-use of dust at that stage. However, the immediately preceding stage of production, activation, does account for all inputs if left unadjusted.[17] As we are required by the statute to account for all inputs, the Department will use CCT/JB's FOP consumption ratios at the activation stage and add the labor and electricity used at the grinding stage.[18]

JB FOP Consumption (lines 981-987):

```
IF COMPRESS(MFRU) IN ('JB') THEN
            CARBMAT_QTY      = [    ];
            ELECTRICITY      = [              ];
            WATER            = [    ]};
            ENERGYCOAL_3_QTY = [    ]};
            DIRLAB           = [           ]};
            INDLAB           = [      ]}; /*See I&D Memo at 5d */
```

---

[11] See CCT's Section D Questionnaire Response, dated January 6, 2011 at Exhibit JB-33, Tables 3-4.
[12] See CCT's Section D Questionnaire Response, dated November 23, 2011 at JB-11; see also, CCT's Section D Questionnaire Response, dated January 6, 2011 at C-20, JB-20.
[13] See CCT's Section D Questionnaire Response, dated January 6, 2011 at Exhibit JB-33, Tables 3-4.
[14] Id.
[15] Id.
[16] Id.
[17] Id.
[18] Id.

5

Attachment I

Surrogate Values Spreadsheet

(Contains Business Proprietary Information)

Attachment 1

Summary of CCT Surrogate Values for PRC Administrative Review

| Category | Factor Input Name | HTS Number | Source of CCT Surrogate Data | Period Data | Source Values | Source Unit | Reported Factor for Conversion | Conversion Needed? | Total Conversion Factor | Intense Dollar | Variable Name | Surrogate Value | Converted Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*See CCT Prelim Analysis Memo for conversion
**See CCT Prelim Analysis Memo for conversion
***See CCT Prelim Analysis Memo for conversion

Attachment II

SAS Log

(Business Proprietary Information–not subject to public summary)

Attachment III

SAS Output

(Business Proprietary Information–not subject to public summary)

2

LEXSEE



Analysis
As of: Nov 05, 2015

JACOBI CARBONS AB, JACOBI CARBONS, INC., NINGXIA GUANGHUA
CHERISHMET ACTIVATED CARBON CO., LTD., CHERISHMET INC.,
BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., DATONG
MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., SHANXI
INDUSTRY TECHNOLOGY TRADING CO., LTD., CARBON ACTIVATED
CORPORATION, CAR GO WORLDWIDE, INC., TANGSHAN SOLID CARBON
CO., LTD., Plaintiffs-Appellants v. UNITED STATES, CALGON CARBON
CORPORATION, NORIT AMERICAS, INC., Defendants-Appellees

2014-1752, 2014-1753, 2014-1754, 2014-1756

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2015 U.S. App. LEXIS 13626; 37 Int'l Trade Rep. (BNA) 1482

August 3, 2015, Decided

**NOTICE:** THIS DECISION WAS ISSUED AS
UNPUBLISHED OR NONPRECEDENTIAL AND
MAY NOT BE CITED AS PRECEDENT. PLEASE
REFER TO FEDERAL RULES OF APPELLATE
PROCEDURE RULE 32.1 GOVERNING THE
CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:**  [*1] Appeals from the United
States Court of International Trade in Nos.
1:12-cv-00365-RKE,
1:12-cv-00372-RKE,1:12-cv-00377-RKE,
1:12-cv-00396-RKE, 1:12-cv-00401-RKE, Senior Judge
Richard K. Eaton.
Jacobi Carbons Ab v. United States, 992 F. Supp. 2d
1360, 2014 Ct. Intl. Trade LEXIS 67 (2014)

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**OVERVIEW: HOLDINGS:** [1]-Decision sustaining the
Department of Commerce's Final Results for an
administrative review of an antidumping duty order on

certain activated carbon from the People's Republic of
China (PRC) was affirmed because substantial evidence
supported Commerce's selection of Philippine import
data to calculate the surrogate value, pursuant to 19
U.S.C.S. § 1677b, for carbonized material. The
Philippine import data because it was product-specific,
publicly available, reflected a broad market average, and
was contemporaneous with the period of review;
[2]-Court would not reverse Commerce's decision about
the best available information on the basis of an argument
not made and evidence not presented on the
administrative record; [3]-There was no record evidence
that coconut shell charcoal was a better surrogate for
coal-based carbonized material than wood charcoal.

**OUTCOME:** Decision sustaining Commerce's Final
Results affirmed.

**CORE TERMS:** charcoal, surrogate, coconut, shell,
import, carbonized, freight, carbon, activated, coal-based,
administrative review, truck, merchandise, coal, final
results, input, aberrational, calculated, antidumping,
comparable, domestic, region, review period, material

Page 1

used, calculate, metric ton, record evidence, regional, flawed, factors of production

**LexisNexis(R) Headnotes**

*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > Dumping Margin*
*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > General Overview*
[HN1]Congress has provided for the imposition of antidumping duties on foreign merchandise sold, or likely to be sold, at less than fair value in the United States. 19 U.S.C.S. § 1673. The Department of Commerce determines antidumping duties based on the amount by which the "normal value" of merchandise (its price in its home market) exceeds its "export price" (its price in the United States). 19 U.S.C.S. §§ 1677(35)(A), 1677b(a). For nonmarket economies like the People's Republic of China, Commerce calculates normal value based on the value of the factors of production utilized in producing the merchandise and an added amount for general expenses and profit plus the cost of containers, coverings, and other expenses. 19 U.S.C.S. § 1677b(c)(1)(B).

*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > Judicial Review*
[HN2]The United States Court of Appeals for the Federal Circuit reviews decisions of the United States Court of International Trade (CIT) de novo, applying the same standard used by the CIT. In antidumping duty proceedings, the Federal Circuit upholds Commerce's determinations unless they are unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C.S. § 1516a(b)(1)(B)(i). Substantial evidence is more than a mere scintilla, and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Review is limited to the record before Commerce in the particular review proceeding at issue, and the burden of creating this record lies with the interested parties, not with Commerce.

*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings >*

*Dumping Margin*
*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > General Overview*
[HN3]To determine the surrogate value for a factor of production from a nonmarket economy like the People's Republic of China (PRC), Congress directed the Department of Commerce to use the "best available information" from a comparable market economy country or countries. 19 U.S.C.S. § 1677b(c)(1)(B). Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute. In doing so, it is Commerce's practice to choose, where possible, data that reflects a broad market average and is publicly available, contemporaneous with the period of review, specific to the input in question, and exclusive of taxes on exports.

*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > Judicial Review*
*International Trade Law > Imports & Exports > Countervailing Duties > Judicial Review*
[HN4]Review by the United States Court of Appeals for the Federal Circuit is limited to the record before the Department of Commerce in the particular review proceeding at issue.

*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > Dumping Margin*
[HN5]The Department of Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review. At best, statements to the contrary indicate that the Department of Commerce prefers domestic prices over import prices all else being equal.

*International Trade Law > Imports & Exports > Antidumping > Investigations & Proceedings > Dumping Margin*
[HN6]19 C.F.R. § 351.408(c)(2) provides that the Department of Commerce normally will value all factors of production in a single surrogate country.

COUNSEL: DANIEL L. PORTER, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC,

Page 2

argued for plaintiffs-appellants Jacobi Carbons AB, Jacobi Carbons, Inc. Also represented by CHRISTOPHER DUNN, JAMES P. DURLING, CLAUDIA DENISE HARTLEBEN.

KAVITA MOHAN, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Washington, DC, argued for plaintiffs-appellants Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., et al. Also represented by FRANCIS J. SAILER, MARK PARDO, ANDREW THOMAS SCHUTZ.

NANCY NOONAN, Arent Fox, LLP, Washington, DC, for plaintiffs-appellants Carbon Activated Corporation, Car Go Worldwide, Inc.

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, for plaintiff-appellant Tangshan Solid Carbon Co., Ltd. Also represented by JAMES KEVIN HORGAN, JOHN J. KENKEL.

ANTONIA RAMOS SOARES, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, [*2] REGINALD T. BLADES, JR.; DEVIN S. SIKES, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC.

ROBERT ALAN LUBERDA, Kelley Drye & Warren, LLP, Washington, DC, argued for defendants-appellees Calgon Carbon Corporation, Norit Americas, Inc. Also represented by DAVID A. HARTQUIST, JOHN M. HERRMANN.

JUDGES: Before MOORE, BRYSON, and CHEN, Circuit Judges. Opinion for the court filed by Circuit Judge MOORE. Dissenting opinion filed by Circuit Judge BRYSON.

OPINION BY: MOORE

OPINION

Moore, *Circuit Judge.*

Appellants Jacobi Carbons AB and Jacobi Carbons, Inc. (collectively, "Jacobi"); Ningxia Guanghua Cherishmet Activated Carbon Co. ("GHC"), Cherishmet Inc., Beijing Pacific Activated Carbon Products Co.,

Datong Municipal Yunguang Activated Carbon Co. ("Datong Municipal"), and Shanxi Industry Technology Trading Co. ("Shanxi") (collectively, "Cherishmet"); and Carbon Activated Corp., Car Go Worldwide, Inc., and Tangshan Solid Carbon Co. ("Tangshan") (collectively, "CAC") appeal the decision of the United States Court of International Trade ("CIT") sustaining the U.S. Department of Commerce's ("Commerce") Final Results in the fourth administrative review of the antidumping [*3] duty order on certain activated carbon from the People's Republic of China ("PRC") covering the period April 1, 2010 through March 31, 2011. For the reasons set forth below, we *affirm*.

Background

[HN1]Congress has provided for the imposition of antidumping duties on foreign merchandise sold, or likely to be sold, at less than fair value in the United States. 19 U.S.C. § 1673. Commerce determines antidumping duties based on the amount by which the "normal value" of merchandise (its price in its home market) exceeds its "export price" (its price in the United States). *Id.* §§ 1677(35)(A), 1677b(a) (2012). For nonmarket economies like the PRC, Commerce calculates normal value based on "the value of the factors of production utilized in producing the merchandise and . . . an [added] amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c)(1)(B).

On April 27, 2007, Commerce issued an antidumping duty order covering certain activated carbon from the PRC. *Certain Activated Carbon from the People's Republic of China,* 72 Fed. Reg. 20,988 (Dep't of Commerce Apr. 27, 2007). After receiving requests seeking administrative review of the order, Commerce initiated the subject review on May 27, 2011. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 76 Fed. Reg. 30,912, 30,913-16 (Dep't of Commerce May 27, 2011). Commerce [*4] selected appellants Jacobi Carbons AB and GHC as two of the mandatory respondents for individual examination during the administrative review. Appellants Shanxi, Datong Municipal, and Tangshan subsequently filed separate rate certifications.

Commerce published the preliminary results of the review on May 4, 2012. *Certain Activated Carbon from the People's Republic of China,* 77 Fed. Reg. 26,496 (Dep't of Commerce May 4, 2012) ("*Preliminary Results*"). For the Preliminary Results, Commerce

Page 3

selected Thailand as the primary surrogate country and therefore used Thai data to calculate surrogate values for the respondents' factors of production. Commerce calculated weighted-average dumping margins of $1.49 per kilogram for Jacobi Carbons AB, $1.07 per kilogram for GHC, and $1.34 per kilogram for the separate rate companies.

Following publication of the Preliminary Results, the respondents placed additional data from the Philippines on the record and urged Commerce to use this data to value the major material inputs. *Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1364 (Ct. Int'l Trade 2014). Commerce published the final results of the review and the accompanying Issues and Decision Memorandum on November 9, 2012. *Certain Activated Carbon from the People's Republic of China*, 77 Fed. Reg. 67,337 (Dep't of Commerce Nov. 9, 2012) ("*Final Results*"); *Certain Activated [*5] Carbon from the People's Republic of China* A-570-904 (Issues and Decision Memorandum for the Final Results of the Fourth Antidumping Duty Administrative Review) (Dep't of Commerce Nov. 9, 2012) ("*Issues and Decisions Memorandum*") (J.A. 371-400). In the Final Results, Commerce selected the Philippines over Thailand as the primary surrogate country and used Philippine data, rather than Thai data, to calculate the surrogate values for many of the respondents' factors of production, including carbonized material and truck freight. In light of these changes, Commerce calculated weighted-average dumping margins of $0.44 per kilogram for Jacobi Carbons AB, $2.11 per kilogram for GHC, and $1.04 per kilogram for the separate rate companies.

Appellants challenged the Final Results at the CIT, arguing that Commerce did not use the best available information when it calculated the surrogate values for carbonized material and truck freight. The CIT disagreed, finding that substantial evidence supported each of Commerce's surrogate value determinations. *Jacobi Carbons*, 992 F. Supp. 2d at 1374, 1377. Because the CIT found that substantial evidence supported Commerce's surrogate value determinations, it sustained the agency's separate rate calculation. [*6] *Id.* at 1377. This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

Discussion

[HN2]We review decisions of the CIT de novo, applying the same standard used by the CIT. *Downhole*

*Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015). In antidumping duty proceedings, we uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). "Our review is limited to the record before Commerce in the particular review proceeding at issue," *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014), and the burden of creating this record lies with the interested parties, not with Commerce, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).

[HN3]To determine the surrogate value for a factor of production from a nonmarket economy like the PRC, Congress directed Commerce to use the "best available information" from a comparable market economy country or countries. 19 U.S.C. § 1677b(c)(1)(B). "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute." *Qingdao*, 766 F.3d at 1386. In doing so, it is Commerce's practice to choose, where possible, data that reflects a broad market average and is publicly available, contemporaneous with the [*7] period of review, specific to the input in question, and exclusive of taxes on exports. *See QVD Food Co. v. United States*, 721 F. Supp. 2d 1311, 1315, 34 Ct. Int'l Trade 1166 (Ct. Int'l Trade 2010), *aff'd*, 658 F.3d 1318 (Fed. Cir. 2011).

I. Surrogate Value for Carbonized Material

Carbonized material is a material input used to produce activated carbon. To determine the surrogate value for carbonized material, Commerce considered two data sources: (1) Global Trade Atlas ("GTA") statistics for Philippine imports categorized under Harmonized Tariff Schedule ("HTS") 4402, "Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated," and (2) pricing data for coconut charcoal contained in *Cocommunity*, a monthly publication of the Asian and Pacific Coconut Community organization.[1] Commerce found that the *Cocommunity* data was flawed for two reasons. First, Commerce found the prices were not representative of the Philippines as a whole because the data was from the Visayas region of the Philippines.

Page 4

*Issues & Decision Memo.* at 18 (J.A. 388). Second, Commerce found that it was not clear whether the *Cocommunity* prices were tax and duty exclusive. *Id.* Commerce therefore used the Philippine import data from the GTA to calculate the surrogate value for carbonized material.

> 1  Commerce also considered a third data source not at issue on appeal consisting of [*8] Thai import statistics. *Issues & Decision Memo.* at 17 (J.A. 387).

Appellants argue that substantial evidence does not support Commerce's selection of the Philippine import data over the *Cocommunity* data. They argue the Philippine import data is flawed because it is less specific to the input in question than the *Cocommunity* data and because it results in an aberrationally high surrogate value compared to the surrogate value of carbonized material in prior reviews of the subject merchandise. Appellants also argue that the record did not support Commerce's criticisms of the *Cocommunity* data. Finally, appellants argue that by selecting the Philippine import data over the domestic Philippine *Cocommunity* data, Commerce violated its preference for using domestic data. Although a close case, substantial evidence supported Commerce's selection of the Philippine import data as the best available information.

A. Specificity

Appellants argue that the Philippine import data is less specific to the carbonized material used to produce the subject merchandise than the *Cocommunity* data. To determine whether a data source is product specific, Commerce compares the products covered by the data source with the material input in question.

1. Material [*9] Input

The material input in question is carbonized material. The record shows that Jacobi's and Cherishmet's suppliers used carbonized material made from coal to produce the subject merchandise. J.A. 110, 133 (questionnaire responses from two of Jacobi's suppliers); J.A. 150, 155-56, 290-301 (Cherishmet's U.S. sales database during the period review); *see also* Jacobi's Br. 6. The record also shows that one of Jacobi's suppliers used carbonized material made from coconut shell charcoal to produce the subject merchandise, in addition to carbonized material made from coal. J.A. 111-15, 765-68. There is no

evidence that any of Jacobi's or Cherishmet's suppliers used carbonized material made of wood to produce the subject merchandise.[2] Thus, it appears based on the record that the material input in question is carbonized material made of coal and coconut shell charcoal.

> 2  The CIT erred when it found that Jacobi and Cherishmet produced the subject merchandise during the period of review using carbonized material made of wood. *See Jacobi Carbons*, 992 F. Supp. 2d at 1372-73. Although it is possible to produce activated carbon using carbonized material made of wood, *id.* (citing J.A. 102, 260), the record indicates that Jacobi and Cherishmet [*10] used only carbonized material made from coal and coconut shell charcoal, not wood, to produce the activated carbon shipped to the United States during the review period, *see* J.A. 110-15, 133, 150, 155-56, 290-301, 765-68. The inputs used to produce the subject merchandise are the inputs most relevant to this review.

2. Data Sources

The *Cocommunity* data is limited to coconut shell charcoal, while the Philippine import data includes all imports to the Philippines categorized under HTS 4402, "Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated"--a broader basket category consisting of carbonized material made from wood and coconut shell.

Appellants argue that the Philippine import data is not specific because there were no imports of coconut shell charcoal to the Philippines during the review period. Appellants contend that HTS 4402 consists of four subcategories, one of which--HTS 4402.00.00.01 ("Of Coconut Shell, Not Agglomerated")--covers coconut shell charcoal.[3] Jacobi's Br. 32; Cherishmet's Br. 30-31. Appellants further contend that the Philippine import data in the HTS 4402.00.00.01 subcategory indicates that there were zero imports of coconut shell charcoal to [*11] the Philippines during the review period. Thus, appellants argue that although in theory the Philippine import data includes coconut shell charcoal, the pricing data for the review period is limited to wood charcoal, not coconut shell charcoal. This is a new argument not made, in any meaningful or detailed sense, to Commerce below.

> 3  The other three categories that appellants contend make up HTS 4402 are 4402.00.00.02

Page 5

("Of Wood, Not Agglomerated"); 4402.00.00.03 ("Of Wood (Including of Shell or Not Agglomerated)"); and 4402.00.00.04 ("Other"). Jacobi's Br. 32; Cherishmet's Br. 30-31.

The unsupported, conclusory statement by Jacobi made below that there was "no data available for coconut shell charcoal from the Philippines imported under HTS 4402.00.10," J.A. 177, is insufficient. Jacobi presented Commerce with no evidence supporting the proposition that there were no imports of coconut shell charcoal to the Philippines during the period of review. Indeed, Jacobi incorrectly transcribed the HTS number, stating there was no data available for coconut shell charcoal from the Philippines under "HTS *4402.00.10*" instead of HTS *4402.00.00.01*, so Commerce could not verify Jacobi's claim. This [*12] is compounded by the fact that the record does not support appellants' claim that HTS 4402 consists of four ten-digit subcategories and that one of those subcategories is HTS 4402.00.00.01. Rather, the record indicates that HTS 4402 has only two subcategories, neither of which is limited to coconut shell charcoal: 4402.10.00 ("Of bamboo") and 4402.90.00 ("Other"). J.A. 255. Thus, Jacobi presented to Commerce a single conclusory sentence which inaccurately references an HTS category, with no record evidence or data to support its claim. Without any record evidence that there were zero imports of coconut shell charcoal to the Philippines during the period of review under HTS 4402.00.00.01, or even that HTS 4402.00.00.01 existed, Commerce could not evaluate Jacobi's statement that there was "no data available for coconut shell charcoal from the Philippines." It was Jacobi's and Cherishmet's responsibility to build an adequate record before Commerce, so any failure of proof lies with them. *QVD Food*, 658 F.3d at 1324. We will not reverse Commerce's decision about the best available information on the basis of an argument not made and evidence not presented on the administrative record. *Qingdao*, 766 F.3d at 1385 ([HN4]"Our review is limited to [*13] the record before Commerce in the particular review proceeding at issue.").

### 3. Commerce's Past Practice

Appellants argue that Commerce's past practice demonstrates that coconut shell charcoal is a better match for coal-based carbonized material than the broader HTS 4402 category of wood charcoal. In past reviews of the instant antidumping duty order, Commerce found coconut shell charcoal comparable to coal-based carbonized material. For example, in the investigation to determine whether to impose antidumping duties on the subject merchandise, Commerce used coconut shell charcoal import data to value carbonized material because the "coconut shell charcoal value, although not identical to the coal-based carbonized material used by respondents, is comparable in that both products are a type of charcoal." *Certain Activated Carbon from the People's Republic of China A-570-904* (Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Activated Carbon from the PRC) (Dep't of Commerce Feb. 23, 2007) (J.A. 48). Similarly, during the first period of review, Commerce wrote:

> [C]oconut shell charcoal shares similar properties with carbonized material and . [*14] . . those similar properties are essential in the production of activated carbon. The expert's report found that coalbased carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated carbon. Thus, in this instance, between the two alternative . . . HTS categories, "Other Cokes of Coal" and "Coconut Shell Charcoal," the Department determines that . . . "Coconut Shell Charcoal" results in a better, input-specific price for coal-based carbonized materials.

Final Results of Redetermination Pursuant to Ct. Remand at 10-11, *Calgon Carbon Corp. v. United States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36 (footnotes omitted) (J.A. 55-56). And during the third period of review, Commerce explained that because "coconut shell charcoal shares similar properties with carbonized material and . . . those similar properties are essential in the production of activated carbon," it would value carbonized material using imports categorized under HTS category "Coconut Shell Charcoal," instead of HTS category "Other Cokes of Coal." *Certain Activated Carbon from the People's Republic of China A-570-904* (Issues and Decision Memorandum for the [*15] Final Results of the Third Antidumping Duty Administrative Review) (Dep't of Commerce Oct. 24, 2011) (J.A. 158-61).

Page 6

In these prior analyses, Commerce was choosing between coconut shell charcoal and the HTS category "Other Cokes of Coal" to find a comparable surrogate for coal-based carbonized material. Commerce's determination that coconut shell charcoal is better than "Other Cokes of Coal" does not mean that coconut shell data is better than wood charcoal. Wood charcoal is also a type of charcoal and can also be used to create the subject merchandise. Thus for the same reasons articulated by Commerce in the earlier periods of review, wood charcoal would be a better surrogate than "Other Cokes of Coal." There are no express findings or comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions.

While coconut shell charcoal is more specific than "Other Cokes of Coal," the record does not compare coconut shell charcoal and wood charcoal. Commerce's past practice does not demonstrate that coconut shell charcoal is a better match for coal-based carbonized material than the broader Philippine import data category, which includes wood [*16] charcoal and coconut shell charcoal.

### 4. Conclusion

Here, the material input in question is carbonized material made of coal and coconut shell charcoal. With respect to the coconut shell subset of this material input, the *Cocommunity* data, which includes only coconut shell charcoal, is more specific than the Philippine import data, which includes other forms of wood charcoal in addition to coconut shell charcoal. With regard to the carbonized material made of coal, which constitutes the bulk of the subject merchandise, there is no evidence on this record comparing wood charcoal and coconut shell charcoal. There are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal. Thus for the bulk of the imports at issue, there is no proof that coconut shell charcoal is a better surrogate. Neither of these data sources is specific to carbonized material made of coal and Commerce's past selection of coconut shell charcoal as the best available surrogate was based on a comparison with "Other Cokes of Coal," not wood charcoal. The imports at issue include coconut shell charcoal and coal-based [*17] carbonized material. Once again, we do not review Commerce's determinations de novo. We cannot conclude on this record that Commerce's decision that both data sources were specific to the inputs in question was not supported by substantial evidence.

### B. Aberrational Nature of Philippine Import Data

Cherishmet also faults the Philippine import data as aberrational compared to the surrogate values for carbonized material in prior reviews of the subject merchandise. During this period of review, Commerce calculated a price of $1,203.90 per metric ton of carbonized material based on the Philippine import data. Cherishmet asserts that Commerce priced the surrogate value of carbonized material much lower in prior reviews:

| Period of Review | Surrogate Value |
| --- | --- |
| 1st | $32.99/MT |
| | $66.256/MT (coconut shell charcoal); |
| 2nd | $435.62/MT (coal-based carbonized material) |
| 3rd | $83.45/MT |

Cherishmet's Br. 32-33 (citations omitted). It argues that the *Cocommunity* data, with a price of $255 per metric ton, maps more closely to Commerce's prior valuations of carbonized material than the Philippine import data, with a price almost five times as high.

The surrogate values presented by Cherishmet suggest that the Philippine import [*18] data is aberrational. And Commerce may opt to disregard data

where there is record evidence that it is aberrational. Here, however, we cannot conclude that Commerce should have disregarded the Philippine import data as aberrational. The government argues that there is an explanation for the apparently aberrational nature of the Philippine import data. Commerce selected India as the surrogate country in the first three periods of review. *See* J.A. 733-35. In the fourth period of review, Commerce found that India was not at a comparable level of economic development to the PRC, and therefore selected a different surrogate country. *See id.; see also* J.A. 94-96. Thus, the first three surrogate values were calculated with reference to a different level of economic development than the current surrogate value.

Looking at the table above, it is not entirely clear which measure is appropriate for comparison to determine whether the Philippine import data is aberrationally high. Commerce's price of $1203.90 is more than thirty times more than the surrogate value calculated for the first period of review ($32.99/MT) and nearly fifteen times higher than the surrogate value calculated for the third [*19] period of review ($83.45/MT). Both of these comparisons lead toward a conclusion that the Philippine import data is aberrational, and it seems unlikely that the switch from India to the Philippines could account for this dramatic change in pricing. However, in the second period of review, Commerce separated the pricing for coconut shell charcoal ($66.256/MT) and coal-based carbonized material ($435.62/MT). The price for coal-based carbonized material is an order of magnitude higher than the price for coconut shell charcoal. Given that the bulk of the imports in question are produced using coal-based carbonized material, the price from this review is only 2.8 times higher than the surrogate value for coal-based carbonized material from the second period of review. Perhaps this disparity would have been enough to cause Commerce to reach a different conclusion regarding the best available information. Or perhaps Commerce would have concluded that the *Cocommunity* data for coconut shell charcoal, which was priced at $255/MT, was too low. Its prior determination during the second period of review that coal-based carbonized material was much more expensive than coconut shell charcoal may [*20] have only reinforced its conclusion here that the Philippine data was the best available information. We do not know how Commerce would have evaluated this complicated issue because it was not raised below.

Neither Jacobi nor Cherishmet presented any evidence or made any arguments that the Philippine import data was aberrational during the administrative review. This is another new argument made for the first time at the CIT on judicial review of Commerce's decision, not to Commerce itself. If all of the arguments made on appeal had been made to Commerce and the record made to support them, Commerce may well have reached a different conclusion regarding the best available information. We will not create a new record, entertain new arguments, and reverse Commerce on the basis of them.

### C. Regional Data

Jacobi argues that substantial record evidence does not support Commerce's determination that the *Cocommunity* data describes "regional" prices from a single state in the Philippines, not national prices. We disagree. The record shows that the *Cocommunity* data covers only a single region of the Philippines. The chart from which the *Cocommunity* data is taken indicates that the price of coconut [*21] shell charcoal is for "Philippines (Domestic), Visayas, Buyer." J.A. 191. The Visayas is one of three principal geographical regions of the Philippines. By contrast, other entries on the *Cocommunity* chart indicate that they are national, not regional. *Id.* (listing coconut shell charcoal from "Sri Lanka (Domestic)" and desiccated coconut from "Philippines (Domestic)"). This constitutes substantial record evidence that the *Cocommunity* data is regional, not national.

Appellants did not show in the record for this administrative review that the *Cocommunity* coconut shell charcoal prices are representative, despite being regional. *Jacobi Carbons*, 992 F. Supp. 2d at 1369. For example, the record does not show that the Visayas region is a substantial portion of the market for coconut shell charcoal or that prices in the Visayas are reflective of the national Philippine market. Without record evidence to the contrary, we conclude that substantial evidence supported Commerce's finding that the *Cocommunity* prices were less representative of a broad market average than the Philippine import data.

### D. Tax and Duty Exclusivity

Appellants challenge Commerce's finding that the *Cocommunity* data was flawed because there was no indication whether [*22] that data was free of taxes and

Page 8

duties. They argue that the burden lay on Commerce to show that the *Cocommunity* data was distorted by taxes and duties. The government disagrees. We need not resolve the parties' dispute here. Even if Commerce erred when it critiqued the *Cocommunity* data for lacking information about whether the prices were tax and duty exclusive, substantial evidence still supports the selection of the Philippines import data.

### B. Conclusion

Substantial evidence supports Commerce's selection of the Philippine import data to calculate the surrogate value for carbonized material. Commerce was forced to select between two flawed data sets, and selected the Philippine import data because it was product-specific, publicly available, reflected a broad market average, and was contemporaneous with the period of review.

Appellants fault Commerce for violating its preference for using domestic data when it selected the Philippine import data instead of the domestic *Cocommunity* data. Commerce determines what constitutes the "best available information" without reference to any such preference. *See Qingdao*, 766 F.3d at 1386. ([HN5]"Commerce generally selects, to the extent practicable, surrogate values that are [*23] publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review."). At best, statements to the contrary indicate that Commerce prefers domestic prices over import prices "all else being equal." *Rhodia Inc. v. United States*, 185 F. Supp. 2d 1343, 1352, 25 Ct. Int'l Trade 1278 (Ct. Int'l Trade 2001).

All else is not equal here. Both the *Cocommunity* data and the Philippine import data are flawed. Such is the nature of surrogate data, which is likely never a perfect substitute. The selection of a data source is highly situational and requires weighing numerous factors; no factor is necessarily more important than any other factor and no factor is necessarily dispositive. Commerce considered both data sets and determined that the Philippine import data constituted the best available information for determining the surrogate value for carbonized material on the administrative record for this review period. That Commerce may have found the *Cocommunity* the best available information in more recent periods of review does not mean that substantial evidence did not support Commerce's decision that the Philippine import data was the best available information.

Commerce selects the best available information based on the record before it [*24] at the time of the decision, not a hypothetical record or the record created for other periods of review.

We may not agree with Commerce's selection, particularly in light of the evidence and arguments not made to Commerce below. However, Jacobi and Cherishmet did not make these arguments or place this evidence before Commerce. We cannot say that Commerce's selection of the Philippine import data was unreasonable based on arguments made and the administrative record created by Jacobi and Cherishmet.

### II. Surrogate Value for Truck Freight

Because Commerce selected Thailand as the primary surrogate country for the Preliminary Results, it initially based the surrogate value for truck freight on publicly available data from a Thai consulting company of the price to transport goods by truck from Bangkok to five other provinces in Thailand in 2005 ("Thai freight data"). *Preliminary Results*, 77 Fed. Reg. at 26,505. At the urging of appellants, Commerce selected the Philippines instead of Thailand as the primary surrogate country in the Final Results. It therefore based the surrogate value for truck freight on the average reported rate of transporting goods by truck in the Philippines from Manila to Legazpi City ("Philippine freight data"). [*25]

On appeal, Cherishmet and CAC argue that substantial evidence did not support Commerce's use of the Philippine freight data instead of the Thai freight data to calculate the surrogate value for truck freight. Specifically, Cherishmet and CAC criticize the Philippine freight data as (1) unrepresentative of a broad market average; (2) nonspecific to the actual transportation costs; and (3) aberrational compared to the surrogate value for truck freight calculated during other periods of review of the subject merchandise.

We disagree. It is true that the Philippine freight data, which Commerce calculated based on the cost of transporting goods over a single route, is less representative of a broad market average than the Thai freight data, which is based on ten different values representing the cost of transporting goods from Bangkok to five other Thai provinces. Although the Philippine freight data covers only a single route, it consists of data reported by multiple trucking companies. It is therefore broader than Cherishmet and CAC suggest. Furthermore,

Page 9

the Philippines is made up of many islands. A more representative sample would include overseas routes in addition to overland routes, [*26] and likely be less comparable to freight costs in the PRC.

Cherishmet and CAC argue that the Philippine freight data is not specific to actual transportation costs because it represents "loose cargo," while the respondents' shipments were containerized. Cherishmet's Br. 53 n.14; CAC's Br. 15. However, the record does not clearly show that the respondents' shipments were containerized. Cherishmet's invoice, which indicates that Cherishmet's products were shipped in a container, is for a shipment to the United States, not within the PRC. *See* J.A. 101 (packing slip with final address in New Jersey). It therefore does not speak to how Cherishmet's products

were shipped within the PRC. And the fact that Commerce calculated a surrogate value for packaging materials does not mean that all of Cherishmet's and Jacobi's shipments were transported in containers. *See* J.A. 404-05.

Cherishmet and CAC also argue that the Philippine freight data is aberrational compared to the surrogate value for truck freight calculated during other periods of review of the subject merchandise. The surrogate value for freight calculated from the Philippine freight data is $0.3152 per metric ton per kilometer. Cherishmet's [*27] Br. 48. Cherishmet calculates the surrogate values for prior periods of review as follows:

| Period of Review | Surrogate Value |
|---|---|
| 1st | $0.0393/MT/km |
| 2nd | $0.0413/MT/km |
| 3rd | $0.0396/MT/km |

*Id.* at 47-48 (citations omitted). Cherishmet argues that the past surrogate values are more in line with the Thai freight data, which has a surrogate value of $0.0379 per metric ton per kilometer for truck freight. *Id.* at 48.

However, this argument was not made to Commerce during the review period, and Cherishmet and CAC point to no evidence in the administrative record supporting it. Furthermore, as discussed earlier, Commerce selected India as the surrogate country for past review periods of the subject merchandize, so the surrogate values cited by Cherishmet and CAC are based on the cost of transporting freight in India. *See* J.A. 733-35. It is not surprising that the cost of transporting goods by truck was higher in the Philippines than it was in India. The record does not support all of Cherishmet and CAC's critiques of the Philippine freight data.

Moreover, the Thai freight data is also flawed. First, the Thai freight data is dated August 8, 2005, more than four years before the period of review. J.A. 316-20. The Thai freight data is [*28] thus not contemporaneous with the period of review, unlike the Philippine freight data.

Second, [HN6]19 C.F.R. § 351.408(c)(2) provides that Commerce "normally will value all factors [of production] in a single surrogate country." Cherishmet and CAC do not challenge Commerce's selection of the Philippines as the surrogate country.

In summary, in selecting the surrogate value for truck freight, Commerce was faced with two imperfect data sources. Substantial evidence supported Commerce's selection of the contemporaneous, albeit less representative, Philippine freight data over the Thai freight data. Moreover, Commerce's selection of the Philippine freight data was in accord with its preference for valuing all factors of production from a single surrogate country.[4]

4  We need not address the arguments related to separate rate calculations as they are predicated on the arguments regarding Commerce's choice of surrogate values for carbonized material and truck freight. Because we find that substantial evidence supports Commerce's calculation of the surrogate values for carbonized material and truck freight, we affirm the CIT's decision sustaining the Final

**Page 10**

Results.

CONCLUSION

We *affirm* the CIT's decision sustaining Commerce's [*29] Final Results.

**AFFIRMED**

**DISSENT BY: BRYSON**

**DISSENT**

Bryson, *Circuit Judge*, dissenting.

I agree with the majority that it was permissible for the Commerce Department to use Thai data as the basis for selecting a surrogate value for truck freight. As to the use of Philippine import data as the basis for the surrogate value for the carbonized materials used in the production of the subject imports, however, I do not agree.

The majority concludes that the Department's decision can be upheld in light of the deference due to the agency in its valuation determinations and the plaintiffs' failure to preserve their claims of error below. I part company with the majority on both points.

1. Waiver

The majority holds that two of the plaintiffs' arguments have been waived because the plaintiffs failed to present evidence in support of those arguments to Commerce during the administrative review proceeding. The two arguments are (1) that the Philippine import data does not actually contain imports of coconut shell charcoal during the review period, and (2) that the Philippine import data is aberrational compared to data used in previous administrative reviews.

The plaintiffs could no doubt have done a better job of making a [*30] record in this case on certain issues, such as whether the price listed in the Philippine publication *Cocommunity*, on which they rely, was a national price, rather than a regional price, and whether that price excluded duties and taxes. However, their failure to raise objections to the use of Philippine import data during the administrative review process is entirely understandable, because the Commerce Department did not indicate its intention to rely on that data at any point before issuing the final results in this case, at which point

it was too late for the plaintiffs to object.

The Court of International Trade made exactly that point when it rejected the government's waiver argument below. The court said:

> [I]t was not until after the submission of the parties' case briefs that Commerce made its determination to select the Philippines as the primary surrogate country, and articulated its basis for its selection of sources to value carbonized material and truck freight (i.e., Philippine HTS 4402 and Cost of Doing Business). It is simply too much to ask of the parties to anticipate (1) that Commerce would change the surrogate country between the preliminary and Final Results, (2) the [*31] reasons that the Department would state for deciding to change surrogate countries, and (3) precisely how Commerce would value the various inputs. Under similar circumstances, it has been held that a party "is not required to predict that Commerce would accept other parties' arguments and change its decision." *Qingdao*, 33 CIT at 1093, 637 F. Supp. 2d at 1237. Accordingly, because plaintiffs had no realistic opportunity to present their arguments before the Department, the court finds that plaintiffs did not fail to exhaust their administrative remedies.

*Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1367 (Ct. Int'l Trade 2014). Accordingly, I conclude that the two arguments the majority characterizes as inadequately preserved below have not been waived.

2. Aberrational Data

Notwithstanding its waiver ruling, the majority addresses the merits of the plaintiffs' contention that the Philippine import data is aberrational.

The government argues that any apparent aberration in the data can be explained by the fact that the first through third reviews used India as a surrogate country whereas the fourth review used the Philippines. The majority correctly rejects that argument, recognizing that it is "unlikely that the switch from India to the

Page 11

Philippines could account for [the] dramatic change in pricing." Nonetheless, [*32] the majority concludes that it was permissible for Commerce to disregard the discrepancy.

If we compare the surrogate values used in the various administrative reviews (including two more recent administrative reviews), it is clear the Philippine import data used in the administrative review at issue in this case departs wildly from the surrogate value relied on by Commerce in other administrative reviews in this case, so much so that it is highly suspect. Not only is the surrogate value derived from the Philippine import data much greater than the Indian data used in the first through third periods of review, but it is also significantly greater than the data used in the fifth and sixth periods of review, which used data from the Philippines.

The surrogate value of $1203.80 per metric ton is almost three times as high as the highest other surrogate value determined in any of the other periods of review, and it is more than fourteen times as high as the surrogate value for the immediately preceding period of review. Meanwhile, the *Cocommunity* data on which the plaintiffs rely (indicated by "CoCo" in the table below), showed a price of $255 per metric ton, which was much more in line [*33] with the surrogate values found in the prior and subsequent administrative reviews. While there might in some circumstances be an explanation for data that is as grossly anomalous as the Philippine import data, no such explanation appears in the record in this case.

| Period of Review | Surrogate Value |
|---|---|
| 1st | $32.99/MT |
| 2nd | $66.256/MT (coconut shell charcoal); |
| | $435.62/MT (coal-based carbonized |
| | material) |
| 3rd | $83.45/MT |
| 4th | $1,203.80/MT |
| CoCo | $255/MT |
| 5th | $391.67/MT |
| 6th | $346.25/MT |

3. Specificity

The plaintiffs argue that the *Cocommunity* data is more specific than the Philippine import data because the *Cocommunity* data relates to coconut shell charcoal, while the Philippine import data relates to "Wood Charcoal (including Shell or Nut Charcoal)." The plaintiffs contend that coconut shell charcoal is comparable to the coal-based charcoals used by the Chinese manufacturers, and that wood-based charcoal is not comparable to coconut shell or coal-based charcoal. The majority rejects the plaintiffs' argument, finding that

there is no express determination in the record that coconut shell charcoal is more comparable to coal-based charcoal than to wood charcoal. I believe the majority reads the available evidence too narrowly. [*34]

The majority quotes a statement made by Commerce before the trial court in a previous administrative review: "[C]oconut shell charcoal shares similar properties with carbonized material and . . . those similar properties are essential in the production of activated carbon. The expert's report found that coal-based carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated

Page 12

carbon." Final Results of Redetermination Pursuant to Ct. Remand at 10-11, *Calgon Carbon Corp. v. United States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36 (footnotes omitted). While that statement was used to justify the selection of coconut shell charcoal over "other cokes of coal," the statement is pertinent in this case (where "other cokes of coal" are not involved) because it clearly states that coconut charcoal is comparable to coal-based charcoal. Because the evidence before Commerce established that coconut shell charcoal is comparable to coal-based charcoal, whereas the evidence does not show the same for wood-based charcoal, the *Cocommunity* data, which was directed to coconut shell charcoal, was more specific than the Philippine import data, which was [*35] directed to both wood-based charcoal and charcoal obtained from coconut shell.

### 4. Defects in the *Cocommunity* Data

Commerce found that the *Cocommunity* data was flawed in fundamental ways that rendered it unusable in determining surrogate value. The majority agrees. I do not regard the perceived flaws in the *Cocommunity* data as nearly so serious.

To begin with, it is true that the *Cocommunity* data is not a perfect match for the value of the carbonized materials used in the production of the plaintiffs' products. But data used to calculate surrogate value seldom is. By its nature, such data is intended to serve as an approximation--as the "best available information." 19 U.S.C. § 1677b(c)(1). In this case, however, the evidence fairly shouts that the Philippine import data used by the Commerce Department was not a good surrogate for the value of the carbonized materials used in manufacturing the subject imports. The flaws in the *Cocommunity* data are trivial in comparison.

The aberrational nature of the surrogate value selected by Commerce should have given Commerce pause and caused it to evaluate the flaws it found in the competing *Cocommunity* data--that the *Cocommunity* price was not shown to be net of duties and [*36] taxes, and that the *Cocommunity* price was not shown to be a national price, as opposed to a regional price. Further consideration would have led Commerce to the following conclusions:

First, the *Cocommunity* price was necessarily exclusive of duties, since the price was for domestic product, not imported goods.

Second, there was no evidence before Commerce that the *Cocommunity* price included taxes, and Jacobi represented to Commerce that it did not. But even if, contrary to Jacobi's representations, the *Cocommunity* price included taxes, a higher price could only work to the detriment of the plaintiffs because it would increase the dumping margin, not reduce it. It does not make sense to refuse the plaintiffs' request to use the *Cocommunity* data on the ground that the data is subject to a flaw that might be prejudicial to them.

Third, the document from which the *Cocommunity* data was derived stated: "In the Philippines, the average price of coconut shell charcoal [for April 2010] was $230 [per metric ton]."[1] In the table that listed the prices, however, the reference to the Philippines was accompanied by a reference to "Visayas," which is a region of the Philippines. While the document suggests [*37] that the price was a national price, the reference to "Visayas" provides some support for Commerce's conclusion that the *Cocommunity* price is limited to the Visayas region of the Philippines. Even accepting that view of the evidence, however, it is highly unlikely that the price in that region is significantly different from the "national" price, since the Visayas region, as the trial court observed, is one of the three principal geographical divisions of the Philippines, occupying the entire central portion of the country.

> 1 The evidence showed that the average price for the entire period of review was $255 per metric ton.

Finally, it is noteworthy that in the two subsequent administrative reviews (the fifth and sixth), Commerce selected the *Cocommunity* data over the Philippine import data, finding that the *Cocommunity* data was both representative (even though it referenced only a single region) and that it was exclusive of duties and taxes.

A fair view of the *Cocommunity* data thus shows that any flaws with that data are modest. In light of the serious doubts raised by the use of the Philippine import data that includes wood charcoal and that produced a price far in excess of any price [*38] used by Commerce in earlier and later reviews of this antidumping duty order, I would hold that it was unreasonable for Commerce to reject the use of the *Cocommunity* data in favor of the Philippine import data in calculating the surrogate value for the carbonized materials used in producing the subject imports. Accordingly, I respectfully dissent.

**Page 13**

**FORM 30. Certificate of Service**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

ALBEMARLE CORP. v. UNITED STATES
No. 15-1288,-1289,-1290

I certify that I served a copy of the foregoing Corrected Nonconfidential Joint Appendix on counsel of record on November 17, 2015 by:

☐   US mail
☐   Fax
☐   Hand
☒   Electronic Means

  (by email or CM/ECF)

Jeffrey S. Grimson                    /s/ Jeffrey S. Grimson
Name of Counsel                      Signature of Counsel

Law Firm  Mowry & Grimson, PLLC
Address  5335 Wisconsin Ave., NW, Suite 810
City, State, ZIP  Washington, DC 20015
Telephone Number  202-688-3610
FAX Number  202-595-8968
E-mail Address  jsg@mowrygrimson.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.